**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |
|---|
| UNITED STATES |
| v. |
| JUSTIN HEATH SMITH |
| *Defendant.* |

Crim. No. 1:25-cr-281 (PAE)

---

**DEFENDANT JUSTIN SMITH'S SENTENCING MEMORANDUM**

---

**BALDASSARE & MARA, LLC**

75 Livingston Avenue, Suite 101
Roseland, NJ 07068
T: (973) 604-6686
F: (973) 556-1071
E: mbaldassare@mabalaw.com
    jhawriluk@mabalaw.com

*On the Brief*:
Michael Baldassare, Esq.
Jeffrey Hawriluk, Esq.

*Attorneys for Defendant*
*Justin Smith*

**THE LAW OFFICES OF**
**THOMAS H. ANDRYKOVITZ, P.C.**

260 Madison Avenue, 15th Floor
New York, NY 10016
T: (917) 719-0505
E: thomas@thomashenrylaw.com

*On the Brief*:
Thomas Andrykovitz, Esq.

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     PROCEDURAL HISTORY ..................................................................................... 3

III.    PERSONAL INFORMATION AND BACKGROUND ........................................... 3

    A.    Childhood and Family ................................................................................. 3

    B.    Education and Work History ....................................................................... 5

IV.     THE APPLICABLE LEGAL STANDARD ............................................................ 7

V.      THE GUIDELINES CALCULATION ................................................................... 7

VI.     THE STATUTORY FACTORS (18 U.S.C. § 3553) ............................................. 7

    A.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)) ............ 7

    B.    The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) ...... 10

        1.    Mr. Smith's Work History ................................................................ 10

        2.    Mr. Smith's efforts and successes during his time at MDC
            demonstrates a character that warrants a reduction in his sentence......... 10

        3.    The Probation Office agrees that Mr. Smith's personal history
            presents mitigating factors. ............................................................ 13

        4.    The conditions at MDC warrant a reduced sentence. ............................. 13

    C.    Promoting Respect for the Law (18 U.S.C. § 3553(a)(2)(A)) ............................. 15

    D.    Deterrence (18 U.S.C. § 3553(a)(2)(B)) ...................................................... 15

    E.    Recidivism and Rehabilitation (18 U.S.C. § 3553(a)(2)(C) & (D)) .................... 16

        1.    Mr. Smith's Amenability to Treatment................................................. 16

        2.    Mr. Smith will be statistically less likely to reoffend given his age
            upon release. .................................................................................. 18

        3.    A shorter sentence will ensure Mr. Smith's support network is still
            intact............................................................................................. 20

    F.    The kinds of sentence and sentencing range (18 U.S.C. § 3553(a)(4)). ............. 21

        1.    USSG § 4B1.5(b) was enacted by Congress, without the expertise
            of the Sentencing Commission. ......................................................... 21

        2.    Strict application of USSG § 4B1.5(b) overstates Mr. Smith's
            culpability. .................................................................................... 25

    G.    Sentencing Disparity (18 U.S.C. § 3553(a)(6)) ............................................. 25

    H.    Restitution (18 U.S.C. § 3553(a)(7)) .......................................................... 25

VII.    CONCLUSION ................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Gall v. United States*,
128 S. Ct. 586 (2007) .......................................................................................... 16, 27

*Kimbrough v. United States*,
552 U.S. 85 (2007) ............................................................................................... 24, 26

*Koon v. United States*,
518 U.S. 81 (1996) ..................................................................................................... 27

*United States v. Baird*,
580 F. Supp. 2d 889 (D.Neb. 2008) ......................................................................... 24

*United States v. Booker*,
543 U.S. 220 (2005) ..................................................................................................... 7

*United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS),
2005 U.S. Dist. LEXIS 6254 (S.D.N.Y. Apr. 11, 2005) ........................................... 20

*United States v. Carvajal*, No. 04-cr-22 (AKH),
2005 U.S. Dist. LEXIS 3076 (S.D.N.Y. Feb. 17, 2005) ........................................... 22

*United States v. Castillo*, No. 03-cr-835 (RWS),
2007 U.S. Dist. LEXIS 7422 (S.D.N.Y. Jan. 25, 2007) ........................................... 20

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) ........................................................................................ 7

*United States v. Cernik*, No. 07-20215,
2008 U.S. Dist. LEXIS 56462 (E.D. Mich. July 25, 2008) ...................................... 16

*United States v. Chavez*, No. 22-CR-303 (JMF),
2024 U.S. Dist. LEXIS 1525 (S.D.N.Y. Jan. 4, 2024) ............................................. 14

*United States v. Dorvee*,
604 F.3d 84 (2d. Cir. 2010) ................................................................................. 23, 24

*United States v. Grober*,
624 F.3d 592 (3d Cir. 2010) ...................................................................................... 24

*United States v. Hernandez*,
604 F.3d 48 (2d Cir. 2010) ........................................................................................ 21

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008) ........................................................................................ 7

*United States v. Ontiveros*, No. 07-333,
2008 U.S. Dist. LEXIS 58774 (E.D. Wis. July 24, 2008) ........................................ 16

*United States v. Ray Parish*,
2024 U.S. Dist. LEXIS 151228 (S.D.N.Y. Aug. 22, 2024) ................................ 14, 15

*United States v. Sanchez*, No. 99-cr-338-12 (RWS),
2007 U.S. Dist. LEXIS 1371 (S.D.N.Y. Jan. 8, 2007) ............................................. 20

*United States v. Thavaraja*,
  740 F.3d 253 (2d Cir. 2014) ............................................................................ 7

*United States v. Turner*,
  629 Fed. App'x 66 (2d Cir. 2015) ................................................................. 20

## **STATUTES**

18 U.S.C. § 3553 ............................................................................................... 7

18 U.S.C. § 3553(a) ........................................................................................... 7

18 U.S.C. § 3553(a)(1) ....................................................................................... 7

18 U.S.C. § 3553(a)(2) ..................................................................................... 15

18 U.S.C. § 3553(a)(2)(A) ............................................................................... 15

18 U.S.C. § 3553(a)(2)(B) ............................................................................... 15

18 U.S.C. § 3553(a)(2)(C) ............................................................................... 16

18 U.S.C. § 3553(a)(2)(D) ............................................................................... 16

18 U.S.C. § 3553(a)(4) ..................................................................................... 21

18 U.S.C. § 3553(a)(6) ..................................................................................... 25

18 U.S.C. § 3553(a)(7) ..................................................................................... 25

## **OTHER AUTHORITIES**

USSG § 2G1.3 ................................................................................................... 24

USSG § 2G2.2 ................................................................................................... 22

USSG § 4B1.5(b) .............................................................................................. 21

USSG § 5G1.1(c)(2) ............................................................................................ 2

## **<u>TABLE OF EXHIBITS</u>**

| **<u>Description</u>** | **<u>Bates</u>** |
|---|---|
| DEFENSE EXHIBITS | D1-44 |
| GOVERNMENT REPORTS | R1-167 |
| SCHOLARLY ARTICLES | S1-63 |

I.    **PRELIMINARY STATEMENT**

Justin Smith submits this memorandum in support of his request for a sound, measured, merciful and appropriate sentence.  Mr. Smith faces a 10-year mandatory minimum sentence. His suggested guidelines range is 188-235 months.  The Probation Office recommends a below-guidelines sentence of 168 months.  For the reasons set forth in the following sections, a sentence at or near 10 years is "sufficient, but not greater than necessary" under the circumstances of this case and this defendant.  18 U.S.C. § 3553(a).

By way of summary, a sentence at or near 120 months will account for the serious nature of Mr. Smith's offense, which he readily acknowledges.  That sentence will also provide adequate consideration of Justin's history and personal characteristics including his law-abiding life until this case, ██████████████████████████, his strong family support network, his work ethic and professional success in the adult entertainment industry, his efforts to help other performers in that field that who are often exploited and suffering from addiction, his demonstrated amenability to rehabilitation and his documented efforts toward his own rehabilitation during his detention at MDC.  *See* Point VI.B.4., *infra*.  *See generally* 18 U.S.C. § 3553(a)(1).

Further, a sentence in the vicinity of 10 years will promote respect for the law and provide adequate specific and general deterrence.  By any measure, a 10-year sentence is substantial, particularly given that it will be imposed upon a man with no criminal history who has had no prior interaction with law enforcement.  The public and potential offenders will understand that fact.  As for specific deterrence, the analysis related to recidivism and rehabilitation, *infra*, Point VI.E.3., is instructive.  *See generally* 18 U.S.C. § 3553(a)(2).

Moreover, the requested sentence will address recidivism and rehabilitation.  Dr. Dorota Novitskie evaluated Justin, conducted psychological tests, and considered the facts, admissions, and additional allegations in this matter.  Dr. Novitskie's conclusions regarding recidivism and rehabilitation support a 120-month sentence.  Other experts agree.  According to the United

States Sentencing Commission, defendants over age 50 – particularly those with no prior law enforcement contact – are significantly less likely to reoffend.  And, a 10-year sentence will ensure that Justin's support network is intact, a critical component to his successful reintegration into society.  *See* Points VI.E.2,3., *infra.  See generally* 18 U.S.C. § 3553(a)(2).

Additionally, a sentence at or near 120 months is warranted under the federal sentencing guidelines.  Mr. Smith, the government and the Probation Office all agree that the mechanical application of the guidelines results in an advisory sentence of 188-235 months.  However, that calculation includes a 5-level "pattern" increase (USSG § 4B1.5(b)) that deserves little consideration at sentencing because it was not enacted by the experts from United States Sentencing Commission based upon empirical and statistical evidence.  Rather, that 5-level increase resulted from an amendment to the guidelines by politicians.  Courts have regularly concluded that a guideline of such "unusual provenance" requires careful scrutiny before it is applied.  Absent those five levels, Mr. Smith's advisory guidelines range is 108-135 months, which – because of the mandatory minimum – is adjusted to 120-135 months per USSG § 5G1.1(c)(2).  A sentence within or near the bottom of that range is appropriate in this case.  That is particularly true given that Mr. Smith's conduct is on the lesser end of defendants who otherwise qualify for the 5-level "pattern" increase.  *See* Points VI.F.1,2., *infra.  See generally* 18 U.S.C. § 3553(a)(4).

Once the Court accounts for Mr. Smith's history and characteristics, and notwithstanding the JSIN statistics, a 10-year sentence will not result in an unwarranted sentencing disparity.  *See* Point VI.G., *infra.  See generally* 18 U.S.C. § 3553(a)(6).

As for restitution, the PSR states that the government has not provided information on this score.  The government informally provided the defense with one restitution request.  To the extent that request is sufficiently supplemented to satisfy the statutory requirements, Mr. Smith understands his obligations.  *See* Point VII, *infra.  See generally* 18 U.S.C. § 3553(a)(7).

*        *        *        *

2

For all these reasons, Justin Smith respectfully submits that a sentence at or near 120 months is "sufficient, but not greater than necessary" under the facts of this case.

## II.    PROCEDURAL HISTORY

Mr. Smith was charged by Complaint, 24-mj-2422, on June 26, 2024.  Since the bail hearing on June 28, 2024, he has been detained at MDC.  On June 20, 2025, Mr. Smith pleaded guilty to a one-count information, 25-cr-281, which charged him with violating 18 U.S.C. § 2422(b).  PSR ¶ 1.  As part of his plea agreement, Mr. Smith agreed not to challenge certain alleged conduct listed in Attachment A.  The parties agreed that Attachment A should not be used to calculate Mr. Smith's advisory guidelines range and the probation office agreed with that, calculating his range based only on the conduct to which he pleaded guilty.  Further, Mr. Smith reserved the right to argue, as he does herein, the extent to which Attachment A should be used to increase his final sentence.[1]

## III.    PERSONAL INFORMATION AND BACKGROUND

### A.    Childhood and Family

Justin Heath Smith was born on April 3, 1981, in Fort Worth, Texas.  PSR ¶ 55.  He was the only child of the relationship between Debbie Smith and Troy Baccus.  PSR ¶ 56.  Justin was raised by his mother alongside his maternal half-sister Jessica in the small town of Lillian, Texas. PSR ¶¶ 56, 57.    Only a few years after coming out as gay to his parents, Justin moved from Lillian to New York City, where he has lived for over 20 years.  PSR ¶¶ 60, 61.  Justin has no criminal history and this case is his first brush with the criminal justice system.  PSR ¶¶ 47-51.

In sum and substance, Justin describes Lillian, Texas as "a town with a gas station, a church, a stop sign, and not much else."  In addition to growing up with Jessica, Justin maintained a close relationship with his father Troy and paternal half-siblings Sussie and Bryan.

---

[1] With respect to Attachment A, the Plea Agreement provides as follows: "In connection with his guilty plea, the defendant agrees that he will not contest at sentencing that he committed the conduct specified in Attachment A to this plea agreement. The parties agree that the defendant's decision not to contest the conduct specified in Attachment A is not an admission to that conduct. The defendant reserves the right to plead not guilty in any future prosecution relating to the conduct specified in Attachment A."

PSR ¶ 56, 57.  Justin had a "close-knit" family.  PSR ¶ 57.  Despite his family "being on the lower end of the economic scale," Justin's needs were always met.  PSR ¶ 57.  His father was always financially supportive and Justin often spent weekends and summers with his father.  PSR ¶ 57.

Justin's childhood was not without its issues.  Alcohol abuse was prevalent in the Smith household.  Justin disclosed that both his parents and paternal half-brother suffered from alcoholism.  PSR ¶ 58.  Unfortunately, this led to instances when Ms. Smith missed important events in Justin's childhood and "aunts had to step in."  *Id*.  Fortunately, Ms. Smith's drinking subsided in Justin's teen years.  Justin's father's drinking also subsided when grandchildren were born.  *Id*.

Alcoholism likewise affected Justin.  He began drinking at the age of 14.  PSR ¶ 86.  Justin's drinking eventually escalated to point of daily intoxication.  *Id*.  Justin's struggle with alcohol coincided with his struggle with his sexuality.  Around the age of 14, Justin realized that he was gay, a fact that he hid from his family for years.  PSR ¶ 78.  At 18 or 19 years old, Justin came out to his mother, a disclosure with which she struggled.  PSR ¶ 60.  It took some time, but Ms. Smith remains supportive of her son despite his differing lifestyle, career choice, and the current charges.  Mr. Baccus, and the remainder of Justin's family remain supportive.  By the age of 19, Justin addressed his alcoholism and quit drinking entirely.  He has been sober for 25 years.

Justin writes to the court:

> I grew up in a small town in Texas with my single mother and my younger sister. We have a fairly large family and are very close with all of them. My aunts are like mothers and my cousins are like sister. Even to this day I am supported by each and every one of them. I consider myself very lucky this way. My mother just turned 70. My sister is 40. Both still live in Texas  near the DFW area. My father, older sister, 3 cousins, 2 aunts and my uncle also live there. I have a VERY close relationship with everyone. I exchange emails with my family almost everyday. My father is 80 now. He, my mother and my Aunt are getting older and aren't in the best of health. I am hopeful ill be out in time to help take care of them.

D1.

**B.**  **<u>Education and Work History</u>**

Justin graduated from Alvarado High School in Alvarado, Texas in 2000.  PSR ¶ 89. He briefly attended community college after graduation.  PSR ¶ 90.  As detailed herein, Justin looks forward to engaging in all programs the BOP has to offer to further his education while he is incarcerated, and to pursuing higher education. *See* D2.

Justin has a lengthy and diverse work history.  Justin began working in Lillian at his local gas station.  He later worked as a manager at a Blockbuster.  PSR ¶ 97.  After moving to New York, Justin transitioned into sales.  He worked at multiple furniture sales establishments after moving to the city, including DDC from approximately 2003 to 2008.  PSR ¶ 96.  Justin's career shifted after the 2008 financial crisis.  He was laid off from DDC and became a bartender at multiple establishments from 2008 to 2012. PSR ¶¶ 95, 96.

In 2012, Justin began working in the adult film industry. PSR ¶ 92.[2]  Justin is professionally known as "Austin Wolf" within the adult entertainment industry (the "Industry"). His longstanding commitment to sobriety fostered a reputation for discipline, professionalism, and reliability.  Colleagues consistently viewed Justin as diligent and self-motivated, qualities that distinguished him in a field where sustained success is uncommon.  Through his work ethic and determination, Justin earned recognition as a focused and dependable performer in an industry where longevity is the exception rather than the rule.  Justin's commercial success in the Industry was significant.  Over the course of his career, he received over a dozen professional awards.  Those honors reflect his broad fan appeal and the professional respect he earned from others within the Industry.

---

[2] Because this matter has received some press, colleagues have been reticent to provide what may well become publicly available letters of support. Justin likewise discouraged some supporters from writing letters. *See* D1. The background presented here is based upon a good faith summary of the events.  Mr. Smith will be prepared to offer specifics and a greater discussion upon the Court's request at his sentencing.

Justin also played a meaningful role in shifting the Industry's culture away from treating performers as disposable assets. He was a vocal advocate for greater equity and fairness within the field. Historically, studios retained the overwhelming share of profits generated by performers' work. Justin championed the principle that performers should receive a more substantial portion of the revenue they create, helping to pave the way for more sustainable and equitable business models within the Industry. Specifically, Justin helped pioneer the shift toward a performer-led business model that embraced emerging direct-to-fan platforms such as "OnlyFans," enabling him and others to retain control over their content, branding, and likeness. Justin's entrepreneurial approach empowered a new generation of performers to move into the mainstream as independent creators and business owners, rather than just actors and entertainers.

Justin recognized the importance of performers developing sophisticated business acumen. He encouraged his colleagues to approach their work as entrepreneurs and to prioritize financial literacy and long-term self-sufficiency. Through his advocacy, many younger performers were inspired to seek professional guidance, create business plans, establish financial goals, invest prudently, and save for retirement.

Behind the scenes, Justin was a thoughtful and consistent advocate for performer health and well-being. He spoke candidly about addiction, mental health, and the challenges of coping with the pressures of the Industry. He encouraged performers to prioritize sexual wellness, adhere to safer sex practices, and offered guidance and support where formal resources were lacking. Although less visible than his public accomplishments, this work reflects Justin's genuine care for his community and his commitment to helping similarly-situated individuals succeed.

Justin was also a strong advocate for inclusivity within the Industry. He spoke out in support of performers whom he believed were unfairly marginalized or who challenged traditional body image standards. Justin used his platform to elevate underrepresented voices and to promote a more diverse and equitable industry.

6

All this ended when ██████████████████████████ was vividly triggered and Justin risked and lost all he had worked for based upon the offense conduct. Those events are detailed herein.

## IV.    THE APPLICABLE LEGAL STANDARD

The applicable legal standard by which the Court should fashion Mr. Smith's sentence is well-settled and straightforward:

> District courts are to use the Guidelines as a "starting point," and then make an independent sentencing determination, taking into account the "nature and circumstances of the offense and the history and characteristics of the defendant," and all of the statutory factors.

*United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (citing and quoting *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) & 18 U.S.C. § 3553(a)). The Supreme Court has held that the guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and leave sentencing courts with "considerable discretion" in determining whether a non-guideline sentence is justified. *United States v. Jones*, 531 F.3d 163,171 (2d Cir. 2008). Indeed, *Booker* instructs district courts to consider all of the statutory factors listed under 18 U.S.C. § 3553(a) in order to tailor an appropriate sentence based on the defendant's specific situation and particular circumstances.

## V.    THE GUIDELINES CALCULATION

The defense, government and Probation Office all agree that Mr. Smith's advisory range is 188-235 months (Level 36/CHC I). That calculation is consistent with the plea agreement. The Probation Office recommends a below-guidelines sentence of 168 months. PSR pp. 25, 27. The government has not yet stated the specific sentence for which it will advocate.

## VI.    THE STATUTORY FACTORS (18 U.S.C. § 3553)

### A.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

Mr. Smith pleaded guilty to one count of 18 U.S.C. § 2422(b). Mr. Smith knows that he committed a serious offense that will have long-lasting effects on the victim. Mr. Smith was part

of the offense during which CC-1 lied to the victim about CC-1's age, saying he was 17 instead his true age, which was late 20s. PSR ¶ 22. During the offense in which Mr. Smith participated with CC-1, the victim and CC-1 exchanged explicit photographs and videos of themselves and others. *Id.* Mr. Smith was present when the victim came to CC-1's apartment. PSR ¶ 23. As CC-1 performed oral sex on the victim, Mr. Smith watched and masturbated. *Id.* Mr. Smith and CC-1 told the victim not to tell anyone about what happened. *Id.* CC-1 told the victim the next time they met, he (CC-1) would invite other males the victim's age to join. *Id.* After the encounter, Mr. Smith and the victim communicated on SnapChat; there is no evidence that they exchanged photos or videos. PSR ¶ 24. Even though there is no allegation that Mr. Smith ever touched the victim, he fully acknowledges and accepts that he played a role in the enticement, a serious offense that will have lasting effects on the victim. To say anything less would be insulting to the victim.

The "nature and circumstances" of the offense also requires an analysis of how Justin Smith came to commit this crime in the first place. Justin writes:





D2-3. Likewise, Dr. Novitskie noted in her report:

Mr. Smith reported that at approximately the age of 9, he was



D29. Mr. Smith's past trauma and the suppressed memory is a critical link in understanding how the instant offense occurred. It likewise warrants a sentence at or near the mandatory minimum.[3]

Lastly, and although he has not admitted to Attachment A to the Plea Agreement, if the Court considers those unchallenged statements when fashioning his sentence, Mr. Smith provides the following context. Both the conduct to which he admitted and the list in

---

[3] The arguments concerning Mr. Smith's trauma are likewise offered under § 3553(a)(1).

Attachment A relate to a timeframe *after* Mr. Smith's ███████████████ triggered his spiral into the instant offense. Thus, under § 3553(a), Attachment A should be considered part and parcel of conduct following the same triggering event, the same downward spiral and the same result: Justin Smith committing the instant offense. Respectfully, when viewed in that context, consideration of Attachment A still permits a sentence at or near 10 years.

### B.    The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

1.    Mr. Smith's Work History

Mr. Smith relies on the preceding discussion of his close ties with is family, law-abiding life, lack of any contact with law enforcement, business success in his chosen field and his successful efforts to revamp the adult entertainment industry to become safer, more inclusive and more equitable for all involved.

2.    Mr. Smith's efforts and successes during his time at MDC demonstrates a character that warrants a reduction in his sentence.

Justin's character is demonstrated by his actions during pretrial detention. He has never received a disciplinary infraction. PSR ¶ 4. Justin currently works as an orderly in the kitchen unit. He received commendations for going above and beyond the requirements for his role, and the positive attitude he brings to his role. *Id*. On July 16, 2025, Justin received a glowing review from Counselor D. Giebfried for his work in MDC:

> Inmate Smith is an outstanding orderly. Inmate Smith performs his duties with little to no supervision. Inmate Smith assists other inmates in their duties in addition to his own. Inmate Smith is an outstanding orderly who works well with others. He is well organized, dependable, timely, and always brings a positive attitude to his work.

D13; PSR ¶ 4.

In addition to his work, Justin attends many programs, and utilizes the limited resources MDC has to offer. He completed the following educational programs and group sessions:

- S.T.E.M. Seminar Series (midterm) provided by Columbia University;
- Non-Residential Drug Abuse Program;

- 24 hours of CU Astronomy Class;
- Four hours of Credit Reports and Scores;
- Three hours of Spending and Saving Plan;
- Four hours of Money Smart- You Can Bank on It;
- Two hours of Your Money Values and Influences;
- Seven hours of Recreation and Leisure Journal;
- Book Club: Can't Hurt Me;
- Positive Assertiveness;
- Practicing RSAs;
- Rational Self-Counseling;
- Thinking Errors;
- ABCs of Thinking;
- Emotional Management;
- Attitudes for Change;
- Assessing DARN Language;
- Stages & Strategies for Change, Targeting Changes, and Informed Consent;
- Sentry Journal: Weight Management and Making a Decision;
- Relationships and Personal Responsibility; and
- Start Now – Unit 1: Starting with Me.

PSR ¶¶ 4,5; D14-25. (Certificates). Justin has taken advantage of every opportunity to better himself for life after what will be a sentence of at least 10 years. In addition to the various programs detailed above, Justin has been reading, and learning Chinese, a marked difference to his life prior to incarceration:

> Embarassingly to admit, I have never read a book before my arrest. So, in addition to my job I take every class that is available to me, including NRDAP. With this I also self educate. I am usually reading 2 to 3 books at a time. From subjects like physics, autobiographies, race theory and even evolution. I am currently teaching myself Chinese and looking forward to college courses when I get my spot. I plan to use the time while incarcerated to better myself. In the 15 months since my arrest I have made strides to change bad habits and create new and positive ones. I work with what I've got and have made significant changes.

D2. Justin's willingness to change and progress in his life demonstrates his character and is worth a reduction in his sentence.

Justin has not only bettered himself while in MDC, he has helped others.  His bunkmate,

Michael, writes to the court:

> Justin has also done whatever he could to help those that needed it, like finding a food tray for someone that missed the serving, an extra piece of clothing for someone that just came into the unit or even advice when it was requested. Being able to win over so many people in this setting is no easy feat, but he was able to do it and it is a testament to the type of person he really is. I have also seen his selflessness first hand as Justin has gone above and beyond as a bunkie. Most bunkies only tolerate each other, which has been my experience, for the most part, when it comes to that living situation. But Justin has always shared with me and has always looked out for me to make sure I wasn't having any major problems in the unit. Justin has even gone as far as getting my tray of food at dinner and even got my laundry taken care of while I was at work. Additionally, he has always tried to give me personal advice from his own past experiences when he saw me making mistakes he had already made in life and learned from. He helped me diagnose my codependency issue which was a huge step for me in realizing why I do a lot of things I do, and why I am in the situation I find myself in now. Without his help on the matter, I would still be blind to it as there is not therapy or counseling in here.

D7-8.  This is a common theme in Justin's life.  One longtime friend writes to the Court:

> From the beginning of our relationship, Justin has gone out of his way to offer guidance and support to those around him. One of the most meaningful examples of this was his kindness toward me personally. When I moved to New York City from Israel at the age of 21 to study acting, I didn't know a single person. Justin took me under his wing, helped me get to know the city, introduced me to people who would become lifelong friends, and supported me in countless ways. He and his partner opened both their home and their hearts to me—something I will always be deeply grateful for.
>
> Later in life, when I became an American citizen and was struggling to find work, Justin once again stepped in to help. He offered me a job as a video editor, treating me with kindness, generosity, and respect. At a time when I felt lost and uncertain, he gave me an opportunity and believed in me when no one else did.
>
> Justin has never sought recognition for his generosity; he simply acts from a place of compassion and decency. He has consistently demonstrated a strong moral compass and a willingness to support

> those in need, often quietly and without expectation of anything in
> return.

D10. However, one cannot pour from an empty cup, and that is true for Justin.  He helped many

people in his life, and that continues through to his bunkmate, but Justin realizes that he needs to

focus on himself and his own mental health, and in turn, reduce the chance of recidivism,

detailed *infra*.

> 3.    The Probation Office agrees that Mr. Smith's personal history presents mitigating
>       factors.

After its investigation, the Probation Office acknowledges and has summarized

mitigating factors for consideration by the Court:

> The instant offense is the defendant's first known criminal
> conviction. His lack of criminal history is a mitigating factor.
>
> The defendant was raised in small town in rural Texas. He reported
> a good upbringing despite his family being on the lower end of the
> economic scale and his parents' struggles with alcoholism. ███
> ████████████████████████████████████████████ e came out
> as homosexual to his family at age 18 and decided he needed to
> move to New York City to be more accepted. The defendant
> struggled with alcoholism and sex addiction. He reported previous
> outpatient treatment but was short-term and inconsistent. The
> defendant reported, and his collateral contacts corroborated, that
> his employment as an adult film star likely exacerbated his sexual
> addiction. The defendant's upbringing and his undertreated mental
> health and substance use history are mitigating factors considered.

PSR at 26.

> 4.    The conditions at MDC warrant a reduced sentence.

Mr. Smith seeks a reduction in his sentence based upon the conditions under which he

has had to live during his detention at MDC since June 28, 2024.  As one Court stated earlier this

year:

> It has gotten to the point that it is routine for judges in both this
> District and the Eastern District to give reduced sentences to
> defendants based on the conditions of confinement in the
> MDC. Prosecutors no longer even put up a fight, let alone dispute
> that the state of affairs is unacceptable.

*United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525, at *2 (S.D.N.Y.

Jan. 4, 2024).  Just a year ago, one Court in this District concluded:

> The conditions at the area's jails make time spent there essentially
> the equivalent of either time and a half or two times what would
> ordinarily be served.  Such time is materially different than [time]
> served at a jail or prison elsewhere in the United States.

*United States v. Ray Parish*, 2024 U.S. Dist. LEXIS 151228, at *14 (S.D.N.Y. Aug. 22, 2024)

(internal citations and quotations omitted).

The Honorable Jesse Furman provided a comprehensive overview of the longstanding

inhumane conditions at that facility and the extent to which other courts have discussed and

expressed true frustration with the conditions.  *Chavez*, 2024 U.S. Dist. LEXIS 1525, at *11-18 .

In sum, MDC is a disgrace and not reflective of what the federal criminal justice system should

be at any level or at any time.

Mr. Smith of course endured the harsh realities of MDC.  Shortly after he was detained in

June 2024, he faced threats because of the nature of his charges:

> I was arrested on June 26th of 2024 and brought to MDC
> Brooklyn. I have been here over 14 months now. Due to the
> multiple murders in the building at least 70% of that time has been
> on lock down. I was in unit 62 first. I was advised by staff to lie
> about my charges, my sexuality and my career. We asked the
> prosecution for some anonymity regarding my alter ego but none
> was given. Within a month I saw 7 men with knives and picks
> heading to my room looking for me. I thankfully was not in the
> room and was able to ask for PC (protective custody). I would later
> find out that the other inmates had found articles about me and had
> spread them through the jail. In my 14 months I have constantly
> had expired food served to me (see my lawyers for evidence of
> this).[4] I have been given mattresses that have been used by many
> many inmates and never cleaned. They are not wrapped in plastic
> and are stained in what I can only assume is human excrement of
> some sort. I say all this so you can know where I have been and to
> what level of treatment I have been given. I know I'm in jail and I
> understand I'm to be punished. And if this is the norm of that, so
> be it. But from what I understand and have read, it is not.

---

[4] *See* D44.

D2.

Based on the conditions at MDC, and in keeping with the Court's conclusions in *Parish*, Mr. Smith requests a reduction of two days for every day he has spent in custody at MDC.  *See Parish*, 2024 U.S. Dist. LEXIS 151228, at *14.[5]

### C.    Promoting Respect for the Law (18 U.S.C. § 3553(a)(2)(A))

Section 3553(a)(2)(A) requires the Court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law and provides just punishment.  For the reasons discussed herein, a sentence at or near 10 years is sufficient.  A sentence any longer would be "disproportionately long in relation to the offense [and] unjust and likewise fail[] to promote respect" for the law.  *United States v. Ontiveros*, No. 07-333, 2008 U.S. Dist. LEXIS 58774, at *6 (E.D. Wis. July 24, 2008). *See United States v. Cernik*, No. 07-20215, 2008 U.S. Dist. LEXIS 56462, at *25 (E.D. Mich. July 25, 2008) (citing *Gall v. United States*, 128 S. Ct. 586, 599 (2007)) ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in the sentencing").  Thus, a sentence at or near the mandatory minimum is warranted.

### D.    Deterrence (18 U.S.C. § 3553(a)(2)(B))

The Court will sentence Mr. Smith to serve at least 10 years in federal prison.  Mr. Smith submits that a sentence at or near the mandatory sentence of 10 years will achieve general deterrence.  His sentence will be widely reported and it cannot be credibly argued that – unlike a white-collar crime sentence for example – a sentence of that length could ever be thought of as "the cost of doing business" such that it will not effectuate deterrence.  Futher, Mr. Smith will be subject to a heightened level of scrutiny and surveillance post-release in the form of a mandatory term of supervised release of at least five-years.  Coupled with the treatment Mr. Smith will

---

[5] The conditions at MDC could also be considered under 18 U.S.C. § 3553(a)(2).

receive while incarcerated, a 10-year sentence, plus supervised release, plus sex offender registration is all the more meaningful to achieve sufficient deterrence.

### E.      Recidivism and Rehabilitation (18 U.S.C. § 3553(a)(2)(C) & (D))

Section 3553(a)(2)(C) focuses the Court on the need to protect the public from future crimes of the defendant, *i.e.*, the risk of recidivism.  Meanwhile, Section 3553(a)(2)(D) focuses the Court on a sentence that will be sufficient to provide a defendant with rehabilitative opportunities, whether educational, vocational or otherwise.  Given how intertwined Mr. Smith's rehabilitation is with the risk of recidivism, these factors will be addressed in tandem. Justin has already begun his rehabilitative journey by utilizing every resource available at MDC, detailed *supra*.  His efforts will be all the more successful once he is at an institution that offers the much-needed treatment he desires.

1.      Mr. Smith's Amenability to Treatment.

Justin has accepted responsibility and wants the essential therapy required to not only reduce the chance of recidivism, but to better his mental health. He has written to the Court regarding considered efforts for continuing empathy toward the victim.  He understands that true empathy takes time and he does not claim to be perfect on this score at this time.   Justin has written to the Court:

> I like to think of myself as a man that helps other. Cares for his community, family and friends. A man that takes responsibility for his wrongs. I want to live up to being that man. By saying I'm sorry for this crime. I'm sorry to my victim. I'm sorry for any pain I have caused. I accept my punishment with no-questions-asked and no excuses.

D2.   Dr. Novitskie has also witnessed Justin's efforts to recognize the importance of mental health treatment:

> Mr. Smith presents as an excellent candidate for psychological treatment because he has the capacity and willingness to understand, apply and participate in treatment while at the facility. Mr. Smith should engage in individual therapy with a licensed mental health professional trained and experienced in working with those who have engaged in similarly problematic behaviors and

> legal issues (e.g., sexual offending-type behaviors) should be considered. I have been informed that Mr. Smith will serve a sentence of at least 10 years. Given that length of time, it is critical (from a rehabilitative standpoint) that he be placed at a location that offers appropriate therapeutic support.

D31.

In line with Dr. Novitskie's recommendation, Justin is taking a thoughtful approach to the lengthy sentence he faces. He identified and hopes to be designated to FCI Seagoville Low, an institution both near his family, and with a sexual offender management program, where he will have access to the targeted mental health treatment he requires. The Residential Sex Offender Treatment Program ("SOTP-R,") in which Justin wishes to participate, is described by the BOP as:

> a high-intensity program designed for high-risk sexual offenders. It is a unit-based program with a cognitive behavioral emphasis. The cohousing of SOTP-R participants permits the implementation of a modified therapeutic community. This model has been proven effective in reducing inmate recidivism. A modified therapeutic community in a prison setting stresses pro-social values and behaviors that are needed in the outside community.

U.S. Dep't of Just., Fed. Bureau of Prisons, *Program Statement 5324.10: Sex Offender Programs* at 14 (Feb. 15, 2013). Justin's amenability to treatment, especially the SOTP-R provided by the BOP, is vital in the sentencing analysis, as a Department of Justice Research Brief concluded:

> evidence suggests that that treatment for sex offenders— particularly cognitive-behavioral/relapse prevention approaches— can produce reductions in both sexual and nonsexual recidivism.

R119. Further, the Research Brief noted that intensive residential treatment, the exact treatment Justin intends to utilize at FCI Seagoville, is most effective for Defendants like Justin:

> High-risk sex offenders who completed intensive residential treatment were more than two times less likely to recidivate than high-risk sex offenders who were not provided intensive treatment. Conversely, low-risk sex offenders who were given intensive treatment were 21 percent more likely to recidivate than low-risk sex offenders who were not given intensive treatment.

R118.  In addition, studies found that "the most reasonable estimate at this point is that treatment can reduce sexual recidivism over a 5-year period by 5–8%." *Id.*  This percentage, at first blush, may seem insignificant.  However, coupled with the reduced likelihood of a defendant in his 50's to reoffend, detailed in the following section, it yields an incredibly low recidivism rate that warrants a sentence at or near the mandatory minimum.

 2.   Mr. Smith will be statistically less likely to reoffend given his age upon release.

 Studies by the United States Sentencing Commission point to one common trend: the older the defendant, the lower the risk of recidivism.  The Commission recognizes:

> Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism. Older offenders were rearrested at lower rates compared to younger offenders within each CHC, and rearrests increased within each age category across CHC.

R82; p. 29. The above statement is best summarized in the following chart published by the USSC:

Table 4.  Rearrest Rates by Age at Release and Criminal History Category
*Federal Offenders Released in 2010*

| AGE | CHC I | CHC II | CHC III | CHC IV | CHC V | CHC VI | TOTAL |
|---|---|---|---|---|---|---|---|
| Younger than 21 | 66.6% | 84.1% | 90.7% | 100.0% | 100.0% | 100.0% | 72.5% |
| 21 – 29 | 48.5% | 66.9% | 79.1% | 85.4% | 86.4% | 89.9% | 64.4% |
| 30 – 39 | 31.2% | 49.6% | 61.3% | 71.4% | 77.3% | 81.1% | 54.1% |
| 40 – 49 | 22.3% | 41.6% | 50.9% | 62.9% | 67.4% | 73.1% | 42.7% |
| 50 - 59 | 15.0% | 30.8% | 46.4% | 48.6% | 61.7% | 65.3% | 30.8% |
| 60 and Older | 9.4% | 18.2% | 28.1% | 30.0% | 48.6% | 46.9% | 15.9% |
| TOTAL | 30.2% | 49.4% | 61.9% | 70.3% | 75.4% | 76.2% | |

R83; p.30.  Mr. Smith will be at least 50 years old if a mandatory minimum sentence is imposed (accounting for time served and good-time credit), putting Mr. Smith in CHC I, 50-59, at a 15 percent rate of recidivism after an eight-year period.  However, it is reasonable to assume the 15

percent rate of recidivism would be far lower for an individual with no prior contacts with law enforcement, like Mr. Smith.  PSR ¶¶ 47-53.  The Commission further recognized in the same study that across all age groups:

> one-fifth (20.3%) of zero-point offenders with no prior contact with the criminal justice system were rearrested during the study period. In comparison, nearly one-third (32.7%) of zero-point offenders with prior contact were rearrested. However, both groups of zero-point offenders were rearrested at lower rates compared to their CHC I counterparts with one criminal history point, 42.3 percent of whom were rearrested during the study period.

R81; p. 28.

Further, the Second Circuit and courts within this District have repeatedly recognized the correlation between a defendant's older age and a reduced risk or likelihood of recidivism.  *See*, *e.g.*, *United States v. Turner*, 629 Fed. App'x 66, 68 (2d Cir. 2015) (acknowledging a defendant's older age and decreased likelihood of recidivism absent evidence to the contrary); *see also United States v. Castillo*, No. 03-cr-835 (RWS), 2007 U.S. Dist. LEXIS 7422, at *20 (S.D.N.Y. Jan. 25, 2007) (citing Sentencing Commission reports regarding age, first-time offenders, and "markedly low" rate of recidivism); *United States v. Sanchez*, No. 99-cr-338-12 (RWS), 2007 U.S. Dist. LEXIS 1371, at *12 (S.D.N.Y. Jan. 8, 2007) (citing Sentencing Commission conclusion that "[r]ecidivism rates decline relatively consistently as age increases"); *United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS), 2005 U.S. Dist. LEXIS 6254, at *10-11 (S.D.N.Y. Apr. 11, 2005) (recognizing that courts within the Second Circuit have sentenced defendants over 40 years old below the Guidelines given lower recidivism rates associated with age); *cf. United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) (considering mitigating evidence, including the defendant's age of 42 years old and the decreased likelihood of recidivism, in remanding for second resentencing).

In summary, the Court must consider Mr. Smith's age at the time of his release, and the lower rate of recidivism for an individual in his fifties with no prior contacts with law enforcement in fashioning a sentence that is "sufficient, but not greater than necessary."

3.    <u>A shorter sentence will ensure Mr. Smith's support network is still intact.</u>

Mr. Smith's support network consists largely of his half-siblings, and most importantly, his aging mother, Debbie.  Debbie writes:

> I know my son does not belong where he is and he has broken my heart with the mistakes he has made. But he knows that he was wrong. I will always love him because he is my son. When he gets out we will be here waiting. And he will be better than he is today. He will help more people. Someone that does the greater good for mankind.

D4.  Debbie is currently 70 years old, and Justin plans to live with her after release.  PSR ¶¶ 55, 67. A shorter sentence at or near the mandatory minimum, will make it more probable that Mr. Smith's mother is there to welcome him home post-release.

The importance of family ties is not just conjecture.  Studies have found that close family ties have not only reduced the risk of recidivism, but served a dual purpose and increased the chance of employment:

> Our findings suggest that by facilitating job attainment, familial social ties, as well as marriage, we may break the cycle of prison to unemployment and thereby stymie the pathway of state dependence leading from prison to reoffending. Although more research is needed to illuminate the specific mechanisms that link social ties to employment, this research suggests that strengthening offenders' social relationships may have important implications for job attainment, and may be one possible path to desistance.

S25; p. 405.  Further, a 2019 study found:

> Family support—so often considered critical for successful reentry and desistance processes more broadly—is not a monolithic or unidimensional construct. Instead, family support is multidimensional, and particular dimensions of family support may possess anti-criminogenic effects while other forms of family support may not significantly reduce recidivism at all. With specific regard to reentry, our findings suggest that affectionate and emotional types of family support may play a secondary role to the more utility-oriented form of instrumental support in promoting positive reentry outcomes. In other words, families may "matter" during reentry because they provide support in the form of caring for the basic needs of returning loved ones.

S50; p. 20.  Thus, a shorter sentence will increase the likelihood Mr. Smith returns to society and the embrace of his mother and a stable household in Texas, increasing his chances of employment, and decreasing the chance of recidivism.

Further, Mr. Smith should not receive a lengthy sentence only for the sake of receiving a lengthy sentence.  The sentiment of § 3553(a)(2)(D) was best summarized by District Judge Hellerstein:

> Rehabilitation is also a goal of punishment. 18 U.S.C. § 3553(a)(2)(D). That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

*United States v. Carvajal*, No. 04-cr-22 (AKH), 2005 U.S. Dist. LEXIS 3076, at *15 (S.D.N.Y. Feb. 17, 2005).  A shorter sentence, at or near the mandatory minimum, will serve the goals of both reducing recidivism and rehabilitation.

Taken together, the targeted psychological treatment Mr. Smith seeks, his age at release, and support network warrant a sentence at or near the mandatory minimum.

**F.    The kinds of sentence and sentencing range (18 U.S.C. § 3553(a)(4)).**

1.    USSG § 4B1.5(b) was enacted by Congress, without the expertise of the Sentencing Commission.

The defense does not dispute the guidelines calculation in the PSR.  However, the manner in which § 4B1.5(b) was enacted warrants careful scrutiny.  Much like the child pornography guidelines, § 4B1.5 was enacted at the direction of congress, and later directly amended as part of the 2003 Protect Act.[6]  The Second Circuit recognized that the child pornography guideline,

---

[6] The 2003 Protect Act directly amended USSG § 4B1.5(b) to remove the requirement "there were at least two minor victims of the prohibited sexual conduct." *See* Amendment 649. This Amendment, known colloquially as the "Feeney Amendment" occurred because two attorneys from the Department of Justice convinced a new Congressman (Tom Feeney) to amend "an unrelated, popular bill without notice to the Sentencing Commission." R140; Stabenow at 19 (citing Skye Phillips, *Protective Downward Departures: Congress and the Executive's Intrusion Into Judicial* 23 *Independence*, 12 L.J. & Pol'y 947, 976-84 (2004) at 983 n.186, 986).  It likewise directly

§ 2G2.2, is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *United States v. Dorvee*, 604 F.3d 84, 98 (2d. Cir. 2010). Similar ire should be directed toward § 4B1.5 as it was enacted and amended in tandem with the child pornography guidelines.

USSG § 4B1.5 was enacted, effective November 1, 2001, but the origin of this guideline can be traced to Section 632 of Public Law 102–141, the Treasury, Postal Service and General Government Appropriations Act of 1992, which directed the Commission to amend § 2G2.2 and add "at least a 5 level increase for offenders who have engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." *See also* USSG § 4B1.5 ("Background: [ ] In addition, section 632 of Public Law 102–141 and section 505 of Public Law 105–314 directed the Commission to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors.")

This Amendment to § 2G2.2 was shoehorned into an appropriations bill after Senator Jesse Helms received two letters complaining about the lack of penalties for child pornography. R127; Stabenow at 6, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 2009) (citing 137 Cong. Rec. S10322-04, Exhibit 2). Courts often find that direct congressional amendments to the guidelines, such as these, should be given less deference than those thoroughly researched and enacted by the experts at the Sentencing Commission. *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *Dorvee*, 604 F.3d at 97-98 ("deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, [t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

---

amended 2G2.2 (child pornography), 2G2.4 (same), 3E1.1 (acceptance of responsibility), 5H1.6 (community and family ties and responsibilities), 5K2.0 (unenumerated departures), 5K2.13 (diminished capacity), 5K2.20 (aberrant behavior), and added 5K2.22 into the Guidelines, which limits departures based on age, physical impairment, and addiction.

and all those factors which give it power to persuade, if lacking power to control.") (internal citations and quotations omitted); *See also United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010) (discussing how and why USSG § 2G2.2 is clearly not based upon empirical evidence); *United States v. Baird*, 580 F. Supp. 2d 889, 894-95 (D.Neb. 2008) (concluding that USSG § 2G2.2 should receive little deference because it was not based upon empirical data and national experience).   This was the beginning of the politically charged amendments to the sentencing guidelines for sex offenses.

The Sentencing Commission originally considered the pattern enhancement for a narrower subset of cases, *i.e.*, those in which actual sexual abuse occurred, and to permit judges greater discretion in applying the enhancement.[7]   Instead, Congress stepped in, bypassed the Commission's expertise, and § 4B1.5 now exists in its current form.   Section 505 of the Protection of Children from Sexual Predators Act of 1998 (Pub. L. 105-314) which directed the Commission to:

> promulgate amendments to the Federal Sentencing Guidelines to increase penalties applicable to the offenses referred to in paragraph (1) [18 U.S.C. § 2241, 2242, 2243, 2422(b),(c), and 2423] in any case in which the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor.[8]

In response, the Commission promulgated § 4B1.5.   In Sentencing Amendment 615, the Commission, cites to the five-level enhancement of § 2G2.2(b)(4) as justification for USSG § 4B1.5(b).   The pattern amendment was foreshadowed in the 1996 Report to Congress, but the

---

[7] 1996 Sentencing Report to Congress.

[8] Of note, and relevant here, Section 503 of the Protection of Children from Sexual Predators Act Of 1998, directed the Commission to amend the guideline for Section 2422 to add the computer enhancement, akin to the child pornography guidelines.  The Commission, in 1996, noted "Not all computer use is equal. Some uses lead to more widespread dissemination of child pornography and to increased accessibility of pornography and other sexually explicit dialogue to children. Sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's crime." Further, "a statutory amendment may be necessary to make these kinds of distinctions because the current statutory directive is aimed broadly at all persons who use a computer to transmit child porn, including receivers and possessors." 1996 Report to Congress pp. 28, 29.  Similar scrutiny should be drawn to the computer enhancement in this case given both the prevalence of cell phones.

Commission only considered the enhancement for sexual abuse cases under § 2A3.2 (sexual abuse), not § 2G1.3 (transportation), then § 2G1.2:

> In addition, the Commission is exploring three options for increasing punishment for offenders convicted of sexual abuse of a minor. Sentencing under the sexual abuse guidelines is complicated by several factors, however. First, as discussed in the report, the guideline range for aggravated sexual abuse under §2A3.1 is perceived as too high for a significant portion of cases. Conversely, when such cases are sentenced under the sexual abuse of a minor guideline, 2A3.2, the offense level is perceived as too low. The key is to bridge this gap without encouraging undercharging. Second, under current guidelines, if a defendant was not previously convicted of sexual abuse, the punishment does not adequately reflect ongoing or repetitive abusive conduct. Third, many sexual abuse cases involve intra-familial abuse, evidentiary difficulties, and other complicating factors that are not easily taken into account through the application of hard and fast rules. Flexibility and deference to the sentencing judge's superior feel for a case appears warranted.
>
> To address and balance these concerns, the Commission is exploring several different ways to expand the "pattern of activity" adjustment to the sexual abuse guidelines. The Commission could provide for a five-level adjustment in §2A3.2. This would ensure substantially increased punishment for repetitive acts. Case analysis suggests that this adjustment, as modified by the 1996 amendments to §2G2.2, would apply in a substantial majority of sexual abuse cases. Alternatively, the same "pattern of activity" standard might be used as a basis for upward departure rather than as a mandatory five-level adjustment. Such a departure would allow the court to consider any acts of sexual abuse committed by the defendant, whether or not the abuse resulted in conviction, involved more than one victim, or occurred as part of the offense of conviction. The Commission may also consider increasing the base offense level of this guideline.[9]

R45; p. 40. Thus, the broad application of § 4B1.5(b) to cases like Mr. Smith's was not the original intention of the Commission. Rather, the pattern enhancement was originally to be considered as in a narrower subset of cases, before Congress directed the Sentencing

---

[9] At the time of this report, the sentences analyzed under § 2A3.2 yielded and a median sentence of 21 months, while § 2G1.3/2G1.2 yielded 44 months. R9; p. 4/Table 1. Thus, the Sentencing Commission's concern that sentences at the time were too low was largely addressed by the passage of the Adam Walsh Act in 2006, which created mandatory minimums for many sex offenses, including 18 U.S.C. § 2422(b).

Commission to amend the Guidelines. Further, the Commission envisioned the guideline be applied with more discretion, as a departure, rather than a mandatory five points.

Whereas the Sentencing Commission deferred to Congress in enacting and amending § 4B1.5 and did not, as required, base the guideline on "empirical data and national experience" the Court should scrutinize the application of this guideline and vary downward. *Kimbrough* 552 U.S. at 109. Thus, a sentence at or near the mandatory minimum is warranted.

2.    Strict application of USSG § 4B1.5(b) overstates Mr. Smith's culpability.

Even if the Court concludes that the mechanistic application of the five-point enhancement is appropriate, the Court should acknowledge that enhancement overstates Mr. Smith's culpability. That increase groups Mr. Smith into a category with defendants who have multiple contact offenses. The strict application of the guideline offers no discretion. As discussed *supra*, the Sentencing Commission originally envisioned this guideline would be applied in a narrower subset of cases, and possibly only via a departure.

### G.    Sentencing Disparity (18 U.S.C. § 3553(a)(6))

Both the Probation Office recommendation of 168 months and the guideline range of 188-235 months are "greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a). The record before this Court (even considering the JSIN statistics, PSR at p. 21) does not support a sentence at or near those numbers based on a concern for disparity once the Court considers Mr. Smith's life and amenability to treatment.

### H.    Restitution (18 U.S.C. § 3553(a)(7))

The PSR does not calculate any amount for restitution. PSR ¶ 117, p. 33. The government identified one request for the defense. If that request is supplemented to meet the legal requirements, Mr. Smith understands his obligations. As for any other requests that may be made, the defense objects to the imposition of any restitution unless and until sufficient information is provided consistent with legal requirements and the terms in the plea agreement.

## VII.    <u>CONCLUSION</u>

As the Supreme Court stated in *Gall v. United States*, 128 S. Ct. 586, 599 (2007):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

(*citing Koon v. United States*, 518 U.S. 81, 113 (1996)).

When *Gall* and the prevailing legal principles regarding sentencing are applied here, the Court should impose a sentence at or near 10 years and decline to impose any restitution.  To the extent the Court concludes that Attachment A requires an increase in Mr. Smith's sentence, he submits that the Court consider – at the very most – a sentence of 135 months, which accounts for the top of the range without considering the unsupported 5-level increase imposed directly by politicians rather than the experts at the United States Sentencing Commission.

Respectfully,

**BALDASSARE & MARA, LLC**

*Attorneys for Defendant Justin Smith*

By:    <u>/s Michael Baldassare</u>
        Michael Baldassare, Esq.

By:    <u>/s Thomas Andrykovitz</u>
        Thomas Andrykovitz, Esq.

Date:  September 15, 2025