<u>Report to the Congress</u>:

# Sex Offenses Against Children
## Findings and Recommendations
## Regarding Federal Penalties

(as directed in the Sex Crimes Against Children
Prevention Act of 1995, Section 6, Public Law 104-71)



<u>United States Sentencing Commission</u>
June 1996

# Executive Summary

The United States Sentencing Commission submits this report at the request of Congress on a subject of deep concern — sex offenses against children. In The Sex Crimes Against Children Prevention Act of 1995 (SCACPA), Congress addressed the serious problem of child pornography and other sex crimes against children and directed the Commission to increase certain penalties for these crimes. The Commission carried out that directive on April 30, 1996 by submitting to Congress guideline amendments that raised the penalties. The SCACPA also directed the Commission to prepare this report, analyzing the sentences imposed for these offenses, and to recommend additional amendments as appropriate. The Commission shares Congressional concerns about protecting America's children from sex offenders and has joined in the effort to do so by recommending a number of amendments that would target the most dangerous offenders, raise sentences, and improve the operation of the guidelines.

In preparing this report, the Commission analyzed all 1994 and 1995 sentences imposed under each of the relevant statutes—a total of 423 cases—to determine what kinds of sentences the defendants received and whether any modifications were necessary. Although federal sentencing policy potentially serves a variety of functions regardless of the number of cases involved, federal prosecutions of child sex offenses represent a small percentage of the total number of such cases nationwide: the vast majority of which are prosecuted in state courts. In addition, because of the nature of federal jurisdiction, 77% of the offenders sentenced in federal court for child sexual abuse were Native American. The Commission also notes that, although federal prosecution is important in the area of child pornography offenses, especially those involving the use of computers, the federal cases sentenced to date typically do not involve the type of computer use that would result in either wide dissemination or a likelihood that the material will be viewed by children. The number of cases sentenced under each of the relevant statutes and guidelines, as well as information about the sentences imposed, is contained in Section A, Table 1.

Penalties for sex offenses against children have been increased several times in recent years and are quite severe. Nevertheless, the Commission's analysis indicates that some amendments may be appropriate to increase sentences for the most dangerous offenders, to ensure consistency in sentencing, and to clarify certain provisions that have been improperly interpreted and used. It appears that a significant portion of child pornography offenders have a criminal history that involves the sexual abuse or exploitation of children and that those with such histories are at greater risk of recidivism. In order to ensure lengthy incarceration of repeat sex offenders who show the greatest risk of victimizing children, the Commission has significantly increased sentences for some child pornography offenses and is considering increases for other pornography and sexual abuse offenses. In addition, the Commission recommends that Congress increase certain statutory maximum penalties so that the guideline amendments designed to increase sentences are allowed to operate to their full extent without being capped by existing statutory limits. These recommendations, and other changes being considered to ensure correct and

i

R2

consistent sentencing under the guidelines, are summarized below and discussed in more detail in Section G.

**Amendments submitted to Congress for implementation in 1996**

■     As directed in the SCACPA, the Commission increased sentences for all pornography guidelines by approximately 25%. Sentences for promotion of prostitution and prohibited sexual conduct were increased by about one third. In addition, a further 25% increase was provided for the use of a computer in child pornography offenses.

■     The Commission increased pornography production sentences by 25% if computers were used to solicit participation in sexually explicit conduct by or with a minor for the production of child pornography.

■     In order to ensure lengthy incarceration of the most dangerous repeat offenders, the Commission expanded the definition of a "pattern of activity" involving the sexual exploitation or abuse of a minor as applied to pornography trafficking offenses. Sentences will be increased by five offense levels — a potential doubling of the sentence — for offenders who engage in a pattern of activity, whether or not the conduct is part of the offense of conviction. Sentences may also be imposed above the guideline range by upward departure if the pattern of activity adjustment does not adequately reflect the seriousness of the offense.

**Recommendation to amend statutory maximum penalties**

■     Congress should increase the statutory maximum for production of child pornography to 15 years and double the statutory maximum for those offenders who have prior convictions for state or federal sex offenses against children. This will permit the sentence increases in the pending amendments and other amendments under consideration to work without being capped by the statutory maximum penalties.

**Additional amendments currently under consideration by the Commission**

■     The Commission will consider adding the five-level "pattern of activity" adjustment currently found only in the pornography trafficking/receipt guideline to the pornography production and possession guidelines. The Commission will also consider adding a "pattern of activity" adjustment to the sexual abuse of a minor guideline, either as a required enhancement or as a basis for upward departure from the guideline range. Alternatively, the Commission will consider increasing the base offense level for the sexual abuse of a minor guideline.

■     The Commission will consider modifying the definition of "distribution" of pornography in the pornography trafficking/receipt guideline to clearly provide

that both commercial distribution for money and non-pecuniary trading of images are subject to increased punishment.

■    Because similar pornography receipt and possession cases are often sentenced differently, the Commission will consider whether to consolidate the trafficking/receipt and possession guidelines to ensure that similar cases are sentenced consistently regardless of the statute under which the offender was convicted.  This could result in lower sentences for certain receipt cases, and higher sentences for certain possession cases which would have a higher base offense level and be subject to enhancements under the trafficking/receipt guideline.  This may require Congressional action to amend a previously enacted directive to the Commission so that the Commission has clear authority to further consider this option.

**R4**

# Table of Contents

A. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1. Recent legislation involving sex offenses against children . . . . . . . . . . . . . . . . . . . . . . 1
   2. Typology and number of offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   3. Table of statutes, guidelines, and sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   4. Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. PORNOGRAPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   1. Statutory provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2. Indexing and cross references among statutes and guidelines . . . . . . . . . . . . . . . . . . . 5
   3. Production Guideline 2G2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   4. Trafficking/Receipt Guideline 2G2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5. Possession Guideline 2G2.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6. The use of substantial assistance motions in child pornography sentencing . . . . . . . . . . 13

C. TRANSPORTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   1. Statutory provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   2. Transportation Guideline 2G1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D. CRIMINAL SEXUAL ABUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   1. Statutory provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   2. Analysis of sentences imposed under Aggravated Sexual Abuse Guideline 2A3.1 . . . . 18
   3. Sexual Abuse of a Minor Guideline 2A3.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   4. Analysis of sentences imposed under Abusive Sexual Contact Guideline 2A3.4 . . . . . . 24

E. THE USE OF COMPUTERS IN CHILD PORNOGRAPHY DISTRIBUTION . . . . . . . . 25
   1. Ways that computers can be used to disseminate pornography . . . . . . . . . . . . . . . . . . 25
   2. Public and congressional concerns about pornography and computers . . . . . . . . . . . . 27
   3. Cyberporn and culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   4. Computer use among federal pornography defendants . . . . . . . . . . . . . . . . . . . . . . 29
   5. Punishing the use of computers to spread child pornography . . . . . . . . . . . . . . . . . . 30

F. TARGETING DANGEROUS OFFENDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
   1. The dangers of sex offenses against children . . . . . . . . . . . . . . . . . . . . . . . . . . 31
   2. Current guidelines take multiple approaches to targeting dangerous offenders . . . . . . 33
   3. Risk classification of child sexual abusers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   4. Implications for sentencing policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

G. RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   1. Guideline amendments submitted to Congress in 1996 . . . . . . . . . . . . . . . . . . . . . 37
   2. Recommendation for increased statutory maximum penalties . . . . . . . . . . . . . . . . . . 38
   3. Amendments currently under consideration by the Commission . . . . . . . . . . . . . . . . 39

## A.    INTRODUCTION

### 1.    Recent legislation involving sex offenses against children

The Sex Crimes Against Children Prevention Act of 1995 (SCACPA), Pub. L. No. 104-71, 109 Stat. 774, directed the Sentencing Commission to increase sentencing guideline offense levels for crimes involving child pornography, prostitution, and other offenses, and to add penalty enhancements for use of a computer in child pornography cases. Guideline amendments to increase these penalties were sent to Congress for review on April 30, 1996. They will become effective on November 1, 1996, barring further action by Congress.

In addition, the Telecommunications Act of 1996 created a new offense involving the persuasion, inducement, enticement or coercion of a minor, in areas under federal jurisdiction or by means of interstate or foreign commerce, to engage in prostitution or other prohibited sexual activity. Amendments to incorporate this new offense into the guidelines were also sent to Congress for review.

Section 6 of the SCACPA directed the Commission to prepare a report concerning offenses involving child pornography and other sex offenses against children. It is, of course, too early to evaluate the effectiveness of the increased punishment that will result from the recent legislation. We can, however, study sentencing under the statutes and guidelines that are currently in effect.

### 2.    Typology and number of offenses

Federal sex offenses against children can be divided into three groups — pornography, transportation, and criminal sexual abuse. The sentencing guidelines and this report are similarly divided. The **pornography** guidelines involve convictions under 18 U.S.C. §§ 2251 and 2252. Guideline 2G2.1 covers offenses involving the **production** of pornography, such as taking sexually explicit photographs of minors or advertising for minors to participate in such production. Guideline 2G2.2 covers **trafficking** in child pornography, such as maintaining a computer bulletin board from which subscribers can "download" child pornography, or sending pornographic material through the mail. **Receipt** of such material is also covered under §2G2.2. Guideline 2G2.4 involves **possession** of three or more items of child pornography.

The **transportation** guideline, 2G1.2, covers convictions under 8 U.S.C. § 1329 and 18 U.S.C. §§ 2421, 2422 and 2423(a). The statute covers transportation of a minor for purposes of either **prostitution** or **other prohibited sexual conduct**. In practice, most cases that do not involve prostitution involve sexual abuse. **Criminal sexual abuse** in its various degrees of seriousness is prosecuted under 18 U.S.C. §§ 2241-2244. The most serious is **aggravated sexual abuse**, which includes rape by means of force, threats, or coercion, and any sexual acts with a child under the age of 12. **Abusive sexual contact** involves forcible or coercive touching of the sexual areas without a sexual act involving penetration. **Sexual abuse of a minor** involves non-forcible sex with a person between the ages of 12 and 16 with at least a four year age difference.

Sex crimes against children represent a small proportion of all federal criminal sentencings. During 1995, 58 defendants were sentenced for child pornography offenses, representing 0.2% of the total number of federal sentencings that year.[1]  Six defendants were sentenced for transportation of a minor, representing 0.02% of all federal sentencings.  In the same year, 145 defendants were sentenced for some form of criminal sexual abuse of a victim under 18 years of age,[2] representing 0.4% of all federal sentencings in 1995.

Federal sexual abuse convictions also represent a small proportion of the total number of nationwide convictions for sexual abuse of minors.  Using the most recently published data, it is estimated that in one year there were approximately 8,662 convictions for the rape of a minor in state courts.[3]  Based on this estimate, federal convictions would account for approximately 1.6% of such convictions nationwide.  Because data are not available, similar comparisons cannot be undertaken regarding pornography offenses.

### 3.    Table of statutes, guidelines, and sentences

As a quick reference, Table 1 on page 4 displays the statutes punishing sex offenses against children and the corresponding sentencing guidelines that are discussed in this report. Offenders convicted under a particular statute may be sentenced under another guideline through

---

[1]The total number of cases sentenced during fiscal year 1995 was 38,500.  UNITED STATES SENTENCING COMMISSION ANNUAL REPORT 1995 36, Table 8.

[2]The criteria for inclusion of these cases was (1) they were sentenced during fiscal year 1995, (2) they included a conviction under 18 U.S.C. §§ 2241-2244, and (3) the victim was less than 18 years old.

[3]State court data on the number of sexual abuse cases involving a minor victim is not available at the national level.  An estimate was derived on the number of these cases using information on state court convictions and offense characteristics of state prison inmates, as reported in two recent publications by the Bureau of Justice Statistics (BJS).  These two publications represent the most current information available on all state court actions and state prison populations.  The BJS reported 21,655 rape convictions in state courts during 1992. BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SOURCEBOOK 1994, Table 5.46 (1995). BJS recently published a monograph on crimes involving child victims.  BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CHILD VICTIMIZERS: VIOLENT OFFENDERS AND THEIR VICTIMS (March, 1996).  This report, based upon a survey of inmates in state prisons conducted during 1991, found that approximately 40 percent of prison inmates incarcerated for forcible rape committed their crimes against a victim less than 18 years of age.  *Id.* at 1.  Applying this proportion (40%) to the number of state convictions for rape (21,655) yields an estimate of 8,662 state rapes involving victims under 18 years of age.  The 145 federal cases in 1995 include a broad range of sexual behavior, including sexual contact, statutory rape and rape.  State convictions for forcible rape likely do not include the less severe offense conduct used in the federal analysis.  As a result, 8,662 may under-represent the total number of state court convictions for offenses similar to the 145 federal cases analyzed.

the operation of cross references contained in the *Guidelines Manual*. These cross references are listed, as are the number of cases sentenced under each guideline from 1994 through 1995, the current base offense levels (BOLs), the BOLs as amended in the proposals sent to Congress this year, the sentencing guideline ranges corresponding to each year, and the average sentences that have been imposed for each offense. The BOL is the basic sentence range without any adjustments or aggravating factors such as criminal history, age of the victim, etc. As reflected in the average sentence column, most offenders receive sentences longer than the BOL based on these aggravating factors. More detailed descriptions of the statutory provisions covered by these guidelines are provided in later sections of this report.

### 4.    Methodology

All 1994 and 1995 cases with convictions for the above referenced statutes were analyzed for this study – a total of 469 cases. Of these, 423 met the statutory criteria and involved victims of less than 18 years of age. Information already collected as part of the regular Commission Monitoring Database was supplemented by collecting additional information relevant to the proposed amendments. Information was gathered concerning:

- the nature of the offense conduct (*e.g.* the extent of pornography trafficking activity)
- whether a computer was used in the offense, and if so, how
- the impact of any plea agreement on the sentence
- the location of the sentence within the guideline range
- the type of assistance offered by defendants receiving a substantial assistance departure
- the criminal history of the offender, especially regarding sex offenses
- information regarding any pattern of sexual abuse or sexual exploitation of children
- information concerning any substance abuse or mental disorder of the defendant
- whether the offense conduct involved prostitution or other prohibited conduct
- the number of victims involved, their ages, and their relationship to the defendant

Each particular sentencing guideline raises different issues, as discussed in Sections devoted to each guideline below. Section E analyzes the use of computers in sexual offenses against children. Section F discusses the use of criminal history and other factors used in identifying repeat sex offenders. Section G contains recommendations for amendment of current statutes and guidelines.

R8

**Table 1: Statutes and Guidelines Concerning Sex Offenses Against Children**

| Statutes | Guideline | Cross Reference(s) | Number of Analyzed Cases*** | Current BOL (Sentence Range in Months)* | Proposed BOL (Sentence Range in Months)** | Current Average Sentence (Months) |
|---|---|---|---|---|---|---|
| 18 U.S.C. §§ 2241; 2242; 2423(b) | 2A3.1 criminal sexual abuse | 2A1.1 | 130 | 27 (70-87) | No change | 130 |
| 18 U.S.C. §§ 2243(a); 2423(b) | 2A3.2 criminal sexual abuse of a minor (statutory rape) | 2A3.1 | 52 | 15 (18-24) | No change | 21 |
| 18 U.S.C. § 2244(a)(1),(2),(3) | 2A3.4 abusive sexual contact | 2A3.1; 2A3.2 | 103 | 10-16 (6-27) | No change | 22 |
| 8 U.S.C. § 1328; 18 U.S.C. §§ 2421; 2422(b); 2423(a) | 2G1.2 transportation of a minor for purposes of prostitution or prohibited sexual conduct | 2A3.1; 2A3.2; 2A3.4; 2G2.1 | 10 | 16 (21-27) | 19 (30-37) | 44 |
| 18 U.S.C. § 2251 (a),(b),(c)(1)(B) | 2G2.1 sexual exploitation of a minor by production of material | | 22 | 25 (57-71) | 27+2 for computer use (70-87) | 79 |
| 18 U.S.C. §§ 2251(c)(1)(A); 2252(a)(1),(2),(3) | 2G2.2 trafficking in child pornography | 2A3.1; 2A3.2; 2A3.4; 2G2.1 | 66 | 15 (18-24) | 17+2 for computer use (24-30) | 29 |
| 18 U.S.C. § 2252(a)(4) | 2G2.4 possession of child pornography | 2G2.1; 2G2.2 | 24 | 13 (12-18) | 15+2 for computer use (18-24) | 15 |

\*   The sentencing range listed would apply only to first-time offenders and does not reflect any of the adjustments that may result in a higher or lower sentence.

\*\* The sentencing range listed would apply only to first-time offenders and does not reflect either the adjustments that may result in a higher or lower sentence or the two-level increase listed for computer use.

\*\*\* Sixteen additional cases convicted under the pornography statutes were cross-referenced to the sexual abuse guidelines.  These cases were not included in the analysis of the sexual abuse guidelines because Congress requested an analysis of cases by statute of conviction.

### B.    PORNOGRAPHY

#### 1.    Statutory provisions

As shown in Table 1, several statutory provisions relate to the sexual exploitation of a minor through the production, trafficking, and possession of pornography.  These are sentenced under guidelines in Chapter Two, Part G, Sections 2.1- 2.5.  This report is limited to those provisions that are the subject of directives in the SCACPA. Offenses under 18 U.S.C. § 2251 generally cover conduct relating to the production of visual depictions involving minors engaged in sexually explicit conduct.  The penalty for a violation of § 2251 is imprisonment of not more than 10 years, a fine, or both.  The penalty for a violation of § 2251 if the defendant has a prior conviction under chapters 109A or 110 of such title is a fine, imprisonment of between five and 15 years, or both.

Subsections (a) and (b) of 18 U.S.C. § 2251 apply when the offense directly involves minors in the production of pornography.  Subsections (c)(1)(A) and (B) apply to publishing notices or advertisements either to traffic in child pornography or to participate in its production. Sections 2252(a)(1), (2) and (3) cover trafficking or receipt of child pornography.  The penalty for these offenses is imprisonment of not more than 10 years, a fine, or both.  If the defendant has a prior conviction under chapters 109A or 110, the sentence is imprisonment of between five and 15 years. The final section, § 2252(a)(4), concerns possession of child pornography.  The statutory penalties for this section are imprisonment of not more than five years, a fine, or both.

#### 2.    Indexing and cross references among statutes and guidelines

Child pornography offenses covered by this study are sentenced under three guidelines. Guideline 2G2.1 concerns the production of child pornography, §2G2.2 concerns trafficking and receipt, and §2G2.4 concerns possession.  The production guideline generally entails the most severe punishment, with a base offense level of 25.  The trafficking/receipt guideline has a base offense level of 15, and the possession guideline has a base offense level of 13.

The statutory index in the *Guidelines Manual* assigns cases to the guideline that is deemed most appropriate, given the conduct charged in the count(s) of conviction.  However, because offenders sometimes are convicted under statutes that do not accurately describe their actual offense conduct, many guidelines have cross references to guidelines with higher offense levels. This ensures that the guideline sentence will more appropriately fit the seriousness of the actual criminal conduct.  For example, the trafficking/receipt guideline has a cross reference to the production guideline "[i]f the offense conduct involved causing . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," and if the resulting offense level is greater than it would be under the trafficking/receipt guideline.

R10

### 3.    Production Guideline 2G2.1

#### a.    Analysis of Sentences Imposed

This guideline has a base offense level of 25, a four-level enhancement if the offense involved a minor under 12 and a two-level enhancement if the minor was 12 or older but had not attained the age of 16.  It also includes a two-level enhancement if the defendant was a parent, relative, or legal guardian of the minor or if the minor was in the custody, care, or supervisory control of the defendant.  A special instruction is included to increase punishment for multiple victims.

Thus, if the defendant used a minor under 12 in the production of sexually explicit material, the offense level would be 29.  A first time offender would face a sentence of imprisonment of between 87 and 108 months.  If more than one minor under 12 was exploited, the defendant's guideline range would be 108-135 months.  If the court granted a three-level downward adjustment for acceptance of responsibility, the guideline range would be 63-78 months and 78-97 months, respectively.

During 1994 and 1995, a total of 22 defendants were sentenced under this guideline. About two-thirds of the defendants (n=14) were so sentenced because they were charged and convicted of offenses referenced directly to this guideline.  The remaining third were convicted of less serious charges but were nevertheless cross-referenced to the pornography production guideline from either §2G1.2 (n=2), §2G2.2 (n=2), or §2G2.4  (n=4).  The average prison sentence for these cases was 79.2 months.  Eighty-one percent were sentenced within the guideline range.  These 17 cases were distributed uniformly across the entire range.  Nineteen percent (n=4) received either a substantial assistance departure (n=2) or other downward departure (n=2). No cases received an upward departure.

The amount of prison time that is appropriate for these offenses is a policy judgment to be made by Congress and the Sentencing Commission.  This judgment can be informed, however, by data on how the range of punishments available under the present guidelines are being used. Increasing offense levels far above that which is believed to be appropriate by practitioners in the courts could lead to improper charges or departures intended to result in lower sentences. [4]

A review of the legislative history of 18 U.S.C. § 2251, beginning with its enactment in the Protection of Children Against Sexual Exploitation Act of 1977, reveals that Congress intended to criminalize the use of foreign or interstate commerce [5] for the production of child

---

[4] For a review of such problems with other federal penalty statutes, see Stephen J. Schulhofer, *Rethinking Mandatory Minimums*, 28 WAKE FOREST L. REV. 199 (1993).

[5] In the report accompanying the Protection of Children Against Sexual Exploitation Act of 1977, the Senate Judiciary Committee stated, "[t]he committee is aware that Section 2251 may literally encompass isolated, individual acts involving the use of children in the production of

pornography, whether or not (1) the scale of the operation was large-scale or small-scale, [6] or (2) involved a commercial purpose. [7]

In about half of the cases, production involved engaging in a sexual act with one or several victims. However, these production cases generally do not reach the scale of commercial pornography. The production guideline makes no distinction between production for commercial purposes and production for personal, non-commercial use. Only a minority of cases sentenced under this guideline involve the production of pornography for commercial distribution. The following is the most extreme example we reviewed of a defendant attempting professional publication.

> *Case 212899. Defendant met young boys through the Big Brother organization and through trips to Mexico and Thailand. Numerous photographs were taken and developed by the defendant of at least 14 boys, appearing to be between the ages of 10 to 18. The photos depicted the boys posing nude, engaged in masturbation, or in mutual masturbation or oral sex with the defendant. Defendant also possessed commercially made child pornography from the 1960s, 1970s and early 1980s. Two letters dated from the early 1980s, one from a pornography publisher in Sweden and the other in Denmark, indicate that the defendant had tried to get some of his photographs published in these countries. However, the photographs were rejected. Defendant had no criminal history. Offense level was 30 (BOL 25, + 4 for victim under 12, + 4 for multiple counts, - 3 for acceptance of responsibility). Defendant was sentenced near top of the 97-121 month guideline range, 120 months.*

Some defendants are sentenced under the production guideline by means of a cross reference, although they are convicted of receiving or possessing child pornography. For example, searches of the home of persons arrested after receiving a controlled delivery of pornographic materials may uncover photographs taken by the defendant for his own use. In such cases, the defendant's act of taking the photograph can be sufficient for the application of the production guideline.

> *Case 193448. Records from a mail-order pornography operation indicated the defendant had ordered 22 pornographic items involving juveniles. Defendant was*

---

sexually explicit materials. Section 2251 is not intended to reach all such isolated incidents, which often are more appropriately the subject of state or local concern. The Committee fully intends that federal prosecutors will wisely exercise their discretion to reach only those cases which are the proper subject of Federal concern."

[6]*See* S. Rep. No. 438, 95th Cong., 1st Sess. (1977), reprinted in 1978 U.S.C.C.A.N. 40, 47.

[7]*See* H.R.. Rep. No. 536, 98th Cong., 1st Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 492, 493.

*sent a solicitation from a Postal Inspection Service undercover operation, from which he then ordered a video tape and a magazine containing explicit sexual contact between minors, some of which were under age 12. After a controlled delivery, a search of the defendant's home uncovered these materials as well as five Polaroid photographs of a partially clothed 15-year-old male. Although the defendant was convicted of receiving child pornography, the court sentenced him under the production guideline. Offense level was 24 (BOL 25, + 2 for victim under 16 at time photos taken, - 3 for acceptance or responsibility). Two previous convictions for minor theft resulted in a criminal history Category I. Defendant was sentenced at the bottom of the guideline range, 51 months.*

### b.    Amendments submitted to Congress in 1996

In response to the Congressional directives contained in the SCACPA, the Commission adopted and submitted guideline amendments to Congress on April 30, 1996. [8]  With respect to the production guideline, the Commission increased the base offense level in §2G2.1 by two levels for offenses under 18 U.S.C. § 2251.  Based on Commission data discussed above about the use of the range of punishments available under the present guidelines, the Commission does not recommend an increase of more than two levels at this time.

The Commission also performed a prison impact analysis to discover how many "person-years" of prison resources will be required by the two-level BOL increase forwarded to Congress on April 30, 1996.  Person-years is a standardized measure of the prison resources required to sentence one year's cases under a particular guideline.  This increase will require the Bureau of Prisons to house the 13 people sentenced under the guideline in a typical recent year for about 16 months longer than under current practice.

In addition to implementing the directives contained in the SCACPA, the Commission added a two level enhancement in §2G2.1 if a computer was used to solicit participation in sexually explicit conduct by or with a minor for the purposes of producing a visual depiction of that conduct, in violation of 18 U.S.C. § 2251(c)(1)(B).  Finally, the Commission recommends that Congress raise the statutory maximum penalties for child pornography production offenses under § 2251 from ten years to fifteen years for the reasons discussed below in Section G.

### 4.    Trafficking/Receipt Guideline 2G2.2

### a.    Analysis of sentences imposed

The trafficking/receipt guideline takes a different approach to apportioning punishment than does the production guideline just discussed.  Although it has a base offense level of 15 (in contrast to the production base offense level of 25), there are a number of very significant

---

[8] Amendments to the Sentencing Guidelines for United States Courts, 61 Fed. Reg. 20,306 (1996).

adjustments that can more than double the offense level, resulting in a sentence that is approximately five times higher than the guideline range using the base offense level alone. There is an enhancement of at least five levels for distribution, and offenses involving the distribution of material valued at more than $40,000 are enhanced further. A two-level enhancement is provided if the material involved a prepubescent minor or a minor under the age of 12, and a four-level enhancement is added if the material involved sadistic or masochistic conduct or other depictions of violence. A five-level enhancement is provided if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. In addition, the commentary in the Application Notes invites an upward departure if the defendant abused a minor at any time.

Thus, under these provisions, if the defendant distributed child pornography that involved a prepubescent child or a child under the age of 12 the offense level would be 22. With a three-level adjustment for acceptance of responsibility, the guideline sentencing range for a first offender would be 30-37 months. However, if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, a five-level enhancement would be added to the offense level of 22, making the defendant's offense level 27. With a three-level acceptance of responsibility adjustment, the guidelines would call for a sentence of between 51-63 months.

During 1994 and 1995, a total of 66 defendants were sentenced under guideline 2G2.2. Sixty-five defendants were so sentenced because they were charged and convicted of offenses referenced directly to this guideline. The remaining defendant was convicted of less serious pornography possession charges but was nevertheless cross-referenced to this guideline from §2G2.4. The average prison sentence for these defendants was 28.5 months. Fifty-four percent of the defendants were sentenced within the guideline range; 20 received a sentence within the first quarter of the range. Approximately 38 percent (n=25) received either a substantial assistance departure (n=10) or some other downward departure (n=15). Five defendants received an upward departure based on prior sexual abuse or sexual exploitation of a minor.

Among the defendants sentenced under the guideline, seven received the enhancement for a pattern of activity involving the sexual abuse or exploitation of a minor. Based upon information in the defendants' case files, the Commission identified 14 cases in which it appears that the pattern of activity adjustment could have been applied but was not. Case review further determined that 8 of the 66 defendants sentenced under this guideline could have been sentenced under the production guideline because they were found in possession of pornographic photographs taken by them for their own personal use.

b.    **Amendments implementing Congressional directives**

The SCACPA directed the Commission to increase the base offense level for trafficking and receipt offenses by at least two levels and to add a two-level enhancement for the use of a computer in such cases. The Commission carried out this directive and submitted the proposed amendments to Congress on April 30, 1996. Based on the data described above, the Commission does not recommend an increase in the base offense level of more than two levels at this time.

### c.    Additional amendment submitted to Congress in 1996 to clarify and expand the "pattern of activity" adjustment

Under §2G2.2(b)(4), a defendant sentenced under the trafficking/receipt guideline who engaged in a "pattern of activity involving the sexual abuse or exploitation of a minor" would receive a five-level enhancement. A review of case files, hotline calls, and appellate case law shows that this enhancement is being interpreted inconsistently. Questions arise regarding the scope of the pattern of activity that is to be considered (*i.e.*, does it include prior convictions or only unconvicted activity? is it limited to behavior within the relevant conduct for the offense of conviction or can it include conduct from many years ago?) Other questions involve the meaning of the terms "sexual abuse" and "sexual exploitation."

Most courts appear to give the enhancement only if the defendant had a pattern of sexually abusing a minor or actually exploiting a minor through taking pictures or filming videotapes. However, case analysis shows that courts do not always make the adjustment even in cases involving repeated sexual abuse. On the other hand, at least one court made the adjustment on the basis of repeated trading of pornographic pictures. The defendant appealed application of the adjustment to the First Circuit, which held that the term "sexually exploited" as used in §2G2.2 does not include the computer transmission of child pornography. In addition, the court held that the pattern of activity must relate to the offense of conviction. Thus, prior convictions or uncharged incidents of sexual abuse cannot alone trigger the enhancement. United States v. Chapman, 60 F.3d 894 (1st Cir. 1995).

In response to the second part of this ruling and other evidence of inconsistent and overly limited application of the adjustment, the Commission sent Congress an amendment to clarify the meaning of "pattern of activity" and ensure increased punishment for all offenders who engage in a pattern of sexual exploitation of children. This amendment is discussed in Section G below.

### d.    Amendments currently under consideration by the Commission

#### i.    Clarify the definition of "distribution" of pornography

The current trafficking/receipt guideline includes a five-level increase if the offense involved distribution. Application Note 1 states that " 'Distribution,' as used in this guideline, includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute." It is unclear whether Application Note 1 was intended to limit distribution to acts of a pecuniary nature, and the Department of Justice reports that the application note is sometimes read as being inapplicable to non-pecuniary distribution. Many cases sentenced under this guideline involve trading clubs or other barter types of exchanges. Section G below discusses a change the Commission is considering to provide that both distribution for money and non-pecuniary distribution should receive the five-level enhancement.

#### ii.    Consolidate the trafficking/receipt and possession guidelines

Based on our review of child pornography cases sentenced under the guidelines, there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases. Indeed, all material that is possessed must at some point have been received (unless it was produced, in which case the defendant would be sentenced under the more severe production guideline). It appears that whether the defendant is charged with receipt or possession depends in part on the investigation techniques used to make the case. For example, receipt is easily proven in "sting" cases, but only possession may be provable as a result of a search based on information from a confidential informant. Current statutes and guidelines, however, require that receipt cases be sentenced under the trafficking/receipt guideline, which has a BOL two levels higher than the possession guideline. The following is an example of a receipt case sentenced under the trafficking/receipt guideline.

> **Case 227339.** *The defendant responded to an advertisement placed in <u>The Kinky Marketplace</u> by a U.S. Postal inspector. The defendant requested a tape depicting one hour of incest and forwarded a blank tape and $80. The undercover inspector sent a return letter asking for verification that the defendant was not an undercover officer as well as the type of "action" in which he was interested. The defendant said he was interested in family incest between parents and their children, and described in explicit detail the sort of sexual scenes he wanted to see. A controlled delivery was made to the defendant's home. After the defendant removed the package from his mail box and carried it inside, the U.S. Postal inspectors executed a search warrant at the residence. Inspectors found the tape in addition to literature and photographs of bestiality and literature on incest. Offense level 14 (BOL 15, +2 for minors under 12, -3 for acceptance of responsibility). Defendant had no criminal record. Final sentence 15 months, bottom of the guideline range.*

The Commission reported concern about the disparity in receipt and possession sentences in 1991 when we amended the guidelines so that receipt cases would be sentenced under the possession guideline. As discussed below in Section G, Congress overrode that amendment and directed the Commission to amend the guidelines so that receipt offenses were sentenced under the trafficking guideline, which has a base offense level two levels higher than the possession guideline.

Based on information in the presentence reports reviewed for this study, it appears that there still may be unwarranted disparity in sentences received for similar conduct and that judges have sought to avoid that disparity in some cases. For example, two cases were "referenced" from the receipt to the possession guideline, even though such a cross reference does not exist, suggesting that judges may have sought to avoid the more severe sentences applicable when a defendant is charged with receipt for conduct that is more like possession than trafficking. Only one case sentenced under the trafficking/receipt guideline was cross referenced from the simple possession guideline, whereas 19 cases sentenced under the possession guideline appear to have been eligible for such a cross reference.

In light of these considerations, the Commission is considering an amendment to consolidate the trafficking/receipt and possession guidelines, a recommendation that is discussed more fully in Section G below.

### 5.    Possession Guideline 2G2.4

#### a.    Analysis of sentences imposed

Guideline 2G2.4 was created in response to the Crime Control Act of 1990, which defined the possession of more than three items of child pornography as a federal offense. The guideline has a base offense level of 13 and a two-level enhancement if the material involves a prepubescent minor or a minor under age 12. There is an additional two-level increase if the offense involves possessing ten or more books, magazines, or other items depicting the sexual exploitation of a minor, thereby making the adjusted offense level equal to the base offense level of the trafficking/receipt guideline. Additionally, the guideline allows the court to sentence a defendant convicted of possession of child pornography under the more severe trafficking/receipt or production guidelines when warranted.

During 1994 and 1995, 24 defendants were sentenced under guideline 2G2.4. The average prison sentence for these defendants was 15.4 months. Seventy-five percent of the defendants were sentenced within the guideline range; half of these received a sentence within the first quarter of the range. Twenty-five percent (n=6) received a substantial assistance departure (n=3) or other downward departure (n=3). No defendants received an upward departure.

Information in the case files suggests that 19 of the 22 defendants (86 percent) sentenced under the possession guideline may have been more appropriately sentenced under the trafficking/receipt guideline.[9] Offense conduct typically included the receipt of pornography as well as its possession. In fewer cases, the defendant also used the mail to express an interest in receiving child pornography.

#### b.    Amendments implementing Congressional directives

The SCACPA directed the Commission to increase the base offense level for child pornography possession offenses by at least two levels and to add a two-level enhancement for the use of a computer in such cases. The Commission carried out this directive and submitted the proposed amendments to Congress on April 30, 1996. The Commission does not recommend any

---

[9] In five of these cases the offenders got a two-level increase for possessing ten or more items of child pornography. This means that they received an offense level of 15, which is the base offense level of the trafficking/receipt guideline to which they could have been referenced. Under the trafficking/receipt guideline, offenders are also exposed to additional upward adjustments not available in the possession guideline.

additional amendments at this time based on the data described above and because of the possibility that some possession sentences may increase if the Commission decides to consolidate the trafficking/receipt and possession guidelines. As described below in Section G, the consolidation of the trafficking/receipt and possession guidelines would make several additional increased punishments available in possession cases, such as the two-level upward adjustment for sadomasochistic material and the five-level upward adjustment for a "pattern of activity" involving the exploitation of a minor.

### 6.    The use of substantial assistance motions in child pornography sentencing

Policy statement 5K1.1 and its statutory counterpart, 18 U.S.C. § 3553(e), codify the public policy decision that defendants who assist the government may receive a sentence lower than that called for by the otherwise applicable statutory minimum and guideline range. An otherwise qualifying defendant does not receive the sentence reduction unless the government makes a motion to the court requesting a departure from the guidelines or mandatory minimum. After the government makes the motion, the court must decide whether to reduce the defendant's sentence and how much of a reduction to make.

The SCACPA directs the Commission to "provide an analysis of the type of assistance that courts have recognized as warranting a downward departure from the sentencing guidelines" based on the defendant providing substantial assistance in the prosecution of other persons. The Commission's monitoring data reveal that 15 of 122 cases sentenced pursuant to the pornography guidelines in 1994 and 1995 received such departures. The Commission conducted telephone interviews with federal prosecutors involved in these cases.

Among the benefits from substantial assistance departures that were noted by the government in our interviews were production of physical evidence, identification of other people involved in the production or trafficking of child pornography, new information of trafficking or production in other districts, and other investigative assistance. The most frequent type of cooperation provided by defendants was debriefing the government fully on the criminal activities of others involved in the offense or in similar kinds of misconduct. In one particular case, the defendant, who pleaded guilty to production of child pornography, named five other men who were also involved in the scheme. He also took agents to a warehouse where they discovered the largest cache of child pornography ever seized in the United States. After the other men involved in the production ring learned of the defendant's cooperation, they all pleaded guilty.

In several cases involving the use of computer bulletin boards, the prosecutors told of defendants who would work with agents by going on-line and "talking" to others interested in child pornography. The defendants' computer expertise and knowledge of the child pornography industry, coupled with their willingness to educate the agents, was a tremendous help to the government. Several defendants who were convicted of receipt of child pornography provided the government with names and information about others involved in receiving or distributing child pornography. This information led to referrals, in many instances, to other federal districts where subsequent prosecutions occurred.

Prosecutors commented favorably on the defendants' decisions to cooperate early in the investigation. On numerous occasions, the prosecutors stated that a defendant began to cooperate immediately after arrest. Often, the cooperation began before the defendant retained counsel. All the defendants receiving the departure agreed to testify against someone else, although none of the defendants actually testified. Prosecutors indicated that the testimony was not necessary in many of the cases because the other defendants pleaded guilty as a result of the early cooperation.

Many of the prosecutors interviewed spoke enthusiastically about the law enforcement benefits of substantial assistance. The prosecutors' responses support the viewpoint that §5K1.1 is an effective tool in helping ferret out those who engage in the trafficking or production of child pornography. However, it appears that only a few defendants convicted of child pornography offenses provide this type of assistance.

In summary, (1) few defendants convicted of trafficking or production of child pornography received substantial assistance departures; (2) the defendants' assistance in many of these cases consisted of debriefing prosecutors or agents about others who engaged in similar misconduct; and (3) the defendants' cooperation in most of the cases benefitted the government greatly by leading to other arrests and prosecutions of people involved in the trafficking and production of child pornography.

## C.    TRANSPORTATION

### 1.    Statutory provisions

Several statutory provisions concern the promotion of prostitution or other prohibited sexual conduct involving a minor. Because federal jurisdiction outside of federally controlled lands hinges on the presence of interstate or international commerce, these statutes involve transportation, travel, or coercion or inducement to travel. Jurisdiction may hinge, as in 18 U.S.C. § 2422(b) recently added by the Telecommunications Act of 1996, on the use of a means of commerce such as the mail or the Internet to induce or coerce a minor to participate in prostitution or other prohibited sexual activity. The statute proscribes "any sexual activity for which any person can be charged with a criminal offense" so long as a basis for federal jurisdiction can be shown.

Thus, the range of conduct covered by these statutes is unusually broad. It includes conduct that is subject to prosecution under different statutes if it occurs within the maritime or territorial jurisdiction of the United States. Thus, rape, sexual abuse of a minor, and other offenses that are the subject of other guidelines may be prosecuted under these jurisdiction-based statutes.

The guideline applicable to these statutes, §2G1.2, uses multiple cross references so courts may use different guidelines to sentence for the underlying criminal conduct. This helps to ensure proportionate punishment among offenders convicted under different statutes whose conduct is in

14

fact similar. These cross-references to other guidelines have, however, resulted in some complexity and they have implications for the implementation of the SCACPA, as discussed below.

### 2.    Transportation Guideline 2G1.2

#### a.    Analysis of sentences imposed

Guideline 2G1.2 serves two functions.  First, it is the sentencing guideline for offenses involving the transportation or coercion of minors for purposes of prostitution.  The base offense level and specific offense characteristics are geared to reflect this conduct.

Second, the guideline serves a "routing" function.  Since the jurisdiction-based statutes indexed to the guideline cover a broad range of conduct, cross references in the guideline allow the court to sentence the defendant under the most appropriate guideline for the underlying offense.  The statutes involve both prostitution *and other prohibited sexual conduct.*  The cross references are designed to route the non-prostitution cases to the guideline that best reflects this underlying conduct.

Guideline 2G1.2 has a base offense level of 16.  An enhancement of four levels is provided if the offense involved the use of physical force or coercion.  The guideline also provides a four-level enhancement if the victim is under 12, and a two-level enhancement if the victim is at least 12 but has not attained the age of 16.  An additional two-level enhancement is provided if the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant.  A Special Instruction is included to treat each person transported as if contained in a separate count of conviction.  Application Note 1 also instructs that multiple counts involving the transportation of different persons are not to be grouped together under §3D1.2, thereby ensuring that incremental punishment is provided.

Thus, if the defendant was transporting a minor, age 13, for purposes of prostitution and physical force was used, the offense level would be 22.  With a three-level adjustment for acceptance of responsibility, the guideline range for a first offender would be 30-37 months.  If the defendant's actual offense conduct included transportation of four minors between the ages of 12 and 16 and physical force was evident, the defendant's offense level would be 26.  With the same acceptance adjustment, the guideline range for a first offender would be 46-57 months.

During 1994 and 1995, 10 defendants were sentenced under guideline 2G1.2.  The average prison sentence was 44.1 months.  Seven defendants were sentenced within the guideline range; three received a sentence within the first quarter of the range.  One received a substantial assistance departure and two received other downward departures.  No defendant received an upward departure.

*Case 229798.  A police sergeant investigating the status of four runaway juvenile girls, ages 13-16, discovered that they had left the state with the defendant.  After*

15

*locating and interviewing the juveniles, police determined that the defendant arranged for the victims to perform sexual activities with adult males. The defendant took advantage of the victims' status as runaways to persuade them that prostitution was a means to obtain money.  Offense level was 19 (BOL 16, +2 for victims under 16, + 4 for four victims, - 3 for acceptance of responsibility). Given criminal history Category IV, the Court imposed a final sentence of 57 months in a range of 46-57 months.*

### b.    Amendments implementing Congressional directives

In response to a congressional directive under the SCACPA, the Commission has submitted to Congress an amendment to provide a three-level increase in the base offense level for offenses under 18 U.S.C. § 2423(a).  Based on the data described above, the Commission does not recommend any additional amendments at this time.

## D.    CRIMINAL SEXUAL ABUSE

### 1.    Statutory provisions

Federal sexual abuse crimes range from offensive sexual touching to forcible rape.  The maximum statutory penalties range from six months imprisonment to life imprisonment.  The Commission has promulgated four guidelines to cover these offenses, guidelines 2A3.1-2A3.4. Defendants convicted of federal pornography or transportation offenses whose underlying conduct included sexual abuse are also subject to sentencing under the sexual abuse guidelines via cross references.

Federal statutes divide sexual abuse crimes into aggravated sexual abuse, 18 U.S.C. § 2241, abusive sexual contact, 18 U.S.C. § 2242, and sexual abuse of a minor, 18 U.S.C. § 2243. These provisions were codified as part of the Sexual Abuse Act of 1986.  The aggravated sexual abuse statute, 18 U.S.C. § 2241, and the sexual abuse statute, 18 U.S.C. § 2242, prohibit engaging in sexual acts in the special maritime and territorial jurisdiction of the United States or a federal prison.  The key distinction between these two provisions lies in the means used to commit the crime; *i.e.* the degree of force or coercion that is used.

The aggravated sexual abuse statute, 18 U.S.C.§ 2241, proscribes knowingly causing another person to engage in a sexual act by using force against that other person or by threatening or placing the other person in fear that any person will be killed, seriously injured, or kidnaped. Aggravated sexual abuse can also, however, be committed in ways that do not include using force or threats.  Subsection (b) of the statute punishes (1) knowingly rendering a person unconscious and thereby engaging in a sexual act with that person or (2) administering a drug or some other intoxicant that substantially impairs the ability of the other person to appraise or control conduct and engaging in a sexual act with that person.  In addition, § 2241 makes it an offense to knowingly engage in a sexual act with a person under 12 years of age. Attempts to commit any of

16

these acts are also prohibited by the statute. Aggravated sexual abuse is punished by a fine and up to life imprisonment.

The sexual abuse statute, 18 U.S.C. § 2242, punishes those who knowingly (1) cause another person to engage in a sexual act by threatening or placing that other person in fear (other than that proscribed in the aggravated sexual abuse statute) or (2) engage in a sexual act with another person who is (a) incapable of appraising the nature of the conduct or (b) physically incapable of declining participation in, or communicating an unwillingness to engage in, the sexual act. Attempts to commit any of these acts is also prohibited. Sexual abuse is punished by a fine and up to 20 years imprisonment.

The sexual abuse of a minor statute, 18 U.S.C. § 2243(a), applies to behavior in which participants engage without force or threat. The statute proscribes knowingly engaging in a sexual act, or attempting to engage in an act, with another person who (1) is between 12 and 16 years of age, and (2) is at least four years younger than the defendant. The statutory maximum imprisonment penalty was 5 years until 1990 when Congress raised it to 15 years. Section 2243(b) applies to convictions for criminal sexual abuse of a "person in official custody." The statutory maximum penalty is one year. No cases convicted under this provision in the past two years involved children, so the sexual abuse of a ward guideline has been excluded from this analysis.

In addition to these provisions proscribing "sexual acts," 18 U.S.C. § 2244 proscribes conduct involving "sexual contact." "Sexual contact" is defined in § 2246 as the "intentional touching either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."[10] The penalties for violating the sexual contact statute depend on the same distinctions found in the statutes for sexual acts: ten years imprisonment if the means used would violate § 2241;[11] three years imprisonment if the means used would violate § 2242; two years imprisonment if the conduct would violate § 2243(a); and six months imprisonment if the conduct would violate § 2243(b). Thus, sexual contact is punished less severely than sexual acts, but the same distinctions in culpability, based on the means used and the age or status of the victim, apply to contact as well as to acts.

The Violent Crime Control and Law Enforcement Act of 1994 doubled the statutory penalties for a defendant who violates the provisions of 18 U.S.C. §§ 2241-2243 and who has one or more prior federal or state convictions relating to aggravated sexual abuse, sexual abuse, or abusive sexual contact.[12]

---

[10]    18 U.S.C. § 2246(3) (1994).

[11]    The maximum penalty was raised from 5 years to 10 years in 1988.

[12]    18 U.S.C. § 2247 (1994).

Because of the limited federal jurisdiction over these types of offenses, few sexual abuse cases are prosecuted in the federal courts.  In 1994 and 1995 only 370 defendants were sentenced in federal court for sexual abuse crimes.  Of these, 322 were sentenced under U.S.C. §§ 2241-2244.  Children were the victims in 285 (88.5%) of the 322 cases.  This analysis examines the sentencing practices in these 285 cases.

### 2.    Analysis of  sentences imposed under Aggravated Sexual Abuse Guideline 2A3.1

Guideline 2A3.1 has a base offense level of 27 and represents sexual abuse as set forth in 18 U.S.C. § 2242.  An enhancement of four levels is provided for use of force, threat of death, serious bodily injury, kidnaping or certain other means as defined in 18 U.S.C. § 2241(a) or (b). This includes any use or threatened use of a dangerous weapon. [13]

Several other specific offense characteristics, ranging from two- to four-level increases, are provided to account for victims younger than 16, for victim abduction, and for various degrees of victim injury.  When a victim is entrusted to the defendant, whether temporarily or permanently, a two-level enhancement applies.  The commentary to §2A3.1 states that the enhancement for victimizing a person in the custody, care, or supervisory control of the defendant is to be applied broadly.  Teachers, day care providers, babysitters, or other temporary caretakers are examples of those who would be subject to this enhancement.

The guideline directs the court to sentence a defendant under the first-degree murder guideline (base offense level 43) if the victim was killed under circumstances that would constitute murder under the federal murder statute (18 U.S.C. § 1111) had the offense occurred within the federal territorial or maritime jurisdiction of the United States.  In response to the Violent Crime Control and Law Enforcement Act of 1994, the Commission added commentary encouraging upward departures (1) if the victim was abused by more than one participant, or (2) if the defendant's criminal history includes a prior sentence for conduct similar to the instant offense.

Thus, if the defendant committed forcible sexual abuse of a child less than 12, the offense level would be 35. A three-level downward adjustment for acceptance of responsibility would lead to a sentencing range of  121-151 months.  This sentencing range thus requires a sentence of at least 10 years and one month of imprisonment for a first offender, unless the court finds factors justifying a downward departure.  In one of the most serious child sex crimes contemplated, abduction and rape of a child under 12 in the custody, care, or supervisory control of the defendant, where the victim suffers permanent or life threatening injury, the offense level for a first-time offender would be 45.  With a three-level downward adjustment for acceptance of responsibility, the defendant's sentencing range would be 360 months to life imprisonment.

Analysis of the 150 cases sentenced under §2A3.1 in both 1994 and 1995 reveals that 130 (87%) involved victims under the age of 18.  Of the 130 cases with child victims, sentencing

---

[13]    USSG §2A3.1, comment. (backg'd.).

information is available on 117 cases.  Based on these 117 cases, the average sentence for defendants sentenced under this guideline for offenses that involved a child victim was 130.4 months.

Because federal jurisdiction for sexual offenses is limited to the territorial and maritime jurisdiction of the United States, 82% of offenders sentenced under this guideline are Native Americans.  The ages of the child victims in these cases ranged from 4 years to 17 years, with an average just under 9 years.  An "age of the victim" sentence enhancement was made in 119 cases.  When the offense conduct began, 23 of the victims were younger than 12 and 96 of the victims were between the ages of 12 and 16.  In 120 cases (92%), the victim knew the defendant.  In 73 cases (56%), the victim was in the care, custody, or supervisory control of the victim.  Several of the defendants were either the father, uncle, or other relative of the defendant.  Sixty-nine defendants (53%) were either alcoholics or drug abusers.  In 27 cases (21%), there was more than one victim.

Thirty-eight (32.5%) of the defendants were sentenced outside of the guideline range.  In one case the court made an upward departure  based on the inadequacy of the criminal history score.  In three cases the defendants received a downward departure for providing substantial assistance to the government.  In the remaining 34 cases (30%), defendants received downward departures for other mitigating reasons, including pursuant to plea agreement (15 cases) and diminished capacity (4 cases).  The average sentence for defendants receiving downward departures was 79.6 months.

Of the 79 cases sentenced within the guideline range, 36 defendants were sentenced in the lowest quarter of the guideline range.  The remaining defendants were sentenced as follows: 17 in the second quarter, 6 in the third quarter, and 20 in the highest quarter.

Eighty-seven defendants were in Criminal History Category I, with 13 in Criminal History Category II, 16 in Category III, and 14 in Categories IV, V, or VI.  Twenty-three defendants (18%) had prior convictions for sexual offenses.  A sample of 17 cases was also examined to determine if the defendant had engaged in an ongoing pattern of victimization.  Of these, 10 defendants were found to have engaged in such a pattern.  An example of one such case follows.

**Case 193462.**  *On October 31, 1992, the victim (age 13) was raped by her cousin's stepfather (age 41) on an Indian reservation.  Present were the defendant, his wife and a stepdaughter.  The defendant purchased liquor and gave it to his wife who mixed large drinks for her daughter and niece.  After the victim drank, she was intoxicated and passed out in a chair.  The defendant's wife suggested that her daughter go to a dance at the recreation center.  The victim sat inebriated in the chair and the defendant's wife passed out on the floor.  The defendant grabbed the victim by the arm, carried her to his bedroom, removed her pants and forcibly had intercourse.  The victim told him to stop and attempted to push him off, but the defendant overpowered her.  It was later revealed that, in the past, the defendant had repeatedly raped both of his stepdaughters (the youngest was 12 at the time of the offense).  Between the time of indictment and trial, the youngest stepdaughter*

*was called to testify when she revealed she had been raped four times by the defendant. The offense level was determined to be 40. (§2A3.1: BOL 27, +4 for use of force, +2 for victim in custody, care or supervisory control of the defendant, +2 for victim between the ages of 12 and 16, +2 for obstruction of justice, +3 for multiple count unit adjustment). Defendant had a criminal history category of I and a guideline range of 292 to 365 months. The defendant was sentenced to 300 months.*

The sexual abuse guidelines have the highest downward departure rate in the guideline system.[14]  Thirty percent of defendants receive downward departures for reasons other than substantial assistance.  A large percentage of cases sentenced within the guideline range are sentenced within the lowest quarter of the range.  In addition, as discussed in the following sections, many cases sentenced under other guidelines with lower BOLs appear to include elements of aggravated sexual abuse.

There are many possible reasons why cases which include elements of aggravation are not always sentenced under the most applicable guideline or given the most severe possible sentence. Some reasons relate to the difficulty of obtaining convictions under these statutes (discussed more fully in section D.3.b.i below).  Some prosecutors and judges may be reluctant to impose the full severity of the sexual abuse guideline because the resulting sentences appear too harsh for the unusually complex offense situations typical of federal sexual abuse cases.  Some cases of sexual abuse may include factors not adequately taken into account by the guideline structure or may involve combinations of factors that mitigate the offense.

For example, many offenders sentenced for sexual abuse crimes in federal court suffer from substance abuse (36%, n=103) or mental illness (13%, n=38) or both (17%, n=47).  Often the offender and victim are intoxicated at the time of the sexual conduct.  In federal sexual crimes the victim and offender generally know each other (91%, n=258).  Many times they are related either directly or through an extended family circumstance.  Exposure of the abuse may have exacted a heavy toll on the family, and incarceration for very long periods of time may appear counterproductive to the court.  These and other reasons, discussed more fully below, make it difficult to mandate that practitioners seek the harshest possible punishment in all cases.

### 3.    Sexual Abuse of a Minor Guideline 2A3.2

#### a.    Analysis of sentences imposed

---

[14] *See* U.S. SENTENCING COMMISSION, 1995 ANNUAL REPORT 92, Table 32.

The sexual abuse of a minor guideline is intended to be applied to sexual acts involving minors aged 12 to 16 years that would be lawful but for the age of the victim. The base offense level is 15.   A two-level increase is provided if the victim was in the custody, care, or supervisory control of the defendant.  By cross-reference, the guideline directs the court to sentence a defendant convicted of statutory rape under the more severe aggravated sexual abuse guideline, §2A3.1, if the defendant's conduct would meet the more serious definitions of rape in 18 U.S.C. §§ 2241 or 2242.   Commentary to §2A3.2, identical to that in §§2A3.1 and 2A3.4, encourages an upward departure if the defendant's criminal history includes a prior sentence for conduct similar to the instant offense.

> ***Case 174221.***  *The female victim, age 14, had intercourse on several occasions with the defendant, age 27, while babysitting his children.  The victim stated that she was babysitting for the defendant's children while the defendant and his wife went out drinking.  Later that evening, the victim put the children to bed and fell asleep on the couch in the living room.  At approximately 2 a.m. the defendant returned home alone and woke her up by kissing her.  He then told her to go into his wife's bedroom with him.  Once in the bedroom, the defendant removed his clothes and told the victim to do the same.  She complied and they both got into bed and had intercourse.  The victim said two similar incidents took place a month later. The offense level was determined to be 20 (§2A3.2 BOL 15, +2 for obstruction of justice charge added by judge, not PSR, and +3 for multiple count unit adjustment).  Defendant had a Criminal History Category IV and a guideline range of  51-63 months.  The defendant was sentenced to 60 months.*

The victim in each of the 52 cases sentenced under this guideline in both 1994 and 1995 was a child between 7 and 16 years old, with an average age of 13.2 years.  In 4 of the cases, the victim was less than 12 years old when the conduct began.  The victim was in the custody, care or supervisory control of the defendant in 16 of the cases.  In most cases (92%) only one victim was involved.

In 41 cases (79%), the defendant was sentenced within the guideline range.  Of these 41 cases, 14 were sentenced in the first (lowest) quarter of the guideline range.  The remaining defendants were sentenced as follows: 11 in the second quarter, 1 in the third quarter, and 15 in the fourth quarter.  In ten of the 52 cases (19%), the defendants received departures.  Three defendants received an upward departure resulting in a higher sentence than required by the guidelines.  Defendants receiving an upward departure were sentenced to an average of 44 months (range between 36 months and 50 months).  Reasons cited for the upward departures included: extreme psychological injury, extreme conduct, general aggravating circumstances, and the on-going nature of the activity.[15]   Forty-two cases (81%) were in Criminal History Category I.  The average sentence of imprisonment was 21.3 months.  Ten (20%) of the defendants had prior convictions for sex offenses.

---

[15] In one case, guideline application information was missing.

R26

None of the defendants sentenced under guideline 2A3.2 received downward departures for substantial assistance.  Seven defendants received downward departures for other mitigating reasons. Three defendants receiving downward departures were sentenced to probation.  Four cases received prison sentences ranging from 5 to 28 months.  The average sentence for these four defendants was 14.0 months.  Reasons cited for downward departure included diminished capacity, family ties/responsibilities, isolated incident, and criminal history.

### b.    Issues concerning the sexual abuse of a minor guideline

#### i.    Non-use of the cross reference to the aggravated sexual abuse guideline

A 1992 Commission study showed that approximately 50 percent of the cases sentenced under §2A3.2 at that time involved aggravated sexual abuse conduct more appropriately punished under §2A3.1.[16]  Some cases involved sexual conduct that would be unlawful even if the victim were an adult, such as incest (typically prosecuted under State law; *see also* 18 U.S.C. § 1153), physical force, placing the victim in fear (which is punishable under 18 U.S.C. § 2242), or some other indication of lack of consent on the victim's part.  Few of the cases sentenced under the guideline could be termed consensual sexual conduct.

Following the 1992 study, the Commission added a cross reference to §2A3.2 that would direct courts to sentence defendants under the more severe aggravated sexual abuse guideline, 2A3.1.  The present analysis indicates, however, that the cross reference is not being used as intended.  According to information presented by probation officers in the presentence reports, among the cases sentenced under the guideline, 61 percent involved conduct that could merit a sentence under §2A3.1.   In 19 percent of the cases the conduct occurred before the cross reference became available.  However,  in 42 percent, the cross-reference was available but was not applied.  The courts did not use the cross reference in 1994 and 1995.

As noted in the discussion of guideline 2A3.1 above, there are many possible explanations for why cases are being sentenced under a guideline that results in a lower sentence than the guideline that appears most appropriate.  Practitioners may perceive that guideline as too severe and seek a sentence that they believe is more appropriate.  On the other hand, prosecutors often encounter proof problems in child sexual abuse cases that prevent them from seeking a sentence that would appear to be more appropriate if all relevant conduct were proven at trial or supported by a preponderance of the evidence at sentencing.  Among other things, the proof problems could include the strength of the Government's case, the reluctance of witnesses to testify or the determination that a victim may be harmed more by a trial than by a plea agreement. Many sex offenses involve very young victims.  Forty-six percent (n=150) of the cases analyzed for this report involve victims under the age of ten years; the abuse may have occurred or begun years before being detected.  These victims may not completely recall all the relevant details of the

---

[16] U.S. Sentencing Commission, Child Sex Offense Working Group Report 5 (1992).

abuse, may make for "ineffective" witnesses at trial, or may be further traumatized by a requirement to describe the abuse publicly in court in an adversarial circumstance. Among older victims, issues such as consent, victim intoxication, and unavailability for testimony come into play.

Other reasons, true of sex offenses in general, may help explain why courts do not apply cross references to §2A3.1 from other sex abuse guidelines. Sexual crimes often present the officers of the court with difficult and unusually complex offense situations. These cases present a greater amount of factual "gray area" than the typical federal prosecution. Evidence from hotline calls and case summaries also suggests that practitioners have difficulty interpreting the statutory language of 18 U.S.C. §§ 2241-2242 (aggravated sexual abuse and sexual abuse) which defines the type of force or threatened conduct necessary for the statute and cross reference to apply.

### ii.    Increasing punishment for repetitive acts

Some sexual abuse of a minor cases involve a factor that a number of courts believe warrants increased punishment — a repetitive pattern of abuse. In very few instances is the offense a one-time event. Many of the defendants are family members who have access and opportunity to abuse the victim for several years. For example, in United States v. Big Medicine, 73 F.3d 994 (10th Cir. 1995), the defendant was convicted of 18 U.S.C. § 2243(a) and sentenced under §2A3.2 for having sexual intercourse with and impregnating his 15-year-old stepdaughter. In that case, the defendant admitted to having had sex with his stepdaughter on approximately 75 occasions over a period of four years, beginning when the victim was 12 years old. In another case, United States v. Chatlin, 51 F.3d 869 (9th Cir. 1995), the defendant impregnated his 13-year-old stepdaughter. The court sentenced the defendant under §2A3.2 but departed upward on the basis of the defendant's repetitive conduct, extreme conduct and extreme psychological harm to the victim. The appellate court affirmed the reasons given as a basis for the departure, but reversed the district court's decision on the degree of the departure.

In order to ensure that offenses involving repetitive acts are punished sufficiently, the Commission is exploring several options for enhancing sentences based on a pattern of activity involving the sexual exploitation of a minor. These options will be reviewed in Section G below.

### iii.    Cases involving incest

According to information presented by probation officers in presentence reports, 45 percent of the cases sentenced under §2A3.2 involved incestuous familial relationships. An additional 53 percent were acquaintance relationships. Just two percent of all cases involved defendants and victims that were neither family nor acquaintances.

Cases involving incest often are sentenced under §2A3.2 because they involve convictions under 18 U.S.C. § 2243(a). The guideline was intended to apply, however, to conduct that would be lawful but for the age of the victim. In United States v. Passi, 62 F.3d 1278 (10th Cir. 1995), the defendant was convicted under 18 U.S.C. § 2243(a) for sexually molesting his biological daughter who became pregnant as a result of the molestation. The court affirmed a cross-

reference from guideline 2A3.2 to guideline 2A3.1 on the grounds that the case involved incest, which was not intended to be sentenced under the sexual abuse of a minor guideline since it was not otherwise lawful conduct.

The cases suggest that some incest cases prosecuted under 18 U.S.C. § 2243(a) might be prosecuted under more serious sexual abuse statutory provisions, inasmuch as the offense involves placing the victim in fear. However, if incest cases are appropriately prosecuted under § 2243(a) and sentenced under §2A3.2, it may be that §2A3.2 has not adequately captured the seriousness of this type of offense conduct.

### 4.    Analysis of sentences imposed under Abusive Sexual Contact Guideline 2A3.4

The abusive sexual contact guideline punishes conduct that does not involve a sexual act; *i.e.,* no penetration takes place. The guideline has three base offense levels linked to the sections of the statutes that describe degrees of force and coercion. The BOL is 16 for offenses committed by means set forth in 18 U.S.C. § 2241 (a) or (b); *i.e.,* using force or placing the victim in extreme fear or by other extreme coercion, such as involuntary intoxication. The BOL is 12 if the offense is committed by the means set forth in 18 U.S.C. § 2242, *i.e.,* using lesser threats or taking advantage of victims who are incapable of declining participation. The BOL is 10 in other cases that involve consensual acts with minors or wards.

The guideline includes specific offense characteristics regarding the age of the victim. Section 2A3.4(b)(1) provides a four-level enhancement if the victim is under 12, with a minimum offense level of 16. A two-level enhancement is provided under certain circumstances if the victim was age 12 to 16. A two-level enhancement is provided if the victim was in the custody, care, or supervisory control of the defendant. The commentary encourages a six-level downward departure in cases of consensual sexual contact "[i]f the defendant and the victim are similar in sexual experience."[17]

Thus, if a defendant knowingly engaged or caused sexual contact by force with a child under 12, an offense which carries a statutory maximum penalty of 10 years, the offense level would be 20. With a three-level downward adjustment for acceptance of responsibility, the guideline range for a first offender would be 24-30 months.

During 1994-1995, 115 cases were sentenced under §2A3.4. Of these, 103 (90%) had child victims. Sentencing information was available for 101 of these cases. Most of the defendants were either parents or other relatives of the victims. Forty-six of the defendants received the enhancement for having the victim in their care, custody or control. The average age of the victims was nine years old, with ages ranging between 2 and 16 years. Eighteen percent of the cases involved multiple victims.

---

[17]    Background Commentary to §2A3.4 recommends an offense level of 6.

The average term of imprisonment was 22 months. Seventy-nine defendants (78%) were sentenced within the guideline range. Of these 79 defendants, 36 were sentenced in the lowest quarter of the guideline range. The remaining defendants were sentenced as follows: 16 in the second quarter, 7 in the third quarter, and 20 in the highest quarter. Two defendants received an upward departure. Reasons cited include: several persons were injured, extreme psychological injury, and on-going abuse. Twenty defendants (20%) received downward departures for cited reasons that included general mitigating factors (4 cases) and their plea agreement (7 cases). None of the defendants received substantial assistance departures. Seventy-eight of the defendants were in Criminal History Category I. Six defendants (6%) had convictions for prior sexual offenses.

Like the sexual abuse of a minor guideline, the abusive sexual contact guideline contains a cross reference, directing the court to sentence under a more severe guideline if the defendant's conduct involves a sexual act and not mere sexual contact. For example, a defendant is to be sentenced under §2A3.1 if the court finds that the defendant's conduct involved penetration, no matter how slight, rather than touching alone. The court must then decide the degree of force involved to determine the appropriate offense level. Sentences for sexual acts involving similar degrees of force or coercion are 15 offense levels higher than for sexual contact alone.

According to information presented by probation officers in presentence reports, in 54 percent of the cases sentenced under the abusive sexual contact guideline, the defendant committed acts that could merit sentencing under the aggravated sexual abuse guideline. Fifteen percent of the cases were sentenced before the cross reference was applicable. In 40 percent of the cases, the conduct was rape and the cross reference could have been used, but it was applied in only four cases. In one case a defendant committed conduct which could be sentenced under the sexual abuse of a minor guideline, §2A3.2, but the cross reference was not applied.

## E.    THE USE OF COMPUTERS IN CHILD PORNOGRAPHY DISTRIBUTION

### 1.    Ways that computers can be used to disseminate pornography

This section begins by describing the different ways that computers can be used to disseminate child pornography. The problems identified by Congress that led to a call for increased punishment for computer use are identified, and those uses that most exacerbate these problems are described. Finally, ways to tailor punishments to suit the harm caused by different types of computer use are analyzed.

All of the systems described below can be accessed through a personal computer using widely available communications hardware and software. A modem attached to a personal computer gives access via ordinary phone lines directly to other computers or to an online service provider. The provider then gives access to other computers and to the Internet. Once on the Internet, users have access to its many components, including e-mail, Newsgroups, and the World Wide Web. The following glossary gives a basic introduction to these systems and to their potential abuse.

**Online Services (America Online, Compuserve, Prodigy, Microsoft Network, etc.):**
These private companies provide subscribers with information services, access to the
Internet, and forums for dialogue among subscribers. They expressly prohibit the posting
of any sexually explicit images on the company-owned sites. However, members can
access the Internet through the service and therefore get material that the online providers
cannot regulate. The "private" chat rooms on America Online and Compuserve also
provide an avenue for explicit conversation between subscribers. Companies differ
concerning the accessability of various services. For example, America Online provides
access to the full range of services to each computer/subscriber. Prodigy, however,
permits subscribers to define different access rights for different individuals using the same
account.

**Bulletin Boards (BBS):** A computer that stores information and provides a means for
users at other locations to send and receive files. Bulletin boards preceded public use of
the Internet and provided the earliest widespread means of sharing information among
computers at different locations through the use of modems and regular phone lines. BBS
are created and maintained by individual operators who establish the rules for access and
for the types of material that may be posted. Graphic files may be sent and received from
BBS. Hundreds of thousands of BBS are currently in operation. Some are "wide open,"
meaning that the telephone number to gain access is publicly available, no password is
required, and there are no subscription fees. Others require paid membership, generally
ranging from $10 to $30 a month. Some BBS screen applicants and verify age and other
information (driver's license, place of employment, credit cards) before granting access.
Most BBS contain harmless information, but a small percentage of "adult" BBS contain
pornography. Almost all of these adult BBS require fees and prior membership approval
before they can be accessed.

**Electronic Mail (E-Mail ):** Electronically transmitted mail through use of the Internet.
Senders must address messages to a particular recipient or group of recipients. Many
versions of e-mail software permit the user to attach text, data, sound, or image files when
sending a message. Senders must know the exact destination address to use e-mail.

**Newsgroups (primarily known as Usenet):** News groups are self-forming clubs
organized by hierarchically indexed topics. Persons with the proper Internet access can
browse the list of groups currently in operation, such as alternative sexuality, and read or
post messages for any group. To be routinely sent a news group's messages, a user must
register with that group. Newsgroups are routing lists for e-mail messages, which can
include graphic files in a compressed format.

**World Wide Web (WWW):** A user-friendly, hypermedia system for storing, linking, and
accessing information on the Internet. Information is indexed using several search
techniques. Web browsers, such as Yahoo, provide information directories linking users
to indexed sites. Search engines, such as Netscape, permit searches for particular
combinations of words or phrases. Or users can "surf" from one site to another simply by
clicking on highlighted phrases that connect to other related sites. Each information site

generally contains a homepage that enables users to link to related files to retrieve text, video, graphics and sound. Among the thousands of Websites currently in operation, some are pornography distribution sites. Some sites provide free access to visual images; others provide purchase order forms.

**2.      Public and congressional concerns about pornography and computers**

Media coverage in the past year has highlighted the availability of pornography through computers. For example, a cover story in Time Magazine reported a controversial study of "cyberporn" by Carnegie Mellon researchers.[18] The story claimed that "the adult BBS market seems to be driven largely by a demand for images that can't be found in the average magazine rack: pedophilia (nude photos of children), hebephilia (youths) and what researchers call paraphilia -- a grab bag of deviant material . . . ."

Others dispute that child pornography is available by computer through ordinary channels. In response to a notice posted on the Internet as part of the Commission's study, Aliza R. Panitz, a Website administrator and Internet educator replied: "During the extensive research involved in creating and maintaining the AltSex [alternative sexuality] site, we have come across a fair number of adults-only sites containing erotic images, but we have NEVER found a site containing either erotic images of children or child pornography. While there may well be child pornography accessible through the Internet, it is neither visible to the casual viewer nor accessible through standard search techniques for erotic materials."

The SCACPA increases punishment for use of a computer in child pornography offenses. The legislative history of the Act indicates that Congress had identified four concerns: (1) the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, (2) the increased difficulty of investigation and prosecution by law enforcement officials, (3) the increased likelihood that child pornography will be viewed by and harm children, and (4) the potential for pedophiles to lure children into sexual relationships through the computer.[19] By lengthening sentences, Congress aims to punish and deter these crimes and to remove from the community the persons who perpetrate them.

---

[18] Marty Rimm, *Marketing Pornography on the Information Superhighway: A Survey of 917,410 Images, Descriptions, Short Stories, and Animations Downloaded 8.5 Million Times by Consumers in Over 2000 Cities in Forty Countries, Provinces, and Territories*, 83 GEO. L.J. 1849-1934 n. 5 (1995). A detailed analysis of the conceptual and methodological flaws in the Rimm study is found in Donna L. Hoffman and Thomas P. Novak, *A Detailed Analysis of the Conceptual, Logical, and Methodological Flaws in the Article, 'Marketing Pornography on the Information Superhighway'*, Project 2000 Critique, Version 1.01 [www2000.ogsm.vanderbilt.edu/rimm.cgi] (1995).

[19] *See* H.R. REP. NO. 90, 104th Cong., 1st Sess. 3-4 (1995), reprinted in 1996 U.S.C.C.A.N. 759.

**R32**

### 3.    Cyberporn and culpability

Online pornography comes from the same pool that can be found in specialty magazines or adult bookstores.  Most of the material accessible by computer is scanned from existing print publications, using graphic scanners that are available for less than a thousand dollars.  Thus, the differences between print and computerized porn is not in the content of the images, but in the means of its distribution.  The seriousness of a crime involving computerized trafficking in child pornography depends in part on 1) the degree to which the computer use facilitates the widespread and instantaneous distribution of the images, and 2) the degree to which it increases the likelihood that children will be exposed to the images.

Different types of computer use have different effects on these two harms. "Downloading" cyberporn is similar to receiving pornography through the mail.  Although anyone with a mailbox can receive print pornography, a modem and a computer with graphic capability are needed to receive cyberporn.

There are many different uses of computers to send or distribute images.  At one end are small-scale collectors who freely give or exchange images with like-minded persons through electronic mail.  The advent of computers has probably made the formation of networks of child pornography consumers easier, since such persons can look for each other by "plugging in" to the right chat room, bulletin board, or newsgroup.  Once formed, these networks can operate as underground distribution systems.[20]

At the other end are large-scale, commercial pornographers. Creating and maintaining a BBS or Website with pornography is similar to opening an adult bookstore.  Unlike adult bookstores, however, which may be limited by zoning laws to particular areas or outlawed altogether, cyberstores may be accessed anywhere a computer can be linked to the Internet, depending on the rules for access to the particular BBS or Website.  This accessibility requires that the creators of Websites and publicly accessible BBS be responsible for the potentially greater accessibility of their products.  Some locations on the WWW contain pornographic images of adults and are easily accessible to anyone using standard Web Browsers.[21]  Some locations give warnings that only persons over 18 should enter, while others do not.  As noted above, some BBS screen applicants before granting access, while others are wide open.  Persons who upload, send,

---

[20]  To attract new members, however, such networks must be visible to some degree, which makes them susceptible to surveillance and sting operations conducted by online law enforcement.

[21] Commercial companies have developed products that are designed to allow computer owners to block access to sites on the Web where pornographic images can be found.  The constitutionality of the provisions in the Telecommunications Act of 1995 that prohibit "indecent" communication by computer have been challenged in part based on the availability of such products, which may provide a less restrictive way to regulate such communication.

R33

or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely disseminated or falls into the hands of children.

While the extent of commercial child pornography distribution through computer networks is a matter of dispute, what seems apparent is that a person's culpability depends on *how* they use a computer. Persons who receive images are similar to consumers of print porn who receive packages from acquaintances or go to bookstores to buy dirty magazines. Persons who transmit the images, however, may be mailing a single photo to a friend, or they may be more similar to a person who opens an adult bookstore in every city in the world. Not all computer use is equal. Some uses lead to more widespread dissemination of child pornography and to increased accessibility of pornography and other sexually explicit dialogue to children. Sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's crime.

### 4.    Computer use among federal pornography defendants

Federal cases to date typically do not involve the type of computer use that would result in either wide dissemination or a likelihood that the material will be viewed by children. Of the 22 cases sentenced under §2G2.1, the production guideline, four involved the use of a computer. In two of these cases, the use was limited to the storage of forms (not pornographic images) related to the pornography. In one case, the defendant used the computer to contact another individual interested in child pornography and invited this person to join the defendant and several teenage victims in sexual misconduct. In the remaining case, the computer was used to possess, receive, distribute, and create or enhance images. Additionally, this defendant posted notices on the availability of child pornography and maintained records.

Of the 66 cases sentenced under §2G2.2, the trafficking/receipt guideline, 22 involved the use of a computer. A broad array of computer involvement was found. In some cases, computers were used only to store the pornographic images. In another case, a defendant stored and received the images by computer, posted notices of interest in receiving and sending child pornography, enhanced the images, and distributed the pornography for profit and with the belief that minors would be among the recipients. Of these 22 cases, 17 involved acts of distribution, seven of which were for profit. In nine of the 22 cases, defendants posted notices of interest in receiving child pornography, and in four cases defendants posted notices regarding the availability of child pornography.

Of the 24 cases sentenced under §2G2.4, the possession guideline, nine involved the use of a computer to store or receive the pornographic images.

In summary, of the 112 child pornography cases reviewed for this study, 35 involved the use of a computer. Of these computer cases, 17 involved defendants who had received pornographic images, generally from a BBS. Another 17 cases involved distribution by computer. About half of these cases involved e-mailing a pornographic image to a single recipient, while the

other half  involved creating or maintaining a BBS from which child pornographic images could be downloaded.[22]

### 5.        Punishing the use of computers to spread child pornography

The SCACPA directed the Commission to add enhancements to the guidelines "[1] if a computer was used to transmit the notice or advertisement to the intended recipient or  [2] *to transport or ship the visual depiction*" (emphasis added).  Amendments sent to Congress on April 30, which add a two-level upward adjustment in cases involving a computer, track this statutory language.  This adjustment applies to persons who knowingly receive e-mail containing pornographic images, as well as to those who send the images.[23]  The adjustment does not distinguish between persons who e-mail images to a single voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers.

Congress and the Commission may wish to develop a more finely-tuned system of apportioning punishment in cases involving the use of computers.  For example, an upward departure might be recommended in cases in which a computer was used to widely disseminate pornography, or in which pornography was made accessible to children.  Alternatively, the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes it widely accessible, such as posting it on a BBS or Website.  However, a statutory amendment may be necessary to make these kinds of distinctions because the current statutory directive is aimed broadly at all persons who use a computer to transmit child porn, including receivers and possessors.

The uses of computers are evolving rapidly.  Though the overall numbers remain small, the portion of federal child pornography cases that involved computers grew between 1994 (23%) and 1995 (28%).  The Commission intends to closely monitor the variety of computer uses in pornography distribution and amend the guidelines as appropriate.

---

[22] One case involved the use of a computer to solicit a person to actually engage in sexual acts with minors.

[23] As reported out of the House Committee on the Judiciary, the computer enhancement did not apply to possession offenses.  Section 3 of the bill was amended in the Senate to provide the two-level enhancement for possession offenses under section 2252(a)(4), as well as to trafficking offenses under sections 2251(c)(1)(A) and 2252(a)(1) through (3).  No legislative history explaining the concerns motivating this amendment is available.  The proposed guideline amendment to the possession guideline §2G2.4 limits the adjustment to cases in which the defendant's possession resulted from the defendant's use of the computer.

## F.    TARGETING DANGEROUS OFFENDERS

### 1.    The dangers of sex offenses against children

During 1993, there were approximately 150,000 confirmed cases of sexual child abuse in the United States.[24]  Studies of the adult population have indicated that at least 20 percent of American women and 5 to 10 percent of American men have been the victims of sexual child abuse.[25]  "Most sexual abuse is committed by men (90%) and by persons known to the child (70% to 90%), with family members constituting one-third to one-half of the perpetrators against girls and 10% to 20% of the perpetrators against boys."[26]  A review of international studies of child sexual abuse reported findings that are generally consistent with those cited above.[27]  Children who have been sexually abused often have higher rates of later childhood and adult mental health symptomatology.[28]

In cases involving the sexual victimization of children, special attention must be paid to identifying those offenders who show the greatest risk of victimizing children in the future, so that they can be provided appropriate treatment or incapacitated through extended imprisonment.  The SCACPA requires that the Commission survey the recidivism rate for offenders convicted of committing sex crimes against children, analyze the impact of treatment on recidivism, and determine whether increased penalties might reduce such recidivism.[29]

---

[24]David Finkelhor, *Current Information on the Scope and Nature of Child Sexual Abuse*, 4 FUTURE OF CHILDREN 31-53 (1994).

[25]B. Watkins & A. Bentovim, *The Sexual Abuse of Male Children and Adolescents: A Review of Current Research*, 33 J. CHILD PSYCHOL. & PSYCHIATRY & ALLIED DISCIPLINES 197-248 (1992).

[26]Finkelhor, *supra* note 24, at 31.

[27]David Finkelhor, *The International Epidemiology of Child Sexual Abuse*, 18 CHILD ABUSE & NEGLECT 409-417 (1994).

[28]*See* RONALD M. HOLMES, SEX CRIMES (1991); Finkelhor, *supra* note 27; S. Harter, P.C. Alexander & R.A. Neimeyer, *Long-Term Effects of Incestuous Child Abuse in College Women: Social Adjustment, Social Cognition, and Family Characteristics*, 56 J. CONSULTING AND CLINICAL PSYCHOL. 5-8 (1988); J.A. Bushnell, J.E. Wells & M.A. Oakley-Brown, *Long-term Effects of Intrafamilial Sexual Abuse in Childhood*, 85 ACTA PSYCHIATR. SCAND. 136-142 (1992).

[29]Section 6(4).  The General Accounting Office (GAO) has also been tasked by Congress to study child sex abusers and the impact of treatment on recidivism.  The Commission has focused on general recidivism and GAO will report on the effectiveness of treatment.

### a.    Recidivism among child sexual abusers

A great deal of scientific literature has been published on the likelihood of sexual re-offending among persons committing sexual offenses.  Much of this literature, however, is not conducive to comparisons across studies or straightforward summation of results because of the varied and imprecise study methodologies employed, examples of which include: poorly described subject selection and rejection criteria; poorly (or non-) defined sexual conduct; diverse definitions of recidivism; and varied lengths of follow-up.

Two recent major reviews of the literature on sexual child abuse have been completed.  The first review, conducted by Furby and her colleagues, was published in 1989.  It examined sexual child abuse research from the 1950s onward.[30]  The second major review, focusing on post-treatment recidivism reported since 1989, was published in 1995.[31]  In this latter review, Nagayama Hall analyzed 12 scientific studies (from a pool of 92 studies) that met the criteria of a control group, and specifically reporting recidivism for a sexual offense.

The overall recidivism rate across studies among untreated sex offenders was 27 percent.  This was compared to a sex offense recidivism rate of 19 percent for offenders who had received treatment related to their sexual misconduct.  It is important to note that the range of sexual recidivism in these studies varied widely.  The range of recidivism among the untreated offenders varied between 6 and 75 percent, dependent upon the specific study.  The range for the treated offenders was between 3 and 44 percent.  The average length of follow-up across studies was 6.8 years.[32]

The earlier Furby review, citing the methodological problems described above, did not report overall rates of recidivism.  The authors did however cautiously report several suggestive trends from their analysis:  "(a) The longer the follow-up period is, the greater is the percentage of men who have committed another crime . . . ; (b) There is as yet no evidence that clinical

---

[30]Lita Furby, *et al.*, *Sex Offender Recidivism: A Review*, 105 PSYCHOL. BULLETIN 3-30 (1989).  The authors reviewed 42 primary study sources and 13 secondary sources.

[31]Gordon C. Nagayama Hall, *Sexual Offender Recidivism Revisited: A Meta-Analysis of Recent Treatment Studies*, 63 J. CONSULTING & CLINICAL PSYCHOL. 802-809 (1995).

[32]For purposes of comparison, Harer (1994) examined recidivism of federal prisoners released from the Bureau of Prisons in 1987.  He reported that for all offense types combined, 40.8% repeated offenses within a three-year period.  In this study, only eight sexual offenders were available for analysis and, of these, four repeated offenses.  No information on type of sex crime or type of recidivating event was reported.  Because of the small number of cases and lack of more specific information about the offenders, this data on sex offenders should be interpreted very cautiously.  MILES D. HARER, RECIDIVISM AMONG FEDERAL PRISON RELEASEES IN 1987: A PRELIMINARY REPORT  (Federal Bureau of Prisons, Office of Research and Evaluation, 1994).

treatment reduces rates of sex reoffenses . . . ; [and (c)] There is some evidence that recidivism rates may be different for different types of offenders."[33]

Several authors have noted that a sexual child molester remains at risk of recidivism for very long periods of time.[34]  One author, who followed sexual offenders for up to 10 years, reported that "there is no evidence of burn out and risk was as great in the seventh year, for example, as it was in the first."[35]

### b.     Commission data on recidivism among federal child sex offenders

Of the 138 cases indexed to the pornography and transportation guidelines, about 20 percent had a prior sex-related conviction. Twenty percent of transportation cases involving prostitution and 13 percent of pornography defendants had a history of sexual misconduct. Higher rates of prior records were found in offenders who were cross-referenced from these guidelines to the sexual abuse guidelines.  It appears that *some* defendants sentenced under *each* of the guidelines exhibit a pattern of recidivism.

Among the 285 defendants analyzed under the sexual abuse guidelines, 14 percent (39 cases) had a prior conviction for a sexual offense. In 64 percent of the 39 cases, the prior sex crime was against a child.  The rate of sex crime recidivism was about the same for aggravated sexual abuse and sexual abuse of a minor (18% and 19%, respectively) and substantially lower for abusive sexual contact (6%).  The likelihood that a child was the prior victim was high for all three guidelines (65% of §2A3.1 sexual recidivists (15 cases), 70% of §2A3.2 sexual recidivists (7 cases), and 50% of §2A3.4 sexual recidivists (3 cases)).

### 2.     Current guidelines take multiple approaches to targeting dangerous offenders

The key to wise use of prison resources is to target those offenders who present the greatest risk of continued harm to society for the lengthiest incarceration.  The current guidelines adopt varied, and sometimes inconsistent, approaches to this task.  The criminal history guidelines in Chapter Four of the *Guidelines Manual* count previous convictions for sex offenses against children just as they count other previous offenses that fall within the rules governing criminal history points.

---

[33]Furby, *et al.*, *supra* note 30 at 27.

[34]*See* Nagayama Hall, *supra* note 31; W.L. Marshall & H.E. Barbaree, *The Long Term Evaluation of a Behavioral Treatment Program for Child Molesters*, 26 BEHAV. RES. THER. 499-511 (1988).  *See also*, Robert J. McGrath, *Sex-Offender Risk Assessment and Disposition Planning: A Review of Empirical and Clinical Findings*, 35 INT'L J. OFFENDER THER. & COMP. CRIMINOLOGY 329-350 (1991); and V.L. Quinsey, *et al.*, *Actuarial Prediction of Sexual Recidivism*, 10 J. INTERPERSONAL VIOLENCE 85-105 (1995).

[35]Quinsey, *et al.*, *supra* note 34 at 94.

The criminal sexual abuse guidelines, §§2A3.1-4, take a different approach.  An application note in each guideline states that "[i]f the defendant's criminal history includes a prior sentence for conduct that is similar to the instant offense, an upward departure may be warranted."  *See, e.g.*, USSG §2A3.1, Application Note 7.  In addition, the aggravated sexual abuse guideline recommends an upward departure in cases involving multiple victims or multiple acts with the same victim, if this behavior is not adequately captured by the counts of conviction or by application of the guidelines' grouping rules.  *See* USSG §2A3.1, Application Note 5.

The pornography guidelines take several different approaches to recidivist offenders.  A five-level upward adjustment for "a pattern of activity involving the sexual abuse of a minor" was added to the trafficking guideline in 1992.  However, the courts are applying this adjustment in inconsistent ways.  In addition, the Application Notes to the trafficking guideline contain a broad recommendation for an upward departure "[i]f the defendant sexually exploited or abused a minor at any time, whether or not such sexual abuse occurred during the course of the offense . . . ."  The pornography production and possession guidelines, however, contain no adjustments or application notes concerning high-risk offenders.  As the case analysis shows, high-risk offenders may be convicted and sentenced under any of the pornography guidelines.  There appears to be no reason to limit this type of adjustment to the trafficking guideline, as discussed in the recommendations under Section G below.

### 3.    Risk classification of child sexual abusers

The development of classification systems for sexual offenders serves two primary purposes: 1) evaluation of the risk of repeat offending, and 2)  diagnosis and treatment planning.  The most consistent finding is that criminal history, especially a history of sexual offenses, is the most important and accurate predictor of the risk of future sexual offending. [36]  This is consistent with research on the prediction of other sorts of recidivism.

In addition to criminal history, sexual offenders can be classified by the characteristics of their victim.  Pedophiles are adults who are sexually attracted to children; hebephiles are adults interested in children who are between puberty and adolescence. [37]  The scientific literature has indicated two additional victim characteristics that are important in classifying sexual offenders: 1)

---

[36]R. Karl Hanson, *et al.*, *Long-Term Recidivism of Child Molesters*, 61 J. CONSULTING & CLINICAL PSYCHOL. 646-652 (1993).  Nearly all of these offenders (93%) were followed for at least 15 years and some were followed for over thirty years.  Quinsey *et al.*, *supra* note 34; and Rice, M.E., Quinsey, V.L., Harris, G.T., *Sexual Recidivism Among Child Molesters Released From A Maximum Security Psychiatric Institution*, 59 J. CONSULTING & CLINICAL PSYCHOL. 381-386 (1991).

[37]Holmes, *supra* note 28.

the relationship of the victim to the perpetrator; *i.e.*, whether the abuse is intra-familial or extra-familial, and 2) the gender of the victim.[38]

One long term follow-up study involved 197 child molesters in Canada.[39]  In this study, male offenders were classified  into three groups based on the characteristics of their victims: extra-familial boys; extra-familial girls; and intra-familial (incest).  During the period of follow-up for these offenders, 42 percent were subsequently reconvicted of a sexual offense, a violent offense or both.[40]  An important finding was that risk of recidivism varied by group.  Offenders against boys were at significantly higher risk of recidivism than incest offenders or offenders against girls.  For incest offenders, the recidivism rate was lower than for offenders against extra-familial girls,  though not at a statistically significant level.[41]  This general pattern of greater risk for extra-familial offenders has been replicated by other researchers, though evidence on the importance of the gender of the victim is inconsistent.[42]

Efforts are under way to extend and improve classification of sexual misconduct through the use of physiologic (*e.g.* phallometric response to erotic stimuli) and psychologic (*e.g.* clinical interview, personality tests, etc.) measures.  McGrath (1991) offers a decision tree framework for assessing the risk of sexual recidivism.  He includes for consideration a broad array of factors such as: presence of other severe psychopathology (*e.g.* psychosis); presence of substance abuse disorders; use of force or violence; presence of ritualistic or bizarre offenses; denial of current offense; treatment refusal; numbers of victims; presence of other paraphilias; stability of environment; deviant sexual arousal patterns; prior criminal activity (both sexual and non-sexual); etc.  He reviews the scientific literature supporting these elements as relevant in a classification

---

[38]The extra-familial versus intra-familial characteristic appears to be the more certain criterion for evaluating risk of recidivism at this time.  The literature on the predictive impact of sex of the victim on recidivism, given that the victim is extra-familial, is mixed.

[39]Hanson *et al., supra* note 36.  Nearly all of these offenders (93%) were followed for at least 15 years and some were fellewed for over 30 years.

[40]In this and other studies examining sexual recidivism, both sexual and violent offenses are generally included in an effort to account for charge bargaining practices.  When reporting results, known sexual recidivism and violent recidivism are described separately.

[41]Hanson, *et al., supra* note 36 at 649.  The specific rates of recidivism for these offender types was presented only in chart form.  It appears that the recidivism rates (and approximate durations of follow-up for these groups), by victim relationship/sex, were: 65% of offenders victimizing extra-familial boys recidivated over a 20 year period; 50% of offenders victimizing extra-familial girls recidivated over a 30 year period; and 25% of incest offenders recidivated over 20 years.

[42]Marshall, *et al., supra* note 34.

model, but a test of the predictive validity has yet to be performed. [43]  Likewise, Prentky and colleagues at the Massachusetts Treatment Center are developing classification models for adult rapists that focus on specific elements of the crime and include measures of lifestyle impulsivity in the decision matrix.[44]

Most research on risk-classification is retrospective; that is, it classifies offenders after the recidivating event and attempts to identify differences that were present before the event. [45]  Some studies have attempted to make retrospective "predictive" classifications.  Rice and colleagues (1991) reported results on the accuracy of a measure (including personal, psychological, criminal and sexual preference characteristics of the offender) on "predicting" recidivism.  They reported that 80 percent of the offenders could be correctly classified with this method. [46]

### 4.    Implications for sentencing policy

Research should be monitored so that reliable results can be incorporated into sentencing policy.  At this time, however, the data are insufficient to base sentencing policy on these methods of classification.  Classification tools have two measures of accuracy: 1) sensitivity, *i.e.*, the ability of a tool to avoid "false negative" errors by correctly identifying the persons who *will* recidivate; and 2) specificity, *i.e.*, the ability of a tool to avoid "false positive" errors by correctly excluding persons who *will not* recidivate.  Generally, a classification tool performs better either in its sensitivity or specificity.  For example, sensitivity can be improved but at the cost of labeling

---

[43]McGrath, *supra* note 34.

[44]Robert A. Prentky, *et al., Predictive Validity of Lifestyle Impulsivity for Rapists*, 22 CRIM. JUST. & BEHAV. 106 (1995); Robert A. Prentky & Raymond A. Knight, *Identifying Critical Dimensions for Discriminating Among Rapists*, 59 J. CONSULTING & CLINICAL PSYCHOL. 643-661 (1991); Robert A. Prentky, *et al., Development of a Rational Taxonomy for the Classification of Rapists: The Massachusetts Treatment Center System*, 13 BULL. AM. ACAD. PSYCHIATRY & L. 39-70 (1985).

[45]*See, e.g.,* Quinsey, *et al., supra* note 34; Hanson *et al., supra* note 36; Rice, *et al., supra* note 36; R. Karl Hanson, *et al., A Comparison of Child Molesters and Nonsexual Criminals: Risk Predictors and Long-Term Recidivism*, 32 J. RES. CRIME & DELINQUENCY 325-337 (1995); Janice Marques, *et al., The Relationship Between Treatment Goals and Recidivism Among Child Molesters*, 32 BEHAV. RES. THER. 577-588 (1994); and Fred S. Berlin & Carl F. Meinecke, *Treatment of Sex Offenders with Antiandrogenic Medication: Conceptualization, Review of Treatment Modalities, and Preliminary Findings*, 138 AM. J. PSYCHIATRY 601 (1981).

[46]Rice *et al., supra* note 36.  The authors also a report a statistic which assesses the classification ability of the tool accounting for the chance probability of correct classification.  They reported that their measures had a relative improvement over chance of 55%.  That is, in a coin toss situation (two outcomes), this instrument would be better than chance 55% of the time.  Given an equal probability of outcome (a coin toss), a correct prediction of the result of the toss would occur approximately 78 out of 100 tosses.

some offenders as potential recidivists who would not repeat the crime. Evaluating a classification system depends on the costs associated with the two types of errors.

From an incapacitation perspective, research presently supports targeting for lengthier incarceration those offenders who have a history of prior sexual misconduct against children. The guideline criminal history score is one method for focusing on repeat offenders. In addition, as discussed in the recommendations below, expansion of the "pattern of activity" adjustment now found in the pornography trafficking/receipt guideline would also improve the sensitivity of the guidelines with minimum damage to their specificity.

## G.    RECOMMENDATIONS

### 1.    Guideline amendments submitted to Congress in 1996

#### a.    Amendments implementing Congressional directives

The Commission carried out the congressional directives contained in sections 2, 3, and 4 of the SCACPA by adopting and submitting guideline amendments to Congress on April 30, 1996.[47] In particular, the Commission (1) increased the base offense levels in §§2G2.1, 2G2.2, and 2G2.4 by two levels for offenses under 18 U.S.C. §§ 2251 and 2252, (2) increased the base offense level in §2G1.2 by three levels for offenses under 18 U.S.C. § 2423(a), and (3) provided a two-level enhancement in §§2G2.2 and 2G2.4 for the use of a computer in child pornography trafficking, receipt, and possession cases.

#### b.    Additional amendments to improve the guidelines

In addition to implementing the directives contained in the SCACPA, the Commission adopted other amendments in 1996 that were designed to improve the child pornography and transportation guidelines.

##### i.    Enhancement for use of a computer to solicit participation in production

In order to punish for the use of a computer more consistently, the Commission added a two-level enhancement in §2G2.1 if a computer was used to solicit participation in sexually explicit conduct by or with a minor for the purpose of producing a visual depiction of that conduct, in violation of 18 U.S.C. § 2251(c)(1)(B). Thus, persons who induce minors to participate in the production of pornography through computerized "chat rooms" or by using e-mail will receive longer sentences. Increased punishment is justified because of the additional harm caused by the use of a computer to lure children into sexual relationships.

---

[47] Amendments to the Sentencing Guidelines for United States Courts, 61 Fed. Reg. 20,306 (1996).

R42

### ii.    Clarification of "pattern of activity" adjustment

In order to better ensure lengthy incarceration for those offenders who are the most likely to commit new sex crimes, the Commission revised the application note in commentary to §2G2.2(b)(4), which provides a five-level enhancement if the defendant engaged in a "pattern of activity involving the sexual abuse or exploitation of a minor." The revision clarifies that the pattern of activity may include acts of sexual abuse or exploitation that are proven to the court at sentencing, even if the acts were not committed during the course of the offense or did not result in a conviction. The revision also clarifies that the defendant must have personally engaged in sexual abuse or exploitation. For example, repeated mailings of pornography do not constitute a pattern of abuse or exploitation for purposes of this adjustment. The commentary was also revised to specify that an upward departure may be appropriate in some cases in which the pattern of activity adjustment does not apply or does not adequately reflect the seriousness of the sexual exploitation or abuse.

### iii.    Consolidation of the transportation guidelines

In order to simplify the guidelines, the Commission consolidated §§2G1.1 and 2G1.2 -- the guidelines covering transportation for the purpose of prostitution or other prohibited sexual conduct. Previously, separate guidelines covered the transportation of minors and the transportation of adults. By adding to the consolidated guideline an adjustment that enhances sentences if minors are transported, offenders transporting children are sentenced the same as they would be if the guidelines had been kept separate. In addition, the scope of the consolidated guideline was expanded to cover the new offense created by section 508 of the Telecommunications Act of 1996.

### 2.    Recommendation for increased statutory maximum penalties

Under 18 U.S.C. §§ 2251(d) and 2252(b)(1), the maximum term of imprisonment for production, trafficking, and receipt offenses is 10 years. If the offender has a previous federal conviction for a child pornography or sexual abuse crime, a five-year statutory minimum and 15-year, or 180-month, statutory maximum applies. Under 18 U.S.C. §§ 2252(b)(2), the maximum term of imprisonment for possession offenses is five years and no higher statutory maximum is authorized for repeat offenders.

The Commission recommends two changes to the statutory penalties for child pornography offenses. First, Congress should raise the statutory maximum penalties for child pornography production offenses under 18 U.S.C. § 2251 from ten years to fifteen years. Defendants sentenced under §2G2.1 are already subject to high offense levels that result in sentences approaching the statutory maximum, particularly when specific offense characteristics (such as production involving a minor under 12 years of age) apply to enhance the sentence. There also is an increased likelihood that the current statutory maximum would trump sentences under §2G2.1 if the Commission adds other specific offense characteristics to that guideline, such as the five-level pattern of activity enhancement found in §2G2.2 and the two-level computer enhancement adopted by the Commission for §2G2.1 this year. Increasing the statutory maximum

38

for offenses under 18 U.S.C. § 2251 also provides more flexibility for the courts to depart upward from the guideline in particularly egregious cases and makes production a more serious offense than trafficking or receipt. This approach was supported by the Department of Justice in its public comment on the amendments to §2G2.1 that were proposed by the Commission this year.

Second, the Commission recommends that Congress adopt a more uniform approach toward repeat sexual offenders, modeled after 18 U.S.C. § 2247(d). Under the current guidelines and the amendments submitted to Congress in 1996, some repeat offenders will receive guideline ranges that extend above the currently authorized statutory maximum penalties. For example, an offender convicted of production of pornography involving minors under the age of 12 will receive an offense level of 31 (BOL 27 + 4 level adjustment for victim age). If the offender's criminal history score places him in category IV, V or VI, the top of the recommended guideline range would be 188, 210, or 235 months, respectively -- well above the 180-month authorized statutory maximum.

In addition, the approach in 18 U.S.C. § 2247 appears superior to §§ 2251(d) and 2252(b)(1) since it allows both prior federal and state offenses of like kind to trigger the higher statutory maximum. Currently, the higher maximum penalty applies only to pornography offenders with prior federal convictions for sex crimes. In contrast, 18 U.S.C. § 2247 provides for up to a doubling of the statutory maximum for persons with prior federal *or state* sexual abuse crimes. Permitting prior state convictions to count toward increasing the statutory maximum appears justified in order to permit lengthier incarceration of offenders who have shown an increased risk of recidivism, regardless of the forum in which those previous offenses were prosecuted.

The § 2247 approach also avoids imposing mandatory minimum penalties, such as are found in §§ 2251(d) and 2252(b)(1). Such mandatory minimums hinder proportionate sentencing tailored to the individual circumstances of a case, the kind of circumstances that the guidelines take into account. They also prevent judges from departing from mandated minimums in unusual cases that present circumstances not anticipated or inadequately considered by the Commission or by Congress.[48]

### 3. Amendments currently under consideration by the Commission

After undertaking the analysis required by the SCACPA, the Commission is evaluating whether additional modifications to the guidelines covering sex offenses against children may be necessary. The particular options pursued will depend on several factors, including congressional action on pending legislation that may affect the operation of the guidelines in this area, and on the results of public hearings and comments received on the proposals put forward in the next amendment cycle. Options under consideration are described below.

---

[48] For a full discussion of problems created by such legislation, see U.S. SENTENCING COMMISSION, SPECIAL REPORT TO CONGRESS: MANDATORY MINIMUM PENALTIES (1991).

### a. Expand the "pattern of activity" adjustment to possession and production of pornography cases and to the sexual abuse of a minor guideline

One option is to make applicable to §§2G2.1 (production) and 2G2.4 (possession) the five-level enhancement currently contained in the trafficking/receipt guideline 2G2.2(b)(4) "if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." The incidence of sexual abuse or exploitation of a minor is prevalent in child pornography production and possession cases as well as child pornography distribution and receipt cases. In addition, the application note that suggests an upward departure in cases that involve actual abuse or exploitation of minors that is not adequately accounted for by the pattern adjustment should be made more generally applicable throughout the pornography guidelines. Application of the enhancement or the upward departure helps ensure lengthier incarceration for offenders convicted of pornography offenses who have engaged in actual abuse of a minor and not only trafficking or possession of pornography depicting such abuse.

In addition, the Commission is exploring three options for increasing punishment for offenders convicted of sexual abuse of a minor. Sentencing under the sexual abuse guidelines is complicated by several factors, however. First, as discussed in the report, the guideline range for aggravated sexual abuse under §2A3.1 is perceived as too high for a significant portion of cases. Conversely, when such cases are sentenced under the sexual abuse of a minor guideline, 2A3.2, the offense level is perceived as too low. The key is to bridge this gap without encouraging undercharging. Second, under current guidelines, if a defendant was not previously convicted of sexual abuse, the punishment does not adequately reflect ongoing or repetitive abusive conduct. Third, many sexual abuse cases involve intra-familial abuse, evidentiary difficulties, and other complicating factors that are not easily taken into account through the application of hard and fast rules. Flexibility and deference to the sentencing judge's superior feel for a case appears warranted.

To address and balance these concerns, the Commission is exploring several different ways to expand the "pattern of activity" adjustment to the sexual abuse guidelines. The Commission could provide for a five-level adjustment in §2A3.2. This would ensure substantially increased punishment for repetitive acts. Case analysis suggests that this adjustment, as modified by the 1996 amendments to §2G2.2, would apply in a substantial majority of sexual abuse cases. Alternatively, the same "pattern of activity" standard might be used as a basis for upward departure rather than as a mandatory five-level adjustment. Such a departure would allow the court to consider any acts of sexual abuse committed by the defendant, whether or not the abuse resulted in conviction, involved more than one victim, or occurred as part of the offense of conviction. The Commission may also consider increasing the base offense level of this guideline.

### b. Clarify the definition of "distribution" of pornography

Currently, §2G2.2 provides for at least a five-level enhancement if the offense involved distribution. Application Note 1 to §2G2.2 states that distribution "includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to

distribute." It is unclear whether Application Note 1 was intended to limit the enhancement to distribution for pecuniary gain, and the Department of Justice reports that the application note is sometimes read as being inapplicable to non-pecuniary distribution. The definition could be amended to clarify that both distribution for money and other distribution, for example, as part of a barter or trading network, should receive the five-level enhancement.

### c.    Consolidate the trafficking/receipt and possession guidelines

As described in the report at Section B.4, defendants convicted of receiving child pornography receive higher sentences than defendants charged with possession, even if they engage in substantially similar conduct. The Commission is considering an amendment to consolidate the trafficking/receipt guideline (§2G2.2) and the possession guideline (§2G2.4). The current trafficking/receipt guideline has a base offense level of 15, and the current possession guideline has a base offense level of 13, both of which will be increased by two levels effective November 1, 1996, subject to congressional disapproval. Consolidation could be accomplished by collapsing the possession and trafficking/receipt guidelines into one guideline. The consolidated guideline would have the higher base offense level of the pre-consolidation trafficking/receipt guideline, but a two-level downward adjustment would apply if the case involved the receipt or possession of fewer than 10 items with no intended distribution. Under this approach, sentences for certain receipt cases would be two levels lower than they would be under the amended guidelines submitted to Congress this year.

In 1991, the Commission reported similar concerns about the disparity between receipt and possession sentences and it amended the guidelines so that receipt cases were sentenced under the possession guideline. But this amendment was overridden by Congress through enactment of Section 632 of Public Law 102-141, the Treasury, Postal Service and General Government Appropriations Act of 1992. The Commission was directed to increase base offense levels for trafficking and receipt (§2G2.2) (from level 13 to level 15) and for possession (§2G2.4) (from level 10 to level 13). The instruction also provided that §2G2.4 shall apply only to offense conduct involving simple possession. Offenses involving receipt and trafficking were to be sentenced under the new higher offense levels prescribed by §2G2.2. The Commission promulgated the mandated amendments, which took effect November 27, 1991. Because Congress has previously directed the Commission to sentence receipt cases under the trafficking guideline rather than the possession guideline, additional legislation may be needed for the Commission to make the changes being considered here.

Despite this statutory history, several factors lead the Commission to conclude that the present approach to the sentencing of receipt and possession cases should be reevaluated. First, there still appears to be disparity in the sentencing of substantially similar crimes, and there is some indication that judges may be trying to avoid such disparity. Second, in response to the Congressional directive in SCACPA, the Commission has already proposed a two-level increase in the base offense level for all trafficking, receipt and possession cases (proposed to be effective November 1, 1996 subject to Congressional disapproval). Thus, even though the consolidation being considered would decrease offense levels (and therefore sentences) in some receipt cases by two levels, offense levels would not drop below where they are now pending the increase

proposed to take effect in November. In effect, the consolidation would nullify the two-level increase proposed to take effect November 1, 1996, and keep certain receipt sentences at their current level while allowing trafficking and possession sentences to increase. Third, the consolidation approach recommended here will actually increase the punishment for some possession cases by making the specific offense characteristics, now available for receipt, available for possession as well. In particular, the specific offense characteristics of §2G2.2 would also apply to possession cases. These include a two-level enhancement for sadistic or masochistic material and the five-level adjustment if the defendant engaged in a pattern of activity of sexual abuse or exploitation.

**R47**

# RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010

**UNITED STATES SENTENCING COMMISSION**
**September 2021**



R48

United States Sentencing Commission
One Columbus Circle, N.E.
Washington, DC 20002
www.ussc.gov

Charles R. Breyer
Acting Chair

Patricia K. Cushwa
*Ex Officio*

Jonathan J. Wroblewski
*Ex Officio*



Kenneth P. Cohen
Staff Director

Glenn R. Schmitt
Director
Office of Research and Data

September 2021

**Ryan Cotter, Ph.D.**
*Deputy Director*
*Office of Research and Data*

**Courtney Semisch, Ph.D.**
*Senior Research Associate*
*Office of Research and Data*

**David Rutter, M.P.A.**
*Research Associate*
*Office of Research and Data*

United States Sentencing Commission



*Recidivism of Federal Offenders Released in 2010*

# TABLE OF CONTENTS

**1** **INTRODUCTION**

    1      Introduction

    4      Key Findings

    6      Scope of Analysis

**9** **OFFENDER AND OFFENSE CHARACTERISTICS**

    10    Offender Characteristics

    12    Original Federal Offense Types and Characteristics

    14    Criminal History

    15    Sentences Originally Imposed

**19** **RECIDIVISM FINDINGS**

    20    Overall

    24    Age and Criminal History

    31    Additional Characteristics

**38** **CONCLUSION**

**39** **APPENDICES**

**53** **ENDNOTES**

i

# INTRODUCTION

United States Sentencing Commission

# INTRODUCTION

This report is the first in a series continuing the United States Sentencing Commission's (the "Commission") research of the recidivism of federal offenders. It provides an overview of the recidivism of federal offenders released from incarceration or sentenced to a term of probation in 2010, combining data regularly collected by the Commission with data compiled from criminal history records from the Federal Bureau of Investigation (FBI). This report provides an overview of recidivism for these offenders and information on key offender and offense characteristics related to recidivism. This report also compares recidivism outcomes for offenders released in 2010 to federal offenders released in 2005.

Recidivism has been an ongoing research priority for the Commission, both in its development of the original sentencing guidelines and in its continuing duty to collect, analyze, and report sentencing data.[1] This study further advances the Commission's work in this area by examining recidivism in the wake of landmark changes in the federal criminal justice system: the Supreme Court's January 12, 2005 decision in *United States v. Booker* that rendered the federal sentencing guidelines advisory and expanded use of evidence-based practices in federal supervision.[2]

In 2013, the Commission undertook a comprehensive, multi-year study of the recidivism of federal offenders. The first of seven reports from that study, *Recidivism Among Federal Offenders: A Comprehensive Overview*,[3] examined the recidivism of 25,431 federal offenders released from prison or placed on probation in 2005. The Commission found that almost one-half (49.3%) of federal offenders released to the community in 2005 were rearrested over an eight-year period.[4] In addition, the report replicated the research of others in demonstrating the relationship between recidivism and an offender's age and criminal history.[5] The Commission's analysis of recidivism rates by age and criminal history demonstrated that the highest rearrest rates occurred among the youngest group of offenders and those with the most serious criminal histories.[6]

The Commission issued six additional publications in the series, all analyzing the offenders released to the community in 2005. Three of the reports provided detailed analyses of recidivism among specific offender groups: *Recidivism Among Federal Drug Trafficking Offenders*, *Recidivism Among Federal Firearms Offenders*, and *Recidivism Among Federal Violent Offenders*.[7] The remaining three reports provided detailed analyses of specific recidivism correlates: *The Past Predicts the Future: Criminal History and Recidivism of Federal*

2

*Recidivism of Federal Offenders Released in 2010*

*Offenders*, *The Effects of Aging on Recidivism Among Federal Offenders*, and *Length of Incarceration and Recidivism*.[8]

This report updates the Commission's earlier studies by analyzing federal offenders released into the community in 2010. The Commission combined offender and offense information that it regularly collects with recidivism data compiled in partnership with the FBI to examine the extent of recidivism, the types and timing of rearrests, and offense and offender characteristics of rearrested offenders. The 32,135 offenders in this study comprise the largest group of offenders with an eight-year recidivism study period examined by the Commission to date.

Notably, this analysis provides an opportunity to examine recidivism in the context of major changes in the federal criminal justice system. The offenders in this study were sentenced and released in conjunction with two significant transformations in federal sentencing and supervision. The Supreme Court's January 12, 2005 decision in *Booker* rendered the guidelines advisory.[9] The overwhelming majority (83.1%) of offenders in this study were sentenced following that landmark decision. Therefore, the majority of these offenders were sentenced under the advisory guideline system which provides increased judicial discretion to impose

sentences outside of the guidelines. In 2009, the Administrative Office of the United States Courts (AOUSC) began implementing new evidence-based practices in offender supervision.[10] The Federal Probation and Pretrial Services Office (PPSO) adopted the Federal Post Conviction Risk Assessment (PCRA), a risk assessment tool that incorporates criminogenic factors related to recidivism to improve supervision outcomes.[11] This study was not designed to directly measure the effects of these sentencing and supervision changes. Nevertheless, by comparing the recidivism patterns of offenders released before and after these changes, it provides insight into the possible impact of increased judicial discretion and evidence-based supervision programs on recidivism.



**This analysis provides an opportunity to examine recidivism in the context of major changes in the federal criminal justice system following the Supreme Court's decision in *Booker* and increased use of evidence-based practices in federal supervision.**

3

United States Sentencing Commission

# KEY FINDINGS

**49.3%**
**REARRESTED**



**50.7%**
**NOT REARRESTED**

**1** The **recidivism rate remained unchanged** for federal offenders released in **2010 compared to** offenders released in **2005** despite two intervening major developments in the federal criminal justice system: the Supreme Court's decision in *Booker* and increased use of evidence-based practices in federal supervision.

- Over an eight-year follow-up period, nearly one-half (49.3%) of federal offenders released in 2010 were rearrested, the same rate for offenders released in 2005 (49.3%).

- Other recidivism patterns also were consistent for the two offender cohorts.

**2** For offenders who were rearrested, the **median time** to arrest was **19 months**. The largest proportion (18.2%) of offenders were rearrested for the first time during the first year following release. In each subsequent year, fewer offenders were rearrested for the first time than in previous years. **Most** offenders in the study were rearrested **prior to the end of supervision terms**. Of those offenders who were sentenced to a term of supervision and rearrested, 76.3 percent were rearrested earlier than the expiration of their originally imposed supervision term.

**Median Time to Rearrest: 19 MONTHS**

**YEAR 8**
**49.3%**

**YEAR 1**
**18.2%**

**3** **Assault** was the **most common** (20.7%) offense at rearrest. The second most common offense was drug trafficking (11.3%), followed by: larceny (8.7%), probation, parole, and supervision violations (8.1%), and administration of justice offenses (7.5%).

4

**4** Combined, **violent offenses** comprised approximately **one-third of rearrests**; 31.4 percent of offenders were rearrested for assault (20.7%), robbery (4.5%), murder (2.3%), other violent offense (2.3%), or sexual assault (1.6%).



**6** **Combined, the impact of CHC and age** on recidivism was **even stronger**. During the eight-year follow-up period, 100 percent of offenders who were younger than 21 at the time of release and in CHC IV, V, and VI (the most serious CHCs) were rearrested. In contrast, only 9.4 percent of offenders in CHC I (the least serious CHC) who were aged 60 and older at release were rearrested.



**5** Similar to findings in its previous studies, the Commission found **age** and **Criminal History Category** (CHC) were **strongly associated with rearrests**.

- Offenders in CHC I (the least serious CHC) had the lowest rearrest rates (30.2%) and offenders in CHC VI (the most serious CHC) had the highest rearrest rates (76.2%).

- In addition, nearly three-quarters (72.5%) of offenders younger than age 21 upon release were rearrested during the study period compared to 15.9 percent of offenders aged 60 and older.

**7** Offenders sentenced for **firearms** and **robbery** offenses had the **highest rearrest rates** during the eight-year follow-up period, with 70.6 percent and 63.2 percent, respectively. In contrast, offenders sentenced for **fraud, theft, or embezzlement** had the **lowest** rearrest rate (35.5%).

5

**R58**

United States Sentencing Commission

# SCOPE OF ANALYSIS

## Defining and Measuring Recidivism

Recidivism "refers to a person's relapse into criminal behavior, often after the person receives sanctions or undergoes intervention for a previous crime."[12] Recidivism measures can provide policy makers with information regarding the relative threat to public safety posed by various types of offenders, and the effectiveness of public safety initiatives in deterring crime and rehabilitating offenders.[13] Recidivism measures are used by numerous public safety agencies to measure program performance and inform policy decisions on issues such as pretrial detention, prisoner classification and programming, and offender supervision in the community.[14]

Two measures are foundational to recidivism research, both of which can impact the outcomes of recidivism analyses. The first measure is the type of event used to indicate a relapse into criminal behavior. Recidivism typically is measured by criminal acts that resulted in the rearrest, reconviction, or reincarceration of an offender.[15]  The Commission used rearrest for this study for several reasons.  Rearrest is the most commonly used measure and is the primary measure of recidivism used by federal agencies in recent recidivism studies.[16]  Federal agencies are using rearrest as the primary measure because it is a more reliable measure than reconviction and reincarceration due to the incomplete nature of disposition data.[17]  Criminal records often fail to include reconvictions and reincarcerations because jurisdictions inconsistently report them.  The records the Commission used to compile the data for this study reflect this inconsistency.  For example, records for 44.1 percent of charges had no associated disposition information.  For these reasons, the incomplete nature of disposition data used to identify reconviction and reincarceration events makes them unreliable measures of recidivism.

It should be noted that using rearrest does result in higher recidivism rates than reconviction or reincarceration.  Not only are rearrests more consistently reported, but also the evidentiary standard for an arrest (probable cause) is less stringent than the evidentiary standard for a conviction and, therefore, incarceration (beyond a reasonable doubt).  Because not all arrests result in conviction or incarceration, rearrests can overstate recidivism.[18]  The Commission's rearrest measure also includes arrests for alleged violations (or revocations) of supervised release, probation, or state parole, which also can contribute to increased overall recidivism rates.  The Commission, however, excluded rearrests for minor traffic offenses.

**6**

*Recidivism of Federal Offenders Released in 2010*

The second component of measuring recidivism is the "follow-up period," the period of time over which events are counted following release into the community. After a starting event, in this case, release from prison into the community or placement on probation, recidivism events are documented through the end of the follow-up period. The length of follow-up periods varies across recidivism studies. Often, due to limitations on available data, some studies follow offenders for as little as six months. Other studies follow offenders for several years. Tracking offenders for a longer duration provides a more accurate estimate of recidivism or desistance from crime.[19] The Commission used an eight-year follow-up period.

## Methodology

This report provides a comprehensive analysis of the recidivism of all federal offenders who were released from federal prison or sentenced to probation in 2010. The offenders in the study cohort were identified in cooperation with the Federal Bureau of Prisons (BOP) and the AOUSC. The BOP provided identifying information, release dates, and other pertinent information for the Commission to identify offenders released from prison. The AOUSC provided identifying information, revocation information, and other pertinent information for offenders sentenced to probation. The Commission compiled the identifying information for these offenders to obtain criminal records in partnership with the FBI.



**Federal agencies most commonly use rearrest as the primary recidivism measure because it is a more reliable measure than reconviction and reincarceration due to the incomplete nature of disposition data.**

7

United States Sentencing Commission

The data used in this report combines data regularly collected by the Commission[20] with data compiled as part of a data sharing agreement with the FBI's Criminal Justice Information Services Division.[21]  Through an agreement with the FBI, the Commission collected and processed criminal history records from all state and federal agencies for the offenders in the study.[22]  The Commission then combined this criminal record data with the data it collected about the offenders when they were originally sentenced.

The final study group of **32,135 offenders** satisfied the following criteria:

- United States citizens;

- Re-entered the community during 2010 after discharging their sentence of incarceration or by commencing a term of probation in 2010;

- Not reported dead, escaped, or detained;[23]

- Have valid FBI numbers that could be located in criminal history repositories (in at least one state, the District of Columbia, or federal records).

## SUMMARY OF ANALYSIS

**2010**
YEAR OF RELEASE

**32,135**
OFFENDERS

**8**
YEAR FOLLOW-UP

This report provides an analysis of the overall recidivism rates during the **eight-year follow-up period** for the 32,135 federal offenders identified for this study, as well as key offense and offender characteristics of this group.[24]  For offenders who recidivated during the study period, the analysis examines the elapsed time from release to rearrest and the types of offenses at rearrest.  The analysis also compares recidivism patterns to those of federal offenders released in 2005.[25]

8

# OFFENDER AND OFFENSE CHARACTERISTICS

United States Sentencing Commission

# OFFENDER AND OFFENSE CHARACTERISTICS

Table 1.  Offender Characteristics
*Federal Offenders Released in 2010*

| Offender Characteristics | |
| --- | --- |
| **Race/Ethnicity** | |
| White | 41.2% |
| Black | 35.8% |
| Hispanic | 18.1% |
| Other | 4.9% |
| **Gender** | |
| Male | 82.7% |
| Female | 17.3% |
| **Education** | |
| Less than High School | 34.9% |
| High School Graduate | 38.4% |
| Some College | 20.3% |
| College Graduate | 6.4% |
| **Age at Sentencing** | |
| Average | 35 Years |
| Median | 33 Years |
| **Age at Release** | |
| Average | 38 Years |
| Median | 37 Years |

## Offender Characteristics

White offenders (41.2%) comprised the largest group of offenders in the study group, followed by Black (35.8%), Hispanic (18.1%), and Other Races (4.9%) (Table 1).[26]  The offenders predominantly were male (82.7%).  Nearly two-thirds (65.1%) of offenders were high school graduates, including 6.4 percent who graduated college.  Approximately one-third (34.9%) of offenders in the study did not complete high school.

**10**

"

**The offenders in this study group were similar to federal offenders released in 2005.**

Figure 1.  Age at Sentencing and Release
*Federal Offenders Released in 2010*



At sentencing, the average age of offenders in the study group was 35 years (median 33 years),[27] with offenders ranging from 18 to 84 years of age.  At the time of release, the average age of offenders was 38 years (median 37 years).  At release, the largest proportion (35.0%) of offenders were age 30 to 39 years old and only 5.3 percent were aged 60 or older (Figure 1).

The offenders in the study group were similar to federal offenders released in 2005.  Among offenders released in 2005,

the overwhelming majority (81.7%) were male.  White offenders (43.7%) comprised the largest group of offenders, followed by Black (33.9%), Hispanic (17.8%), and Other Races (4.6%).  The educational attainment was as follows: 34.2 percent did not complete high school, 36.9 percent graduated high school, 21.4 percent completed some college, and 7.5 percent graduated college.  The median age at release was 36 years.[28]

11

United States Sentencing Commission

## Original Federal Offense Types and Characteristics

The largest proportion of offenders in the study group, 43.1 percent, were released following sentences for drug trafficking offenses (Figure 2).[29]  The remaining offenders were sentenced for fraud, theft, or embezzlement (17.4%), firearms (15.3%), immigration (4.4%),[30] robbery (4.1%), or other types of offenses (15.7%).[31]  A small proportion of offenders were sentenced for a violent offense, comprising 9.4 percent of the study group (Figure 3).[32]

Offenders in this study committed similar federal offenses as offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission used a slightly different offense classification scheme for federal offenses.[33]  Nevertheless, the distribution of offense types was similar for the two cohorts.



Figure 2.  Federal Offense Type
*Federal Offenders Released in 2010*

- DRUG TRAFFICKING — 43.1%
- FRAUD/THEFT/EMBEZZLEMENT — 17.4%
- FIREARMS — 15.3%
- IMMIGRATION — 4.4%
- ROBBERY — 4.1%
- OTHER OFFENSES — 15.7%

The largest proportion of offenders released in 2005 were sentenced for drug trafficking (41.6%).  Fraud (13.6%) and larceny (3.9%) were reported separately for offenders released in 2005, combined, they accounted for the third largest group of offenders. The second largest group was all other offenses (20.3%), followed by firearms (12.8%), robbery (4.3%), and immigration (3.5%).[34]

> **"**
> **A small proportion of offenders in the study group were originally sentenced for a violent offense.**



Figure 3.  Violent Federal Offenses
*Federal Offenders Released in 2010*

- VIOLENT 9.4%
- NON-VIOLENT 90.6%

Figure 4. Selected Sentencing Factors
*Federal Offenders Released in 2010*



Figure 4 provides information on selected sentencing factors for offenders in the study group.  Weapon-involved offenses were determined by the application of a weapon-related specific offense characteristic at sentencing or a conviction under 18 U.S.C. § 924(c),[35] or both.[36]  Sentence enhancements for weapon-involved offenses applied to 11.7 percent of offenders in the study.

Chapter Three of the *Guidelines Manual* provides adjustments pertaining to an offender's role in the offense.  Relevant to this study, Chapter Three provides adjustments for offenders whose conduct constitutes an aggravating role (§3B1.1) or a mitigating role (§3B1.2) in the offense.  Section 3B1.1 provides a 2- to 4-level increase for offenders who acted in an aggravating role in the offense.[37]  Conversely, §3B1.2 provides a 2- to 4-level decrease for offenders who acted in a

mitigating role in the offense.[38]  Courts applied these role adjustments for a small proportion of offenders at the time of sentencing; a slightly greater proportion of offenders had offense level decreases for mitigating role (8.4%) compared to offenders with offense level increases for aggravating role (5.0%).

Section 3E1.1 of the *Guidelines Manual* provides for a 2- or 3-level decrease for an offender who demonstrates acceptance of responsibility for the offense.[39]  The majority (92.2%) of offenders in the study had an offense level decrease for acceptance of responsibility at the time of sentencing.

United States Sentencing Commission

## Criminal History

Chapter Four of the *Guidelines Manual* provides for the calculation of a criminal history score based primarily on the type of sentence and length of any prior sentence of imprisonment, among other considerations.[40]  The guidelines provide rules to determine the total number of criminal history points applicable to an offender's prior convictions, which, in turn, determine the offender's Criminal History Category (CHC) in the Sentencing Table.[41]  For example, three points are assigned for each prior sentence of imprisonment exceeding one year and one month.  In addition to points for prior sentences, two additional points are added if the defendant committed the federal offense while under any criminal justice sentence, such as probation.  The total number of criminal history points determine the offender's CHC, ranging from I to VI.

Figure 5 shows the CHCs and underlying criminal history points for the offenders in the study.  The largest proportion (45.3%) of offenders were in CHC I, the lowest Criminal History Category, with zero or one criminal history point assigned.  The majority of CHC I offenders in the study had zero points assigned under the guidelines.  Of the zero-point offenders, nearly half (47.9%) were first-time offenders who had no prior contact with the criminal justice system; that is, they did not have arrests or convictions prior to the original offense of conviction.[42]  At the other end of the spectrum, 11.1 percent of offenders were in the most serious Criminal History Category of VI.[43]  The number of criminal history points underlying calculations of CHC VI ranged from 13 to 56.  The remaining offenders were in CHC II (11.9%), CHC III (15.8%), CHC IV (9.8%), and CHC V (6.1%).[44]

Figure 5.  Criminal History Category and Underlying Criminal History Points
*Federal Offenders Released in 2010*



14

Figure 6.  Calendar Year of Federal Sentencing
*Federal Offenders Released in 2010*



In addition to CHC, the guidelines provide for enhanced penalties for some repeat offenders; two of those provisions are pertinent to this study.  First, §4B1.1 (Career Offender) provides enhanced penalties for offenders with an instant conviction for a felony "crime of violence" or a "controlled substance offense" (as those terms are defined in §4B1.2) and who have at least two prior felony convictions for such offenses.[45]  Second, §4B1.4 (Armed Career Criminal) provides enhanced penalties for armed career criminals pursuant to 18 U.S.C. § 924(e), the Armed Career Criminal Act (ACCA).  The ACCA and, in turn, §4B1.4, provide increased sentences for offenders who were convicted under 18 U.S.C. § 922(g) and who have at least three prior convictions for a "violent felony" or "serious drug offense."[46]  These enhancements applied to a very

small proportion of offenders in the study; 3.8 percent were originally sentenced under the career offender or armed career criminal provisions.[47]

## Sentences Originally Imposed

The offenders in the study group were originally sentenced between 1990 and 2010 (Figure 6).  More than three-quarters (76.2%) were sentenced prior to the release year of 2010.  Notably, the overwhelming majority of offenders in the study (83.1%) were sentenced after January 12, 2005, the date of the Supreme Court's decision in *Booker*,[48] that rendered the sentencing guidelines advisory.  In addition, the offenders in the study were released (or sentenced to probation) during the PPSO's implementation of updated evidence-based supervision practices and use of the PCRA.

**15**

United States Sentencing Commission

Figure 7.  Type of Sentence Imposed
*Federal Offenders Released in 2010*



Most offenders in the study group originally were sentenced to a term of imprisonment.  As shown in Figure 7, a prison-only sentence was imposed for 80.8 percent of offenders.  Another 9.9 percent of offenders were sentenced to probation only (*i.e.*, where no type of confinement was imposed).  An additional 5.7 percent of offenders were sentenced to terms of probation with some type of alternative confinement, and 3.6 percent were sentenced to a combination of imprisonment and alternative confinement, such as a halfway house or home confinement.[49]  Following the same methodology used in the *2016 Recidivism Overview Report*, the Commission combined these four sentencing categories into two categories for analysis.[50]  The prison category comprises the 84.4 percent of offenders sentenced to prison only and those sentenced to a combination of imprisonment and alternative confinement; the probation category comprises the 15.6 percent of offenders sentenced to probation only and those sentenced to probation with some type of alternative confinement.

The average sentence imposed for all offenders in the study group was 51 months.[51]  For offenders sentenced to prison, the average imprisonment term was nearly five years (59 months).  The majority (60.2%) of offenders sentenced to prison were sentenced to terms ranging from two years to less than ten years (Figure 8).  Offenders sentenced to prison terms of ten years or longer comprised 14.2 percent

**16**

*Recidivism of Federal Offenders Released in 2010*

of imprisoned offenders.[52]  For offenders sentenced to probation, the average probation term imposed was slightly more than three years (38 months).  The largest proportion (37.8%) of offenders sentenced to probation were sentenced to a three-year term.

Section 5D1.1(a) of the *Guidelines Manual* provides that courts may impose a term of supervised release following a sentence of imprisonment for any felony or misdemeanor and must do so if required by statute.[53]  Nearly all (99.4%) of the offenders sentenced to prison also were sentenced to subsequent terms of supervised release.  The average term of supervised release imposed was nearly four years (46 months).  As shown in Figure 8, courts most often imposed supervised release terms of three to less than four years, accounting for 52.3 percent of offenders.  A very small proportion of offenders, 2.0 percent, were sentenced to terms of supervised release of ten years or more, or life.  Nearly all (99.4%) offenders in the study were sentenced to some type of supervision (probation or supervised release).



**Nearly all offenders in the study group were sentenced to some type of supervision (probation or supervised release).**

Figure 8.  Length of Imprisonment, Probation, and Supervised Release
*Federal Offenders Released in 2010*



United States Sentencing Commission

**18**

# RECIDIVISM FINDINGS

United States Sentencing Commission

# OVERALL FINDINGS

Table 2.  Comparison of Overall Rearrest Findings
*Federal Offenders Released in 2010 and 2005*

| | Offenders Released in 2010 | Offenders Released in 2005 |
|---|---|---|
| Percent Rearrested | 49.3% | 49.3% |
| Median Months to Rearrest | 19 | 21 |
| Median Number of Rearrests | 2 | 2 |
| Most Common Post Release Offense | Assault (20.7%) | Assault (23.3%) |
| Median Age at Release | 33 | 33 |

## Overall Recidivism Findings

The recidivism of federal offenders has remained constant.  Nearly half (49.3%) of offenders released in 2010 were rearrested within the eight-year follow-up period.[54] This rate is identical to the rearrest rate (49.3%) for federal offenders released in 2005.[55]  In addition, recidivism patterns were the same for offenders released in 2010 and offenders released in 2005 (Table 2).

Among offenders in this study who were rearrested, the median time to arrest was 19 months.  For one-half of offenders who were rearrested, the first rearrest occurred just over one and one-half years following their initial release to the community.  The number of rearrests during the follow-up period ranged from one to 43 and the median number of rearrests was two.  Slightly less than one-third (30.7%) of offenders had a single rearrest, but one-quarter (26.1%) were rearrested five times or more.  Assault was

the most serious and most common offense at rearrest (20.7%).[56]  For offenders who were rearrested, the median age at release was 33 years (average 35 years).

As shown in Table 2, recidivism patterns were unchanged from the Commission's findings in its *2016 Recidivism Overview Report* for federal offenders released in 2005.  In that study, the Commission also reported a median number of arrests of two and a median age at release of 33 years.  The most common offense at rearrest also was assault, and a slightly larger proportion of offenders in that study had assault as the most common type of offense (23.3%).  The median time to rearrest in that study was slightly longer at 21 months.

Notably, these similar recidivism patterns occurred in different federal criminal justice environments.  The overwhelming majority of offenders released in 2005 (77.8%) were sentenced prior to *Booker*, under the mandatory guideline system.[57]  In contrast, the

**20**

overwhelming majority of offenders released in 2010 were sentenced post-*Booker*, under the advisory guideline system.[58]  In addition, the two groups of offenders were released into different supervisory systems.  The offenders in this study were released in 2010, when the PPSO had increased its reliance on evidence-based practices by implementing the PCRA tool.  While this study was not specifically designed to assess the impact of these changes on recidivism, it is nevertheless notable that recidivism patterns remained entirely unchanged in their wake.

### Timing of Rearrest

The largest proportion of rearrests occurred soon after release and steadily decreased over time.  Of those offenders who were rearrested, the largest proportion were rearrested for the first time during the first year following release.  In each subsequent year, fewer offenders were rearrested for the first time than in previous years.  This pattern also mirrors that reported by the Commission for offenders released in 2005.  As shown in Figure 9, 18.2 percent of offenders in this study were rearrested during the first year following release into the community.  In the second year, an additional 10.4 percent of offenders were rearrested for the first time, and in the third year, an additional 6.8 percent were rearrested for the first time.  By the eighth year, only 1.8 percent of offenders who were not previously arrested recidivated for the first time.

Time to rearrest also is unchanged from offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission reported that 16.6 percent of offenders in the 2005 cohort were rearrested during the first year of release, and fewer offenders were rearrested for the first time in each of the subsequent years.  Nearly identical to the current findings, that study also showed that 10.5 percent of offenders were rearrested for the first time in the second year, 6.6 percent were rearrested for the first time in the third year, and only 1.8 percent of offenders were rearrested for the first time in the eighth year.[59]

Figure 9.  Time to First Rearrest
*Federal Offenders Released in 2010*



United States Sentencing Commission

### Rearrests and Federal Supervision Status

To further explore the issue of timing of rearrest, the Commission also examined rearrests relative to federal supervision status.  As discussed above, nearly all (99.4%) offenders in the study originally were sentenced to a term of federal supervision (either probation or supervised release).  The average supervision term imposed was less than four years (44 months).  Because almost all[60] of the supervision terms imposed were shorter than the eight-year follow-up period, a large proportion of offenders had the opportunity to successfully complete their originally imposed supervision terms prior to the end of the study period.  While the data for this study included the length of supervision terms imposed, it did not include supervision status at the time of rearrest.  Therefore, for each rearrested offender, the Commission compared the length of supervision term imposed to the elapsed time prior to rearrest to provide a proxy of the offenders' supervision status at the time of rearrest.[61]

Overall, 49.2 percent of offenders originally sentenced to any term of supervision were rearrested during the study period.  Based on the length of terms imposed, most offenders in the study were rearrested prior to the end of those terms.  As shown in Figure 10, of those offenders who were sentenced to a term of supervision and rearrested, 76.3 percent were rearrested earlier than the expiration of their originally imposed supervision

Figure 10.  Rearrests by Supervision Status
*Federal Offenders Released in 2010 on Supervision*



term.  The remaining 23.7 percent were rearrested after the expiration of their originally imposed supervision term.

### Types of Rearrests

The Commission ranked offenses by severity to analyze new offenses committed by the offenders in the study.  This severity ranking was similar to the one in the Commission's *2016 Recidivism Overview Report*[62] and presents new offenses in order of seriousness.  If an offender was rearrested multiple times during the study period or had multiple charges in an arrest, the most serious offense according to this ranking was reported as the type of offense at rearrest.[63]

22

*Recidivism of Federal Offenders Released in 2010*

Figure 11.  Most Serious Offense at Rearrest
*Federal Offenders Released in 2010*



This analysis differs from the Commission's previous work in the reporting of one rearrest category.  To provide an increased level of detail for this analysis, the Commission expanded the previously reported "public order" category.  The Commission examined the offense types comprising the public order category and determined that reporting four separate categories provided a more meaningful analysis.  Therefore, the previously existing public order category is divided into administration of justice offenses; probation, parole, and supervision violations; other sex offenses; and public order offenses.

Using this method, the largest proportion (20.7%) of offenders in this study were rearrested for assault (Figure 11).  The second most common offense was drug trafficking (11.3%), followed by larceny (8.7%), probation, parole, and supervision violations (8.1%), and administration of justice offenses (7.5%).  Other offense types each comprised less than seven percent of rearrests, including all remaining types of violent offenses.  Combined, violent offenses comprised approximately one-third of rearrests; a total of 31.4 percent of offenders were rearrested for assault (20.7%), robbery (4.5%), murder (2.3%), an other violent offense (2.3%), or sexual assault (1.6%).[64]

**R76**

United States Sentencing Commission

The predominant offenses at rearrest for offenders released in 2010 are consistent with the Commission's previous recidivism findings for offenders released in 2005. The *2016 Recidivism Overview Report* also reported that assault was the most common offense at rearrest; 23.3 percent of all federal offenders were rearrested for assault, followed by public order (15.5%),[65] drug trafficking (11.5%), and larceny (7.7%).[66]

Similarly, the Commission also reported that violent offenses comprised approximately one-third of rearrests, with 32.3 percent of offenders having been rearrested for assault (23.3%), robbery (4.7%), rape (1.9%), homicide (1.3%), or an other violent offense (1.1%).

## Age and Criminal History

Age and criminal history are consistently strong predictors of recidivism.[67] This strong association is demonstrated in the current study as well as in the Commission's prior study of offenders released in 2005. For both the 2010 and 2005 cohorts, *lower* rearrest rates were associated with older offenders and *higher* rearrest rates were associated with offenders with more extensive criminal histories. The combined impact of age and criminal history on recidivism is more pronounced. This section of the report focuses on these two primary correlates of recidivism: age and criminal history.

### Age

Figure 12 shows the age distribution of federal offenders released in 2010 and their corresponding recidivism rates. As shown in the figure, more than half of federal offenders were younger than 40 years of age at the time of release. Figure 12 also demonstrates the inverse relationship of age and recidivism. The youngest offenders had the highest recidivism rates, and those rates steadily declined with increasing age. For example, nearly three-quarters (72.5%) of offenders younger than age 21 were rearrested during the study period. Nearly two-thirds (64.4%) of offenders aged 21 to 29 were rearrested and less than one-third (30.8%) of offenders aged 50 to 59 were rearrested. The lowest rearrest rates were for offenders age 60 and older; 15.9 percent of offenders in that age group were rearrested during the study period.

In addition to having higher rearrest rates, younger offenders also recidivated sooner after release compared to their older counterparts. While the median time to rearrest was 19 months for all offenders in the study, as shown in Table 3, the median time to rearrest for the youngest group of offenders (younger than 21 years) was 12 months. One-half of offenders in that age group were rearrested before one year had elapsed following their release, and the other one-half of offenders were rearrested after one year had elapsed following their release. The median time to rearrest increased for offenders in each successive age group, nearly doubling to almost two years (22 months) for the two oldest groups of offenders.

24

*Recidivism of Federal Offenders Released in 2010*

Figure 12.  Age at Release and Rearrest Rates
*Federal Offenders Released in 2010*



    The demonstrated relationship between age and recidivism is consistent with previous Commission findings.  In its *2017 Recidivism Age Report* the Commission demonstrated the overall relationship between age and recidivism.  In that study, the Commission found that younger offenders were more likely to be rearrested than older offenders and were rearrested faster than older offenders.[68]  For offenders released in 2005, the rearrest rate was highest (67.6%) among offenders younger than 21 and declined in each subsequent age group to 16.4 percent for offenders aged 60 and older.  In addition, offenders who were younger than age 30 when they were released had the shortest median time to rearrest (17 months).  Conversely, offenders aged 60 and older had the longest median time to rearrest (28 months).[69]  Furthermore, in that report the Commission demonstrated that the age-recidivism relationship persisted across all other factors in the analysis (*e.g.*, criminal history).[70]

### Criminal History Points and Criminal History Category

    Criminal history also is strongly correlated with recidivism.  The Commission examined the relationship between rearrests and both the total number of criminal history points and the resulting CHC.  This examination confirmed that offenders with more extensive criminal histories had higher rearrest rates.

Table 3.  Time to Rearrest by Age Group
*Federal Offenders Released in 2010*

| Age at Release | Time to Rearrest (median months) |
|---|---|
| Younger than 21 | 12 |
| 21 - 29 Years | 16 |
| 30 - 39 Years | 20 |
| 40 - 49 Years | 21 |
| 50 - 59 Years | 22 |
| 60 and Older | 22 |

**25**

**R78**

United States Sentencing Commission

As shown in Figure 13, rearrest rates increased with each CHC.  The rearrest rates ranged from less than one-third (30.2%) of offenders in CHC I to nearly one-half (49.4%) of offenders in CHC II, and steadily increased to more than three-quarters (76.2%) of offenders in CHC VI.

An offender's criminal history points largely determine the CHC.[71]  Therefore, the relationship between recidivism and criminal history is more evident comparing rearrest rates and criminal history points.  As shown in Figure 14, offenders with zero criminal history points had the lowest rearrest rates.  Slightly more than one-quarter (26.8%) of offenders with no criminal history points assigned were rearrested during the study period.  Rearrests increased more than 15 percentage points for offenders with one criminal history point (42.3%); and then increased steadily.  With two exceptions (8 points and 12 points) each additional criminal history point was associated with a higher rate of rearrest.  For example, more than half (57.9%) of offenders with four criminal history points were rearrested, more than two-thirds (69.2%) of offenders with seven criminal history points were rearrested, and 80.6 percent of offenders with 13 or more criminal history points were rearrested during the study period.

These findings are consistent with the Commission's previous findings for recidivism and criminal history for federal offenders released in 2005.  In its *2016 Recidivism Overview Report* and its *2017 Recidivism Criminal History Report*, the

Figure 13. Rearrest Rates by Criminal History Category
*Federal Offenders Released in 2010*



CRIMINAL HISTORY CATEGORY

| I | II | III | IV | V | VI |
|---|----|-----|----|---|----|
| 30.2% | 49.4% | 61.9% | 70.3% | 75.4% | 76.2% |

**26**

*Recidivism of Federal Offenders Released in 2010*

Commission reported the lowest recidivism rates among offenders with zero criminal history points (30.2%), a sharp increase for offenders with one criminal history point (46.9%), and a generally steady increase in recidivism with each additional criminal history point.[72] The *2016 Recidivism Overview Report* reported a recidivism rate of 81.5 percent for offenders with ten or more criminal history points and the *2017 Recidivism Criminal History Report* reported a recidivism rate of 85.7 percent for offenders with 15 or more criminal history points. In addition, both publications reported that rearrest rates steadily increased from a low of 33.8 percent for offenders in CHC I to a high of 80.1 percent for offenders in CHC VI.[73]

This study demonstrated notably lower rearrest rates among offenders in CHC I compared to offenders in the higher CHCs. To further analyze the relationship between criminal history and recidivism, the Commission undertook a closer examination of CHC I offenders. As described above, offenders in CHC I are assigned either zero or one criminal history point. As a group, offenders with zero criminal history points had a rearrest rate of 26.8 percent. Among offenders with zero criminal history points, approximately half (47.9%) had no prior contact with the criminal justice system. The remaining half (52.1%) of offenders with zero points had either prior arrests that did not result in convictions or convictions that did not qualify for criminal history points, or

Figure 14. Rearrest Rates by Criminal History Points
*Federal Offenders Released in 2010*



R80

United States Sentencing Commission

Figure 15.  Rearrest Rates for Offenders with Limited Criminal History
*Federal Offenders Released in 2010*



both.  As shown in Figure 15, one-fifth (20.3%) of zero-point offenders with no prior contact with the criminal justice system were rearrested during the study period.  In comparison, nearly one-third (32.7%) of zero-point offenders with prior contact were rearrested.  However, both groups of zero-point offenders were rearrested at lower rates compared to their CHC I counterparts with one criminal history point, 42.3 percent of whom were rearrested during the study period.

These findings also are similar to the Commission's findings in the *2017 Recidivism Criminal History Report*.  In that publication, the Commission reported that offenders with zero criminal history points had a rearrest rate of 30.2 percent.  However, offenders who had no prior contact with the criminal justice system had a rearrest rate of 25.7 percent and offenders with prior contact had a rearrest rate of 37.4 percent.[74]

The Commission also analyzed career offenders and armed career criminals for both the 2010 and 2005 cohorts.  Recidivism rates for those offenders were lower than for offenders who were in the highest CHC, absent application of those recidivist provisions.  Only 3.8 percent of offenders in this study were sentenced as career offenders or armed career criminals.  However, almost two-thirds (62.8%) of those offenders were rearrested during the study period (Figure 16).  These rates were lower than the rearrest rates for offenders in the most serious CHC of VI (76.2%).  This difference is attributable to the provisions in §§4B1.1 and 4B1.4.  Those guideline provisions assign career offender and armed career criminal status based on a combination of the type of instant offense and types of prior convictions.[75]  Because those guidelines assign CHC based on offender status in lieu of criminal history points, the resulting CHCs often supersede the otherwise applicable CHCs.[76]  For

**28**

*Recidivism of Federal Offenders Released in 2010*

Figure 16. Rearrest Rates for Offenders with Most Extensive Criminal History
*Federal Offenders Released in 2010*



example, more than half (51.0%) of career offenders and armed career criminals had higher CHCs than would have otherwise applied based on criminal history points alone.

Similarly, among offenders released in 2005, 69.5 percent of offenders who qualified as career offenders or armed career criminals were rearrested, compared to 80.1 percent of offenders in CHC VI. The Commission also reported similar findings in other studies. In its 2016 *Report to the Congress: Career Offender Sentencing Enhancements*, the Commission studied offenders who were released between 2004 and 2006 who had been sentenced as career offenders under §4B1.1. Two-thirds (66.2%) of career offenders were rearrested in the eight-year study period.[77] In its *Armed Career Criminal Report*, the Commission studied offenders who were released between 2009 and 2011 who had been sentenced as armed

career criminals pursuant to ACCA and §4B1.4. More than half (59.0%) of armed career criminals were rearrested in the eight-year study period.[78]

### The Combined Impact of Age and Criminal History

Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism. Older offenders were rearrested at lower rates compared to younger offenders within each CHC, and rearrests increased within each age category across CHC. The Commission reported a similar pattern for offenders released in 2005 in its *2017 Recidivism Age Report*.[79] In the current study, offenders aged 60 and older at release and in CHC I had the lowest rearrest rate, 9.4 percent (Table 4). The rearrest rate was twice as high (18.2%) for CHC II offenders in that age group. Furthermore, the rearrest

United States Sentencing Commission

rate was five times as high (46.9%) for CHC VI offenders in that age group; a rate comparable to CHC I offenders aged 21 to 29 at release (48.5%). At the other end of the spectrum, all offenders younger than age 21 at release and in CHCs IV, V, and VI were rearrested. Because CHC is determined, in part, by the number and length of prior sentences, only 19 offenders were under the age of 21 and in CHC IV, V, and VI. There were 347 offenders under the age of 21 at release in CHC I, and two-thirds (66.6%) of those offenders were rearrested, a rate comparable to CHC V offenders aged 40 to 49 (67.4%).

Similarly, in the 2005 cohort, offenders aged 60 and older in CHC I had the lowest rearrest rate, 11.3 percent. In comparison, 53.0 percent of CHC I offenders in the youngest age group in that study, younger than 30 years of age, were rearrested. Considering CHC VI offenders in that study, 37.7 percent of offenders aged 60 and older were rearrested, compared to 89.7 percent of offenders younger than 30 years of age.



**Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism.**

Table 4. Rearrest Rates by Age at Release and Criminal History Category
*Federal Offenders Released in 2010*

| AGE | CRIMINAL HISTORY CATEGORY (CHC) | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | CHC I | CHC II | CHC III | CHC IV | CHC V | CHC VI | |
| Younger than 21 | 66.6% | 84.1% | 90.7% | 100.0% | 100.0% | 100.0% | 72.5% |
| 21 – 29 | 48.5% | 66.9% | 79.1% | 85.4% | 86.4% | 89.9% | 64.4% |
| 30 – 39 | 31.2% | 49.6% | 61.3% | 71.4% | 77.3% | 81.1% | 54.1% |
| 40 – 49 | 22.3% | 41.6% | 50.9% | 62.9% | 67.4% | 73.1% | 42.7% |
| 50 - 59 | 15.0% | 30.8% | 46.4% | 48.6% | 61.7% | 65.3% | 30.8% |
| 60 and Older | 9.4% | 18.2% | 28.1% | 30.0% | 48.6% | 46.9% | 15.9% |
| TOTAL | 30.2% | 49.4% | 61.9% | 70.3% | 75.4% | 76.2% | |

**30**

*Recidivism of Federal Offenders Released in 2010*

# ADDITIONAL CHARACTERISTICS

## Offender Characteristics

As shown in Table 5, male offenders had substantially higher rearrest rates (52.3%) compared to female offenders (35.1%) during the study period.  Black offenders had the highest rearrest rates (58.2%), followed by Other Races (50.2%), Hispanic (46.5%), and White (42.9%) offenders.  These demographic differences in rearrest rates, however, must be considered in light of the association between criminal history and recidivism discussed above.  Black offenders had the smallest proportion (30.0%) of offenders in CHC I compared to White (52.7%), Hispanic (55.3%), and Other Races (58.2%).  Also, Black offenders had the largest proportion (16.5%) of offenders in CHC VI compared to White (9.1%), Hispanic (6.5%), and Other Races (4.6%).  Rearrest rates were comparable for offenders in the highest CHC.  For offenders in CHC VI, the rearrest rates were as follows:  Black (75.0%), White (78.3%), Hispanic (74.1%), and Other Races (80.8%).

Rearrest rates decreased steadily for each successive increase in educational level.  More than half of offenders who did not complete high school (60.8%) or graduated high school (50.2%) were rearrested.  In comparison, 37.2 percent of offenders with some college and 19.6 percent of college graduates were rearrested during the study period.

Table 5.  Rearrest Rates by Offender Characteristics
*Federal Offenders Released in 2010*

| Offender Characteristics | % Rearrested |
|---|---|
| **Gender** | |
| Male | 52.3% |
| Female | 35.1% |
| **Race/Ethnicity** | |
| White | 42.9% |
| Black | 58.2% |
| Hispanic | 46.5% |
| Other | 50.2% |
| **Education** | |
| Less than High School | 60.8% |
| High School Graduate | 50.2% |
| Some College | 37.2% |
| College Graduate | 19.6% |

Rearrest rates based on these offender characteristics were the same for offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission reported that 52.2 percent of male offenders and 36.4 percent of female offenders were rearrested during the study period.  In addition, eight years after release into the community, Black offenders had been arrested at the highest rates (59.1%), followed by Other Races (49.4%), Hispanic (49.1%), and White (41.7%) offenders.  Education levels were similarly associated with different rates of recidivism.  Offenders who did not complete high school had the highest recidivism rates (60.4%), followed by high school graduates (50.7%) and those with some college (39.3%).  College graduates had the lowest rates (19.1%).[80]

**31**

**R84**

United States Sentencing Commission

Figure 17.  Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*



## Offense Characteristics

Rearrest rates varied substantially by the type of offense for which offenders were originally sentenced (Figure 17). Offenders sentenced for a federal firearms offense had the highest rearrest rate, 70.6 percent, followed by robbery (63.2%) and immigration[81] (56.7%).  Fewer than half of offenders sentenced for drug trafficking (48.0%), fraud, theft, or embezzlement (35.5%), and all other offenses (41.9%)

were rearrested.[82]  In addition, offenders who were released following sentencing for a violent offense were more likely to be rearrested than non-violent offenders, 59.9 percent compared to 48.2 percent (Figure 18).

These findings reflect previous Commission findings for federal offenders released in 2005.  In its *2016 Recidivism Overview Report*, the Commission reported the highest rearrest rates for offenders who were released following sentences for firearms (68.3%) and robbery (67.3%) offenses.  In addition, the lowest rearrest rates were for offenders sentenced for fraud (34.2%), larceny (44.4%), and all other (42.0%) offenses.[83]  In addition, in its *2017 Recidivism Criminal History Report* the Commission determined that 64.1 percent of violent offenders were rearrested during the study period.[84]

> "
> **Offenders sentenced for a federal firearms offense had the highest rearrest rate.**

**R85**

Figure 18.  Rearrest Rates by Violent Federal Offense Type
*Federal Offenders Released in 2010*



The Commission examined whether offenders in the study were consistent in their offending patterns.  To make this determination, the Commission compared each offender's original federal offense type to the most serious offense at rearrest.  These comparisons did not demonstrate consistent patterns.  Similar to the overall findings reported above, assault was the most common type of rearrest for offenders originally sentenced for drug trafficking (19.9%), firearms (26.6%), immigration (22.8%), and all other types offenses (20.8%) (Table 6).

A pattern demonstrating consistency in the most common type of rearrest and federal offense appeared for only two groups of offenders.  For offenders originally sentenced for fraud, theft, or embezzlement, the most common type

of rearrest was larceny (18.8%) and the second most common type of rearrest was assault (13.8%), but the third was fraud (13.0%).  In addition, the most common type of rearrest was robbery (24.7%) for offenders originally sentenced for robbery.

Table 6.  Federal Offense Type by Most Common Rearrest Type
*Federal Offenders Released in 2010*

| Federal Offense Type | Most Common Rearrest |
|---|---|
| Drug Trafficking | Assault (19.9%) |
| Firearms | Assault (26.6%) |
| Immigration | Assault (22.8%) |
| All Other | Assault (20.8%) |
| Fraud/Theft/Embezzlement | Larceny (18.8%) |
| Robbery | Robbery (24.7%) |

United States Sentencing Commission

Figure 19.  Prevalence of Violence (Instant Federal Offense and Rearrest)
*Federal Offenders Released in 2010*



Violent offenders were more likely to be rearrested for a violent offense compared to non-violent offenders; 45.5 percent of offenders originally sentenced for a violent offense also had a violent offense as the most serious offense at rearrest. In comparison, 29.6 percent of offenders sentenced for non-violent offenses had a violent offense as the most serious offense at rearrest (Figure 19).



**The Commission examined whether offenders in the study were consistent in their offending patterns and found that violent offenders were more likely to be rearrested for violent offenses compared to non-violent offenders.**

The Commission also assessed the relationship between various sentencing factors and recidivism.  As shown in Figure 20, most sentencing factors were not strongly associated with rearrest.  More than one-half (54.0%) of offenders whose original federal offense involved a weapon were rearrested, compared to less than half (48.7%) of offenders whose offense did not involve a weapon.  In addition, rearrest rates for offenders with and without sentencing adjustments for mitigating role and acceptance of responsibility were comparable.  In contrast, a notably smaller proportion of offenders who received an aggravating role adjustment (36.2%) were rearrested compared to offenders who did not receive the adjustment (49.9%).

**34**

*Recidivism of Federal Offenders Released in 2010*

While the lower rearrest rate for arguably more culpable offenders may seem counterintuitive, two factors associated with lower rearrest rates, age at release and federal offense type, characterized offenders who received the adjustment. First, offenders who received a sentencing adjustment for an aggravating role were, on average, older at release (43 years) than offenders who did not receive the enhancement (38 years). Second, offenders originally sentenced for offenses with the lowest rearrest rates, fraud, theft, or embezzlement, comprised nearly one-third (30.2%) of offenders who received an aggravating role enhancement. That proportion is almost twice the proportion of fraud, theft, or embezzlement offenders in the overall study group of 17.4 percent.

## Sentences Imposed

### *Imprisonment*

More than half (53.0%) of offenders sentenced to imprisonment were rearrested (Figure 21), and there was some variation in rearrest rates comparing length of imprisonment terms. Offenders originally sentenced to imprisonment terms of less than six months had the lowest rearrest rates, 41.7 percent. In comparison, offenders who originally were sentenced to imprisonment terms of two to just under five years (55.0%) and five to just under ten years (56.2%) had the highest rearrest rates. The rearrest rate for offenders originally sentenced to terms of imprisonment of ten years or longer was comparatively low at 50.3 percent.

Figure 20.  Rearrest Rates by Selected Sentencing Factors
*Federal Offenders Released in 2010*



**35**

United States Sentencing Commission

The Commission's findings in its *2020 Recidivism Incarceration Report* provide context for this outcome. That study included two research designs that matched offender comparison groups to analyze the relationship between length of incarceration and recidivism. The Commission used various statistical models and consistently found that incarceration lengths of more than ten years were associated with lower odds of rearrest. Two sets of analyses in that study demonstrated that offenders incarcerated for more than ten years were between 30 percent and 45 percent less likely to recidivate eight years after release compared to groups of offenders sentenced to shorter terms of imprisonment.[85] The Commission found no statistically significant relationship between recidivism and incarceration lengths of 60 months or less.[86] In addition, when focusing on the shortest period of incarceration studied (12 to 24 months), the research designs yielded varying results, neither of which were statistically significant nor sufficiently reliable to make evidence-based conclusions.[87]

### Probation

Fewer than one-third (29.3%) of offenders sentenced to probation were rearrested (Figure 22). Offenders sentenced to a probation term of any length had lower rearrest rates compared to offenders sentenced to prison. The largest proportion of offenders sentenced to probation who were rearrested (31.5%) were sentenced to terms of three years and five years or more.

Figure 21. Rearrest Rates by Length of Imprisonment Terms
*Federal Offenders Released in 2010*



36

*Recidivism of Federal Offenders Released in 2010*

Figure 22.  Rearrest Rates by Length of Probation Terms
*Federal Offenders Released in 2010*



## Supervised Release

Nearly all (99.4%) offenders sentenced to a term of imprisonment also were sentenced to a term of supervised release, and there was some variation in rearrest rates comparing length of supervised release terms (Figure 23).  Offenders sentenced to less than two years of supervised release had the lowest rearrest rates, 46.4 percent, compared to 56.3 percent for offenders originally sentenced to three to just under four years of supervised release.

Figure 23.  Rearrest Rates by Length of Supervised Release Terms
*Federal Offenders Released in 2010*



**37**

United States Sentencing Commission

# CONCLUSION

This study examined the recidivism of federal offenders released in 2010 during an eight-year follow-up period.  Almost one-half (49.3%) of federal offenders were rearrested during the study period.  This recidivism rate is identical to the rate reported by the Commission for federal offenders released in 2005.  Notably, this consistency ensued despite two substantial changes in the federal sentencing landscape:  the change from a mandatory to an advisory guideline system following *Booker*, and the increasing reliance on evidence-based practices in federal supervision.  Other recidivism patterns also were the same for the two offender cohorts.

Consistent with its prior reports,[88] the Commission found that the combined factors of age and criminal history were strongly associated with recidivism.  All offenders in the study aged 21 and younger in CHC IV through VI were rearrested, compared to 9.4 percent of offenders aged 60 and older in CHC I.  In addition, offenders who originally were sentenced for firearms offenses had the highest rearrest rates of any offense type and offenders originally sentenced for a violent offense had higher rearrest rates compared to non-violent offenders.  The study also examined the relationships of other sentencing and offender characteristics that also were consistent with prior studies.



## For More Information

**Visit the Commission's website for additional resources on recidivism.**

*www.ussc.gov*

### Related Reports



**Recidivism Series**
*2005 Study Cohort*

Published 2016 - 2020

**38**

# APPENDICES

United States Sentencing Commission

# APPENDIX A

## Methodology

The Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts (AOUSC) to provide the Commission with secure electronic access to criminal history records through CJIS's Interstate Identification Index (III) and International Justice and Public Safety Network (NLETS).  Results received using this system provide an individual's Criminal History Record Information (CHRI) maintained by all U.S. states, the District of Columbia, U.S. territories, and federal agencies.  Once the raw CHRI was obtained, the Commission organized and standardized the arrest and court disposition information into an analytical dataset.  The resulting data contained CHRI for 32,135 offenders with valid identifying information and who were released in 2010.

### Identifying the Study Cohort

The study cohort includes all federal offenders who were U.S. citizens and released from federal prison after serving a sentence of imprisonment or placed on probation in 2010.  For offenders released from prison, the Bureau of Prisons (BOP) provided release dates and identifying information for all offenders released in 2010.  The Commission identified offenders placed on probation in 2010

and, with the assistance of the AOUSC, identified and removed offenders who died while on supervised release during the recidivism follow-up period.

### Processing the Criminal History Record Information

The Commission entered into a data sharing agreement with the FBI's CJIS Division and the AOUSC to acquire electronic records of offender CHRI.  The AOUSC extracted offender CHRI through its Access to Law Enforcement System (ATLAS) which provides an interface to III and NLETS.  The III allows authorized agencies to determine whether any federal or state repository has CHRI on an individual.  Agencies can then securely access specific state CHRI through NLETS.  As a result, ATLAS collects CHRI from all state and federal agencies.

The ATLAS system returns the literal text in the RAP sheets in the format in which the original records appear: dates of criminal justice system actions (*e.g.*, arrests); offense categories which indicate the charges in the terminology used by that agency (*e.g.*, text strings or numeric categories); subsequent action tied to arrest charges (*e.g.*, charges filed by prosecutors, court findings of guilt, etc.); and sentencing and corrections information.  All of these records are subject to availability from the originating source.

**40**

The ATLAS system also "parses" records from RAP sheets received from all 50 states, the District of Columbia, and federal agencies. Parsing records involves organizing key data elements into logical components, for example: arrest, court, and correctional events. Key data elements include offender identifiers, dates of key actions (*e.g.*, arrests and convictions), the criminal charges, and outcomes, such as convictions and sentencing information, when provided by the courts. The parsing process collates the multi-state records into a uniform structure, regardless of the state, for all individuals with a valid FBI number who were found in one or more repositories across the country.

### *Standardizing the Criminal Records*

After acquiring offender CHRI, the Commission contracted with Integrity One Partners (IOP) to consolidate records for each offender and remove duplicative or extraneous material.[89] Following this preliminary process, IOP utilized a crosswalk created for the Commission's prior recidivism research[90] to standardize offense codes across states and federal agencies. The crosswalk was updated to standardize new offense codes not mapped in the original crosswalk. The crosswalk standardizes arrest and court codes, regardless of originating sources, into a common framework for analysis. This step was needed because criminal

record repositories are primarily designed to store records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges. Thus, standardizing the offense information was necessary for cross-jurisdictional analysis.

Within each arrest cycle, arrest charges were categorized using standardized codes. A charge severity index was created which incorporates both criminal law classification (*e.g.*, felony or misdemeanor) and offense severity. Offenses were first classified into standardized subcategories. These subcategories were then further grouped for analytical purposes into one of 20 major crime categories in ranking order by severity. For each offender, the most severe major crime category was identified in their arrest information. The rearrest categories and their underlying subcategories are provided in Table A.

41

United States Sentencing Commission

Table A.  Rearrest Offense Categories and Charges

| | |
|---|---|
| **MURDER** | *Murder of public officer* |
| | *Murder* |
| | *Attempted murder* |
| | *Unspecified manslaughter/homicide* |
| | *Nonnegligent manslaughter/homicide* |
| **SEXUAL ASSAULT** | *Rape* |
| | *Forcible sodomy* |
| | *Fondling* |
| | *Statutory rape* |
| | *Luring minor by computer* |
| | *Other sexual assault* |
| | *Sexual assault unspecified* |
| **ROBBERY** | *Armed robbery* |
| | *Robbery unspecified* |
| | *Unarmed robbery* |
| **ASSAULT** | *Aggravated/felony assault* |
| | *Simple/misdemeanor assault* |
| | *Assault unspecified* |
| | *Assault of public officer* |
| | *Intimidation* |
| | *Hit and run driving with bodily injury* |
| | *Intimidating a witness* |
| **OTHER VIOLENT** | *Kidnapping* |
| | *Blackmail/Extortion* |
| | *Rioting* |
| | *Child abuse* |
| | *Other violent offense* |
| | *Arson* |
| **DRUG TRAFFICKING** | *Trafficking cocaine/crack* |
| | *Trafficking heroin* |
| | *Trafficking marijuana* |
| | *Trafficking methamphetamine* |
| | *Trafficking other/unspecified controlled substance* |
| **BURGLARY** | *Burglary* |

**42**

**R95**

| | |
|---|---|
| LARCENY | *Motor vehicle theft* |
| | *Grand/felony larceny* |
| | *Petty/misdemeanor larceny* |
| | *Larceny unspecified* |
| | *Receiving stolen property* |
| | *Trafficking stolen property* |
| | *Unauthorized use of vehicle* |
| FRAUD | *Fraud/forgery* |
| | *Identity theft* |
| | *Embezzlement* |
| | *Bribery* |
| OTHER PROPERTY | *Destruction of property* |
| | *Hit and run with property damage* |
| | *Trespassing* |
| | *Possession of burglary tools* |
| | *Other property offense* |
| DRUG POSSESSION | *Possession of cocaine/crack* |
| | *Possession of heroin* |
| | *Possession of marijuana* |
| | *Possession of methamphetamine* |
| | *Possession of other/unspecified controlled substance* |
| OTHER DRUG | *Unspecified cocaine/crack offense* |
| | *Unspecified heroin offense* |
| | *Unspecified marijuana offense* |
| | *Unspecified methamphetamine offense* |
| | *Unspecified other/unspecified drug offense* |
| WEAPON | *Weapon offense* |
| OTHER SEX OFFENSE | *Morals offense* |
| | *Indecent exposure* |
| | *Commercialized vice* |
| | *Contributing to the delinquency of a minor* |
| **DUI/DWI** | *Driving while intoxicated/under the influence, Substance unspecified* |
| | *Driving while intoxicated/under the influence, alcohol* |
| | *Driving while intoxicated/under the influence, drugs* |
| IMMIGRATION | *Immigration offense* |

**43**

United States Sentencing Commission

| | |
|---|---|
| **ADMINISTRATION OF JUSTICE OFFENSES** | *Escape from custody* |
| | *Flight to avoid prosecution* |
| | *Warrant* |
| | *Contempt of court* |
| | *Failure to appear* |
| | *Violation of restraining order* |
| | *Other court offense* |
| | *Prison contraband offense* |
| | *Sex offender registry offense* |
| | *Obstruction of justice* |
| **PROBATION/PAROLE/ SUPERVISED RELEASE VIOLATION** | *Parole violation* |
| | *Unspecified probation/parole violation* |
| | *Probation violation* |
| **PUBLIC ORDER OFFENSES** | *Family-related offense* |
| | *Drunkenness/vagrancy/disorderly conduct* |
| | *Invasion of privacy* |
| | *Liquor law violation* |
| | *Other public order offense* |
| | *Curfew violation* |
| **OTHER/UNSPECIFIED OFFENSES** | *Vehicular manslaughter/homicide* |
| | *Negligent (involuntary) manslaughter/homicide* |
| | *Habitual offender* |
| | *Runaway* |
| | *Truancy* |
| | *Ungovernability* |
| | *Status liquor law violation* |
| | *Miscellaneous status offense* |
| | *Other offense* |
| | *Unspecified inchoate offense* |
| | *Military offense* |
| | *Not applicable* |
| | *Unspecified offense* |

**44**

*Recidivism of Federal Offenders Released in 2010*

# APPENDIX B

Table B-1.  Selected Offender Characteristics
*Federal Offenders Released in 2010 and 2005*

| | Release Year | |
|---|---|---|
| **Offender Characteristics** | 2010 | 2005 |
| **Race/Ethnicity** | | |
| White | 41.2% | 43.7% |
| Black | 35.8% | 33.9% |
| Hispanic | 18.1% | 17.8% |
| Other | 4.9% | 4.6% |
| **Gender** | | |
| Male | 82.7% | 81.7% |
| Female | 17.3% | 18.3% |
| **Education** | | |
| Less than High School | 34.9% | 34.2% |
| High School Graduate | 38.4% | 36.9% |
| Some College | 20.3% | 21.4% |
| College Graduate | 6.4% | 7.5% |
| **Age at Sentencing** | | |
| Average | 35 Years | 35 Years |
| Median | 33 Years | 33 Years |
| **Age at Release** | | |
| Average | 38 Years | 38 Years |
| Median | 37 Years | 36 Years |

United States Sentencing Commission

Table B-2.  Selected Offense Characteristics and Sentencing Information
*Federal Offenders Released in 2010 and 2005*

| Offense Characteristics and Sentencing Information | Release Year | |
|---|---|---|
| | 2010 | 2005 |
| **Federal Offense Type*** | | |
| Drug Trafficking | 43.1% | 41.6% |
| Firearms | 15.3% | 12.8% |
| Fraud/Theft/Embezzlement | 17.4% | 13.6% |
| Immigration | 4.4% | 3.5% |
| Robbery | 4.1% | 4.3% |
| All Other Offenses | 15.7% | 24.2% |
| **Weapon Involvement** | | |
| Enhancement Applied | 11.7% | 9.8% |
| **Aggravating Role** | | |
| Enhancement Applied | 5.0% | 6.4% |
| **Mitigating Role** | | |
| Reduction Applied | 8.4% | 10.6% |
| **Acceptance of Responsibility** | | |
| Reduction Applied | 92.2% | 90.7% |
| **Criminal History Category** | | |
| CHC I | 45.3% | 53.6% |
| CHC II | 11.9% | 12.2% |
| CHC III | 15.8% | 14.3% |
| CHC IV | 9.8% | 7.9% |
| CHC V | 6.1% | 4.4% |
| CHC VI | 11.1% | 7.6% |
| **Sentence Type** | | |
| Prison | 84.4% | 81.2% |
| Probation | 15.6% | 18.8% |
| **Sentence Length** | | |
| Average | 51 Months | 45 Months |
| Median | 36 Months | 30 Months |
| **Imprisonment Length** | | |
| Average | 59 Months | 55 Months |
| Median | 45 Months | 37 Months |

* The Commission used slightly different offense classification schemes for federal offenses in the two analyses.  The offense type categories for this report were derived from the 30 Type of Crime categories the Commission reports in its *Sourcebook of Federal Sentencing Statistics*.  *See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 210–14 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.  The offense type categories reported in the 2016 Recidivism Overview Report were derived from the 33 Primary Offense categories the Commission previously reported in its *Sourcebook of Federal Sentencing Statistics*.  *See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 167–70 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf.  To facilitate comparison, the offense types for offenders in the 2005 cohort were updated in this table to conform to the classification scheme used for the 2010 cohort.

*Recidivism of Federal Offenders Released in 2010*

# APPENDIX C

Figure C.  Distribution of Other Offense Types at Original Sentencing
*Federal Offenders Released in 2010*



| Distribution of Other Offenses | |
|---|---|
| Money Laundering | 1.7% |
| Administration of Justice | 1.6% |
| Child Pornography | 1.5% |
| Tax | 1.5% |
| Forgery/Counterfeit/Copyright | 1.5% |
| Assault | 1.0% |
| Sexual Abuse | 0.9% |
| All Other | 6.0% |

**47**

United States Sentencing Commission

# APPENDIX D

Table D-1.  Selected Offender Characteristics
*Federal Offenders Released in 2010 With No Rearrests*

| Offender Characteristics | |
|---|---|
| **Race/Ethnicity** | |
| White | 46.4% |
| Black | 29.6% |
| Hispanic | 19.1% |
| Other | 4.9% |
| **Gender** | |
| Male | 77.9% |
| Female | 22.1% |
| **Education** | |
| Less than High School | 27.0% |
| High School Graduate | 37.7% |
| Some College | 25.2% |
| College Graduate | 10.1% |
| **Age at Sentencing** | |
| Average | 39 Years |
| Median | 37 Years |
| **Age at Release** | |
| Average | 41 Years |
| Median | 40 Years |

**48**

*Recidivism of Federal Offenders Released in 2010*

Table D-2.  Selected Offense Characteristics and Sentencing Information
*Federal Offenders Released in 2010 With No Rearrests*

| Offense Characteristics and Sentencing Information | |
|---|---|
| **Federal Offense Type** | |
| Drug Trafficking | 44.2% |
| Firearms | 8.9% |
| Fraud/Theft/Embezzlement | 22.1% |
| Immigration | 3.8% |
| Robbery | 3.0% |
| All Other Offenses | 18.0% |
| **Criminal History Category** | |
| CHC I | 62.4% |
| CHC II | 11.8% |
| CHC III | 11.9% |
| CHC IV | 5.7% |
| CHC V | 3.0% |
| CHC VI | 5.2% |
| **Sentence Type** | |
| Prison | 78.3% |
| Probation | 21.7% |

United States Sentencing Commission

# APPENDIX E

Table E.  Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*

| Federal Offense Type | Total Offenders | Offenders Rearrested | |
|---|---|---|---|
| | N | N | % |
| Drug Trafficking | 13,835 | 6,641 | 48.0 |
| Firearms | 4,917 | 3,469 | 70.6 |
| Fraud/Theft/Embezzlement | 5,580 | 1,980 | 35.5 |
| Robbery | 1,322 | 835 | 63.2 |
| Immigration | 1,431 | 812 | 56.7 |
| Forgery/Counterfeit/Copyright | 480 | 280 | 58.3 |
| Assault | 321 | 223 | 69.5 |
| Child Pornography | 494 | 204 | 41.3 |
| Administration of Justice | 510 | 189 | 37.1 |
| Other | 368 | 184 | 50.0 |
| Sexual Abuse | 283 | 159 | 56.2 |
| Prison Offenses | 160 | 133 | 83.1 |
| Obscenity/Other Sex Offenses | 184 | 131 | 71.2 |
| Money Laundering | 539 | 127 | 23.6 |
| Drug Possession | 165 | 84 | 50.9 |
| Stalking/Harassing | 103 | 63 | 61.2 |
| Tax | 483 | 61 | 12.6 |
| Extortion/Racketeering | 151 | 43 | 28.5 |
| Arson | 71 | 34 | 47.9 |
| Burglary/Trespass | 46 | 32 | 69.6 |
| Manslaughter | 47 | 31 | 66.0 |
| Murder | 68 | 31 | 45.6 |
| Bribery/Corruption | 236 | 31 | 13.1 |
| Commercialized Vice | 111 | 20 | 18.0 |
| Individual Rights | 67 | 17 | 25.4 |
| Environmental | 93 | 17 | 18.3 |
| Kidnapping | 20 | 11 | 55.0 |
| National Defense | 21 | 5 | 23.8 |
| Food and Drug | 24 | 4 | 16.7 |
| Antitrust | 5 | 0 | 0.0 |

**50**

# ENDNOTES

United States Sentencing Commission

# ENDNOTES

1       28 U.S.C. § 995(a)(12)–(14).

2       543 U.S. 220 (2005) (striking the mandatory provision of 18 U.S.C. § 3553(b)(1) and rendering the guidelines advisory).

3       Kim Steven Hunt & Robert Dumville, U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf [hereinafter 2016 Recidivism Overview Report].

4       *Id.* at 15.

5       U.S. Sent'g Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 41–44 (1987), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf. *See also* William Rhodes, Christina Dyous, Ryan Kling, Dana Hunt & Jeremy Luallen, ABT Assoc., Recidivism of Offenders on Federal Community Supervision (2012), https://www.ojp.gov/pdffiles1/bjs/grants/241018.pdf [hereinafter Rhodes]; Alfred Blumstein, David P. Farrington & Soumyo Moitra, *Delinquency Careers: Innocents, Desisters, and Persisters*, 6 Crime & Just. 187 (1985) (describing two major cohort studies and the recidivism probability of youthful offenders increasing with successive involvements with law enforcement); Paul Gendreau, Tracy Little & Claire Goggin, *A Meta-Analysis of the Predictors of Adult Offender Recidivism: What Works!*, 34 Criminology 575 (1996) (explaining meta-analysis of 131 studies which found the strongest predictors of recidivism included criminogenic needs, criminal history, social achievement, age/gender/race, and family factors) [hereinafter Gendreau].

6       *See* 2016 Recidivism Overview Report, *supra* note 3, at 5.

7       Louis Reedt, Kim Steven Hunt, James L. Parker, Melissa K. Reimer & Kevin T. Maass, U.S. Sent'g Comm'n, Recidivism Among Federal Drug Trafficking Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf; Matthew J. Iaconetti, Tracey Kyckelhahn & Mari McGilton, U.S. Sent'g Comm'n, Recidivism Among Federal Firearms Offenders (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf [hereinafter 2019 Recidivism Firearms Report]; Kim Steven Hunt, Matthew J. Iaconetti & Kevin T. Maass, U.S. Sent'g Comm'n, Recidivism Among Federal Violent Offenders (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf [hereinafter 2019 Recidivism Violence Report].

8       Tracey Kyckelhahn & Trishia Cooper, U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf [hereinafter 2017 Recidivism Criminal History Report]; Kim Steven Hunt & Billy Easley, U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf [hereinafter 2017 Recidivism Age Report]; Ryan Cotter, U.S. Sent'g Comm'n, Length of Incarceration and Recidivism (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf [hereinafter 2020 Recidivism Incarceration Report].

9       *See* case cited *supra* note 2 and accompanying text.

10      Jonathan E. Hurtig & Lisa Marie Lenart, *The Development of the Evidence-Based Practice Blue Print and Where We are Now*, 75 Fed. Prob. J. (2011), https://www.uscourts.gov/sites/default/files/75_2_6_0.pdf; Melissa

**52**

Alexander, Bradley Whitley & Christopher Bersch, *Driving Evidence-Based Supervision to the Next Level: Utilizing PCRA, "Drivers," and Effective Supervision Techniques*, 78 Fed. Prob. J. 2 (2014), https://www.uscourts.gov/sites/default/files/probation_dec_2014_1219b.pdf.

11      Prob. & Pretrial Servs. Off., Admin. Off. of the U.S. Cts., An Overview of the Federal Post Conviction Risk Assessment (2018), https://www.uscourts.gov/sites/default/files/overview_of_the_post_conviction_risk_assessment_0.pdf.

12      Nat'l Inst. of Just., U.S. Dep't of Just., *Recidivism*, (June 17, 2014), https://web.archive.org/web/20160120175242/http://www.nij.gov/topics/corrections/recidivism/pages/welcome.aspx; *see also* Michael D. Maltz, Recidivism 1, 54 (2001) [hereinafter Maltz].

13      *See* Maltz, *supra* note 12, at 7–20; *see also* Ryan King & Brian Elderbroom, Urb. Inst., Improving Recidivism as a Performance Measure (2014), https://www.bja.gov/Publications/UI-ImprovingRecidivism.pdf.

14      *See, e.g.*, Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, Investigating The Impact Of Pretrial Detention On Sentencing Outcomes (2013), https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_state-sentencing_FNL.pdf.

15      *See* Maltz, *supra* note 12, at 61–64.  *See also* Nat'l Inst. of Just., U.S. Dep't of Just., *Measuring Recidivism* (Feb. 20, 2008), https://web.archive.org/web/20160129195540/http://www.nij.gov/topics/corrections/recidivism/pages/measuring.aspx.

16      *See, e.g.*, Mariel Alper, Matthew R. Durose & Joshua Markman, Bureau of Just. Stat., U.S. Dep't of Just., Update of Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014) (2018), https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf [hereinafter Alper]; Admin. Off. of the U.S. Cts., *Just the Facts:  Post-Conviction Supervision and Recidivism*, (Oct. 22, 2018), https://www.uscourts.gov/news/2018/10/22/just-facts-post-conviction-supervision-and-recidivism#chart1; Rhodes, *supra* note 5.

17      *See* Maltz, *supra* note 12, at 55–60.

18      *See* Maltz, *supra* note 12, at 56–58.

19      *See* Alper, *supra* note 16.

20      The Commission collects and analyzes data on federal sentences to carry out its statutory responsibilities.  As authorized by Congress, the Commission's research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices, (2) the publication of data concerning the sentencing process, (3) the systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the sentencing factors in 18 U.S.C. § 3553(a), and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.  *See* 28 U.S.C. § 995(a)(12), (14)–(16).  The Commission collects information for every federal felony and Class A misdemeanor offense sentenced each year.  Sentencing courts are statutorily required to submit five sentencing documents to the Commission within 30 days of entry of judgment in a criminal case, including: (1) the charging document, (2) the plea agreement, (3) the Presentence Report, (4) the Judgment and Commitment order, and (5) the Statement of Reasons form.  *See* 28 U.S.C. § 994(w)(1).  For each case in its Individual Offender Datafile, the Commission routinely collects case identifiers, sentencing data, demographic variables, statutory information, the complete range of court guideline application decisions, and departure and variance information from these documents.

21      The data utilized in the course of conducting analyses in this report includes information obtained pursuant to an interagency agreement with the FBI, which prohibits the Commission from releasing the dataset.

22      Appendix A provides a detailed description of the data collection methodology.

United States Sentencing Commission

23      This includes any offenders released from BOP on detainer, which ordinarily indicates transfer of custody to state court or to a state correctional facility following completion of their federal sentence.

24      Offenders were excluded from various analyses in this report due to missing information for the variables required for those analyses.

25      Appendix B provides comparisons of offender and offense characteristics for the two study groups.

26      The 1,586 offenders comprising the Other Race category were American Indian/Alaskan Native (52.0%), Asian or Pacific Islander (41.8%), or Multi-racial/Other (6.2%).

27      The median is the midpoint; half of the offenders were below the median and the remaining half of offenders were above the median.

28      *See* 2016 Recidivism Overview Report, *supra* note 3, at 9.

29      The offense type categories were derived from the 30 Type of Crime categories the Commission reports in its *Sourcebook of Federal Sentencing Statistics*. *See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 210–14 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

30      U.S. citizens sentenced for immigration offenses primarily are sentenced under §2L1.1 (Smuggling, Transporting, or Harboring an Unlawful Alien). *See id.* at 132.

31      Offense type categories were selected for analysis that comprised more than four percent of the total. Information for the offense types comprising the "other" category is provided in Appendix C.

32      The Commission defined violent offenses based on guideline application.  In cases where multiple Chapter Two guidelines applied because the offender had multiple counts of conviction for different offenses, this report identifies the offender as violent if any of the guidelines that applied was for a violent offense, regardless of whether that guideline ultimately produced the highest offense level (*i.e.*, the primary guideline). *See* U.S. Sent'g Comm'n, *Guidelines Manual*, §1B1.5(a), comment. (n.1) (Nov. 2018) [hereinafter USSG].

33      The offense type categories reported in the *2016 Recidivism Overview Report* were derived from the 33 Primary Offense categories the Commission previously reported in its *Sourcebook of Federal Sentencing Statistics*. *See* U.S. Sent'g Comm'n, 2017 Sourcebook of Federal Sentencing Statistics 167–70 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf.

34      *See* 2016 Recidivism Overview Report, *supra* note 3, at 10.

35      Section 924(c) provides incremental, consecutive mandatory minimum penalties for the use, carrying, or possession of a firearm during or in furtherance of a crime of violence or a drug trafficking crime.  *See* 18 U.S.C. § 924(c).

36      Weapon involvement does not include: (1) cases in which a weapon is present in the offense, but the offender was not convicted of 18 U.S.C. § 924(c) or did not receive a weapon-related sentencing enhancement, (2) cases in which the specific enhancement can be applied for multiple reasons (*e.g.*, the specific enhancement can be applied if the offense involved either physical contact or if a dangerous weapon was possessed), or (3) cases sentenced as weapon offenses under Chapter Two, Part K of the *Guidelines Manual* (unless they were convicted of 18 U.S.C. § 924(c)).

37      USSG §3B1.1. Section 3B1.1 provides for a 4-level increase for an offender who was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, a 3-level increase for a manager or supervisor of criminal activity that involved five or more participants or was

**54**

otherwise extensive, and a 2-level increase for an organizer, leader, manager, or supervisor in any criminal activity than otherwise described. *Id.*

38      USSG §3B1.2. Section 3B1.2 provides for a 4-level decrease for an offender who was a minimal participant in any criminal activity, a 2-level decrease for any offender who was a minor participant in any criminal activity, and a 3-level decrease for offenders falling between the two. *Id.*

39      USSG §3E1.1. Section 3E1.1 provides for a 2-level decrease if the offender clearly demonstrates acceptance of responsibility for the offense. An additional 1-level decrease can apply if the offense level determined prior to the 2-level decrease is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty. *Id.*

40      USSG Ch.4. Other considerations include the type of offense (certain minor offenses are excluded from the criminal history score) and the length of time between the prior sentence and the instant federal offense. The guidelines exclude certain prior convictions based on factors such as the type of offense (*e.g.*, fish and game violations), disposition (*e.g.*, diversionary dispositions without a finding of guilt), or remoteness of the conviction. *See* USSG §4A1.2.

41      USSG Ch.5, Pt.A (Sentencing Table).

42      Of the 11,338 offenders with zero criminal history points, the remaining 52.1% had prior contact with the criminal justice system; that is, they had prior arrests that did not lead to convictions or they had convictions that did not receive points due to the age of the conviction or the minor nature of the offense.

43      In some instances, the percentage of offenders comprising the criminal history points categories do not sum to the total percentage of offenders comprising the associated CHC. This is because some guidelines provide for a CHC that supersedes the CHC determined by criminal history points. *See, e.g.*, USSG §4B1.1(b). Additionally, in a small number of cases, the CHC is determined by court findings and differs from the calculated criminal history points.

44      By comparison, the corresponding rates for offenders released in 2005 were as follows: CHC I (53.6%), CHC II (12.2%), CHC III (14.3%), CHC IV (7.9%), CHC V (4.4%), and CHC VI (7.6%). 2016 Recidivism Overview Report, *supra* note 3, at 10.

45      USSG §4B1.1(a).

46      *See* 18 U.S.C. § 924(e); USSG §4B1.4.

47      Of the 1,211 offenders sentenced under these provisions, 81.7% were sentenced as career offenders, 18.1% were sentenced as armed career criminals, and 0.2% were sentenced under both provisions.

48      *See* case cited *supra* note 2 and accompanying text.

49      The four types of sentences correspond to the four "Zones" (A–D) in the Sentencing Table of the *Guidelines Manual. See* USSG Ch.5, Pt.A (Sentencing Table); *see also* USSG §§5B1.1, 5C1.1 (setting forth the sentencing options for Zones A–D). Zone A authorizes probation only; Zone B authorizes probation with a condition of imprisonment; Zone C authorizes a "split" sentence of imprisonment and community confinement (*e.g.*, home detention or a halfway house); and Zone D authorizes sentences of imprisonment only. *See* USSG §§5B1.1, 5C1.1.

50      *See* 2016 Recidivism Overview Report, *supra* note 3, at 11. As in the *2016 Recidivism Overview Report*, the Commission analyzed the sentences imposed for offenders sentenced to alternatives for the current study. Similar to the prior analysis, offenders in the current study who were sentenced to prison with some type of alternative confinement had a median term of imprisonment of five months. In addition, nearly all (99.0%) offenders sentenced to a Zone B sentence of probation with some type of alternative confinement were

United States Sentencing Commission

sentenced to home confinement or community confinement (*e.g.*, a halfway house) rather than confinement in a jail or prison.

51      The median sentence imposed was 36 months.  Sentence imposed includes any time served amounts and imprisonment under §5G1.3.  Probation sentences are included as zero months.  Any portion of a sentence that is an alternative confinement as described in §5C1.1 is included.  Life sentences and sentences exceeding 470 months are included in the calculation as 470 months.

52      Twelve offenders among those sentenced to ten years or longer were originally sentenced to imprisonment terms of life.  They are included in the release cohort because they were subsequently resentenced to reduced terms.  Sentences reported in this study are the sentences originally imposed.  The Commission did not collect resentencing information prior to fiscal year 2006; therefore, complete resentencing information is not available for all offenders in the study.

53      USSG §5D1.1(a)–(c); 18 U.S.C. § 3583(a).  Convictions for drug trafficking offenses and certain kidnapping and sex offenses require a term of supervised release.  *See, e.g.*, 21 U.S.C. §§ 841, 846; 18 U.S.C. § 3583(k).

54      Selected data for offenders in the study who were not rearrested is provided in Appendix D.

55      2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 15.

56      *See infra* note 63 and accompanying text.

57      2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 11.

58      The rearrest rates for offenders released in 2010 were marginally different for offenders sentenced before (53.5%) and after (48.5%) the *Booker* decision.  Having been sentenced prior to January 12, 2005, offenders sentenced pre-*Booker* naturally had longer sentences compared to offenders sentenced post-*Booker*.  Attributes related to their longer sentences also are associated with recidivism.  For example, a smaller proportion of pre-*Booker* offenders (19.0%) were in CHC I than post-*Booker* offenders (50.7%).  In addition, a larger proportion of pre-*Booker* offenders (17.9%) than post-*Booker* offenders (7.7%) were sentenced for a violent offense.  Conversely, a smaller proportion of pre-*Booker* offenders (1.7%) than post-*Booker* offenders (20.6%) were sentenced for fraud, theft, or embezzlement.

59      2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 16.

60      Courts originally imposed supervision terms of eight years or longer (including life) for only 2.7% of offenders in the study.

61      This measurement is based on the supervision term imposed at the time of original sentencing and does not account for any changes in supervision status following release.  Such information was not available in the data used for this study.  Therefore, if a court terminated an offender's supervision prior to the expiration of the term initially imposed, that offender would still be considered under supervision for this analysis.  Alternatively, if a court extended an offender's supervision beyond the term originally imposed, that offender would be considered to have completed the supervision term for purposes of this analysis.

62      2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 9, 31 n.24.

63      Accordingly, the data should not be interpreted to represent the overall frequency of the listed offense among rearrests.

64      The "other violent" category includes violent offenses that do not fit into any of the specific violent categories.  It includes arson, blackmail/extortion, child abuse, kidnapping, rioting, and any other unspecified violent offense.

**56**

65      The Commission separated rearrests for administration of justice offenses (*e.g.*, failure to appear, resisting arrest without violence, and tampering with evidence), probation, parole, and supervision violations, and other sex offenses from public order offenses (*e.g.*, disorderly conduct, vice crimes, and public drunkenness) for this analysis, whereas the Commission previously combined those offense types into a single "public order" category.  *See* 2017 Recidivism Age Report, *supra* note 8, at 34 n.6.  *See also* Courtney Semisch, Kristen Sharpe & Alyssa Purdy, U.S. Sent'g Comm'n, Federal Armed Career Criminals: Prevalence, Patterns, and Pathways 80 n.68 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210303_ACCA-Report.pdf [hereinafter Armed Career Criminal Report].  Combined, the current findings for administration of justice, probation, parole, and supervision violations, other sex offenses, and public order offenses generally are analogous to the 2016 finding for public order offenses.  Reported separately, or in combination, the Commission ranks these offense types low in its severity ranking.  In addition, the four separate offense categories reported in this study comprised the previously existing public order category, making them largely comparable.

66      2016 Recidivism Overview Report, *supra* note 3, at 17.

67      *See* 2016 Recidivism Overview Report, *supra* note 3, at 18–19, 23.  *See also* 2017 Recidivism Criminal History Report, *supra* note 8; 2017 Recidivism Age Report, *supra* note 8.

68      2017 Recidivism Age Report, *supra* note 8, at 22–23.

69      *Id.* at 22.

70      *Id.* at 25.

71      *See supra* notes 39–40 and accompanying text.

72      2016 Recidivism Overview Report, *supra* note 3, at 18; 2017 Recidivism Criminal History Report, *supra* note 8, at 7.

73      2016 Recidivism Overview Report, *supra* note 3, at 18–19; 2017 Recidivism Criminal History Report, *supra* note 8, at 7–8.

74      2017 Recidivism Criminal History Report, *supra* note 8, at 9.

75      *See supra* notes 45–46 and accompanying text.

76      *See* USSG §§4B1.1(b), 4B1.4(c).

77      U.S. Sent'g Comm'n, Report to the Congress: Career Offender Sentencing Enhancements 39 (2016), www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

78      Armed Career Criminal Report, *supra* note 65, at 43.

79      2017 Recidivism Age Report, *supra* note 8, at 25.

80      *See* 2016 Recidivism Overview Report, *supra* note 3, at 24.

81      *See supra* note 30.

82      Rearrest rates for the offense types comprising the "All Other" category are provided in Appendix E.

83      2016 Recidivism Overview Report, *supra* note 3, at 20.  The Commission also reported on the recidivism of firearms offenders in its 2019 *Recidivism Firearms Report*.  Offenders in that study were designated as

United States Sentencing Commission

firearms offenders who: 1) were sentenced under §2K2.1, the primary sentencing guideline for unlawful receipt, possession or transportation of firearms or ammunition, and prohibited transactions involving firearms or ammunition, 2) sentenced pursuant to 18 U.S.C. § 924(e), the Armed Career Criminal Act ("ACCA"), 3) sentenced as career offenders pursuant to §4B1.1 who were also convicted of a federal firearms crime as part of the instant offense, or 4) convicted under 18 U.S.C. § 924(c) who did not otherwise receive the ACCA or career offender enhancement. All other offenders in the study were designated as non-firearms offenders. Because of this specific definition, the firearms offenders in this study are not directly comparable to those in the previous study. Nevertheless, 68.1% of firearms offenders in the previous study were rearrested. 2019 RECIDIVISM FIREARMS REPORT, *supra* note 7, at 2, 17.

84       2017 RECIDIVISM CRIMINAL HISTORY REPORT, *supra* note 8, at 11–12. The Commission also reported on the recidivism of violent offenders in its 2019 *Recidivism Violence Report.* Offenders in that study were designated as violent who engaged in violent criminal conduct as part of their instant offense *or* had been arrested for a violent offense in their past. In addition, offenders were designated as non-violent who *neither* engaged in a violent instant offense nor been arrested for a violent crime in their past. Because of this specific definition, the violent offenders in this study are not directly comparable to those in the previous study. Nevertheless, in the previous study, 63.8% of violent offenders were rearrested, compared to 39.8% of non-violent offenders. 2019 RECIDIVISM VIOLENCE REPORT, *supra* note 7, at 3–4.

85       2020 RECIDIVISM INCARCERATION REPORT, *supra* note 8, at 4.

86       *Id.* at 4, 53 n.10.

87       *Id.* at 4.

88       *See* 2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 18–19, 23. *See also* 2017 RECIDIVISM CRIMINAL HISTORY REPORT, *supra* note 8; 2017 RECIDIVISM AGE REPORT, *supra* note 8.

89       Instances of arrest or sentencing that appeared to be duplicates of existing events were removed by IOP. Minor traffic offenses (*e.g.*, speeding) and arrest entries occurring outside of the eight-year follow-up period were removed and, therefore, not used to ascertain recidivism.

90       *See* 2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, Appendix B.

**58**



## United States Sentencing Commission

www.ussc.gov

THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING

ONE COLUMBUS CIRCLE N.E.

SUITE 2-500, SOUTH LOBBY

WASHINGTON, DC 20002-8002

**U.S. Department of Justice**
Office of Justice Programs
*Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking*





# SOMAPI | RESEARCH BRIEF

SEX OFFENDER MANAGEMENT ASSESSMENT AND PLANNING INITIATIVE
Luis C.deBaca, Director • July 2015

# The Effectiveness of Treatment for Adult Sexual Offenders

by Roger Przybylski

## Introduction

Therapeutic interventions aimed at reducing the likelihood of reoffending are a staple of contemporary sex offender management practice. Although there is strong scientific evidence that therapeutic interventions work for criminal offenders overall, the effectiveness of treatment for sex offenders has been subject to debate.

This brief addresses the effectiveness of treatment for adult sexual offenders. Based on a review of the scientific literature, it summarizes what is scientifically known about the topic and identifies policy implications and knowledge gaps that have emerged from the extant research.

## Summary of Research Findings

The effectiveness of treatment for sex offenders has been assessed in both individual studies and synthesis research. There is general agreement in the research community that, among individual studies, well-designed and executed randomized controlled trials (RCTs) provide the most trustworthy evidence about an intervention's effectiveness.[1] Findings from a single study, however, must be replicated before definitive conclusions about the effectiveness of an intervention can be made.[2] Synthesis studies, such as a systematic review[3] or meta-analysis,[4] examine the findings from many individual studies and are undertaken to reach conclusions about an intervention's effectiveness based on an entire body of relevant research. When systematic reviews and meta-analyses are done well, they arguably provide

### About SOMAPI

In 2011, the SMART Office began work on the Sex Offender Management Assessment and Planning Initiative (SOMAPI), a project designed to assess the state of research and practice in sex offender management. As part of the effort, the SMART Office contracted with the National Criminal Justice Association (NCJA) and a team of subject-matter experts to review the literature on sexual offending and sex offender management and develop summaries of the research for dissemination to the field. These summaries are available online at http://smart.gov/SOMAPI/index.html.

A national inventory of sex offender management professionals also was conducted in 2011 to gain insight about promising practices and pressing needs in the field. Finally, a Discussion Forum involving national experts was held in 2012 for the purpose of reviewing the research summaries and inventory results and refining what is currently known about sex offender management.

Based on the work carried out under SOMAPI, the SMART Office has published a series of Research Briefs, each focusing on a topic covered in the sexual offending and sex offender management literature review. Each brief is designed to get key findings from the literature review into the hands of policymakers and practitioners. Overall, the briefs are intended to advance the ongoing dialogue about effective interventions for sexual offenders and provide policymakers and practitioners with trustworthy, up-to-date information they can use to identify what works to combat sexual offending and prevent sexual victimization.



Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

the most trustworthy evidence about an intervention's effectiveness.

# Findings From Individual Studies

One of the few studies to use an RCT design to evaluate the effectiveness of treatment for adult sex offenders was conducted by Marques and colleagues (2005). Widely known as the California Sex Offender Treatment and Evaluation Project (SOTEP), the study examined the effects of a cognitive-behavioral/relapse prevention program on the recidivism of sex offenders who were serving prison sentences for child molestation or rape. Based on a mean follow-up period of approximately 8 years, the study found no significant differences in sexual or violent recidivism between treated sex offenders and two untreated control groups.

Due to its use of random assignment, the SOTEP study is frequently cited as evidence that treatment for sex offenders is ineffective. However, Marques and her colleagues (2005) have pointed out that the study's treatment and control groups likely differed in important ways, and the treatment program itself did not fully adhere to the risk-need-responsivity (RNR) principles of effective intervention. Moreover, some of the treatment subgroups—such as high-risk offenders who "got it," meaning that they derived benefit from the program or basically met specified treatment goals—recidivated at a significantly lower rate than offenders who "did not get it."

Given the findings from the SOTEP study, it is important to recognize that treatment effectiveness can be dependent on a variety of factors, including the treatment climate, program delivery, and how the participant responds to treatment (Friendship, Mann, and Beech, 2003, p. 4). In their study of community-based treatment, for example, Beech and colleagues (2001) found that offenders who were responsive to treatment (based on change in pro-offending attitudes) were less likely to sexually recidivate than offenders who were not.

Several recent studies conducted in prison-based settings also suggest that treatment works.[5] For example—

- A study of a program in a Canadian prison that employed a cognitive-behavioral approach and subscribed to the RNR principles of effective intervention found that treatment produced significant reductions in sexual recidivism (Oliver,

Wong, and Nicholaichuk, 2008). Treated sex offenders in the study had sexual reconviction rates of 16.9 percent after 5 years and 21.8 percent after 10 years, compared to sexual reconviction rates for the untreated sex offenders of 24.5 percent after 5 years and 32.3 percent after 10 years of followup.

- A study of a prison-based therapeutic community treatment program in Colorado found that participation in treatment was significantly related to success on parole (Lowden et al., 2003). Sex offenders who completed treatment and participated in aftercare had revocation rates three times lower than untreated sex offenders. Each additional month spent in treatment increased the likelihood of success upon release by 1 percent (12 percent per year).

- In Minnesota, Duwe & Goldman (2009) found that participating in treatment significantly reduced the likelihood and pace of recidivism. For offenders who completed treatment, the observed sexual, violent, and general rearrest recidivism rates were 13.4 percent, 29 percent, and 55.4 percent, respectively. By comparison, the observed sexual, violent, and general rearrest rates for sex offenders who did not participate in treatment were 19.5 percent, 34.1 percent, and 58.1 percent. This study is important because it used propensity score matching (PSM) to create the study's comparison group. PSM is a sophisticated statistical technique for achieving greater equivalence between the treatment and comparison offenders.

# Findings From Synthesis Research

Although early reviews of sex offender treatment outcome research produced inconclusive results,[6] synthesis research conducted more recently has produced more positive, albeit qualified findings.[7] In a meta-analysis of 43 studies of psychological treatment for sex offenders, for example, Hanson and colleagues (2002) found that treatment produced a small but statistically significant reduction in both sexual and overall recidivism.[8] The researchers also reported that newer treatment programs were found to have a positive treatment effect, whereas older treatment programs were associated with a small but nonsignificant increase in sexual recidivism.

Although the Hanson et al. (2002) meta-analysis was criticized by Rice and Harris (2003) for relying on poor-quality studies, three important meta-analyses that

incorporated methodological quality considerations have been carried out in recent years, and each found evidence of a positive treatment effect.

Lösel and Schmucker (2005) conducted one of the largest meta-analyses assessing the effectiveness of sex offender treatment ever undertaken. Altogether, 69 studies and a combined total of 22,181 subjects were included in the analysis. The researchers found an average sexual recidivism rate of 11.1 percent for treated sex offenders and 17.5 percent for untreated sex offenders, based on an average followup period of slightly more than 5 years.[9] The average recidivism rates for violent crime and any crime were 6.6 percent and 22.4 percent for treated sex offenders, compared to 11.8 percent and 32.5 percent for untreated sex offenders, respectively. Lösel and Schmucker also found that, among psychological treatments, cognitive-behavioral treatments and behavior therapy had significant treatment effects. Treatment effects also were greater for sex offenders who completed treatment, as dropping out of treatment doubled the odds of recidivating.

Two other important meta-analyses that were based on high-quality studies were conducted by MacKenzie (2006) and Hanson and colleagues (2009). MacKenzie's analysis found that treated sex offenders had a significantly lower rate of recidivism than untreated sex offenders: 12 percent compared to 22 percent.[10] In one analysis based on only the highest quality studies, MacKenzie found that cognitive-behavioral/ relapse prevention treatment, behavioral treatment, and hormonal medication significantly reduced sexual recidivism. Hanson and his colleagues (2009) also found that treatment worked. Treated sex offenders had average sexual and overall recidivism rates of 10.9 percent and 31.8 percent, based on an average follow-up period of 4.7 years, compared to 19.2 percent and 48.3 percent for the untreated offenders.[11] The researchers also found that adhering to the RNR principles of effective intervention increased treatment effectiveness. Although treatment that adhered to one or two of the principles was more effective than treatment that did not adhere to any of the principles, treatment that adhered to all three principles was most effective. These findings are supported in a study of the risk principle by Lovins, Lowekamp, and Latessa (2009), which found that high-risk sex offenders who completed intensive residential treatment were more than two times less likely to recidivate than high-risk sex offenders who were not

provided intensive treatment. Conversely, low-risk sex offenders who were given intensive treatment were 21 percent *more* likely to recidivate than low-risk sex offenders who were not given intensive treatment.

In addition, a systematic review conducted by Luong and Wormith (2006) found that sex offenders who received treatment recidivated at a significantly lower rate than sex offenders who did not receive treatment. Again, cognitive-behavioral approaches were associated with significant reductions in both sexual and general recidivism. Prentky, Schwartz and Burns-Smith (2006) conducted a narrative review of treatment effectiveness studies and concluded that "the most reasonable estimate at this point is that treatment can reduce sexual recidivism *over a 5- year period by 5–8%*" (p. 5).

Finally, there is evidence suggesting that the use of the Good Lives Model (GLM) in sex offender treatment has become more prevalent in recent years. Rather than focusing solely on risk avoidance and management, the GLM attempts to equip sex offenders with the skills, attitudes, and resources needed to lead a prosocial, fulfilling life, thereby reducing the likelihood of reoffending. Although there is growing interest in the GLM approach, studies that have been undertaken to date have focused on validating the model for sex offenders or discovering within-treatment change,[12] but little is currently known about the efficacy of GLM for reducing the recidivism of sex offenders.

## Limitations and Research Needs

Even though the knowledge base regarding treatment effectiveness has greatly improved, more high-quality studies—both well-designed and executed RCTs, and highly rigorous quasi-experiments that employ equivalent treatment and comparison groups on treatment effectiveness—are needed. Propensity score matching and other advanced techniques for controlling bias and achieving equivalence between treatment and comparison subjects can help enhance the credibility of evidence produced by studies that do not employ random assignment. Systematic reviews and meta-analyses that are based on prudent exclusionary criteria and that employ the most rigorous analytical methods available are also needed. Future research should also attempt to build a stronger evidence base on the differential impact of treatment on different types of sex

offenders. Specifying what types of treatment work, for which type of offenders, in which situations, is a key research priority.

Subgroup analyses are particularly important because the positive effects of treatment for a particular subgroup of offenders can be masked in a finding that treatment failed to have a positive impact for the overall treatment sample. Researchers must be diligent, however, not to selectively emphasize treatment benefits for a subgroup of study subjects while ignoring findings for the larger treatment sample (Sherman, 2003; p. 13). New treatment models, such as the GLM, also need to be rigorously evaluated to assess their effectiveness at reducing recidivism.

## Summary and Conclusions

This review examined the evidence on treatment effectiveness from both individual studies and synthesis research. Although there is agreement among researchers that the knowledge base is far from complete, the evidence suggests that that treatment for sex offenders—particularly cognitive-behavioral/relapse prevention approaches—can produce reductions in both sexual and nonsexual recidivism. Treatment, however, does not affect all sex offenders in the same way. Treatment may have a differential impact, depending on the characteristics of the treatment participant and other contextual factors. Hence, rather than following a one-size-fits-all approach, treatment is apt to be most effective when it is tailored to the risks, needs, and offense dynamics of individual sex offenders. There is also evidence that the RNR principles are important for sex offender treatment. Hanson et al. (2009) found that treatment that adhered to the RNR principles of effective intervention showed the largest reductions in recidivism. In discussing their findings, Hanson and colleagues stated that "we believe that the research evidence supporting the RNR principles is sufficient so that they should be a primary consideration in the design and implementation of intervention programs for sex offenders" (p. 25).

## Notes

1. See, for example, Sherman et al. (1998), MacKenzie (2006), and Farrington and Welsh (2007).

2. See, for example, Lipsey (2002), Petrosino and Lavenberg (2007), and Beech et al. (2001).

3. Narrative reviews were the most common form of synthesis research in the past, but today researchers primarily rely on a more objective and quantitative process called a systematic review. Unlike a narrative review, a systematic review adheres to a pre-established protocol to locate, appraise, and synthesize information from all relevant scientific studies on a particular topic (Petrosino & Lavenberg, 2007). For an example of a systematic review, see Lösel and Schmucker (2005) or MacKenzie (2006).

4. Systematic reviews are increasingly incorporating a statistical procedure called meta-analysis, which helps to reduce bias and the potential for erroneous conclusions. In practice, meta-analysis combines the results of many evaluations into one large study with many subjects, thereby counteracting a common methodological problem in evaluation research: small sample sizes.

5. In addition to Oliver, Wong, and Nicholaichuk (2008), see McGrath et al. (2003) and Zgoba and Simon (2005).

6. See, for example, Furby, Weinrott, and Blackshaw (1989) and the General Accounting Office (1996).

7. One exception to the pattern of recent positive review findings comes from a systematic review focused on psychological interventions for sex offenders, conducted by Kenworthy and colleagues (2004). Nine studies, all RCTs, were included in the analysis and the researchers concluded that, due to limited data, the effects of treatment are unclear.

8. Average followup periods ranged from 1 to 16 years, with a median of 46 months.

9. These recidivism rates are based on the sample size-weighted average for treated and comparison groups. The unweighted average recidivism rates were 12 percent for the treated groups and 24 percent for comparison groups. The average followup period for treated sex offenders was 63.54 months (5.3 years), and the average followup period for untreated offenders was 62.41 months (5.2 years).

10. MacKenzie also examined how various substantive and methodological characteristics of the studies affected treatment outcomes. In one analysis, the effects of various treatment types were examined

using only studies having high-quality methodology. Based only on these high-quality studies, MacKenzie found that cognitive-behavioral/relapse prevention treatment, behavioral treatment, and hormonal medication significantly reduced sexual recidivism. For sex offenders receiving cognitive-behavioral/relapse prevention treatment, the average recidivism rate was 9 percent, compared with an average recidivism rate of 21 percent for untreated sex offenders.

11. Average followup periods ranged from 1 to 21 years, with a median of 4.7 years.

12. See Yates and Kingston (2006), Yates et al. (2009), and Kingston, Yates, and Firestone (2011).

# References

Beech, A.R., Erikson, M., Friendship, C., & Ditchfield, J. (2001). *A Six-Year Follow-Up of Men Going Through Representative Probation-Based Sex Offender Treatment Programmes.* Findings, 114. London, England: Home Office.

Duwe, G., & Goldman, R. (2009). The impact of prison-based treatment on sex offender recidivism: Evidence from Minnesota. *Sexual Abuse: A Journal of Research and Treatment,* 21, 279–307.

Farrington, D.P., & Welsh, B.C. (2007). *Saving Children from a Life of Crime, Early Risk Factors and Effective Interventions.* New York: Oxford University Press.

Friendship, C., Mann, R.E., & Beech, A.R. (2003). *The Prison-Based Sex Offender Treatment Programme—An Evaluation.* London, England: Home Office.

Furby, L., Weinrott, M.R, & Blackshaw, L. (1989). Sex-offender recidivism: A review. *Psychological Bulletin,* 105, 3–30.

General Accounting Office. (1996). *Sex Offender Treatment: Research Results Inconclusive About What Works to Reduce Recidivism.* GAO 96-137. Washington, DC: General Accounting Office.

Hanson, R.K., Bourgon, G., Helmus, L., & Hodgson, S. (2009). *A Meta-Analysis of the Effectiveness of Treatment for Sex Offenders: Risk, Need, and Responsivity.* Ottawa, Ontario, Canada: Public Safety Canada.

Hanson, R.K., Gordon, A., Harris, A.J.R., Mareques, J.K., Murphy, W., Quinsey, V.L., & Seto, M.C. (2002). First report of the collaborative outcome data project

on the effectiveness of psychological treatment for sex offenders. *Sexual Abuse: A Journal of Research and Treatment,* 14(2), 169–194.

Kenworthy, T., Adams, C.E., Bilby, C., Brooks-Gordon, B., & Fenton, M. (2004). Psychological interventions for those who have sexually offended or are at risk of offending. *Cochrane Database of Systematic Reviews* 2004, 3, CD004858.

Kingston, D.A., Yates, P.M., & Firestone, P. (2011). The self-regulation model of sexual offending: Relationship to risk and need. *Law and Human Behavior,* 36(3), 215–224.

Lipsey, M.W. (2002). Meta-analysis and program evaluation. *Socialvetenskaplig Tidskrift,* 9, 194–208 (translated).

Lösel, F., & Schmucker, M. (2005). The effectiveness of treatment for sex offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology,* 1, 117–146.

Lovins, B., Lowenkamp, C.T., & Latessa, E.J. (2009). Applying the risk principle to sex offenders: Can treatment make some sex offenders worse? *The Prison Journal,* 89, 344–357.

Lowden, K., Hetz, N., Patrick, D., Pasini-Hill, D., Harrison, L., & English, K. (2003). *Evaluation of Colorado's Prison Therapeutic Community for Sex Offenders: A Report of Findings.* Denver, CO: Office of Research and Statistics, Division of Criminal Justice, Colorado Department of Public Safety.

Luong, D., & Wormith, S.J. (2006). *The Effectiveness of Psychological Sex Offender Treatment: A Meta-Analysis.* Department of Psychology, University of Saskatchewan, Saskatoon, Canada. Available from the authors at Duyen.Luong@usask.ca.

MacKenzie, D.L. (2006). *What Works in Corrections: Reducing the Criminal Activities of Offenders and Delinquents.* New York, NY: Cambridge University Press.

Marques, J.K., Wiederanders, M., Day, D.M., Nelson, C., & van Ommeren, A. (2005). Effects of a relapse prevention program on sexual recidivism: Final results from California's Sex Offender Treatment and Evaluation Program (SOTEP). *Sexual Abuse: A Journal of Research and Treatment,* 17, 79–107.

Oliver, M., Wong, S., & Nicholaichuk, T.P. (2008). Outcome evaluation of a high-intensity inpatient sex offender treatment program. *Journal of Interpersonal Violence,* 24, 522–536.

 SOMAPI **RESEARCH BRIEF**

Petrosino, A., & Lavenberg, J. (2007). Systematic reviews and metal-analytic best evidence on "what works" for criminal justice decisionmakers. *Western Criminology Review,* 8, 1–15.

Prentky, R., Schwartz, B., & Burns-Smith, G. (2006). *Treatment of Adult Sex Offenders.* Harrisburg, PA: VAWnet, National Online Resource Center on Violence Against Women/Pennsylvania Coalition Against Domestic Violence.

Rice, M.E., & Harris, G.T. (2003). The size and signs of treatment effects in sex offender therapy. In R.A. Prentky, E.S. Janus & M.C. Seto (eds.), *Annals of the New York Academy of Sciences* (pp. 428-440). New York, NY: New York Academy of Sciences.

Sherman, L. W. (2003). Misleading evidence and evidence-led policy: Making social science more experimental. *Annals of the American Academy of Political and Social Science,* 589, 6–19.

Sherman, L.W., Gottfredson, D., MacKenzie, D., Eck, J., Reuter, P., & Bushway, S. (1998). *Preventing Crime: What Works, What Doesn't, What's Promising.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice.

Yates, P.M., & Kingston, D.A. (2006). The self-regulation model of sexual offending: The relationship between offence pathways and static and dynamic sexual offence risk. *Sexual Abuse: A Journal of Research and Treatment,* 18, 259–270.

Yates, P.M., Simons, D., Kingston, D.A., & Tyler, C. (2009). The Good Lives model of rehabilitation applied to treatment: Assessment and relationship to treatment progress and compliance. Paper presented at the 28th Annual Research and Treatment Conference for the Association for the Treatment of Sexual Abusers, Dallas, TX.

Zgoba, K. M., & Simon, L. M. J. (2005). Recidivism rates of sex offenders up to 7 years later: Does treatment matter? *Criminal Justice Review,* 30, 155–173.

This research brief was produced by the National Criminal Justice Association under grant number 2010-DB-BX-K086, awarded by the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART), Office of Justice Programs, U.S. Department of Justice. The opinions, findings, and conclusions or recommendations expressed in this research brief are those of the author(s) and contributors and do not necessarily represent the official position or policies of the SMART Office or the U.S. Department of Justice.

**ABOUT SMART**

The Adam Walsh Child Protection and Safety Act of 2006 authorized the establishment of the Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office within OJP. SMART is responsible for assisting with implementation of the Sex Offender Registration and Notification Act (SORNA), and also for providing assistance to criminal justice professionals across the entire spectrum of sex offender management activities needed to ensure public safety.

# Deconstructing the Myth of Careful Study:
# A Primer on the Flawed Progression of the Child Pornography Guidelines

Troy Stabenow[1]

January 1, 2009

## Table of Contents

I.      Introduction..................................................................................... 2

II.     The Commission in Charge.............................................................. 3

      A.      1987 Guidelines.................................................... 4
      B.      1988 Amendment.................................................. 4

III.    The Seeds of Conflict...................................................................... 4

IV.     Congress Takes Charge................................................................... 6

      A.      1991 Amendment.................................................. 6
      B.      1996 Amendment.................................................. 9

V.      The 1996 Report to Congress......................................................... 12

      A.      Troubling Methodology........................................ 13
      B.      Use of a Computer Enhancement.......................... 15
      C.      Comments by the Commission.............................. 16

VI.     Congress Reacts to the Commission's Report ............................. 17

      A.      2000 Amendment.................................................. 17
      B.      2001 Amendment.................................................. 19

VII .   Congress Yields Power to the Department of Justice.................... 19

      A.      The Protect Act.................................................... 19
      B.      2003 Amendments................................................ 23

---

[1] Assistant Federal Public Defender, Western District of Missouri, Jefferson City Branch Office.  Copyright January 1, 2009.  All Rights Reserved.  This revision includes additional data not available in the May and July 2008 versions of this article, and changes the examples in Part VII to reflect current statutory penalties and Guidelines. All suggestions, comments, corrections, criticisms, and written opinions by courts accepting or rejecting the positions of this paper would be appreciated, and should be sent to troy_stabenow@fd.org.  Please do not request advice on a particular case unless there is an unusual issue or use of this paper.  Special thanks to Amy Baron-Evans for her contributions to Section IX, and for her editorial review throughout. Thanks also to David Johnson and Virginia Grady of the FPD Office in Colorado for their input, corrections, and advice.

C.    2004 Amendment................................................................ 24

VIII.  The Typical Defendant.............................................................. 26

IX. Additional Factors To Consider.......................................................30

X.    The Implications of Gall and Kimbrough on
       Child Pornography Cases .......................................................... 33

XI.    Conclusion............................................................................... 38

Appendix A: Guideline Changes Charts: 1987 to Present.................................... 39

Appendix B:  Letter from the Commission opposing increased penalties.......... 41

Appendix C: Select Portion of Amendment 664.................................... 44

## I. Introduction

In 1997, child pornography offenders[2] received a mean sentence of 20.59 months confinement.[3]  *See* Federal Justice Statistics Resource Center, "*Type of sentence for defendants convicted*," http://fjsrc.urban.org/tsec.cfm.  In 2007, defendants sentenced for the same conduct received a mean sentence of 91.30 months confinement.  *Id.*  This represents a 443% increase in the mean imposed sentence for this class of offenders.   The mean, by year:

| Year | Total Cases | # Prison Cases | Mean Confinement (Months) | # Probation Cases | Total Mean (months prison) |
|------|-------------|----------------|----------------------------|--------------------|-----------------------------|
| 1997 | 238 | 183 | 26.79 | 55 | 20.59 |
| 1998 | 273 | 225 | 38.86 | 48 | 32.02 |
| 1999 | 368 | 313 | 39.13 | 55 | 33.28 |
| 2000 | 417 | 376 | 44.85 | 41 | 40.44 |
| 2001 | 440 | 380 | 46.26 | 60 | 39.95 |
| 2002 | 499 | 457 | 45.65 | 42 | 41.80 |
| 2003 | 553 | 504 | 46.12 | 49 | 42.03 |
| 2004 | 652 | 618 | 55.99 | 34 | 53.07 |
| 2005 | 947 | 884 | 65.78 | 63 | 61.40 |
| 2006 | 1036 | 1008 | 80.21 | 28 | 78.04 |
| 2007 | 1170 | 1145 | 93.30 | 25 | 91.30 |

---

[2] For the purpose of this section, a child pornography defender is any person convicted for possessing, receiving, or distributing child pornography in violation of 18 United States Code Sections 2252 or 2252A, but who was not involved in the production or attempted production of child pornography.  This correlates to an offender punished pursuant to Guideline Section 2G2.2 of the 2008 Federal Sentencing Guidelines.

[3] Calculated as follows: 183 defendants received a mean sentence of 26.79 months confinement, while 55 defendants received sentence of probation (0 months confinement).  The "Total Mean" for all 238 defendants: (183x26.79) + (55x0) = 4,902.57 / 238 = 20.59.

The Sourcebook of Federal Sentencing Statistics, 2007, which tracks data by fiscal instead of calendar year documents 1,025 sentences for 2G2.2 offenses in Fiscal Year 2007[4].  *See* 2007 Sourcebook, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.  Of these 1,025 cases, 351 involved downward departures or variances, of which 219 were pure "Booker" variances).  *Id*. at Table 28.   Despite the high ration (34%) of sentences below the initially applicable Guidelines by federal judges, mean sentences nevertheless soared by 13.26 months per defendant over the similar defendants sentenced just one calendar year earlier.

The pertinent question to ask is what caused such an incredible increase over the last decade?  Does the typical offender today require 70.71 months, or almost six full years, more confinement than the same offender a decade ago?  Is there a rational basis for an average annual increase of over seven months per imposed sentence?  Most importantly, are these changes the result of "an empirical approach based on data about past practices" *Kimbrough v. United States*, 128 S. Ct. 558, 567 (2007).

The answer to these questions is a resounding "no."  As this article demonstrates, the changes to the child pornography guidelines are not the product of an empirically demonstrated need for consistently tougher sentencing.  Instead, these changes are largely the consequence of numerous morality earmarks, slipped into larger bills over the last fifteen years, often without notice, debate, or empirical study of any kind.  Congressionally mandated changes were even enacted to prevent the Commission from implementing carefully considered modifications which would have *lowered* applicable offense levels.

Familiarity with the history of § 2G2.2 is therefore crucial to appropriate sentencing.  While judges "may not presume that the Guidelines range is reasonable," courts may nevertheless be forgiven for believing that pornography guidelines reflect the latest research and knowledge in the field.  *See Gall v. United States*, 128 S. Ct. 586 (2007) at 596-97; *see also Rita v. United States*, 127 S. Ct. 2456 (2007) at 2465.  It is incumbent upon the defense attorney to provide evidence to the contrary.  This paper provides the tools for a defense presentation to the court that the child pornography guidelines, as applied to a particular defendant, are not based on sound research and reflective experience, and therefore fail to produce an appropriate sentence.

Several sections in particular may provide useful material for educating the courts.  These sections, which could be excerpted to form the basis of a sentencing motion, include sections III, IV-A, IV-B, V, VII, VIII, IX, and Appendix A.

## II.  The Commission in Charge: April 13, 1987 to November 1, 1990

For the first three years of the Guidelines regime, the provisions of § 2G2.2 were the result of study at the Commission, without obvious outside interference.  These years are

---

[4] The 2007 Sourcebook documents 1,025 cases at Table 28, and either 1,033 or 1,084 cases at Table 17.  Because Table 28 provides more detailed statistics, and provides data on departures and variances, it is relied upon for the purposes of this article.

reviewed below, with changes indicated by bold, italicized type:

### A.  1987

On April 13, 1987, the Sentencing Commission submitted its initial § 2G2.2 offering. *See* U.S.S.G. § 1A1.1(n.1).  At the time, simple possession of child pornography was not a federal crime, so § 2G2.2 was limited to "transporting, receiving, or trafficking" offenses.

> **§ 2G2.2**
> **Base Offense Level:  13**
> **Specific Characteristics:**
> > **(b)(1) a minor under 12 years:**                   **+2**
> > **(b)(2) if distribution of < $100,000 in value**    **+5**
> > **(b)(2) if > $100,000 in value, see 2F1.1**

### B. 1988

On June 15, 1998, the Sentencing Commission amended specific characteristic § 2G2.2(b)(1).  *See* Amendment 31, U.S.S.G. App. C.  Study indicated that "an alternative measure" was necessary "for determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown."  *Id.*  The phrase "or a prepubescent minor" was added to "a minor under the age of twelve years."  *Id.*

> § 2G2.2
> Base Offense Level:  13
> Specific Characteristics:
> > (b)(1) *a prepubescent minor or* a minor under 12 years:    +2
> > (b)(2) if distribution of < $100,000 in value              +5
> > (b)(2) if > $100,000 in value, see 2F1.1

## II.  The Seeds of Conflict

On November 29, 1990, Congress criminalized the possession of child pornography.  *See* Pub.L. 101-647, Title III, § 323(a), (b), Nov. 29, 1990, 104 Stat. 4818, 4819.  Congress also raised maximum possible penalties, introduced a mandatory minimum for repeat offenders, and directed that "the United States Sentencing Commission shall amend existing guidelines for sentences involving sexual crimes against children, including offenses contained in chapter 109A of title 18, so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate."  *Id.*

The Commission had to immediately consider whether to treat possession of child pornography as equivalent to trafficking, or whether to create a separate Base Offense Level.  On January 17, 1991, the Sentencing Commission published its proposed solution.  *See* 56 FR 1846-01, 1991 WL 310646 (F.R.).  The solution consisted of three parts:

First, a new section, § 2G2.4, with a Base Offense Level of 10, would be created for the offense of possession of child pornography, and the analogous offenses of receiving and transporting child pornography. *Id.* In instances where the relevant conduct involved an association with trafficking, a cross reference to § 2G2.2 would apply. *Id.*

Second, the Commission modified § 2G2.2 to apply only to cases involving "Selling or Possessing with Intent to Sell" child pornography. *Id.* The proposal included a new, four-level specific offense enhancement for "material that portrays sadistic or masochistic conduct or other depictions of violence." *Id.* This specific offense enhancement was neither recommended for, nor applied to the newly created § 2G2.4.

Third, the Commission inserted an application note to § 2G2.2 encouraging consideration of "an upward departure" where "the defendant sexually abused a minor at any time, whether or not such sexual abuse occurred during the course of the offense." *Id.*

The Commission determined that current penalties were adequate and that it would be inadvisable to introduce more substantial penalties. *Id.*

The Commission would later explain the reasoning for these changes in a detailed letter to Congress. *See* Appendix B; *see also* 137 Cong. Rec. H6736-02, 1991 WL 187764 (Cong.Rec.). In reviewing its 1991 decision to create a new, lower base offense level for receipt, possession, and transportation, the Commission would state:

> It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy... The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact, a number of judges had written the Commission to express the view that the offense level for the least serious forms of conduct under § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. *Id.*

Ultimately, the first part of this plan (i.e new § 2G2.4) was implemented via Guideline Amendment 372, effective November 1, 1991. The second and third parts of this solution (enhancements for sadistic material and a pattern of abuse) had already been implemented via Guideline Amendment 325, effective November 1, 1990. *See* Amendments 372 and 325, U.S.S.G. App. C.

Page -5-

**R126**

§ 2G2.2
Base Offense Level:  13
Specific Characteristics:
     (b)(1) prepubescent or a minor under 12 years:     +2
     (b)(2) if distribution of < $100,000 in value     +5
     (b)(2) if > $100,000 in value, see 2F1.1
     ***(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4***
***Application Note 4: The Commission recommends consideration of an upward
departure for actual sexual abuse of a child at any time in the defendant's past.***

     ***§ 2G2.4***
***Base Offense Level 10***
***Specific Characteristics:***
     ***(b)(1) prepubescent or a minor under 12 years:     +2***

## III.  Congress Takes Charge: Nov 27, 1991 - 2003

### A.  1991

In June, 1991, Senator Jesse Helms of North Carolina learned of the Commission's proposed approach to "smut peddlers and pedophiles."  *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363).  The carefully studied plan to refine § 2G2.2 and implement a new guideline for the lesser harms of possession, receipt, and transportation of child pornography, would be short-lived.

Shortly after the Commission published its 1991 modifications, Senator Helms received letters from two religious organizations opposed to the proposed Guideline modifications.  *See* Exhibit 2, 137 Cong. Rec. S10322-04.  The Religious Alliance Against Pornography, wrote, "We are profoundly disappointed to discover that the proposed guidelines recommended reduced sentencing levels for transporting, receiving, and possessing child pornography...We believe the pending Crime Bill offers an appropriate and opportune time to make vital adjustments consistent with the seriousness of the crime."  *Id.*  Morality in the Media echoed this opinion, requesting "if anything, the penalties should be made stricter, not weaker."  *Id.*

Based upon these letters, Senator Helms introduced what can fairly be described as a morality earmark.  On July 18, 1991, while most senators were in committee meetings, Senators Domenici and Helms briefly re-opened the pending debate on House Resolution 2622, the Treasury-Postal Service Appropriations Bill of 1991.  *See* 137 Cong. Rec. S10322-04.  Senator Domenici of New Mexico asked that the pending amendments be laid aside to allow Senator Helms to introduce an amendment regarding child pornography.  *Id.*  As there was no objection, Senator Helms took the floor and proposed "Amendment Number 780."  *Id.*  Amendment 780

would require the Commission to maintain receipt and transportation as § 2G2.2 offenses, and would direct expanded enhancements to both § 2G2.2 and § 2G2.4.  *Id.*  Since no other senators were present on the floor, the matter was "stacked" until the next roll call.  *Id.*  Ultimately, the amendment was included with several other amendments to the appropriations bill, and was approved by a vote of 99-0.  *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363).

Because the issue was never debated in the Senate, Senator Helms' remarks are the only record of Senate intent.[5]  *Id.*  As to Amendment 780, Senator Helms stated, incorrectly, "The Sentencing Commission recently, for some unbeknown reason, decided to reduce the sentence for these smut peddlers so low that most of these convicted smut peddlers and pedophiles will receive, at most, probation...The amendment instructs the Sentencing Commission to increase the penalty for child porn offenses so that offenders will serve at least some time in jail."  *Id.*

On September 24, 1991, the House of Representatives received and considered Amendment 780.  *See* 137 Cong. Rec. H6736-02.   Inserted into the record was a letter from the Chair of the Sentencing Commission in which the Chair politely, but strongly, objected to Amendment 780.  *Id.*; *See also* Appendix B.  The Chair wrote:

Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography...

...In keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. **Senate Amendment No. 780, unfortunately, would negate the**

---

[5] To support his amendment, Senator Helms  introduced the two letters mentioned above, and several recycled reports from 1986 and 1987 which discussed the general evils of child pornography.  *See* Exhibit 2, 137 Cong. Rec. S10322-04.  He did not introduce any empirical data regarding the (then) current state of federal sentencing, or the advisability or necessity of lengthier sentences.  *Id.*

**Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation**. [emphasis added].

For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more severe penalties mandated by the Senate amendment by negotiating a plea to simple possession. **One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.** [emphasis added] *Id.*

After a brief discussion by just three representatives, Amendment 780 was added to the House bill by a vote of 414-18.[6] *See* 137 Cong. Rec. H6736-02; 1991 WL 187764 (Cong.Rec.). Amendment 780 would eventually become Section 632 of Public Law 102-141.

Although even the most zealous defense attorney would likely have agreed with Senator Helms that "smut peddlers and pedophiles" should serve "at least some time in jail," Amendment 780 had a vastly more expansive result. *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992 at 137 Cong. Rec. S10356-01, S10363. Amendment 780 was nothing less than a rejection of the empirical, studied approach to child pornography sentencing. Henceforth, major changes would come from Congress, and would be dictated not by experience and study, but instead by a general moral

---

[6] During the brief discussion, one objection to the Commission's analysis of receipt and distribution was offered as follows: "Virtually all enforcement is accomplished through sting operations conducted through the mails. As a result, most offenders (even active distributors) are caught in the act of receiving child pornography out of their mail box...If anything, the stated rationale supports treating receipt the same as distribution since distributors are likely to be caught in the act of receipt." *Id.* This position is objectionable on several grounds: first, these facts, if ever true, are now inaccurate and outdated; and second, no matter how popular this position might be politically, it is inconsistent with our system of justice. American justice does not punish defendants based on speculation about what other unrelated defendants might have done in some other cases, but instead, punishes the individual defendant for what they can be shown to have done in their particular case.

Page -8-

R129

sense that the penalties for "smut peddlers" should always, and regularly, be made stricter, not weaker.

On November 27, 1991, in accordance with the directive of Section 632 of Public Law 102-141, signed by the President October 28, 1991, the Sentencing Commission drastically altered the Guidelines.  *See* Amendments 435 and 436, U.S.S.G. App. C.  In keeping with the directives of Senator Helms, as expressed in Section 632 of Public Law 102-141, a person sentenced for simple possession on November 28, 1991 received the same Base Offense Level as a serious trafficker sentenced just one day earlier.

Guideline Amendment 435 modified § 2G2.2 in the following ways: First, offenses involving the receipt, transportation, or advertisement of child pornography were all returned to § 2G2.2.  *Id.*  The new § 2G2.2 therefore described "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic."  *Id.*  Second, the Base Offense Level was increased from 13 to 15. *Id.*  Third, a new specific offense enhancement of a five level increase for a pattern of activity involving the sexual abuse or exploitation of a minor was inserted.  *Id.*

> § 2G2.2
> ***Base Offense Level:  15***
> Specific Characteristics:
> > (b)(1) prepubescent or a minor under 12 years:      +2
> > (b)(2) if distribution of < $100,000 in value      +5
> > (b)(2) if > $100,000 in value, see 2F1.1
> > (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
> > ***(b)(4) Pattern of Abuse +5***

Guideline Amendment 436 modified § 2G2.4 by redacting all offenses except simple possession.  *Id.*  The Base Offense Level was raised from 10 to 13.  *Id.*  A specific two-level offense characteristic for possessing ten or more "books, magazines, periodicals, films, video tapes, or other items containing a visual depiction involving the sexual exploitation of a minor" was added.  *Id.*

> § 2G2.4
> ***Base Offense Level: 13***
> Specific Characteristics:
> > (b)(1) prepubescent or a minor under 12 years:      +2
> > ***(b)(2) if 10 or more items: +2***

**B.  1996 Amendment.**

In March, 1995, as part of the Family Reinforcement Act, which was itself part of the "Contract with America," Representative William McCollum introduced House Resolution 1240,

"An Act to Combat Crime by Enhancing the Penalties for Certain Sexual Crimes Against Children." *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759. House Resolution 1240 proposed to raise by at least two levels the Base Offense Level for the producers and distributors of child pornography, and to increase by at least two levels the Total Offense Level in cases of a violation of 18 U.S.C. 2251(c)(1)(A) or 2252 (a)(1)-(3), where a computer was used to "transmit the notice of," or "transport or ship" the visual depictions. *Id*; *See also* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.).

The Judiciary Committee promptly forwarded the measure to the main body of the House, noting, "the sexual crimes addressed by H.R. 1240 are usually prosecuted by state authorities rather than federal authorities. Assuming that this situation continues, the Congressional Budget Office estimates that the increased sentences under this bill would have no significant impact on the operating costs of federal prisons." *Id.* This statement was generally correct for the time, as demonstrated by the fact that in 1993, federal prosecutors accepted for prosecution only 25 of the 79 obscenity/pornography cases presented to them. *See* Compendium of Federal Justice Statistics, 1993 at Table 1.2; http://www.ojp.usdoj.gov/bjs/abstract/cfjs93.htm.

The measure arrived at the House on April 4, 1995. *See* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.). As described on the floor of the House, the bill "directs the Sentencing Commission, created by the Congress in 1984, to serve as an independent entity within the judicial branch, to increase the offense levels for certain crimes involving child obscenity;" to increase "by a minimum of 17 months incarceration the range of penalties that may be imposed for creating child pornography. It increases by a minimum of 6 months incarceration the penalties that may be imposed for trafficking child pornography. It increases by a minimum of 1 year incarceration the penalties that may be imposed for trafficking in child pornography if a computer was used in the transmission of the material or transmission of an advertisement for the material." *Id.*

The debate, such as it was, provides meaningful insight into the perceived focus of the bill. After two members praised the bill, and one member praised a colleague for fair play, Representative Lofgren addressed the House. *Id.* Rep. Lofgren lamented the "wimpy" sentences for child pornographers, and advised, "We need to take a look at the underlying statute, not just advisory recommendations by the Sentencing Commission." *Id.* She then recommended that both parties should jointly work towards a punishment of mandatory life imprisonment for this:

"lucrative business that rewards people who would abuse children, who would force them to do sexual acts on video, it is a lucrative business. If the abusers of children for money knew that they faced life imprisonment, I think it would have a salutary impact . . .We could have done something tough. But instead all we have got is a little hole punch, a little phrase, and it does not mean very much." *Id.*

Rep. Lofgren was followed by Representative Conyers, who explained,

"There were two ways that we could have moved in this area. One is to direct the U.S.

Sentencing Commission to increase penalties for child obscenity violations. The other was to go into the underlying statute of some of these anti-pornography laws and attempt to increase the penalties there, but we might have gotten into a wide area that would infringe on civil liberties questions and other highly technical questions, and this bill would not have come up...This is one of the few bills during this first 100 days that, by moving with some dispatch, we have not offended any sensibilities." *Id.*

From these discussions, it is clear that House Resolution 1240 was designed with two primary purposes in mind. First, to avoid the need for debate, study, and considered review. Second, to increase the punishment for those who produced and trafficked child pornography for profit. As Senator Lofgren noted, it exactly achieved these goals, moving from introduction before the Judiciary Committee to unanimous passage by the House in just three short weeks. *Id.*

The measure arrived at the Senate on April 6, 1995. *See* 141 Cong. Rec. S5519-02, 1995 WL 169823 (Cong.Rec.)**.** Upon arrival, Senators Grassley, Hatch, and Thurmond jointly proposed a seemingly minor amendment to the newly re-labeled Sex Crimes Against Children Prevention Act of 1995. *Id.* This "minor" amendment would extend the resolution to include all defendants convicted of child pornography offenses, not just the producers and traffickers of the material. *See* 141 Cong. Rec. H14319-02. As in the House however, discussion was limited to the target population of child pornography producers and mass distributors. *Id.* Senator Grassley discussed the dangers of the "business forum" that traders in child pornography had found using computers. *See* 141 Cong. Rec. S5509-02. Senator Hatch then enlisted the support of the Senate with the following impassioned speech:

> Obscenity is a plague upon the moral fabric of this great Nation. It poisons the minds and spirits of our youth and fuels the growth of organized crime. Child pornography, a particularly pernicious evil, is something that no civilized society can tolerate.

> To this end, I am introducing legislation to increase the penalties imposed under sections 2251 and 2252 of title 18 of the United States Code, upon those who exploit and degrade the weakest and most helpless members of our society, our children. **Those persons who choose to engage in sexual exploitation of children, whether to satisfy prurient desire or to gain filthy lucre, must be made to feel the full weight of the law** and suffer a punishment commensurate with the seriousness of their offense. [emphasis added]

> In addition to increasing the penalties for distributing child pornography or otherwise sexually exploiting children, I am pleased to note that **this legislation helps our law enforcement efforts in this area keep pace with changing technology by increasing the penalties for the use of computers in connection with the distribution of child pornography**. As an ever-increasing percentage of Americans, and especially our young people, enter the information superhighway, it is critical that we act to ensure that this highway is not littered with the debris of child pornography. [emphasis added]

The bill also directs the Sentencing Commission to assess the impact of these increased penalties and to report to Congress any necessary modifications in the law. The Sentencing Commission will also be required to survey the recidivism rates for those who commit sex crimes against children and analyze the effect of treatment for those offenders.

*Id.*

The bill passed by unanimous consent. *See* 141 Cong. Rec. H14319-02. Public Law 104-71 was enacted December 23, 1995. On April 30, 1996, the Commission, as directed, published these Congressional changes. *See* 61 Fed. Reg. 20,306 (1996). As per Public Law 104-71 the Commission included provisions to raise the base offense levels in §§ 2G2.1, 2G2.2, and 2G2.4; and to provide a two-level enhancement under §2G2.2 "if a computer was used for the transmission of the material or a notice or advertisement" and § 2G2.4 for use of a computer "if the defendant's possession of the material resulted from the defendant's use of a computer." *Id.*

The Commission separately recommended to expand the definition of "pattern of activity involving sexual abuse" to reflect and respond to differing case opinions within the circuits about the applicability of the enhancement. *Id.* Amendment 537 took effect November 1, 1996. *See* Amendment 537, U.S.S.G. App. C.

§ 2G2.2
**Base Offense Level: 17**
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years +2
    (b)(2) if distribution of < $100,000 in value +5
    (b)(2) if > $100,000 in value, see 2F1.1
    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    **(b)(5) transmission of material or notice by computer +2**

§ 2G2.4
**Base Offense Level: 15**
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years:    +2
    (b)(2) if 10 or more items: +2
    **(b)(3) Possession as a result of computer use +2**

## IV. The 1996 Report to Congress

Section 6, Sex Crimes Against Children Prevention Act of 1995 (SCACPA), required the Sentencing Commission to "submit a report to Congress concerning offenses involving child pornography and other sex offenses against children" within 180 days. *See* Pub L. 104-71. In June 1996, while Amendment 537 was still pending, the Sentencing Commission presented a detailed, forty-two page report to Congress. *See* Report to Congress, Sex Offenses Against Children, 1996; http://www.ussc.gov/r_congress/SCAC.HTM; *See also* Attachment A.

## A. Troubling Methodology:

The Commission opened the report by observing "Penalties for sex offenses against children have been increased several times in recent years and are quite severe. Nevertheless, the Commission's analysis indicates that some amendments may be appropriate to increase sentences for the most dangerous offenders, to ensure consistency in sentencing, and to clarify certain provisions that have been improperly interpreted and used." *Id.* at i.

The primary focus of the report were these "most dangerous offenders." After a review of only 112 child pornography cases, the Commission concluded that "a significant portion of child pornography offenders have a criminal history that involves the sexual abuse or exploitation of children and that those with such histories are at a greater risk of recidivism."[7] *Id.* at i, 3, 29. It was with these particular offenders in mind, and to "ensure lengthy incarceration of the most dangerous offenders" that the Commission "significantly increased sentences for some child pornography offenses," "expanded the definition of a pattern of activity involving the sexual exploitation or abuse of a minor," and recommended that Congress should "increase the statutory maximum for production." *Id.* at i, ii.

These recommendations informed opinion within Congress, and became the basis for further Congressionally directed changes in 1998, 2000, and 2003. It is worth asking, however, whether the data derived from such a small sample size in 1994 and 1995 should still be affecting policy in 2008. Does the information still hold true today? It does not.

We should understand that the 112 cases reviewed by the Commission represented only about one-third of child pornography cases presented for prosecution during that time frame. *See* Compendium of Federal Justice Statistics, 1993, at Table 1.2. In the early to mid 1990s, the United States rarely prosecuted child pornography offenses, selecting only the truly egregious offenders for federal prosecution. *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759; *see also* Compendium of Federal Justice Statistics, 1993 at Table 1.2. Generic offenders were prosecuted in state court. *Id.*

By 2006, when 2,191 defendants were federally prosecuted for child pornography offenses, federal authorities had broadened their reach, and were routinely prosecuting less egregious instances of misconduct. *See* Bureau of Justice Statistics Bulletin: "Federal Prosecution of Child Sex Exploitation Offenses, 2006," at page 5; available at http://www.ojp.usdoj.gov/bjs/pub/pdf/fpcseo06.pdf. This rise in prosecutions accompanied the formation of agencies such as the Innocent Images Project in 1995 (56 offices nationwide); the Internet Crimes Against Children Task Force (56 offices nationwide); the National Center for Missing and Exploited Children; and the introduction of local projects such as "Project Safe Childhood," and "Operation Predator."*Id.* at pages 1, 2, 3. While total sex offense prosecutions rose from 431 in 1994 to 2,191 in 2006, an average of 15% growth per year for over a decade, child

---

[7] The Commission studied a total of 423 cases, of which only 112 cases were of child pornography. *Id.* at 1,2. Of the 112, 90 were limited to possession, receipt, or trafficking of child pornography (as opposed to production). *Id.* at 4.

pornography cases accounted for 82% of the growth in case load.  *Id*. at page 1.



Next, the small pool of offenders in 1995 produced skewed data.  The group studied by the Commission included "a significant portion of child pornography offenders [who] have a criminal history that involves the sexual abuse or exploitation of children."  That group bears little resemblance to the average offender sentenced pursuant to 2G2.2 today.  In 2006, 79.9% of child pornography defendants had no prior felonies of any kind, let alone a criminal history of past "sexual abuse or exploitation."  *Id.*  at page 5.

Furthermore, the 1996 report was based upon a study of all "sex offenses against children."  *Id.* at i.  As a result, the small 1996 study pool included the crimes of transporting children for prostitution, criminal sexual abuse, production of child pornography, etc.  *Id.* at 4. Today, while 12.5 % of child pornography clients of all types have any association with the production of child pornography, all of these offenders are either directly controlled by 2G2.1, 2G2.3, 2G2.5, or are cross-referenced to these Guidelines.[8]  Thus, **none** of the standard 2G2.2 defendants have any association with the production of child pornography.  While producers, molesters, and enticers have, by their criminal conduct, demonstrated that they can and will molest children, the average defendant sentenced pursuant to 2G2.2 has no history of any inappropriate contact with minors. The net result of these demographic differences is that the defendant towards whom the strongest comments and recommendations in the 1996 report were targeted, the "large-scale, commercial

---

[8] Calculated by examining Table 17 of the 2007 Sourcebook. Total production related offenses [164 (2G2.1) + 1 (2G2.3) + 2 (2G2.5)]  / Total child pornography offenses [164 (2G2.1) + 1,033 (2G2.2) + 1 (2G2.3) + 129 (2G2.4) + 2 (2G2.5)].

pornographers," and the "most dangerous repeat offenders" have almost no relation to the typical client sentenced pursuant to 2G2.2.  *See* 1996 Report to Congress at pages ii, 28.

In 1995, 1998, 2000, and 2003, Congress legislated changes that continue to affect all defendants today.  *See* Amendments 535, 575, 592, 649 and 661, U.S.S.G. App. C.  These changes modified the Guidelines in an effort aimed at combating the pernicious evil of repeat abusers, pornography producers, and mass distributors.  The methodology behind this tinkering, such as it was, can be demonstrated to apply to only a small portion of the 2G2.2 defendants today.  Why then should courts blindly prescribe lengthy prison terms to correct a problem that isn't present in the case before them.  Looked at another way, would we want a doctor to prescribe medicine based on a decade old medical text, written by well meaning legislators, despite clear evidence that his patient did not suffer from the symptoms the text and medicine were designed to address?  For the overwhelming majority of today's 2G2.2 defendants, the applied Base Offense Level and specific offense enhancements are predicated upon a series of premises which do not accompany their case, or even their class of crime.  The prosecution should have to establish the continued applicability of the assumptions underlying the Guidelines in each case.  Without a demonstration that the defendant was involved in the behavior targeted by Congress and the Commission, the only remaining data is that which supported the Base Offense Levels of November 1, 1991.  In this environment, respect for the Guidelines should be withheld, and the Court should consider a variance.

**B.  Use of a Computer Enhancement**

The 1996 Report to Congress critically reviewed the congressionally mandated two-level enhancement for use of a computer.  This two level enhancement, dictated in 1995 by the SCACPA (see Section III-B above) had yet to be enacted, but already the Commission could foresee problems.

First, the Commission noted that the Senate amendment, which extended the scope of the act to include possession offenses, was made without any legislative history to explain the concerns motivating the change.  *Id.* at 30.  The initial offering in the House limited the change to  instances of trafficking. The House made a clear record that the measure was designed to (1) fight the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, (2) combat the increased difficulty of investigation and prosecution by law enforcement officials, (3) minimize the increased likelihood that child pornography will be viewed by and harm children, and (4) limit the potential for pedophiles to lure children into sexual relations through the computer. *Id.*, discussing the legislative history of the SCACPA found at H.R. Rep. No 90, 104th Congr., 1st Sess. 3-4 (1995) as reprinted in 1996 U.S.C.C.A.N. 759.

Although the Commission added the enhancement as directed in the final version of the SCACPA, it noted " Not all computer use is equal...sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's case."  *Id.* at 29.  Without a rationale for applying the broadened enhancement, the Commission was left to observe:

"Online pornography comes from the same pool that can be found in specialty magazines or

Page -15-

**R136**

adult bookstores...thus, the differences between print and computerized porn is not in the content of the images, but in the means of distribution. The seriousness of a crime involving computerized trafficking in child pornography depends in part on 1) the degree to which the computer use facilitates the widespread and instantaneous distribution of images, and 2) the degree to which it increases the likelihood that children will be exposed to the images. Different types of computer use have different effects on these two harms. "Downloading" cyberporn is similar to receiving pornography through the mail...At the other end are large-scale, commercial pornographers. Creating and maintaining a B[ulletin] B[oard] S[ystem] or Website with pornography is similar to opening an adult bookstore...persons who upload, send, or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely disseminates or falls into the hands of children." *Id.* at 28.

"What seems apparent is that a person's culpability depends on *how* they use a computer..." *Id.* at 29.

"The adjustment does not distinguish between persons who email images to a single, voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers...the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes is widely accessible, such as posting it on a BBS or Website. However, a statutory amendment may be necessary to make these kinds of distinctions, because the current statutory directive is aimed broadly at all person who use a computer to transmit child porn, including receivers and possessors. " *Id.*

These concerns, expressed by the Commission in 1996 are even more true today. The Commission's fears were grounded in the fact that only 7 or 8 of the 112 cases they studied involved the use of a computer to establish a BBS, a website, or a similarly threatening means of spreading child pornography. *Id.* at 29. Study indicated that 23% of defendants in 1993, and 28% of defendants in 1995 used a computer. *Id.* at 30. Thus, many defendants to whom the enhancement was applied were not threatening the harm the enhancement was designed to address. *Id.* at 28-30.

How much more true is the over-inclusive effect of the enhancement today? In 2006, 97% of the 1,012 child pornography defendants had used a computer. *See* Bureau Bulletin at page 6. Today, forensic computer technology and monitoring facilitates, not thwarts, the investigation of child pornography offenses. So, if a client today used a computer, but did not widely disseminate the images, did not use them to entice or coerce a child, and did not show them to a child, then their conduct is completely outside the scope of the fear that prompted Congress to require the enhancement, and therefore a variance should be considered.

## C. Comments by the Commission

In reference to the implementation of the Prevention Act of 1995, the Commission noted: "As directed in the SCACPA, the Commission increased sentences for all pornography guidelines by approximately 25%...In addition, a further 25% was provided for the use of a computer in child pornography offenses." *Id.* at ii. "Based on the data described above, the Commission does not recommend an increase in the base offense level of more than two levels" [referring to the two level

increase mandated for change on November 1, 1996] *Id.* at 9.

The Commission presented three amendments which were under consideration.

First, in an effort to target the most serious, repeat offenders, the Commission indicated it was considering adding the "pattern of activity" enhancement to § 2G2.4. *Id.* at 40.

Second, the Commission considered the need to modify the definition of "distribution." *Id.* The Commission noted that "many cases sentenced under this guideline involve trade clubs or other barter types of exchanges." *Id.* at 10. The Commission sought Congressional input into whether an amendment to include barter forms of distribution should be pursued. *Id.* at 40.

Third, returning to an issue from 1991, the Commission noted "there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases. Indeed, all material that is possessed must at some point have been received (unless it was produced, in which case the defendant would be sentenced under the more severe production guideline)." *Id.* at 11. "There is some indication that judges may be trying to avoid such a disparity" by sentencing receipt under the incorrect Guideline. *Id.* at 11, 41. Given this "unwarranted disparity," the underlying mission to reduce unwarranted disparities, and a Congressional prohibition from 1991 against reducing the offense level for receipt, the Commission indicated that it was being forced to consider consolidating possession into the higher § 2G2.2 Guideline. *Id.* at 11, 41. The Commission indicated consolidation would result in several specific offense characteristics from § 2G2.2 applying to cases of simple possession. *Id.* at 13. There is no mention in the report that the resulting higher sentences would be necessary or likely to affect deterrence, just punishment, or the need to protect society.

## V.    **Congress Reacts to the Commission's Report**

### A.  **2000 Amendment**

In 1998, Congress reacted to the 1996 Report to Congres by enacting the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314. Section 506 directed the Commission to "clarify that the term 'distribution of pornography' applies to the distribution of pornography--(A) for monetary remuneration; or (B) for a nonpecuniary interest." *Id.* Section 507 responded to the Commission's consideration of applying the pattern of abuse enhancement to § 2G2.4 by directing "with respect to any action relating to the Federal Sentencing Guidelines subject to this title, ensure reasonable consistency with other guidelines of the Federal Sentencing Guidelines." *Id.*

On November 1, 2000, these directives became effective via Amendment 592. *See* Amendment 592, U.S.S.G. App. C. The Commission explained its changes to § 2G2.2:

The amendment addresses the directive in the Act [Protection of Children for Sexual Predators Act of 1998] to clarify that the term "distribution of pornography" applies to the distribution of pornography for both monetary remuneration and a non-pecuniary interest. In response to the directive, the amendment modifies the enhancement in § 2G2.2 (Trafficking

in Material Involving the Sexual Exploitation of a Minor), relating to the distribution of child pornographic material...the amendment (1) modifies the definition of "distribution" to mean any act, including production, transportation, and possession with intent to distribute, related to the transfer of the material, regardless of whether it was for pecuniary gain; and (2) provides for varying levels of enhancement depending upon the purpose and audience of the distribution. These varying levels are intended to respond to increased congressional concerns, as indicated in the legislative history of the Act, that pedophiles, including those who use the Internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity.

The Commission explained its amendment to § 2G2.4 as follows:

The amendment clarifies the meaning of the term "item" in subsection (b)(2) of § 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). That subsection provides a two-level enhancement if the offense involved possession of ten or more items of child pornography. The amendment adopts the holding of all circuits that have addressed the matter that a computer file qualifies as an item for purposes of the enhancement. The amendment also provides for an invited upward departure if the offense involves a large number of visual depictions of child pornography, regardless of the number of "items" involved. This provision invites courts to depart upward in cases in which a particular item, such as a book or a computer file, contains an unusually large number of pornographic images involving children.

In the next amendment cycle, the Commission intends to continue consideration of the directive requiring that the Commission "provide for an appropriate enhancement in any case in which the defendant engaged in a pattern of activity of sexual abuse and exploitation of a minor." In addition, the Commission intends to consider further the general directive in the Act requiring the Commission to ensure "that the sentences, guidelines, and policy statements for offenders convicted of such offenses are appropriately severe and reasonably consistent with the other relevant directives and the relevant existing guidelines. *Id.*

§ 2G2.2
Base Offense Level:  17
Specific Characteristics:
  (b)(1) prepubescent or a minor under 12 years  +2
  (b)(2) if distribution
    A) For pecuniary gain, see 2F1.1 but not less than +5
    **B) For value but not pecuniary gain +5**
    **C) To a minor +5**
    **D) To persuade a minor to engage in sexual conduct +7**
    **E) Other than for the reasons above +**2
  (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
  (b)(4) Pattern of Abuse +5
  (b)(5) transmission of material or notice by computer +2

§ 2G2.4 (Unchanged)

**B. 2001 Amendment**

In 2001 the Commission made changes to § 2F1.1.  Accordingly, Section § 2G2.2(b)(2)(A) was amended by striking "§ 2F1.1 (Fraud and Deceit) and inserting "§ 2B1.1 (Theft, Property Destruction, and Fraud)"

§ 2G2.2
Base Offense Level:  17
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years  +2
    (b)(2) if distribution
        A) For pecuniary gain, see **2B1.1** but not less than +5
        B) For value but not pecuniary gain +5
        C) To a minor +5
        D) To persuade a minor to engage in sexual conduct +7
        E) Other than for the reasons above +2
    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    (b)(5) transmission of material or notice by computer +2

**VI**. **Congress Yields Power to the Department of Justice**

**A. The Protect Act**

In 2003, two government attorneys convinced a novice Congressman[9] to insert drastic changes to the child pornography Guidelines into an unrelated, popular bill, without notice to the Sentencing Commission.[10]   *See* Skye Phillips, *Protect Downward Departures: Congress and the*

---

[9] Prior to "authoring" the amendment given his name, Representative Feeney had introduced only one piece of legislation during his time in office, a resolution honoring the cheerleaders at the University of Central Florida.  *See* Michael S. Gerber, *"Down with Discretion*," Legal Affairs, http://www.legalaffairs.org/printerfriendly.msp?id=547.

[10] Jay Apperson, one of the actual co-authors of this provision, is noteworthy for the frequent legal controversies associated with his work.  In 2005, Mr. Apperson  was dismissed from government service following a scandal in which he authored an ex parte letter from Representative Sensenbrenner of Wisconsin to (then) Chief Judge Flaum of the 7th Circuit regarding an active case.  The letter demanded that Chief Judge Flaum reconsider a pending drug case because the sentence on appeal was too low.  *See* Maurice Posley, *Lawmaker Prods Court, Raises Brows*, Chicago Tribune (July 10, 2005).   Furthermore, the letter demanded a "prompt response" detailing what actions Chief Judge Flaum would take "to rectify" the sentence.  *Id.; see also*

*Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter Phillips) at 983 n. 185, 986.   This additional component of the Protect Act, Pub. L. No. 108-21 (2003), modified § 2G2.2 and § 2G2.4, nullified the ability of judges to consider many downward departures for child pornography defendants, and drastically changed the statutory penalties for child pornography offenses.  *See* Attachment B for a copy of relevant portions.

        The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography. *Phillips* at 967-984.  As the legislation progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment to the bill that would directly amend various Guidelines and would bar downward departures not sponsored by government attorneys.  *Id.; See also United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004).   The technical amendments to 2G2.2 and 2G2.4 were a minor component of the sweeping changes contained in the amendment and no opportunity for study or research into their affect was possible.  Representative  Feeney later admitted he was just the "messenger" for the two government officials who authored the provision and ***chose not to notify or consult the Sentencing Commission***.  *Phillips*, at 983 n. 185, 986; [emphasis added].

        Debate on the amendment was limited to twenty minutes, and there is no indication that the details of the changes to 2G2.2 and 2G2.4 were evaluated.  *Id*. at 983.  The House later passed the Child Abduction Prevention Act with the Feeney Amendment added.  *Id*. at 992-994.  Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law April 30, 2003. *Id*. at 990-992, 991 n.219.

        Numerous members of Congress objected to these changes, and the procedure by which they were introduced, including Senators Ted Kennedy and Patrick Leahy.  *Id* at n.215.  Senator Leahy explained, "The substance of the Hatch-Sensenbrenner amendment-whether in the form that was voted on in conference, or in the form that was circulated after the conference adjourned-is just as

---

*http://sentencing.typepad.com/sentencing_law_and_policy/2005/07/sentencing_from.html*.  Mr. Apperson recently came back to public attention based on allegations that he was inappropriately exempted from normal hiring processes by the United States Attorney for the District of Columbia based on his conservative politics.  *See* Carol D. Loenning, "Hiring Process was Bypassed for Prosecutor," Washington Post, (May 8, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/05/07/AR2007050701825.html.  A strident opponent of judicial discretion, Mr. Apperson has also notoriously suggested that Justice Thurgood Marshall had "no place on the Court," and that the United States needs a "white history month."  *See* Carol D. Loenning, "Hiring Process was Bypassed for Prosecutor," Washington Post, (May 8, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/05/07/AR2007050701825.html; Michael S. Gerber, *"Down with Discretion*," Legal Affairs, http://www.legalaffairs.org/printerfriendly.msp?id=547.

outrageous as the way in which it was adopted. This amendment modifies in very limited ways the Feeney amendment, which was added to the bill on the House floor after only 20 minutes of debate. This far-reaching proposal will undermine the federal sentencing system and prevent judges from imposing just and responsible sentences." *Id.; See also* 149 Cong. Rec. S5137-01, 5145 (daily ed. Apr. 10, 2003) (statement by Sen. Leahy).

As was later noted by the Federal Public Defender for the Western District of Washington in a letter to Congress, "that the Feeney Amendment received virtually no attention or debate is inexplicable unless one assumes that it was produced at a time and in a way designed to escape detection and debate before its passage." *See* Materials From Interested Groups Opposing Original Feeney Amendment at 15 Fed.Sent.R. 346, 2003 WL 22208850 (Vera Inst.Just.)

Contained in both the original Feeney Amendment and the final version of the Protect Act, was a direct amendment to U.S.S.G. §§ 2G2.2 and 2G2.4, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, Pub.L. 108-21, § 401(i)(1)(B),(C). The Act also directly amended § 2G2.4 by adding an enhancement for "material that portrays sadistic or masochistic conduct." *Id*. The Act directed the Commission to expand the range of the "pattern of abuse" enhancement to make it encompass single-victim, opportunity offenses commonly associated with the prosecution of Native Americans.  *See* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004), available at http://www.ussc.gov/15_15year/15year.htm at 73.  Finally, the Protect Act also adjusted mandatory minimum sentences and statutory sentencing maximums for child pornography offenses.  No research, study, body of experience, or rationale, was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement related to the number of images of child pornography.  Nor was there any justification provided for § 2G2.4(b)(4)'s new 4-level enhancement.

When the Commission created § 2G2.4 in 1991 (due to Congress making it a federal offense to possess child pornography), it did not include a four-level enhancement for "material that portrays sadistic or masochistic conduct."  The history of §§ 2G2.2 and 2G2.4 shows us that this was an intentional act.  In 1990, the Commission added the sadistic conduct enhancement to § 2G2.2.  *See* U.S.S.G. Appendix C, Amendment 325.  However, in drafting and promulgating § 2G2.4, no such enhancement was included.  *Compare* U.S.S.G. § 2G2.2 (1991) *with* U.S.S.G. § 2G2.4 (1991).  This exclusion should be presumed to be intentional.  *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) (if language is included in one section of a statute but excluded in another section of the same Act, it is presumed that the exclusion was done "intentionally and purposely").

The Sentencing Commission's expert analysis did not compel this enhancement in possession cases.  In other words, this enhancement was not necessary to fulfill the purposes of sentencing in possession cases.  And so long as the Commission's expert-based conclusions controlled, the possession Guideline remained unaltered in this respect.  But this all changed with the passage of the PROTECT Act.

Without consulting the Commission or conducting any other research into the necessity of

Page -21-

applying this enhancement to simple possession, Congress directly amended the possession of child pornography Guideline. Inserted into § 2G2.4 was the new subsection (b)(4). *See Pub. L. No.* 108-21, § 401. With this move – and without any explanation or justification – Congress began to sentence the mere possession of child pornography as akin to trafficking of child pornography. It was Congressional actions like this that ultimately compelled the Sentencing Commission's reluctant consolidation of §§ 2G2.2 and 2G2.4. *See* U.S.S.G. Appendix C, Amendment 664

As summarized by one commentator, with the passage of the PROTECT Act:

Congress directly amended [for the first time] the Federal Sentencing Guidelines by drafting Guideline text. In the past, Congress often . . . issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text. This time, Congress completely ignored the *expert* role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications.

Steven L. Chanenson, *Hoist With Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 & nn.54-57 (2004) (emphasis original); *see also Detwiler*, 338 F.Supp.2d at 1171. Of even greater significance, Congress acted in this way without giving either the Judicial Conference or the Sentencing Commission "a fair opportunity to consider and comment" on the direct amendment. *See* Chanenson, 17 Fed. Sent'g Rep. at n.56 (*citing, e.g.* Letter from the Judicial Conference of the United States to Senator Orrin G. Hatch (April 3, 2003), *reprinted at* 15 Fed. Sent'g Rep. 343, 343 (2003)).

As the former United States Attorney for the Eastern District of New York observed:

"Equally alarming was the process by which these reforms were introduced and considered in Congress. The Feeney Amendment was introduced without input from the federal judiciary, the organized bar, academics, criminal justice experts, probation officers or prison officials. Even the Sentencing Commission itself -- the very body charged with the responsibility of creating and amending the Guidelines -- was not consulted. Indeed, the statutory process for considering guideline amendments -- one that calls for the Sentencing Commission to consult with numerous interested parties in the criminal justice process  -- was ignored.

What is more, the proponents of this legislation sought to minimize the opportunity for debate or opposition. The reforms were appended at the eleventh hour to a politically-popular piece of child abduction legislation that no legislator could easily oppose. The first time that Congress gave serious consideration to the changes was in a House-Senate conference, hastily convened just days before Congress' spring recess. Last-minute revisions to the bill were circulated at 1:00 in the morning on April 9, as a result of a process that Senator Diane Feinstein compared to "rewrit[ing] the criminal code on the back of an envelope." And the only time the full Senate had an opportunity to debate the bill at all was on April 10, the day that it passed.

To be sure, Congress is a political institution, and proponents of legislation generally seek to maximize the prospects for its passage. But this was no pork-barrel legislation. In one

section of a bill, Congress sought to eliminate nine separate guideline departure provisions and legislatively overrule dozens of federal court sentencing decisions, not to mention the leading Supreme Court case construing the Guidelines. Surely, nationwide sentencing reforms of the magnitude contained in this statute deserved far more deliberate consideration than this...

Even more blatant was the rebuke of the Sentencing Commission inherent in this legislation. In enacting this bill, Congress (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure guidelines for the next two years. All told, the statute is the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress nearly 20 years ago."

*See* Alan Vinegrad, *The New Federal Sentencing Law*, 15 Federal Sentencing Reporter 310, 314-315 (June 2003).

### B. 2003 Amendments

The first changes to § 2G2.2 and § 2G2.4 took effect immediately upon the Act's signature into law. *See* Pub. L. No. 108-21 (2003); *See also* Amendment 649, U.S.S.G. App. C.

§ 2G2.2
Base Offense Level: 17
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years  +2
    (b)(2) if distribution
        A) For pecuniary gain, see 2B1.1, but not less than +5
        B) For value but not pecuniary gain +5
        C) To a minor +5
        D) To persuade a minor to engage in sexual conduct +7
        E) Other than for the reasons above +2

    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    (b)(5) transmission of material or notice by computer +2
    **(b)(6) If**
        **A) 10-150 images       +2**
        **B) 150-300            +3**
        **C) 300-600            +4**
        **D) 600+               +5**

§ 2G2.4
Base Offense Level: 15
Specific Characteristics:
      (b)(1) prepubescent or a minor under 12 years:     +2
      (b)(2) if 10 or more items: +2
      (b)(3) Possession as a result of computer use +2
      **(b)(4) if material portrays sadistic of masochistic conduct, or other violence +4**
      **(b)(5) If**
          **A) 10-150 images    +2**
          **B) 150-300       +3**
          **C) 300-600       +4**
          **D) 600+         +5**

On November 1, 2003, a technical change to § 2G2.2(b)(5) was made inserting ", receipt, or distribution" after "transmission." *See* Amendment 663, U.S.S.G. App. C.

Note: For the remainder of 2003, "double counting" was allowed under § 2G2.4 for possessing more than ten items, and for possessing more than ten images. It is difficult to understand why a defendant who possesses eleven printed pictures (eleven items containing one image each) should receive four levels of enhancement, while a defendant who possesses a single computer disk with 149 images (one item containing 149 images) should receive only a two level enhancement. This overlap, and the peculiar double-counting situation it created are indicative of the general lack of study, consideration, and review associated with the modifications of the Protect Act. The double-counting scenario was resolved on November 1, 2004 when Amendment 664 merged § 2G2.4 into § 2G2.2 and dropped the ten item specific offense enhancement. *See* Amendment 664, U.S.S.G. App. C.

**C. 2004 Amendment**

In November 2004, in an effort to reconcile the provisions of the Protect Act, the Sentencing Commission completely reworked §§ 2G2.2 and 2G2.4. *See* Amendment 664, USSG App. C; *See* also Appendix C. The Commission attempted to correct issues such as the double counting scenario described above. *Id.* The Commission also raised the Base Offense Level for trafficking, receipt, and distribution related offenses from 17 to 22. *Id.* Section 2G2.4 was merged into § 2G2.2, and the Base offense Level for possession increased from 15 to 18. *Id.* The Base Offense Level for simple receipt jumped from 17 to 22, with an allowance for a 2 level reduction under certain circumstances.[11] *Id.* The Commission observed, "The Protect Act established five year

---

[11] The provision allowing "passive" receivers and solicitors of child pornography to qualify for a lesser sentence appears to violate earlier congressional directives that "the Commission shall not promulgate any amendments that, with respect to such cases, would result in sentencing ranges that are lower than those that would have applied under such subsection."

Page -24-

mandatory minimum terms . . . As a result of these new mandatory minimum penalties . . . the Commission increased the base offense level for these offenses . . . The Commission determined that a base offense level of 22 is appropriate for trafficking because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached." *See* Amendment 664, USSG App. C.

The decision by the Commission to increase Base Offense Levels may have been politically expedient, but it was contrary to the Commission's established function. Congress created the Sentencing Commission as an independent expert body and placed it in the Judicial Branch. The Supreme Court upheld the promulgation of the Guidelines by the Commission against Separation of Powers challenge, "not without difficulty," based in part on a prediction that the Commission would not be enlisted in the work of the political branches, but instead would bring "judicial experience and expertise" to the "neutral endeavor" of sentencing, "the Judicial Branch's own business." *Mistretta v. United States*, 488 U.S. 361, 407-08 (1989). Justice Scalia disagreed, stating that it was "not about commingling, but about the creation of a new Branch altogether, a sort of junior-varsity Congress." *Id.* at 427 (Scalia, J., dissenting).

As the above explanation for Amendment 664 clearly indicates, the Sentencing Commission increased the Base Offense Levels and re-structured the specific offense characteristics of §2G2.2 with the singular goal of ensuring that the guidelines range matched or exceeded the newly increased mandatory minimums and rules put forth in the Protect Act, rather than with the goal of serving the statutory purposes of sentencing overall. These actions undermine the Supreme Court's analysis in *Mistretta*: "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta v. United States*, 488 U.S. 361, 407 (1989).

The Commission acknowledged this problem in its Fifteen Year report in 2004. "Direct congressional control over sentencing policy for sex offenses has increased throughout the guidelines era." *See* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004), available at http://www.ussc.gov/15_15year/15year.htm at 72. Regarding the Protect Act's affect on child sex offenses such as child pornography, the Commission noted: "The frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id.* at *73.*

A useful analysis was provided by the Criminal Law Committee of the Judicial Conference in March 2007. The Criminal Law Committee, which believes that the Commission, when deciding

---

Pub. L. No. 108-21 (2003). However, by first raising the Base Offense Level by three levels for all non-possessory offenses, it became possible for the Commission to "give back" two levels to this select group of minor offenders without running afoul of congressional mandates.

whether to amend the guidelines in response to a mandatory minimum, should make an assessment based on its own expert opinion, believes this opinion should be independent of any potentially applicable mandatory minimum.  *See* Comments of the Criminal Law Committee of the Judicial Conference (March 16, 2007), http://www.ussc.gov/hearings/03_20_07/walton-testimony.pdf. Afer all, if the resulting guideline, alone or in combination with specific offense characteristics, is lower than the mandatory minimum, § 5G1.1(b) will operate. The Commission could likewise consider in its independent evaluation any information in published reports or hearing records upon which Congress may have relied.  *Id*. What it should not do, is "launder" the actions of the political branches by signing the Commission's name to the work.

§2G2.2
**Base Offense Level:**
      **(a)(1):  18 if a violation of 18 U.S.C. §1466A(b) or §2252(a)(4) or §2252A(a)(5)**
      **(a)(2): 22 otherwise        BUT**
      **If (a)(2), + conduct was limited to receipt or solicitation, + no intent to traffic or distribute, then -2**
Specific Characteristics:
      (b)(1) prepubescent or a minor under 12 years  +2
      (b)(2) if distribution
            A) For pecuniary gain, see 2B1.1**,** but not less than +5
            B) For value but not pecuniary gain +5
            C) To a minor +5
            **D) To a minor to persuade the minor to engage in illegal activity other than E) +6**
            **E)** To persuade a minor to engage in sexual conduct +7
            F) Other than for the reasons above +2
      (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
      (b)(4) Pattern of Abuse +5
      (b)(5) transmission of material or notice by computer +2
      **(b)(6) If**
         **A) 10-150 images    +2**
         **B) 150-300        +3**
         **C) 300-600        +4**
         **D) 600+          +5**

Redacted/Not Merged with 2G2.2: the enhancement for possessing greater than ten items containing visual depictions of the sexual exploitation of a minor.  *See* Amendment 664, U.S.S.G. App. C.

## VIII.  The Typical Defendant

The flaw with U.S.S.G. § 2G2.2 today is that a common, first-time offender can chart at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History.   As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of

age, number of images)."  *See* Amendment 664, U.S.S.G. App. C "Reason for Amendment", (November 1, 2004).  The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement.  *See* U.S.S.G. § 2G2.2(b)(6).  Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase.  *See* U.S.S.G. § 2G2.2(b)(7)(D). The 2004 Guidelines created an Application Note defining any video-clip as creating 75 images.  *See* U.S.S.G. § 2G2.2, App. Note 4(ii).  Thus one email containing eight, three-second video clips would also trigger a five-level increase.  Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase.  *See* U.S.S.G. § 2G2.2(b)(2),(4).  Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value.  *See* U.S.S.G. § 2G2.2(b)(3)(B).  Thus, an individual who swapped a single picture, downloaded a handful of video clips, and engaged in viewing and receiving child pornography for a few hours on one occasion, can quickly obtain an offense level of 40.  Even after Acceptance of Responsibility, an individual with no prior criminal history can quickly yield a Guideline Range of 210-262 months, where the statutory maximum caps the sentence at 240 months.  *See* U.S.S.G. § 5G1.1(a).

The results are illogical; Congress set the statutory range for first time distributors as five to twenty years.  Congress could not have intended for a common first-time offender with no prior criminal history and no history of contact with minors to receive a sentence of 210 to 240 months.  An individual with a Criminal History Category of II faces a Guideline range of 235 to 240 months, and any higher Criminal History score mandates the statutory maximum.  These result runs contrary not only to Congressional will, but also to a principal Guideline policy - providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.

Let us examine the results of these Congressionally directed and influenced changes as they apply to two hypothetical, but statistically typical defendants. Quoted statistics are derived from United States Sentencing Commission's "Use of Guidelines and Specific Offense Characteristics: FY 2006" report found at http://www.ussc.gov/gl_freq/06_glinexgline.pdf  and *the 2007 Sourcebook*,  http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.

**Defendant #1.**
Convicted of distributing child pornography.  Sentenced pursuant § 2G2.2.
Specific Offense Characteristics:
- Possessed a picture depicting a child under the age of 12 (96.2%)
- Used a computer (96.8 % of defendants)
- Possessed one picture involving bondage (63.2%)
- Emailed 5 pictures to another person in expectation of getting 5 pictures back
    (49.4% of defendants receive some type of distribution enhancement)
- Possessed four short movie clips and ten pictures resulting in a calculated 310
    pictures (53.6 % had greater than 300, 85.5% had greater than 10)
Defendant #1 has no criminal history and has never abused or exploited a child.

He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, we can easily calculate his Guideline Range:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | 108-135 months |
| November 1, 2004: | 188-235 months |

Percentage increase in the low end of the Guideline Range after Acceptance since 1987: 1,567%.
Actual increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines:  167 months.

If we simply add the extra 10 second movie clips to this collection, defendant #1 charts as follows:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | **121-151 months** |
| November 1, 2004: | **210-262 months** |

This would result in a 1750% increase, or a 198 month increase over a defendant sentenced for the same conduct on October 30, 1991.

**Defendant #2**
Convicted of possessing child pornography.  Sentenced pursuant to § 2G2.2.
Specific Offense Characteristics:
    - Possessed a picture depicting a child under the age of 12 (93.5%)
    - Used a computer to obtain the image (93.1%)
    - Had one disk containing two movie files and 10 pictures, equating to 160 pictures
         (38% had at least 150 pictures, 63.1% had greater than 10 images)
Defendant #2 has no criminal history and has never abused or exploited a child.
He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, Defendant #2 receives this Guideline Range:

April 30, 1987:      No punishment - not illegal
November 1, 1991:   6-12  months
November 27, 1991:  12-18  months
November 1, 1996:   21-27 months
April 30, 2003:      30-37 months
November 1, 2004:   41-51 months

Percentage increase in the Total Offense Level after Acceptance since 1991: 683%
Increase in the low end of the applicable Guideline Range since Congress directly,
and repeatedly, began increasing the Guidelines: 41  months.

A comparison of defendant #1's case to the Guidelines to two offenses that the normal citizen would likely consider far more egregious demonstrates the absurdity of the system.

First consider the hypothetical of a fifty year-old man who "meets" a thirteen year-old girl on the internet.  After the offender discovers that the girl lives on a nearby military post, and that her father is away at training, he uses his superior worldliness to create a complex relationship with the child.  Ultimately, he persuades her to meet at a park on the base. Over the course of several months, until they are discovered, they regularly meet for sex.  This violation of 8 U.S.C. § 2243 is subject to Guideline 2A3.2.  Applying a Base Offense Level of 18, a four-level enhancement for unduly influencing a child (b)(2), and a two-level enhancement for use of a computer (b)(3), the Total Offense Level is 24.  After Acceptance, the Guideline range for this Category I offender would be 37-46 months.

Next, consider the same hypothetical fifty year-old man who intentionally seeks out and contacts a twelve year-old girl over the internet (a violation of 18 U.S.C. § 2422(b)). Using his age and experience, he gradually convinces her that sex with a fifty year-old man is desirable.  Over several months, the offender creates a relationship of "trust."  He then persuades the child to meet. The offender crosses state lines and rendezvous with the child, whereupon the two engage in repeated sex.  U.S.S.G. § 2G1.3(a)(3) establishes a base offense level of 28 for the offense.  After a two-level enhancement for unduly influencing the child under U.S.S.G. §2G1.3(b)(2), a two-level enhancement for use of the computer (b)(3), and a two-level enhancement for commission of a sex act (b)(4), the final offense level would be 34. After Acceptance, the Guideline range for this Category I offender would be 108-135 months.

That the Guidelines would mete out the most severe punishment for the least egregious of these three offenses requires some correction.  Defendant #1's Guideline range is 567% higher for trading pornography than for the man who coerces a lonely military child into sex.  Defendant #1 faces a Guideline range 194% higher than the man who planned a months-long campaign to cross state boundaries and engage in repeated sex with a twelve year-old.  *Id*. at 1279.  Such results either means that the entire Guideline system is bunk, or it is an indication that the stacked enhancements resulting from the Protect Act produce sentences that are greater than necessary to satisfy sentencing purposes.

Courts of appeals may accord a presumption of reasonableness to a within guideline

sentence based on the general assumption that the guidelines are the product of careful study based on extensive empirical evidence, *Rita*, 127 S. Ct. at 2464, but "not all of the Guidelines are tied to this empirical evidence." *Gall*, 1287 S. Ct. at 594 n.2. Where, as here, we can demonstrate that the Guidelines were dramatically skewed upwards by the efforts of two government attorneys, who used a novice Congressman to backdoor changes into a major bill, over the objection of the Sentencing Commission, which specifically stated that no careful study or review had been allowed, then the assumption of careful study becomes unfounded, and the resulting Guideline is worthy of little respect.

## IX. Additional Factors To Consider

It is important to recognize that the latest version of the Guideline could not take into account  new tools and empirical data implemented after the latest version of 2G2.2 was designed. Since 2004, both the Bureau of Prisons and the Courts have acquired additional tools for monitoring offenders and protecting society.  Additionally, new studies focused purely on child pornography defendants have empirically demonstrated that many child pornographers are less dangerous than previously believed.

First, lifetime supervised release, with the availability of a lifetime sentence after revocation, provides a greatly expanded system of monitoring and forcing compliance on these offenders.  The provision for lifetime supervised release was added to the 2004 verison of 18 U.S.C. § 3583(k); Subsec. (k). Pub.L. 108-21, § 101(3).  The power of the judge to impose necessary treatment, search, or safety restrictions was greatly expanded in 2006 as part of the Sex Offender Registration and Notification Act (also known as the Adam Walsh Child Protection and Safety Act of 2006) of Public Law 248-109.  This act expanded standard conditions of supervised release to include mandatory registration of all sex offenders, broadened the court's standard search authority, and instituted greater mandatory punishments for a violation of the conditions of supervised release. *See* 18 U.S.C. § 3583(d)(3); Pub.L. 109-248, §§ 141(e)(1), (e)(2), 210(b).  Anecdotal evidence suggests that local probation offices responded to this legislation by developing a greatly expanded package of "special conditions of supervised release " designed to provide targeted treatment, electronic monitoring, sharply limit or prohibit access to minors and access to computerized devices, etc.  These tools collectively allow the court to more closely supervise offenders, deter future offenses, and safeguard the public.

Second, the system now has a vehicle for identifying and removing dangerous offenders from society.  18 U.S.C. § 4248 now provides means to indefinitely commit sexually dangerous offenders.  *See* 18 U.S.C. § 4248, added by Pub. L. 109-248, Title III, § 302(4), July 27, 2006; 120 Stat. 620.  The Bureau of Prison, over the course of an offender's confinement and treatment, is able to identify and refer dangerous individuals for commitment.  This system, if used properly, may benefit society and defendants (in general) both.  Rather than initially issue an extended sentence for fear that a child pornography defendant might prove dangerous, the court can sentence the defendant for the harm they actually committed.  Treatment providers and case workers can then make assessments based on long periods of observation about which clients should be referred for the strictest conditions on liberty, or even be referred for indefinite commitment.  The court ultimately is empowered to exercise judgement in those cases where the personal history during

incarceration and treatment merits prolonged conditions or detention.  For most defendants however, that should not prove necessary.

Third, empirical testing disproves the fear that the typical child pornography defendant will go on to molest children.  Michael Seto, a prominent expert in the field explains the impetus for his studies as follows:

> There is increasingly strong rhetoric about the dangers of the internet, including claims of a large and profitable child pornography industry... and vast online networks of pedophiles, child pornography offenders, and sex offenders against children.  There is little research however, to support the rhetoric or to guide major policy and legal changes that are taking place as a result...

> There is a major gap between scientific understanding of these topics and the practices and policies that have been developed in response to the problem...much of what laypeople and professionals believe about pedophiles and sexual offending against children...is not supported by empirical evidence.

> Michael Seto, *Pedophilia and Sexual Offending Against Children: Theory, Assessment, and Intervention,* American Psychological Association, 2008 at xi, xii.

In 2005[12] Mr. Seto and his colleagues engaged in a detailed examination of documented child pornographers.  The goal was to determine what factors predict the likelihood that child pornography offenders would later commit a contact sexual offense.  *See* Michael C. Seto and Angela W Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, Sexual Abuse: Journal of Research and Treatment, Vol. 17, No.2, April 2005.  The study followed 201 child pornography offenders for a period of years after their release from prison. The greatest indicators of risk to re-offend or to commit a contact sexual offense were prior history of contact offenses, and prior criminal history.  Seto and Eke concluded:

> "Possession of child pornography is a valid indicator of pedophilia..."

But,

> "Only one of the offenders with only child pornography offenses committed a contact sexual offense in the follow-up period...our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children." *Id.* at 202, 208.  The valid indicators for later commission of a contact offenses were prior criminal history, and prior instances of contact sexual abuse.  *Id.*

---

[12] Mr. Seto recently completed an expanded follow-up study that validated the 2005 conclusions.  This study, which was presented in October 2008 at the national Association for the Treatment of Sexual Abusers conference in Atlanta has not yet been published.

Many members of the public would undoubtedly struggle with these findings. Many child pornography defendants state that they never thought that looking at pictures over the internet would hurt anyone, and that they would never actually participate in the molestation of children. To many in the public, this statement is ridiculous. To many citizens, pedophile equals molester. The fact that the terms are used interchangeably in many news stories contributes to this perception. How then can the average person appreciate the distinction?

For those with teenage children, or those who know young adults, the genre of movies typified by films such as *Hostel*, or *Saw*[13] may provide a useful analogy. These highly disturbing films focus on the vicarious "thrill" derived by watching kidnaped adults suffer the realization of imminent torture and death. These Hollywood movies are essentially "snuff" movies without the accompanying sex. The films are presumably fake, but they appear very real, and are enormously popular with young adults[14]. If fans look at similar "clips," on-line, there would be no way of knowing for sure whether the images were produced fakes (from Hollywood), or actual torture movies.

This analogy provides useful perspective. The analogy is imperfect of course, in that child pornography images tend to be real, and thus document the actual, illegal maltreatment of children, not a Hollywood simulation. On the other hand, to the viewers, the emotional experience of watching a woman's face blow-torched apart in one of the Hostel films is of an equally "real" feeling event. For a large portion of both sets of viewers, there may exist a sense that their watching films and photos is a harmless fantasy indulgence that does not contribute to actual acts of violence.

Has the latest generation suddenly spawned millions of young adults who intend to eventually kidnap and torture others for pleasure then? Making frequent trips to the cinema to view the latest installment of these films, or even worse buying them on DVD, is certainly a valid indicator that the watcher derives excitement from seeing others (apparently) tortured. However, most viewers would probably be horrified at the prospect of actually engaging in the conduct they find exciting when it is watched in the context of a movie theater or in their home den. This vast majority draws a line between the fantasy of the media, and the "reality" of actually committing a torture act. Internal moral controls, fear of external punishment, etc. likely deter all but a handful of the remainder (those who might otherwise actually pursue their interest). This leaves the dangerous

---

[13] Hostel is movie depicting the kidnaping and graphic torture deaths of young travelers at the hands of rich "tourists" who pay for the privilege of torturing chained victims to death. Saw features two men kidnaped and chained together to a corpse. Two hacksaws are located within easy reach. Each man discovers a tape instructing him to kill the other (And presumably saw off their own foot in order to escape). *See* http://en.wikipedia.org/wiki/Hostel_(film); http://en.wikipedia.org/wiki/Saw_(film).

[14] Hostel, a 2005 Lion's Gate film, grossed 80.5 million at the box office and sparked a 2007 sequel. Saw, a 2004 Lion's Gate film, grossed 103 million at the box office, and sparked five sequels. *See* http://www.boxofficemojo.com/movies/?id=hostel.htm; http://www.boxofficemojo.com/movies/?id=saw.htm.

handful. The risk is that films such as Saw or Hostel excite this handful of dangerous fans by inflaming their intentions to engage in such frightful behavior, and by arguably normalizing their fantasies. For these reasons, viewers who pay money to watch the latest Hostel or Saw movie may be contributing to the eventual kidnap and torture of someone real by contributing to the industry that normalizes and produces images.

When we try to identify the imminent dangers in our society, instances of viewing Hostel or Saw are insufficient to distinguish the casual, excited viewer of Saw VI from the quiet man down the street named Jeffrey Dahmer. It is common knowledge that past criminal history (kidnaps, assaults, etc), and past contact behavior (torturing cats, skinning squirrels, etc.) are much stronger indicators of likely later abusive patterns. Mr. Seto's study demonstrates that the same variables apply in child pornography cases.

The frequent theme at the sentencing of child pornography defendants is the worry (stated or unstated) that the defendant will molest children later in life. Mr. Seto's study demonstrates that for child pornography defendants, past criminality and past sexual contacts are reliable ways to separate "fantasy" pedophiles from intentional contact offenders. Mr. Seto's study also demonstrates that in the absence of these factors, the likelihood of a later contact offense is far, far, less likely.

## X. The implications of Gall and Kimbrough for Child Pornography Cases[15]

Thankfully, recent changes in the law allow us to argue this position to the courts.

The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564; *see also Gall*, 128 S. Ct. at 602 (same). "The statute, as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough*, 128 S. Ct. at 570.

Because the "Guidelines are not the only consideration," the judge, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. The judge must independently evaluate the appropriate sentence in light of the Section 3553(a) purposes and factors, and must consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures), or "regardless." *Rita*, 127 S. Ct. at 2463, 2465, 2467-68. In doing so, the judge "may not presume that the Guidelines range is reasonable." *Gall*, 128 S. Ct. at 596-97; *see also Rita*, 127 S. Ct. at 2465 (same).

Of great importance is the fact that district court judges must now consider and respond to nonfrivolous arguments that the guideline sentence itself reflects an unsound judgment because it

---

[15] Large passages in this section are excerpted, with permission of the author, directly from Amy Baron-Evans, *"Rita, Gall and Kimbrough: A Chance for Real Sentencing Improvements."; See also* http://www.fd.org/pdf_lib/2G2.2%20Reply%20to%20Govt.pdf.

fails properly to reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way, or a different sentence is appropriate regardless. *Rita*, 127 S. Ct. at 2465, 2468. District courts are no longer required, or permitted, to simply defer to Commission policies. *Id*. Courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Id*. at 2463. Even the government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'"[16] *Kimbrough*, 128 S. Ct. at 570.

Thus, judges may vary from the child pornography guidelines because of the individual circumstances of the case, *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007), and/or because the Guidelines are not the product of empirical data, national experience, or independent expertise and thus do not satisfy § 3553(a)'s objectives, or both. *See United States v. Baird*, slip op., 2008 WL 151258 (D. Neb. Jan. 11, 2008). As the Fourth Circuit observed while upholding an individual circumstances variance from 78-97 months down to 24 months:

"In the wake of Gall, the Government's principal argument is that the district court failed to take into account the seriousness with which Congress views sexual crimes involving children. The district court's statement of reasons, however, expressly acknowledged the seriousness of the offense charged in computing the sentence. See J.A. at 96 (explaining that Congress considered Smith's crime 'a very serious offense' and that the district court 'was treating it as such'). In addition, the district court noted during the sentencing hearing that 'Congress has indicated its abhorrence of the offense or offenses relating to child pornography.' (J.A. at 92)." *United States v. Smith*, slip op., 2008 WL 1816564 (4th Cir. Apr. 23, 2008).

Helpful language may also be found from recent case law dealing with the seemingly settled issue of variances based on fast-track disparities. The First Circuit recently abrogated a ban on the consideration of fast-track disparities in sentencing, noting:

"While the *Kimbrough* Court acknowledged that a sentencing court can be constrained by express congressional directives, such as statutory mandatory maximum and minimum prison terms, 128 S. Ct. at 571-72, the PROTECT Act — as the Fifth Circuit would have to concede — contains no such express imperative. The Act, by its terms, neither forbids nor discourages the use of a particular sentencing rationale, and it says nothing about a district court's discretion to deviate from the guidelines." *U.S. v. Rodriguez*, __F.3d __, 2008 WL 2265898 (1st Cir. June 4, 2008)

As district court judges become comfortable in the knowledge that the appellate courts will respect their reasoned discretion, these opportunities for effective advocacy will grow. Indeed, in the right circumstances, a detailed record may encourage, and support, exceptional downward variances. *See United States v. Rowan II*, slip op., 2008 WL 2332527 (C.A.5 June 9,

---

[16] *See also* Tr. of Oral Argument at 50, *Rita v. United States* (U.S. argued Feb. 20, 2007); Tr. of Oral Argument at 32-33, *Claiborne v. United States* (U.S. argued Feb. 20, 2007).

2008)(abrogating prior circuit precedent to affirm a variance from 47-56 months downwards to supervised release for possession of child pornography).

   This article has demonstrated a number of policy problems with the child pornography guidelines that can be easily put into the record.  First, the guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary.  Second, repeated Congressional directives were targeted to deter mass producers, repeat abusers, and mass distributors, but this group makes up less than 5% of the defendants effected by the changes.  Third, the two point enhancement for use of a computer is applied to nearly every defendant, but the rationale for creating and continuing the enhancement is rarely present.  Fourth, the latest, and most dramatic changes to the Guidelines result not from study by the Commission, nor debate in Congress, but instead by the actions of two unknown authors within the Department of Justice.

   In a decisive rejection of mindless uniformity, the Court has recognized that unwarranted uniformity is every bit as objectionable as unwarranted disparity:  "[I]t is perfectly clear that the District Judge . . . also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated."  *Id*. at 600 (emphasis in original).  Thus, the judge "must make an individualized assessment based on the facts presented," and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."  *Gall*, 128 S. Ct. at 597.  *Kimbrough,* for example, was an "unremarkable" "mine-run" case in which the guideline itself reflects unsound judgment in that it fails properly to reflect § 3553(a) considerations.  128 S. Ct. at 575.  There, the Court upheld a below-guideline sentence in an ordinary crack trafficking case because the crack guidelines (like all of the drug guidelines) were not based on past practice at their inception, and reflect unsound judgment in light of the purposes of sentencing and the need to avoid unwarranted disparities.  The Court said:  "In the main," the Commission used an "empirical approach based on data about past practices, including 10,000 presentence investigation reports," but it "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."  *Id*. at 567.  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case."  *Id*. at 575.

   In *Kimbrough*, "the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)."  128 S. Ct. at 576.  The Court did not mean that the district court properly relied on something "unique" about Mr. Kimbrough or his offense because it made quite clear that this was an "unremarkable" "mine-run" case.  What it meant was that the facts of the case fit what is wrong with the crack cocaine guidelines.  Thus, a defense attorney who argues for a below-guideline sentence is not seeking a "categorical" rejection of a guideline in all possible cases, but a rejection of the guideline in the particular case because the facts fit the policy problems of the guideline.

   Although some guidelines may be entitled to respect, this does not pertain to guidelines, like the child pornography guidelines, that "do not exemplify the Commission's exercise of its characteristic institutional role."  *Kimbrough*, 128 S. Ct. at 575.  Where, as here, the Commission is

Page -35-

merely parroting the directives of Congress, which in turn admits that it was merely enacting an undebated item written by federal prosecutors, then little respect is due.

In *Rita*, the basis for the non-binding- with-no-independent-legal-effect presumption was that it was "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve 3553(a) objectives" because the original Commission (instead of basing the Guidelines on the purposes of sentencing as Congress directed, *see* 28 U.S.C. § 991(b)(1)(A)) used an "empirical approach" based on "past practice," and the Guidelines "*can*" evolve in response to non-guideline sentencing decisions and consultation with the criminal justice community. *Rita*, 127 S. Ct. at 2464-65 (emphasis supplied). But this is simply untrue when the Commission has not exercised its capacity to develop guidelines based on empirical data, national experience, and independent expertise. *Kimbrough*, 128 S. Ct. at 575.

After *Gall* and *Kimbrough*, the fact that a guideline (or amendment to a guideline) was spawned by congressional action is a red flag for lack of empirical basis, raising the question whether the guideline reflects unsound judgment. *See Gall*, 128 S. Ct. at 594 n.2 ("For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes."); *Kimbrough*, 128 S. Ct. at 575 ("The crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'"); *id.* at 569 n.10 ("The amended Guidelines still produce sentencing ranges keyed to the mandatory minimums in the 1986 Act.").

The Court affirmatively recognizes that Congress makes mistakes, and that when the Commission blindly follows or exacerbates a congressional mistake with guidelines that are not based on empirical evidence or experience, and that are contrary to sentencing purposes and/or create unwarranted disparities or unwarranted similarities, the courts are free to reject such guidelines. *Kimbrough*, 128 S. Ct. at 567-68, 569 n.2, 571-72, 574-75; *Gall*, 128 S. Ct. at 594 & n.2.

The Commission has acknowledged that the goals of sentencing reform have not been fully achieved because, "[i]n some cases, the results of research and collaboration have been overridden or ignored . . . through enactment of mandatory minimums or specific directives to the Commission." *See* U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at vii (2004). Indeed, "frequent mandatory minimum legislation and specific directives to the Commission to amend the [sex offense] guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id.* at 73. The term "directives" may convey the impression of express instructions to amend the guidelines in particular ways, but many of the guidelines were created or amended as a reflexive response to a new or increased mandatory minimum, an increased statutory maximum, an instruction to study some aspect of sentencing or to change penalties if appropriate, or behind-the-scenes discussions not in the public record at all. In some instances, the Commission exceeded an

Page -36-

**R157**

express congressional directive, or took other action that appears to contravene congressional intent.

It is important to recognize that a Guideline which follows to the letter a congressional directive stated in "express terms" is not immune from scrutiny by the sentencing judge as a potentially unsound judgment. Even the government acknowledges as much. *See* Brief of the United States at 29, *Kimbrough v. United States* ("As long as Congress expresses its will wholly through the Guidelines system, the policies in the Guidelines will best be understood as advisory under *Booker* and subject to the general principles of sentencing in section 3553(a)."); Letter stating the government's position on the career offender guideline, docketed March 17, 2008 in *United States v. Funk*, No. 05-3708, 3709 (6th Cir.) ("position of the United States" is that "*Kimbrough*'s reference to [§ 994(h)] reflected the conclusion that Congress intended the Guidelines to reflect the policy stated in Section 994(h), not that the guideline implementing that policy binds federal courts.") (emphasis in original), available on the Sentencing Resource Page of www.fd.org.

Congress has the exclusive right and responsibility to legislate statutory minimums and maximums,[17] and those outer limits trump any inconsistent guideline range, as is obvious, and as USSG § 5G1.1 says. But when Congress uses the Commission as a conduit for a specific sentence or sentencing increase, the resulting guideline is but one factor to be considered under § 3553(a), and is subject to the same critical analysis as other guidelines, as the courts have found in both career offender and child pornography cases. *See United States v. Martin*, 520 F.3d 87, 88-96 (1st Cir. 2008) (courts have broad discretion to sentence below career offender guideline under *Gall* and *Kimbrough*); *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008) (Section 994(h) is a directive to the Commission, not the courts); *United States v. Marshall*, slip op., 2008 WL 55989 **7-8 (7th Cir. Jan. 4, 2008) ("We must reexamine our case law" holding "that courts are not authorized to find that the guidelines themselves, or the statutes upon which they are based, are unreasonable . . . in light of the Supreme Court's recent decision in *Kimbrough*."); *United States v. Malone*, 2008 U.S. Dist. LEXIS 13648 (E.D. Mich. Feb. 22, 2008) (imposing below guideline sentence based on Commission's reports finding career offender guideline unsound); *United States v. Baird*, slip op., 2008 WL 151258 *7 (D. Neb. 2008) ("Because . . . the Guidelines for child [pornography] offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but . . . in response to statutory directives. . . . the court affords them less deference than it would to empirically-grounded guidelines."). If it were otherwise, the Separation of Powers problem that most troubled the Court in *Mistretta* would arise. *See Mistretta*, 488 U.S. at 407.

The fact that 33% of FY 2007 child pornography defendants were sentenced below the Guidelines is encouraging. *See 2007 Sourcebook*; http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm at Table 28.   It is also indicative of the fact

---

[17] See *United States* v. *Evans*, 333 U.S. 483, 486 (1948) (observing that "as concerns the federal powers, defining crimes and fixing penalties are legislative, not judicial, functions"); *Ex parte United States*, 242 U.S. 27, 41-42 (1916) (stating that "the authority to define and fix the punishment for crime is legislative," while the "right . . . to impose the punishment provided by law, is judicial"); *United States* v. *Wiltberger*, 18 U.S. (1 Wheat) 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *United States* v. *Hudson*, 11 U.S. (1 Cranch) 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.").

that the courts recognize the flawed character of the child pornography sentencing scheme.  This flaw exists, and severely impacts our clients, regardless of whether our clients were special or "extraordinary."  Following *Rita*, *Gall*, and *Kimbrough*, the Courts are now in an even better position to ameliorate this problem.

As one district court judge recently observed:

[F]or policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as . . . child crimes and sexual offenses.  Consequently, the Guideline ranges of imprisonment for those crimes are a *less reliable appraisal of a fair sentence*.  In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role — basing its determinations on "'empirical data and national experience, guided by a professional staff with appropriate expertise'", — it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in § 3553(a).

*United States v. Bennett*, 8:07CR235 (D. Neb. May 30, 2008) (Sentencing Memorandum)available at http://sentencing.typepad.com/sentencing_law_and_policy/files/bennett_sentencing_opinion.pdf

## XI. Conclusion

Child pornography is a pernicious evil.  However, the hysteria associated with public events such as the Dateline "To Catch a Predator" series is not a sound basis for sentencing.  Since 1991, the punishment for these offenses has been dramatically and irrationally increased, to the point where today rapists, murderers, and molesters receive lesser sentences than would a man who swaps a few, thirty-year old, pictures of child pornography that were produced before the defendant was even born.  Recent changes to the sentencing system, and an increased familiarity with the underlying presumptions of § 2G2.2 should persuade and embolden the courts to conclude that unless a defendant was a repeat offender, or a mass distributor, the Guidelines yield a sentence 'greater than necessary' to achieve §3553(a)'s purposes.

# Appendix A
# Guideline Changes Chart 1987 to Present

| Date | 13-Apr-87 | 1-Nov-91 | 27-Nov-91 | 1-Nov-96 | 1-Nov-00 | 1-Nov-01 | 30-Jan-03 | 30-Apr-03 | 1-Nov-04 |
|---|---|---|---|---|---|---|---|---|---|
| **Simple Possession (Base Offense Level)** | | 10 | 13 | 15 | 15 | 15 | 15 | 15 | 18 |
| <12 years or prepubescent | | +2 | +2 | +2 | +2 | +2 | +2 | +2 | |
| >10 items containing images | | | +2 | +2 | +2 | +2 | +2 | (see below) | (see below) |
| # of images | | | | | | | | +2 to 5 | +2 to +5 |
| use of a computer | | | | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | | | | | | | +4 | +4 |
| Max | | 12 | 17 | 21 | 21 | 21 | 21 | 28 | 31 |
| Max Guideline Range w/o Acceptance, CH I | | 10-16 months | 24-30 months | 37-46 mnths | 37-46 months | 37-46 months | 37-46 months | 78-97 months | 108-135 months* |
| Max Guideline Range w/ Acceptance, CH I | | 6-12 months | 15-21 months | 27-33 mnths | 27-33 months | 27-33 months | 27-33 months | 51-63 months | 78-97 months |
| Statutory Range | | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 10 yrs | NMT 10 |
| | | | | | | | | | |
| **Distribution (Base Offense Level)** | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 22 |
| Receipt w/intent to traffick/distro (Base) | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 22 |
| Receipt w/o intent to traffick/distro (Base) | 13 | 10 | 15 | 17 | 17 | 17 | 17 | 17 | 20 |
| Possession w/ intent to traffick/distro (Base) | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 18 |
| Distribution for SS | +5 to +11 (2F1.1) | +5 to +x | +5 to +x | +5 to + 18 | +5 to + 18 (2F1.1) | +5 to +26 (2B1.1) | +5 to +30 | +5 to +30 | +5 to +30 |
| Disribution for other reason that n SS | | | | | +2 to +7 | +2 to +7 | +2 to +7 | +2 to +7 | +2 to +7 |
| <12 years | +2 | +2 | | | | | | | |
| <12 years or prepubescent | | | +2 | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | +4 | +4 | +4 | +4 | +4 | +4 | +4 | +4 |
| pattern of abuse or exploitation | | | +5 | +5 | +5 | +5 | +5 | +5 | +5 |
| use of a computer | | | | +2 | +2 | +2 | +2 | +2 | +2 |
| # of images | | | | | | | | +2 to +5 | +2 to +5 |
| Max | 20+ | 24+ | 31+ | 35+ | 35+ | 37+ | 37+ | 42+ | 47+ |
| Max Guideline Range w/o Acceptance, CH I | 33-41 | 51-63 | 108-135 | 168-210** | 168-210** | 210-262** | 210-262** | 360-Life*** | Life*** |
| Max Guideline Range w/ Acceptance, CH I | 24-30 | 37-46 | 78-97 | 121-151 | 121-151 | 151-188** | 151-188** | 262-327*** | Life*** |
| Statutory Range | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NLT 5, NMT 20 | NLT 5, NMT 20 |

\* Exceeds statutory max of 120 months for 1st time offender
\*\* Exceeds statutory max of 180 months for 1st time offender
\*\*\* Exceeds statutory max of 240 months for 1st time offender

Bold, Red type indicates a change from the previous year.

# Guideline Changes Chart 1987 to Present
(Page 2)

Distribution Offenses:
      Base Offense Level:  13 (Committee)
                           15 (by law in 1991)
                           17 (by law in 1996)
                           22 (to comport with new mandatory minimum in 2003)

Receipt Offenses:
      Base Offense Level:  10 (Committee)
                           13 (by law in 1991)
                           15 (by law in 1991)
                           20/22 (to comport with new mandatory minimums in 2003)

Simple Possession:
      Base Offense Level   10 (Committee)
                           13 (by law in 1991)
                           18 (to comport with new mandatory minimums in 2003)

+2 for a victim <12       Committee
sadistic/masochistic     Committee
Pattern of Abuse         Committee
Distribution               Committee

+2 computer             by law / Congress
# of pictures            by law / written by the DOJ

## Appendix B:
## Letter from the Commission opposing increased penalties


U.S. SENTENCING COMMISSION
Washington, DC, August 7, 1991.
Hon. EDWARD R. ROYBAL,
Chairman, Subcommittee on Treasury, Postal Service, and General Government,
Capitol, Washington, DC.


   DEAR CONGRESSMAN ROYBAL: I am writing in reference to Senate Amendment No. 780 to the FY 1992 Treasury, Postal Service Appropriations Bill that directs the United States Sentencing Commission to amend the sentencing guidelines pertaining to child pornography offenses.

   Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography. The Commission has always regarded child pornography offenses as serious, as indicated by the fact that the guidelines do not permit straight probation for the least serious forms of this conduct and require a substantial term of imprisonment for the more serious forms.


   The Commission's 1991 amendments to the child pornography guideline were principally motivate by the creation of a new offense in the 1990 crime bill (codified at 18 U.S.C. s 2252(a)(4)) that punishes by imprisonment up to five years the knowing possession of three or more items of child pornography. Prior to the 1990 crime bill, 18 U.S.C. s 2252 provided up to ten years imprisonment upon a first offense conviction for a wide range of conduct varying in seriousness from the simple receipt through the mail of one item of child pornography to for-profit trafficking in large volumes of such material. Convictions for such conduct were sentenced under guideline § 2G2.2, which provided a base offense level of 13, increased by 2 levels (about 25 percent) if the material involved a prepubescent minor or minor under age 12, and further increased by at least 5 levels if the offense involved for-profit distribution.


   In response to the 1990 crime bill amendment, the Commission created a new guideline, § 2G2.4, and assigned to it a base offense level of 10, increased to 12 if the pornographic material involved a prepubescent minor or minor under age 12. The base offense level of 10 was the highest of the alternatives proposed for public comment 1 and is roughly 50 percent greater than the base offense level for simple receipt or possession (in federal jurisdiction) of one item of adult obscene matter. The sentencing significance of this is that a first offender who violates 18 U.S.C. s 2252(a)(4) by possessing three items depicting a prepubescent child and who manifests remorse will be subject to a guideline range of 6-12 months imprisonment. A sentence of probation is only permitted in such circumstances if the defendant, as a condition of probation, loses his liberty for at least six months in jail, community confinement, or home detention.


   In constructing the new guideline, the Commission made several other significant decision. First, the Commission provided that if the actual offense conduct involves trafficking in child pornography, the trafficking guideline, with its more severe penalties, will apply, although the defendant may only be convicted of simple child pornography

possession. Similarly, if the actual offense conduct involves production of child pornography, the still more severe penalties of guideline 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material . . .) will apply. The purpose of these "cross references" is to ensure that defendants will be punished commensurate with the seriousness of their real offense conduct, even if a plea bargain allows a plea to a possession charge. Furthermore, for those cases in which the defendant possesses a large quantity of prohibited material, but the government is unable to prove trafficking (in order to trigger the cross reference to the trafficking guideline), commentary to the new guideline recommends an above-guideline sentence.

Secondly, in keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under s § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. Senate Amendment No. 780, unfortunately, would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation.

For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more sever penalties mandated by the Senate amendment by negotiating a plea to simple possession. One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.

The Commission fully concurs in the need to provide appropriately sever penalties for these offenses that involve the sexual exploitation of young victims. The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact a number of judges had written the Commission to express the view that the offense level for the lest serious forms of conduct under s § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under s § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. By ordering the Commission to raise penalties even higher for the least serious cases (i.e., simple possession and receipt), Senate Amendment No. 780 may aggravate this below-guideline sentencing rate and heighten sentencing disparity.

As I stated in recent testimony submitted to the Senate Judiciary Committee in connection with the 1991 crime bill, the Commission welcomes the opportunity to work with Congress to ensure that the guidelines are achieving the objectives Congress sees fit to establish, and we will implement any new congressional directives as promptly as the law permits. At the same time, we believe it is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy.

If the conferees determine that a directive to the Commission is needed in this area, I recommend consideration of the attached substitute provision. This directive, with its more flexible language, is patterned after similar directives in the Commission's original statute and several subsequent crime bills. It expresses the clear Congressional will that the Commission provide appropriately severe penalties in this area without hamstringing the ability of the Commission to take into account variations in the actual offense conduct and significant offender characteristics. Given reasonable flexibility, I am confident the Commission can accomplish the desired aim without creating anomalous results or compromising the core principles of the Sentencing Reform Act.

Thank you for your consideration in this matter.

With highest regards and best wishes, I am,

Sincerely,

WILLIAM W. WILKINS, JR.,
Chairman.

**Appendix C:**
**Select Portions of Amendment 664**

"Background: Section 401(i)(1)(C) of Public Law 108-21 directly amended subsection (b) to add subdivision (7), effective April 30, 2003.".

Reason for Amendment: This amendment implements the directives to the Commission regarding child pornography and sexual abuse offenses in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, (the "PROTECT Act"), Pub. L. 108-21. This amendment makes changes to Chapter Two, Part A (Criminal Sexual Abuse), Chapter Two, Part G (Offenses Involving Commercial Sex Acts, Sexual Exploitation of Minors, and Obscenity), §§ 3D1.2 (Groups of Closely Related Counts), 5B1.3 (Conditions of Probation), 5D1.2 (Term of Supervised Release), and 5D1.3 (Conditions of Supervised Release), and Appendix A (Statutory Index).

First, the amendment consolidates §§ 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic), and 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct), into one guideline, § 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). Consolidation addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline (§ 2G2.2 or § 2G2.4) for cases involving convictions of 18 U.S.C. § 2252 or § 2252A. Furthermore, as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics.

Section 103 of the PROTECT Act established five-year mandatory minimum terms of imprisonment for offenses related to trafficking and receipt of child pornography under 18 U.S.C. §§ 2252(a)(1)-(3) and 2252A(a)(1), (2), (3), (4) and (6). This section also increased the statutory maximum terms of imprisonment for these offenses from 15 years to 20 years. Furthermore, the PROTECT Act increased the statutory maximum penalty for possession offenses from five to ten years. As a result of these new mandatory minimum penalties and the increases in the statutory maxima for these offenses, the Commission increased the base offense level for these offenses.

The amendment provides two alternative base offense levels depending upon the statute of conviction. The base offense level is set at level 18 for a defendant convicted of the possession of child pornography under 18 U.S.C. § 2252(a)(4), 18 U.S.C. § 2252A(a)(5), or 18 U.S.C. § 1466A(b), and at level 22 for a defendant convicted of any other offense referenced to this guideline, primarily trafficking and receipt of child pornography. The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations. The Commission increased the base offense level for possession offenses from level 15 to level 18 because of the increase in the statutory maximum term of imprisonment from 5 to 10 years, and to maintain proportionality with receipt and trafficking offenses. The amendment also provides a two-level decrease at § 2G2.2(b)(1) for a

Page -44-

**R165**

defendant whose base offense level is level 22, whose conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor, and whose conduct did not involve an intent to traffic in or distribute the material. Thus, individuals convicted of receipt of child pornography with no intent to traffic or distribute the material essentially will have an adjusted offense level of level 20, as opposed to an offense level of level 22, for receipt with intent to traffic, prior to application of any other specific offense characteristics. The Commission's review of these cases indicated the conduct involved in such "simple receipt" cases in most instances was indistinguishable from "simple possession" cases. The statutory penalties for "simple receipt" cases, however, are the same as the statutory penalties for trafficking cases. Reconciling these competing concerns, the Commission determined that a two-level reduction from the base offense level of level 22 is warranted, if the defendant establishes that there was no intent to distribute the material.

The amendment also provides a new, six-level enhancement at § 2G2.2(b)(3)(D) for offenses that involve distribution to a minor with intent to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than sexual activity.

The amendment also makes a number of changes to the commentary at § 2G2.2, as follows. The amendment adds several definitions, including definitions of "computer," "image," and "interactive computer service," to provide greater guidance for these terms and uniformity in application of the guideline. The amendment also broadens the "use of a computer" enhancement at § 2G2.2(b)(5) in two ways. First, the amendment expands the enhancement to include an "interactive computer service" (e.g., Internet access devices), as defined in 47 U.S.C. § 230(f)(2). The Commission concluded that the term "computer" did not capture all types of Internet devices. Thus, the amendment expands the definition of "computer" to include other devices that involve interactive computer services (e.g., Web-Tv). In addition, the amendment broadens the enhancement by explicitly providing that the enhancement applies to offenses in which the computer or interactive computer service was used to obtain possession of child pornographic material. Prior to this amendment, the enhancement only applied if the computer was used for the transmission, receipt or distribution of the material.

The PROTECT Act directly amended §§ 2G2.2 and 2G2.4 to create a specific offense characteristic related to the number of child pornography images. That specific offense characteristic provides a graduated enhancement of two to five levels, depending on the number of images. However, the congressional amendment did not provide a definition of "image," which raised questions regarding how to apply the specific offense characteristic. This amendment defines the term "image" and provides an instruction regarding how to apply the specific offense characteristic to videotapes. Application Note 4 states that an "image" means any visual depiction described in 18 U.S.C. § 2256(5) and (8) and instructs that each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered one image. Furthermore, the application note provides that each video, video-clip, movie, or similar recording shall be considered to have 75 images for purposes of the specific offense characteristic. Application Note 4 also provides two possible grounds for an upward departure (if the number of images substantially under-represents the number of minors or if the length of the videotape or recording is substantially more than five minutes). Because the image specific offense characteristic created directly by Congress in the PROTECT Act essentially supercedes an earlier directive regarding a specific offense characteristic relating to the number of items (see Pub. L. 102-141 and Amendment 436), the Commission deleted the specific offense characteristic for possessing ten or more child pornographic items (formerly § 2G2.4(b)(3)). This deletion avoids potential litigation regarding issues of "double counting" if both specific offense characteristics were retained in the guideline.

In response to the increase in the use of undercover officers in child pornography investigations, the amendment expands the definition of "minor." "Minor" is defined as (1) an individual who had not attained the age of 18 years; (2) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (A) had not attained the age of 18 years, and (B) could be provided to a participant for the purposes of engaging in sexually explicit conduct; or (3) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

The amendment also makes clear that distribution includes advertising and posting material involving the sexual exploitation of a minor on a website for public viewing but does not include soliciting such material. In response to a circuit conflict, the amendment adds an application note to make clear that the specific offense characteristic for material portraying sadistic or masochistic conduct applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material. The circuit courts have disagreed regarding whether a defendant must have specifically intended to receive the sadistic or masochistic images. Some circuit courts have required that the defendant must have intended to receive these images. See United States v. Kimbrough, 69 F.3d 723 (5th Cir. 1995); United States v. Tucker, 136 F.3d 763 (11th Cir. 1998). The Seventh Circuit has held that this specific offense characteristic is applied based on a strict liability standard, and that no proof of intent is necessary. See United States v. Richardson, 238 F.3d 837 (7th Cir. 2001). The Commission followed the Seventh Circuit's holding that the enhancement applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material.

Second, section 103 of the PROTECT Act increased the mandatory minimum term of imprisonment from 10 to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251. In response, the amendment increases the base offense level at § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production) from level 27 to level 32. A base offense level of level 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics that are expected to apply in almost all production cases (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met in by the Chapter Two calculations almost every case.

The amendment adds three new specific offense characteristics that are associated with the production of child pornography. The amendment provides, at § 2G2.1(b)(2), a two-level increase if the offense involved the commission of a sex act or sexual contact, or a four-level increase if the offense involved a sex act and conduct described in 18 U.S.C. § 2241(a) or (b) (i.e., the use of force was involved). The Commission concluded that this type of conduct is more serious than the production of a picture without a sex act or the use of force, and therefore, a two-or four-level increase is appropriate. The amendment also adds a two-level increase if the production offense also involved distribution. The Commission concluded that because traffickers sentenced at § 2G2.2 receive an increase for distributing images of child pornography, an individual who produces and distributes the image(s) also should be punished for distributing the item. Lastly, the amendment adds a new, four-level increase if the offense involved material portraying sadistic or masochistic conduct. Similar to the distribution specific offense characteristic, the Commission concluded that, because § 2G2.2 contains a four-level increase for possessing, receiving or trafficking these images, the producers of such images also should receive comparable additional punishment.