

**Justice Quarterly**

ISSN: 0741-8825 (Print) 1745-9109 (Online) Journal homepage: https://www.tandfonline.com/loi/rjqy20

# Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism

## Mark T. Berg & Beth M. Huebner

**To cite this article:** Mark T. Berg & Beth M. Huebner (2011) Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism, Justice Quarterly, 28:2, 382-410, DOI: 10.1080/07418825.2010.498383

**To link to this article:** https://doi.org/10.1080/07418825.2010.498383

Published online: 30 Jul 2010.

Submit your article to this journal ↗

Article views: 7070

View related articles ↗

Citing articles: 181 View citing articles ↗

JUSTICE QUARTERLY   VOLUME 28   NUMBER 2   (APRIL 2011)

# Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism

## Mark T. Berg and Beth M. Huebner

Scholars consistently find that reentering offenders who obtain steady work and maintain social ties to family are less likely to recidivate. Some theorize that familial ties may operate independently from employment to influence recidivism and that such ties may also serve a moderating role. The current study employs an integrated conceptual framework in order to test hypotheses about the link between familial ties, post-release employment, and recidivism. The findings suggest that family ties have implications for both recidivism and job attainment. In fact, the results suggest that good quality social ties may be particularly important for men with histories of frequent unemployment. The implications of these findings are discussed with regard to theory and future research on prisoner reentry and recidivism.

*Keywords*   prisoner reentry; recidivism; social ties

## Introduction

A massive growth in the USA prison population has stimulated scientific interest in prisoner reentry. According to recent estimates, more than 1.5 million people are currently under the jurisdiction of state and federal prisons (West & Sabol, 2009). Approximately two-thirds of returning offenders renew their involvement

Mark T. Berg is an assistant professor in the School of Public and Environmental Affairs at Indiana University-Purdue University, Indianapolis. His recent research, funded by the Harry Frank Guggenheim Foundation, focuses on the structural-cultural context of violent events, the reintegration process, and longitudinal patterns of criminal behavior. Beth M. Huebner is an associate professor and director of Graduate Studies in the Department of Criminology and Criminal Justice at the University of Missouri-St. Louis. Her recent research, funded by the National Institute of Justice, considers the efficacy of sex offender residency laws and explores variation in patterns of offending for urban and rural parolees. Correspondence to: Mark T. Berg, School of Public and Environmental Affairs, Indiana University-Purude University Indianapolis, 801 W. Michigan St., BS 4073, Indianapolis, IN 46202, USA. E-mail: markberg@iupui.edu.

 Routledge
Taylor & Francis Group

ISSN 0741-8825 print/1745-9109 online/11/020382-29
© 2011 Academy of Criminal Justice Sciences
DOI: 10.1080/07418825.2010.498383

in criminal behavior, and nearly half will serve another sentence in prison (Langan & Levin, 2002). In light of these facts, social scientists have increasingly focused their efforts on explaining the etiology of recidivism and desistence among offenders making the transition from prison to the community. Studies consistently find that two conditions play a particularly salient role in the reentry process: employment and social ties to family (Glaser, 1964; Laub & Sampson, 2003; Petersilia, 2003; Visher & Travis, 2003). Evidence derived from a variety of data sources shows that offenders who maintain a steady job and have close ties with members of their family are less likely to renew their involvement in criminal behavior upon release from prison. While this evidence is fairly clear, the manner by which familial ties affect recidivism has been relatively unexamined. Taken together, the literature suggests that good quality social ties with family lower the risk for recidivism, in part, by facilitating job attainment (Glaser, 1964; Visher, Debus, & Yahner, 2008). In other words, by connecting offenders with stable employment familial social ties may play an *indirect* role in affecting recidivism.

Extant research shows that the social capital obtained through relational ties is of "paramount importance in connecting people with jobs" (Granovetter, 1974, p. 22). This capital is especially beneficial for job-seekers who are at a relative disadvantage in terms of their marketable qualifications (i.e., work history, education) and reputations (Granovetter, 1974, 1985; Lin, 2001). Most offenders leaving prison lack a competitive resume, they are under-skilled relative to the general population, plus they shoulder a debilitating stigma that is attached to their criminal history (Pager, 2003). Owing to these deficits, parolees face significant challenges finding work (Petersilia, 2003). Some, however, rely on family members to procure job arrangements, and it is through this mechanism of job attainment that family ties are thought to be instrumental in altering post-release behavior (see Glaser, 1964). Despite important advances in knowledge about reentry, criminologists have yet to isolate, "how exactly social ties aid released inmates in the transition back into society" (Bales & Mears, 2008, p. 313); in particular, little is known about whether family ties help offenders overcome obstacles in the job market and secure employment (cf. Visher & Travis, 2003). Empirical knowledge of these proposed associations will serve as an additional step toward a more complete understanding of recidivism and prisoner reentry.

The current study builds upon existing reentry research by investigating two questions regarding the association between family-based social ties, job attainment and recidivism. First, we examine whether employment is a conduit through which familial social ties influence recidivism. Second, we examine whether familial ties buffer the effects of deficits in employment qualifications on job attainment. This analysis uses data that include both pre- and post-release factors; the study sample comprises a group of men whose involvement in criminal behavior was tracked for more than three years following parole. Results are discussed with regard to criminological theory, future research on recidivism, and prisoner reentry policy.

## Background

### Family Ties and Returning Offenders

A large body of social science research has shown that during personal crises (e.g., divorce, death, and serious health complications) family members are fertile sources of psychological, material, and financial support (Cattell, 2001; Umberson, 1987; Wellman & Wortley, 1990). In fact, criminological research finds that upon release from prison, offenders commonly rely on parents, grandparents, siblings, aunts, and uncles. Family members come to represent core members of offenders' social networks (Malik-Kane & Visher, 2008; Shapiro & Schwartz, 2001). For example, approximately 40% of offenders in a Baltimore release cohort expected to rely on family as a source of support in the post-prison environment and, in fact, almost 50% ultimately did (Visher, Kachnowski, La Vigne, & Travis, 2004). Nelson, Dees, and Allen (1999) reported that approximately 80% of the parolees in their study resided with family members upon release from prison. Meisenhelder (1977, pp. 328–329) found in his study that family was a major source of relational attachments for offenders and became "a secure place for [them] within the conventional community." Likewise, several other qualitative studies have observed that family serves an important role in the post-release environment, namely as a resourceful network of support (Braman, 2004; Farrall, 2004; Glaser, 1964; Shover, 1996).

It is believed that, relative to the wider community, the family is more apt to overlook offenders' stigma—a phenomenon that facilitates the formation of social ties between offenders and members of their family (Eckland-Olson, Supancic, Campbell, & Lenihan, 1983). A record of imprisonment can lead to gross exclusion (Matza, 1969, pp. 159–162) from conventional social networks in one's community, particularly when those networks comprise individuals who have little prior information to construct an image of the offender's self other than what is known based on their criminal record (Ericson, 1977; Lofland, 1969). By contrast, family members are unlikely to consider the offenders' arrest record as representative of their real self (Maruna, 2001), rather they recognize it as a *part* of the offenders' total personality. There-fore, reentering offenders' past transgressions have a less corrosive effect on tie formation with members of their own family versus members of the wider community (Braithwaite, 1989; Lofland, 1969, p. 214). In fact, a considerable amount of research by Sampson and Laub (1993) stresses this notion, suggest-ing that a reason the relational tie between offenders and spouses is unique and potentially beneficial—in terms of desistence—is that it is unencumbered by the stigma associated with a lengthy record of offending. In view of the criminological literature, Farrall (2004, p. 72) concludes that "the family has appeared to be a particularly strong resource for those attempting to desist to call upon."

## Family Ties and Recidivism

Existing theoretical and empirical research implies that social ties to family involve *three* components that purportedly affect their involvement in criminal behavior. First, ties have a controlling effect on returning offenders' behavior; second, they provide a provision of emotional support; and third, they facilitate identity transformation. We review these ideas in the forthcoming paragraphs.

Turning to the first of these components, the effect of social ties on offending is often understood through the lens of control theory. Social control models assume that people's motivation to offend is restrained by their relations to society, conceived of as social bonds (Hirschi, 1969). Variability in the strength of the social bond accounts for variation in offending. Family ties represent a source of social control in that they connect reentering offenders to the conventional social order and in doing so thwart their impulses to recidivate (Laub & Sampson, 2003). In the words of Glaser (1964, p. 335), these ties are "insulation from the criminal influences" that reentering offenders encounter in free society. For instance, family ties structure offenders' daily routines, placing restrictions on where they go to socialize, with whom they associate, and the types of behaviors they engage in while socializing (i.e., heavy drinking, partying in bars and clubs, and drug use) (see Warr, 1998).

Second, existing research suggests that intimate ties supply returning offenders with a provision of emotional support. This support reduces the impulse to offend in several ways. First, families provide offenders with emotional resources to cope with the stressful challenges of reentry (Agnew, 2005; Glaser, 1964). In fact, Maruna (2001) as well as Laub and Sampson (2003) offer recent empirical evidence to suggest that offenders' families provide a durable emotional barrier which shields them from the disorienting experiences common to reentry. Elsewhere, theorists claim that familial ties serve as the basis of the shaming process, and family members take on a nurturing role in the process of social reintegration (Braithwaite, 1989). Empirical research with parolees has supported the purported centrality of familial support (Naser & Visher, 2006; Sullivan, Mino, & Nelson, 2002). For example, interviewed roughly three months after their release date, a sample of ex-prisoners from Ohio identified support from the family as the most important thing that kept them from returning to prison (Visher & Courtney, 2006, p. 2). Other studies find that ex-prisoners with close ties to their family report higher levels of optimism, confidence in the future, and an unwillingness to commit to criminal behavior (Burnett, 2004; Maruna, 2001; Nelson, Dees, & Allen, 1999). For example, a number of the men in Laub and Sampson's (2003) research asserted that the emotional support offered by members of their family, including spouses, children, and in-laws, was fundamental to their eventual success at desistence. Noting this finding, Laub and Sampson (2003, p. 137) remarked, "for some men [those who had desisted], a wife was one of the first people to care for them and about them."

Third, a growing research literature indicates that family relationships are fundamental components in the process of cognitive change. Specifically, theory

argues that the process of cognitive transformation is coupled with the formation of relational ties; these ties act as an anchor, enabling offenders to construct an alternative identity (Finestone, 1967). Giordano, Cernkovich, and Rudolph (2002) describe, for instance, how social ties within intimate networks are representative of a structural contingency or a hook for change. According to their research, these hooks are requisite to the development of a replacement self that is fundamentally incompatible with continued offending. Interpersonal ties with conventional actors serve to reaffirm the legitimacy of ex-prisoners' conventional orientation by providing testimony to the authenticity of their reform (Maruna, 2001, p. 157; Shover, 1996). In this way, participation in the roles inhered in family ties reinforces ex-prisoners' perception of themselves as a contributing member of society, and at the same time it galvanizes their commitment to conformity (Braithwaite, 1989; Maruna & Toch, 2005).

## Family Ties and Employment

Another emerging perspective in the literature implies that beyond supplying social control, social support, and the impetus for identity transformation, familial ties also serve an instrumental function in the post-release environment—namely, they act as a bridge to the job market (Glaser, 1964). Familial ties are said to contain a cache of social capital, which is conceived of as a relational investment inhered in the structure of the social network (Furstenberg, 2005; Portes, 1998). When acted upon, the stock of capital within the familial network assists offenders in attaining various symbolic and material resources in the post-release setting, including a steady job.

Specifically, theory suggests that social capital promotes the likelihood of job attainment in four distinct ways. First, according to Lin (2001) "information flow" is facilitated by social capital. For example, offenders with imperfect knowledge of job markets learn of positions and opportunities in the marketplace from members of their family. In fact, Granovetter (1974, p. 11) discovered in his study of capital and job acquisition that personal contact was the predominant method of finding a job. Second, social capital has an "influence" on individuals who have the authority to make key decisions within organizations (Lin, 2001). For example, employers may be swayed to hire an applicant, despite their criminal record, based on inside knowledge about the applicant's character that the employer gleaned from their family. Third, an individual's ties to a given social network are viewed by others as "certification" of the person's ability to access valued resources (Lin, 2001). In this way, deficits in ex-prisoners' personal qualifications or reputation might be outweighed by their potential to secure material assets from the familial network in which they are embedded. Finally, in Lin's (2001, p. 20) words, social ties "reinforce identity and recognition." Knowing that an ex-prisoner has social standing in a group serves to enhance perceptions of their reputation in the eyes of others. Empirical evidence shows, for example, that certain ex-prisoners are granted jobs

because their family has a respectable degree of status in the community (Sullivan, 1989).

In short, the social capital embedded within familial ties connects offenders to jobs by facilitating information flow, influencing decision makers, certifying one's qualifications, and affecting one's reputation. This is not to say that employment history and education (i.e., credentials) are irrelevant assets in the job marketplace. Indeed, within certain sectors, such as technology, these credentials are perhaps fully adequate (cf. Granovetter, 1974). But empirical evidence generally shows that formal credentials are often "insufficient to convey the social skills and resources so essential" (Lin, 2001) for the acquisition of a job. Given that ex-prisoners are often severely disadvantaged in terms of their credentials upon release, including their reputations, then social networks are especially relevant to their ability to secure a steady job (Braman, 2004; Petersilia, 2003; see also Uggen, Wakefield, & Western, 2005).

## Employment and Criminal Offending

Research conducted on high-risk samples often finds a negative link between employment and criminal behavior (see Laub & Sampson, 2003; cf. Uggen et al., 2005). For example, Laub and Sampson (2003) analyzed longitudinal data on 500 men and found that during periods of employment they were less likely to commit predatory crime and engage in heavy alcohol use. Similarly, using retrospective data gathered from Nebraska inmates, Horney, Osgood, and Marshall (1995) found that the probability of committing property offenses was reduced in the months when sample members were employed. Uggen's (1999) analysis of the National Supported Works Demonstration Project data indicates that jobs of high quality diminished the likelihood of recidivism among released offenders, even after controlling for selection into employment. Theory stresses that a steady job gives offenders a sense of identity and meaning to their life, while it also places restrictions on their routines, thereby reducing their exposure to situations conducive to criminal behavior (Glaser, 1964; Laub & Sampson, 2003; see also Sullivan, 1989). Employment, however, also enables individuals to pay their bills, secure housing, and develop a wider network of ties to conventional society (Petersilia, 2003; Visher & Courtney, 2006; Visher & Travis, 2003). Plus, employment reduces the economic incentive to engage in income-generating crimes (Petersilia & Rosenfeld, 2008; Shover, 1996). Others note that role commitments associated with employment also reduce offending by virtue of the fact that such behavior is inconsistent with the role and might jeopardize it altogether (Matsueda & Heimer, 1997; Sampson & Laub, 1993).

## Reentry and Job Attainment

By several accounts, obtaining steady employment in the post-prison context is a difficult task for reentering offenders, a task that is encumbered by two major

challenges (see Bushway, Stoll, & Weiman, 2007; Holzer, Raphael, & Stoll, 2001). First, the stigma of criminal conviction makes reentering offenders unattractive job candidates. For example, an audit study found that employers were unwilling to hire those with a reported criminal record even when they exceeded the qualifications for the position (Pager, 2003). Also, nearly 60% of employers surveyed in four large US cities reported that they would "definitely not" or "probably not" hire an ex-prisoner (Holzer, 1996). A mixed-method study of 740 men released from prison showed that that within two months after their parole date nearly 80% spent time searching for a job. However, most of the men reported difficultly during the search because of their criminal record (Visher et al., 2008). Once in the community, not only are many employers reluctant to hire convicted felons, but many former prisoners are legally barred from certain occupations (Petersilia, 2003). By virtue of their record, offenders face an especially narrow range of job opportunities.

Second, many offenders lack much-needed work skills, educational qualifications, and a stable history of employment. For instance, recent estimates show that roughly one-third of 25-34-year-old male inmates in state prisons held a high school diploma compared to 90% of males of the same age in the general population (Uggen et al., 2005). Whereas roughly 80% of 25-34-year-old non-imprisoned males were employed full-time, only 55% of inmates in the same demographic group reported being employed at the time of their most recent arrest. Additionally, Rubenstein (2001) estimates that 40% of adult state prisoners are functionally illiterate compared to 21% of non-incarcerated adults (cf. Petersilia, 2003). A history of irregular work and inadequate qualifications signals to potential employers that applicants are relatively poor candidates for an open position. Some scholars speculate that spending time in prison may further erode existing job skills and embed offenders into criminal networks as behaviors that are adaptive to prison life and street offending may be detrimental to working a job (Maruna & Toch, 2005; Uggen et al., 2005).

However, consistent with social capital theory, a small body of empirical research suggests that familial ties are an important mechanism by which ex-prisoners secure a job and overcome the hurdles of stigma and insufficient qualifications. Glaser (1964) observed that parolees frequently relied on personal contacts with family members for job procurement. A more recent study by Visher et al. (2008) noted that most offenders found work through personal connections including relatives (see also Visher et al., 2004). Similarly, research by Farrall (2004) found some evidence showing that offenders' parents offered them jobs—if the parents were self-employed—or found employment for them via personal contacts. In sum, existing evidence implies that an important way by which familial ties influence recidivism is through employment, and an important way by which offenders find a job is through familial ties. However, given the paucity of multivariate research along these lines, additional systematic evidence is needed to verify the validity of these claims.

## Current Study

In short, offenders often rely on social ties upon release from prison, and extant research suggests that family ties may have a more proximate influence on recidivism through the supply of social control, support, and the momentum for cognitive change that they provide. However, these ties might also reduce recidivism indirectly through the acquisition of a steady job. Stated otherwise, employment is perhaps an important mechanism through which familial ties influence offending in the post-release environment. Although these causal relationships have been implied in the literature, relatively little empirical research has been conducted in this area. In fact, Visher and Travis (2003, p. 99) fault researchers for focusing on the "single outcome of recidivism rather than attempting to understand the complicated process through which family may affect reintegration." The overarching goal of this study is to make progress toward filling in this knowledge gap; we draw on the literature outlined in the foregoing paragraphs to delineate three hypotheses regarding the relationship between interpersonal ties to family, employment, and recidivism.

Hypothesis 1:  Good quality familial ties have a direct negative effect on recidivism.

Hypothesis 2:  A significant quantity of the negative relationship between familial ties and recidivism is indirect and mediated by the effect of employment.

Social capital theory predicts that social ties are instrumental in securing access to jobs, if this notion is valid then the direct effect of social ties on recidivism should be significantly reduced once we control for post-release employment.

Hypothesis 3:  (a) Offenders who lack a high school diploma and who have an insufficient work history will be less likely to acquire employment upon release; (b) moreover, familial ties will moderate the negative effects of deficits in both education and work history on post-prison employment.

Here we predict a negative relationship between deficits in personal capital (i.e., work history and education) and post-release employment, and we also expect that this relationship will be weaker for those with good quality social ties.

## Data and Methods

The dataset for the current study comprises a random sample of 401 males paroled from prisons in a single Midwestern state in 2000. Information on whether they were arrested following their parole date was gathered through

October 2004.[1] The data were culled from official agency records. We obtained information on offenders' pre-prison demographic characteristics, officially recorded criminal history records, and post-release arrests from department of corrections databases. Data on post-prison social conditions and pre-prison employment and substance abuse history were obtained from the Level of Service Inventory-Revised (LSI-R). Following state DOC guidelines, the LSI-R assessment was administered by parole officers to members of the sample in a semi-structured interview within approximately two weeks of when they were discharged from prison, during their initial parole meeting.

More specifically, the LSI-R is a widely used 54-item risk assessment instrument administered in a structured interview used to plot probationers and parolees risk for reoffending and measure their progress while under supervision; it captures pre- and post-prison static and dynamic factors known to closely correlate with offending (see Andrews & Bonta, 2006). The LSI-R is appropriate for a study of this type. Several studies show that the LSI-R has predictive validity (Vose, Cullen, & Smith, 2008), high test–retest reliability (see Andrews & Bonta, 2006). The LSI-R is widely used by correctional officials in North America who currently adopt the instrument as part of offender management protocols (see Petersilia, 2003; Smith, Cullen, & Latessa, 2009).[2]

Our purpose is not to conduct an evaluation of the LSI-R's predictive validity, but to draw upon the rich array of information the instrument offers on an item-by-item basis for the purpose of testing the current hypotheses. In the paragraphs that follow the study measures are described, followed by a presentation of descriptive statistics and the results of the multivariate analyses.[3]

## Dependent Variables

The goal of this analysis is to explore the role of post-prison social ties in predicting parolee recidivism and employment. Hence, we use two separate dependent variables in the analyses. Consistent with extant research, we operationalize *recidivism* as offenders' first arrest following release from prison. Data on time to failure were also collected and reflect the number of days until rearrest. In

1. Using an electronic sorting process, staff from the state department of corrections (DOC) placed all parolees released in 2000 into a single electronic file and randomly selected every fifth parolee from the total parole file until a sample of 570 offenders was compiled (401 males; 169 females). We focus here on the 401 males in the sample. Random sampling was used to reduce the costs to the department of corrections associated with data collection. The sample is reflective of the population of parolees from the state in 2000. Further details on the study state are available from the authors by request.
2. The efficacy of the LSI-R has been well documented (Gendreau, Little, & Goggin, 1996; Petersilia, 2003); however, it is important to note that there is an ongoing debate surrounding the utility of this instrument for women (see Holtfreter, Reisig, & Morash, 2004; Smith et al., 2009). DOC officials from the state in which the data originates conduct annual assessments to determine the internal reliability of LSI-R; this is done using a test–retest method. The assessment conducted during the time frame in which these datasets were collected showed high test–retest reliability from 2001 through 2004.
3. Due to confidentiality reasons and bureaucratic oversight we were not allowed to access answers to the open-ended questions from the LSI-R interview.

total, 66% of the sample were rearrested during the 46-month follow-up period, and parolees averaged 619 days (SD = 389) in the community before recidivating (see Table 1).

In addition, we include a measure of *post-release employment* that was gathered by the department of corrections and reported on the LSI-R assessment—this measure reflects employment status during the release period (1 = full-time work—30+ hours per week, 0 = part-time, sporadic employment or unemployed). Offenders who reported acquiring full-time work (30 or more hours of paid employment per week) were asked to provide parole officials with their employers' contact information, and this information was used to verify the offender's employment status. In total, 46% of the sample were employed during the release period. Post-release employment was assessed within approximately four weeks of parolees' intake date and was not recorded during their initial meeting with their parole officer. Thus, information from the intake interview—which occurred in the first two weeks of parolees' release from prison, as noted earlier—was updated to include offenders' post-release employment status. Employment information was not gathered during the first meeting by parole officers since offenders had not had the occasion to investigate opportunities in the local job marketplace, owing to the fact that they were only recently incarcerated.[4] The rate of employment at the four-week time-point (46%, see Table 1) in the current study sample is similar to statistics reported elsewhere using a similar window of time. For example, in the study by Visher et al. (2008), by two months after release nearly 43% of offenders were employed.

## Independent Variables

Familial social ties are measured using two distinct constructs derived from the LSI-R. The first gauges the quality of offenders' ties to their parents and the second measures the quality of relationships with non-parental relatives. *Parental ties* is a dichotomous measure (1 = reflects a relatively satisfactory or satisfactory relationship; 0 = reflects an unsatisfactory, or relatively unsatisfactory, or non-existent relationship with parents).[5] Similarly, the *ties to relatives* measure includes relationships with siblings, grandparents, cousins, and aunts

4. Parole officials reported to the authors that some reentering offenders learned of job opportunities while they were incarcerated, often through family connections. And therefore some were able to make a transition immediately into employment upon release (for similar see Nelson et al., 1999).
5. The measures of ties to relatives and parental ties were originally scored on an ordinal scale (see Appendix 1). We recoded both the relative and parental ties variables into binary measures because both of the variables (i.e., ties to relatives and ties to parents) were sharply skewed. For the parental ties construct, five offenders received a score of (3), and nine offenders received a score of (0). In terms of familial ties, six offenders received a score of (3) and eight a score of (0). To generate reliable estimates unaffected by rare and extreme scores, we recoded the two family ties variables into dichotomous measures, with scores of 0 and 1 recoded as (0) and scores of 2 and 3 recoded as (1).

392    BERG AND HUEBNER

**Table 1**  Summary statistics and descriptive narratives for study variables

| Variable | Mean | SD | Description |
|---|---|---|---|
| **Dependent variables** | | | |
| Recidivism | 66% | | Occurrence and timing of the first post-release arrest during the 46-month follow-up period |
| Post-release employment | 46% | | 1 = parolee is employed for 30+ hours per week; 0 = offender works less than 30 hours per week, have sporadic work histories, are in a temporary position, or employment cannot be verified |
| **Independent variables** | | | |
| *Pre-prison characteristics* | | | |
| Prior arrests | 9.14 | 8.57 | Number of prior arrests |
| Release age | 31.81 | 8.71 | Age in years at release from prison |
| Non-White | 28% | | 1 = African-American, Hispanic, or Native American; 0 = White |
| No high school education | 67% | | 1 = offender had not completed high school or obtained a GED; 0 = respondent has completed high school |
| Alcohol abuse history | 73% | | 1 = respondent drank alcohol more than three times per week, reported passing out or blacking out, substance use affected other life domains (work, education, intimate relations, family), or they had contacts with medical facilities for treatment and dependence; 0 = offender did not report these behaviors prior to imprisonment |
| Drug abuse history | 68% | | 1 = offender used drugs more than three times per week, reported passing out or blacking out, substance use affected other life domains, or they had contacts with medical facilities for treatment and dependence.; 0 = responded did not report prior drug use. |
| Frequently unemployed | 60% | | 1 = offender worked less than 50% of the time in the 12 months prior to their incarceration or if they had numerous job changes annually in their lives; 0 = parolee worked more than 50% time and maintained job stability over time |
| Property conviction | 46% | | 1 = served time in prison for larceny, theft, burglary, fraud; 0 = drug-related or other crime |
| Violent conviction | 14% | | 1 = served time in prison for rape, robbery, homicide, felonious assault, arson; 0 = drug-related or other crime |
| *Post-prison conditions* | | | |

**Table 1**    (Continued)

| Variable | Mean | SD | Description |
|---|---|---|---|
| Stable living arrangements | 1.18 | .76 | Ordinal measure ranging from 0 to 3; 0 = a very unsatisfactory situation with a very clear and strong need for improvement, 1 = a relatively satisfactory situation with a need for improvement, 2 = a relatively satisfactory situation with some need for improvement evident, 3 = a relatively satisfactory situation with no need for improvement |
| Antisocial attitudes | 1.22 | .77 | Ordinal measure ranging from 0 to 3; 0 = a relatively satisfactory situation with no need for improvement, 1 = a relatively satisfactory situation with some need for improvement, 2 = a relatively satisfactory situation with a need for improvement, 3 = a very unsatisfactory situation with a very clear and strong need for improvement |
| Mental health problems | .49 | .62 | Ordinal measure ranging from 0 to 2; (0) = no interference, (1) = mild interference, (2) = severe interference, active psychosis |
| Parental ties | 44% | | 1 = relationship with parents is relatively or very satisfactory; 0 = relationship is relatively unsatisfactory or very unsatisfactory, or non-existent |
| Ties to relatives | 46% | | 1 = relationship with aunts, uncles, cousins, or siblings is relatively satisfactory or very satisfactory; 0 = relationships are relatively unsatisfactory or very unsatisfactory, or nonexistent |
| Intimate partner relationship | 1.44 | .77 | 0 = relationship is very unsatisfactory 1 = relatively unsatisfactory situation, 2 = relatively satisfactory situation, 3 = refers to a very satisfactory relationship |

and uncles[6] (1 = reflects a relatively satisfactory to absolutely satisfactory relationship; 0 = reflects a relatively unsatisfactory, unsatisfactory, or non-existent familial relationship).[7] In total, 44% of the sample had positive ties with relatives, and 46% reported strong relationships with parents. Additional information on the coding of the family ties variables is given in Appendix 1.

In addition, we include a measure designed to capture the extent of an offender's *intimate partner relationships*; this measure refers to marriage as well as intimate relationships not bonded by marriage. Scores range from 0 through 3 (0 = very unsatisfactory with a very clear and strong need for improvement, 1 = relatively unsatisfactory situation with a need for improvement, 2 = satisfactory situation with some need for improvement, and 3 = refers to a satisfactory situation with no need for improvement). For more information on the variable coding scheme, please see Appendix 1.

We included two measures meant to capture the extent of offenders' employment qualifications or credentials. The measure of *work history* reflects whether respondents were frequently unemployed prior to incarceration (1 = offender worked less than 50% of the time in the 12 months prior to their incarceration *or* if they had numerous job changes annually in the years preceding their incarceration; 0 = parolee worked more than 50% time and maintained job stability). A history of frequent unemployment signals to employers that potential employees are unlikely to commit themselves to working at a job for a significant period of time (Granovetter, 1974). Similarly, education is a gateway to employment opportunities, and achievement in school can be viewed by employers as a proxy for effort and ambition (see Rosenbaum, Kariya, Settersten, & Maier, 1990; Thurow, 1975). Therefore, we also included a measure of whether offenders had not completed high school, deemed *high school education* (1 = did not complete high school; 0 = completed high school or obtained a GED). In terms of personal characteristics, 67% of offenders lacked a high school education and 60% reported a history of frequent unemployment.

Measures of past criminal behavior are critical to capturing long-term involvement in the criminal justice system (DeLisi, 2005). Three variables capture offenders' criminal history. The first of these, *prior arrests*, is a continuous measure reflecting the total number of times offenders were arrested prior

---

6. The LSI-R scoring guide states that corrections officers should "Look for one solid relationship (if the offender has regular contact with 1 out of 5 siblings and that 1 sibling is a good, pro-social support for the offender, then you may score that 1 positive person)." Also, corrections officers are urged to "look at the density of the relationship (with who does the offender have the most contact)." The parental ties measures are to be scored using a similar logic of that used to score the parental measures (see Note 4).

7. We re-estimated all analyses with the two family ties variables (i.e., ties to parents and ties to relatives) in their original four-score ordinal metric (0) to (3) and the results were virtually the same as those reported here (available upon request). However, it is important to note that we found that the overall model fit was more robust with the dichotomized measures relative to the model that employed the ordinal versions of the family ties measures. In fact, we found that the models showed a moderate level of improvement in structural fit with the implementation of the dichotomized measures. Based on this evidence, we have greater confidence in the reliability and validity of the estimates generated with the dichotomized measures versus those from the ordinal metric.

to their current prison term. In addition, we included two variables indexing the nature of the offense for which the sample member was incarcerated, including *violent offense* (1 = rape, robbery, homicide, felonious assault, arson), *property offense* (1 = larceny, theft, burglary, fraud). *Drug offenses* serve as the reference category. Respondents averaged 9.14 prior arrests and 46% were serving time for a property offense and 14% for a violent crime.

Finally, we employ four broad clusters of control variables in the analyses to safeguard against omitted variable bias, all of which were measured at the initial parole interview, including demographic characteristics, pre-prison substance use, criminal history, mental health, and post-release factors. With regard to demographic characteristics, we incorporate a measure of *race* that is scored as a dichotomous variable (non-White = 1),[8] and a continuous indicator of offenders' *age at release* in years ($x$ = 31.81, SD = 8.71). Two measures of pre-prison substance use are included, both of which are derived from the LSI-R. The dichotomous measures, *alcohol abuse history* and *drug abuse history*, assess whether an offender ever had a drug or alcohol problem. We coded the items based on the criterion for substance abuse history spelled out in LSI-R scoring guide, individuals are coded (1) if, prior to prison, they drank alcohol (or used drugs) more than three times per week and reported passing out, blacking out or substance use affected other life domains (work, education, intimate relations, family), or they had contacts with medical facilities for treatment and dependence. Offenders who did not report substance abuse were the reference category and coded as (0). Overall, 73% of the sample indicated prior alcohol use and 68% had a drug abuse history.

Next, we incorporate a measure of *mental health problems* which is an ordinal variable scored from 0 through 2 ($x$ = .49, SD = .62) gathered from the LSI-R.[9] We collapsed LSI-R questions 46 and 47—two dichotomous indicators of mild and severe mental issues, respectively—to create a single item. Parolees who report or convey no problems receive a score of 0, those with mild mental health interference receive a score of 1, and with severe interference or active psychosis a score of 2. Next, we also include an ordinal variable from the LSI-R capturing whether residents have secured *stable living arrangements* ($x$ = 1.18, SD = .76). This factor is said to play an important role in successful reentry outcomes (Petersilia, 2003). Scores range from 0 through 3 (0 = very unsatisfactory with a very clear and strong need for improvement, 1 = relatively unsatisfactory situation with a need for improvement, 2 = satisfactory situation with some need for improvement, and 3 = refers to a satisfactory situation with no need for improvement).

Finally, a measure of offenders' altitudinal orientation toward crime is added to the analysis; here it is labeled *antisocial attitudes* and is derived from the

8. With regard to our measure of race, the category of non-White includes 15 individuals who identified either as Hispanic, Asian, or Native American. Due to the small cell counts, it was not feasible to conduct analyses with separate measures created for individuals in these three groups. However, we conducted alternate analyses where the 15 non-White members were recoded in the data file and included as White; the results under the new coding scheme were virtually identical to those reported here.

9. Information on the specific diagnoses from the psychological assessment was not made available to the researchers due to concerns surrounding subject confidentiality.

LSI-R. A parolee's orientation toward offending may underpin their involvement in conventional institutions and also predict offending (Shover, 1996; Stouthamer-Loeber, Loeber, Wei, Farrington, & Wikstrom, 2002). Scores on the item range from 0 through 3, a score of 3 = a very unsatisfactory situation with very clear and strong need for improvement, 2 = relatively unsatisfactory situation with need for improvement, 1 = a satisfactory situation with some need for improvement, and 0 = a satisfactory situation with no need for improvement. The item coding adopted here is reverse coded from the original scoring metric.

## Analytical Plan

The analyses proceed in three stages correspond to the study hypotheses. First, we examine the effects of family ties and employment on recidivism. Cox proportional hazards techniques are used to examine the occurrence and timing of recidivism. Hazard models are appropriate for this study as they effectively manage the bias that arises in the process of estimating equations based on censored cases (Cox, 1972; Singer & Willett, 2003). Plus, hazard models take into account differential exposure time, or the variation within the sample in the number of days that subjects are monitored—in the present case, variation in exposure arises from variation in parole dates (Hosmer & Lemeshow, 1999). Positive coefficients indicate that an individual with a given characteristic recidivates more quickly, while negative coefficients denote delayed time until failure.

Second, we deploy logistic regression techniques to estimate the effects of parental ties and ties to relatives on post-release employment (Long, 1997). These models consider the relationships between social ties and the acquisition of a job. Finally to test Hypothesis 3, we use logistic regression models to examine whether parental ties and ties to relatives moderate the effects of poor pre-prison work history and high school education on job attainment.

## Results

Table 2 presents the estimates from the Cox proportional hazard models, predicting the timing of the rearrest event. Model 1 omits the measure of post-release employment, and therefore estimates the effect of parental ties and ties to other relatives on recidivism, net of control measures. Consistent with Hypothesis 1, results indicate that parental ties have a negligible influence on recidivism risk; ?however, men with strong social ties had delayed times to recidivism. The log-odds coefficient (−.393) suggests that good quality ties to relatives have a strong negative effect on the timing of recidivism. In terms of pre-prison, demographic characteristics, men with more extensive criminal history records failed more quickly as did younger men. Measures of education, race, pre-prison employment history, nature of the current offense, and substance abuse history were not statistically significant in the models. However, antisocial attitudes and mental health problems were positively related to recidivism.

**Table 2**  Cox proportional hazard models predicting recidivism

|  | Model 1 | | | Model 2 | | |
|---|---|---|---|---|---|---|
|  | Coef. | SE | OR | Coef. | SE | OR |
| Pre-prison characteristics |  |  |  |  |  |  |
| Prior arrests | .020** | .006 | 1.02 | .020** | .007 | 1.22 |
| Age at release | −.027* | .009 | .973 | −.030* | .009 | .738 |
| Race (non-White) | −.174 | .155 |  | −.150 | −.156 |  |
| No high school education | −.077 | .154 |  | −.102 | .155 |  |
| Drug conviction | .030 | .170 |  | .049 | .174 |  |
| Violence conviction | .083 | .194 |  | .058 | .195 |  |
| Alcohol abuse history | .027 | .191 |  | .021 | .200 |  |
| Drug abuse history | .170 | .232 |  | .133 | .233 |  |
| Frequently unemployed | .180 | .167 |  | .269 | .172 |  |
| Post-prison conditions |  |  |  |  |  |  |
| Stable living Arrangements | −.019 | .093 |  | −.020 | .092 |  |
| Antisocial attitudes | .224* | .110 | 1.25 | .209* | .099 | 1.23 |
| Mental health problems | .282* | .110 | 1.32 | .243* | .112 | 1.27 |
| Intimate partner ties | −.034 | .097 |  | −.011 | .097 |  |
| Ties to relatives | −.393* | .154 | .675 | −.237 | .162 |  |
| Parental ties | −.057 | .165 |  | −.021 | .169 |  |
| Employed | — | — |  | −.375* | .168 | .687 |

$*p < .05$; $**p < .01$.

Next, post-release employment was added to Model 2. Two main findings emerged from this model. First, post-release employment had a significant, negative influence on recidivism, indicating that men who secured jobs following release from prison are less likely to fail on parole and fail less quickly than unemployed men. Second, when post-release employment is added to the model, the ties-to-relatives variable is no longer significant.[10] Figure 1 depicts the survival rates of employed versus unemployed offenders using the estimates generated in Model 2 of Table 2. Across the follow-up period, employed offenders were less likely to be rearrested.[11] For

10. The LSI-R also contains an item related to whether parolees maintain close ties with family members who are involved in crime. To examine its potential role in predicting recidivism, we added this measure to the models in Table 2 in a supplementary set of analyses. Slightly less than 10% of the sample indicated having such ties. Results from multivariate analysis showed that the measure had a non-significant effect on the timing of recidivism ($\beta = .148$, $p = .101$).
11. We conducted supplementary analysis to probe the nature of the relationship between familial ties and recidivism, particularly the effect of parental ties. First, we re-estimated Models 1 and 2 of Table 1, but analyzed separate models for each of the familial ties measures. We carried out this procedure primarily to determine if the effect of parental ties was diminished by the presence of ties to relatives and vice versa. The correlation between parental ties and ties to relatives was statistically significant ($r = .45$, $p < .05$), and potentially large enough to partially mask the effects of one another. Results of this exercise indicated that absent the measure of ties to relatives, parental ties did not have a significant effect on recidivism with or without employment in the model.



**Figure 1**    Survival rate stratified by employment status.

instance, by the 600-day mark, approximately 24% of unemployed offenders had survived without an arrest (not recidivated) versus 42% of employed parolees.

Moving to Table 3, we consider if educational attainment, work history, and familial ties are related to post-release employment. Consistent with Hypothesis 2, we find that those who were frequently unemployed prior to incarceration are less likely to be employed in the post-release period. Specifically, men who had an insufficient work history prior to imprisonment were 92% less likely to be employed compared with men with steady pre-prison employment. Contrary to expectations, the relationship between high school education and post-release employment status was not statistically significant. We also predicted that familial ties may bridge offenders to jobs. Somewhat consistent with our predictions, Model 1 of Table 3 indicates that ties to relatives are positively related to employment, whereas parental ties do not have a significant influence on employment status. Furthermore, offenders who are involved in an intimate relationship are also more likely to be employed, suggesting that perhaps ties with intimate partners connect offenders to jobs and sustain their involvement in the

**Table 3**  Logistic Regression Model  Predicting Post-Release Employment

| | Model 1 | | | Model 2 | | | Model 3 | | | Model 4 | | | Model 5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *B* | SE | OR | *B* | SE | OR | *B* | SE | OR | *B* | SE | OR | *B* | SE | OR |
| Pre-Prison Characterstics | | | | | | | | | | | | | | | |
| Prior Arrests | .067 | .177 | | −.005 | .157 | | .068 | .172 | | .048 | .168 | | .061 | .187 | |
| Age at Release | −.043* | .017 | .957 | −.040* | .010 | .960 | −.041* | .017 | .959 | −.048* | .018 | 1.04 | −.053* | .011 | 2.61 |
| Race (Non-White) | .143 | .330 | | .307 | .433 | | .139 | .385 | | .138 | .388 | | .161 | .368 | |
| No High School Education | −.366 | .333 | | −.247 | .240 | | −.637 | .407 | | −.607 | .408 | | −.364 | .233 | |
| Drug Conviction | .009 | .486 | | .047 | .325 | | .091 | .352 | | .110 | .358 | | .112 | .466 | |
| Violence Conviction | −.274 | .432 | | −.388 | .277 | | −.278 | .300 | | −.276 | .317 | | −.301 | .399 | |
| Alcohol Abuse History | .185 | .334 | | .101 | .329 | | .179 | .308 | | .168 | .325 | | .181 | .330 | |
| Drug Abuse History | −.051 | .193 | | −.047 | .125 | | −.051 | .322 | | −.046 | .193 | | .363 | .210 | |
| Frequently Unemployed | −1.92* | .367 | .146 | −1.57* | .371 | .207 | −1.91* | .321 | .148 | −1.55* | .368 | .212 | −1.20* | .299 | .301 |
| Post-Prison Conditions | | | | | | | | | | | | | | | |
| Stable Living Arrangements | .343 | .249 | | .300 | .244 | | .292 | .240 | | .287 | .281 | | .340 | .189 | |
| Antisocial Attitudes | .509 | .428 | | .519 | .418 | | .490 | .422 | | .428 | .377 | | .477 | .369 | |
| Mental Health Problems | −.310 | .243 | | −.359 | .299 | | −.388 | .310 | | −.377 | .278 | | −.299 | .311 | |
| Intimate Partner Ties | .444* | .200 | 1.56 | .468* | .247 | 1.73 | .518* | .259 | | .527* | .261 | 1.69 | .527* | .219 | 1.69 |
| Ties to Relatives | .756* | .323 | 2.13 | .727 | .299 | 2.07 | .755* | .327 | | .688* | .322 | 1.98 | .689* | .323 | 1.99 |
| Parental Ties | .039 | .184 | | .009 | .188 | | .033 | .117 | | .039 | .111 | | .033 | .164 | |
| Interaction Terms | | | | | | | | | | | | | | | |
| Ties to Relatives × Frequently Unemployed | - | - | | −1.36* | .448 | .256 | - | | | - | - | | - | - | |
| Parental Ties × Frequently Unemployed | - | - | | - | - | | −.891 | .591 | | - | - | | - | - | |
| Ties to Relatives × No High School Edu. | - | - | | - | - | | - | - | | −.765 | .570 | | - | - | |
| Parental Ties × No High School Edu. | - | - | | - | - | | - | - | | - | - | | −1.01 | .573 | |

*p < .05; **p < .01

job.[12] It is also possible, however, that parolees' relations with intimate partners hinge on whether they have a job and therefore partners do not connect offenders to jobs per se, but provide the motivation for them to attain a job.[13] But without additional data it is difficult to decipher the true nature of the effects associated with ties to intimate partners. Overall, the estimates suggest that family ties—in the form of ties to close relatives other than their parents—may play a role in connecting offenders to jobs, while deficits in employment credentials (but not educational attainment) represent a barrier to steady post-release employment.

The next four models include the interactions between each of the two forms of family ties with both education and work history in order to predict post-release employment. Turning to Model 2, the results show that the interaction between ties to relatives and frequent unemployment is statistically significant, suggesting that the negative effect of frequent unemployment on post-release employment is contingent upon ties to relatives. Next, contrary to predictions, parental ties do not moderate the effects of frequent unemployment in Model 3; rather frequent pre-prison unemployment has a negative effect on post-release employment despite whether one has good quality ties to parents. In Model 4, the interaction between ties to relatives and education is not statistically significant. Finally, Model 5 indicates that parental ties also do not moderate the relationship between education and employment as the interaction term is not significant.[14]

Figure 2 decomposes the statistically significant interaction term found in Model 2 of Table 3, and displays the probability of post-release employment stratified by work history and the nature of offenders' ties to relatives. Looking

12. In theory, much like parents and other relatives in one's social network, a spouse or intimate partner also perhaps represents a tie that facilitates job attainment (Lin, 2001). However, this idea is not fully articulated in theory, thus we largely focus on relations with the family of origin in this regard. Recall that Table 3 shows that offenders who are involved in an intimate relationship are more likely to be employed, which is consistent with theoretical expectations. We created product terms between intimate ties and frequent unemployment and between intimate ties and educational attainment in order to examine whether intimate partner ties moderate the effects of deficits in personal capital on employment. The two interaction terms failed to reach statistical significance, suggesting that intimate partners do not play a significant role in moderating the effect of educational attainment or work history on the acquisition of a job.

13. We would like to thank an anonymous reviewer for suggesting this potential explanation.

14. We examined the possibility that the findings in Table 2 with regard to family ties and employment may not be generalizeable across time points during the post-release period. Common to reentry research of this type, we use static measures of post-release conditions in our analysis, while recidivism is a time-varying outcome. However, the nature of the post-release context likely changes over time, which may limit the predictive efficacy of our fixed measures. Indeed, the effects noted in Table 2 may be time-dependent. To gain some insight into this possibility, we re-estimated the models in Table 2 but restricted the outcome to capture recidivism at 6-, 12-, and 18-month time periods. In other words, we estimated Models 1 and 2 in Table 2 with the outcome measure censored at three different periods. Results from the supplementary analyses were very similar to those reported here, with the exception of the drug abuse history variable—it was positive and significant in the 6- and 12-month models but not in the other set of models restricted at 18 months. These results are not shown owing to space concerns; however, they are available upon request from the authors.



**Figure 2** Effects of ties to relatives on post-release employment by history of pre-prison employment: predicted probabilities.

at the pair of vertical bars situated on the left side of the figure above the heading "frequently unemployed", the predicted probability of employment for those with poor quality ties to their relatives is (.35) versus (.54) for those with good quality ties. Moving to the right side of the figure, the two bars positioned above the heading "stable employment" indicate that the predicted probability of post-release employment is (.61) for those who had poor ties versus (.78) for those who had good quality ties. This analysis suggests that, controlling for their employment history, offenders with good quality ties to their relatives are at an advantage with regard to acquiring post-release employment—these relational ties not only benefit offenders with a relatively viable work history, but also those with an instable pre-prison work history. As the diagram indicates, without a provision of good quality ties, parolees with an instable pre-prison work history have a lower predicted probability of job attainment in the post-release context.

## Discussion and Conclusion

Extant research suggests that family members are a meaningful component of offenders' social networks in the post-prison context; in fact, ties to family are a persistent correlate of post-release success. This evidence prompts questions about the nature of the processes through which family ties affect

recidivism. Although criminological research has theorized the meaning of the link between familial ties and recidivism, to date only a small number have empirically investigated the mechanisms by which these ties alter post-release behavior.

In the current study, we employed an integrated theoretical framework involving social capital and criminological theories in order to develop a series of hypotheses. Specifically, we sought to resolve questions regarding whether social ties connect offenders with jobs, and in turn indirectly shape recidivism risk. The analyses uncovered three main conclusions to this end. First, offenders who were employed and had good quality ties to relatives were less likely to recidivate. Second, offenders with good quality ties to relatives were more likely to be employed in the follow-up period. Third, a history of frequent unemployment reduced post-release employment; however, this effect was moderated by good quality ties to relatives. Specifically, a history of frequent unemployment had a strong negative effect on post-release job attainment; however, the magnitude of this effect was significantly weaker among those with good quality ties to their relatives.

The findings of this study have several implications for theory and future research on prisoner reentry and recidivism. First, the findings build on recent empirical developments relating to the role of familial social ties in the etiology of recidivism. For instance, a study by Bales and Mears (2008) found that inmates who were visited in prison had lower rates of recidivism and these effects were more pronounced when visitation was made by offenders' family members. Assuming that the familial interaction occurring during periods of visitation is transferred beyond the prison walls into the post-release setting, the current findings suggest that one way in-prison visitation promotes desistence isby acting as a vehicle through which offenders gain access to the job market (see Glaser, 1964, pp. 214–216). Although beyond the scope of this study, it is reasonable to posit that information is perhaps transmitted during in-prison visits between inmates and their families regarding potential sources of employment (see also Shapiro & Schwartz, 2001). By procuring job arrangements while imprisoned, released offenders reenter free society already tethered to family networks and also enter the job marketplace on a more solid footing (Glaser, 1964). Taken together, these findings highlight the need for a continuum of broad-based family support programs that include parents, spouses, and extended family members.

Second, the findings fail to support the notion that familial ties bear *directly* upon recidivism. While ties to relatives significantly reduced recidivism, once employment was included in the model, the effects of these ties were reduced and were no longer statistically significant. This finding is consistent with recent qualitative research which suggests that the social support provided by family members is a condition that motivates offenders to immerse themselves into more conventional life domains (see Giordano et al., 2002; Maruna, 2001; see Shover, 1996). Hence, it may be that the processes of social control, support, and identity transformation provided by family ties may motivate offenders to

attain legitimate work (see Maruna, 2001, pp. 122–123). In this way, family social processes may not be direct importance for offenders' behavior per se, but have a more meaningful influence on their involvement in roles—i.e., holding a job—consistent with leading a conventional lifestyle (Shover, 1996).

However, there is an alternative explanation in the literature for the null effects of family ties on recidivism. The literature suggests that the social support family ties supply to reentering offenders may perhaps grow more salient with the passage of time. Owing to the fact that offender's intent to "go straight" was not authentic in the past, observers note that offenders' family members sometimes feel suspicious and reluctant to dedicate much of their time and effort to being an agent of reform (see Braman, 2004; Glaser, 1964; Maruna, 2001, p. 156). But as offenders demonstrate their dedication to conformity in concrete ways, some studies find that family members subsequently increase their level of commitment to facilitating offender's successful transition into society. For instance, Farrall (2004, pp. 66–67) noted that employment "changed others opinions" of offenders resolve to abstaining from crime. In one case, an offender's family "no longer saw him as a druggie" once he began working steadily at a job, this in turn enhanced the quality of the relationship between he and his family (see also Glaser, 1964, p. 221).[15] If the degree of social support that families supply is contingent upon offenders' demonstration of reform, then this would suggest that perhaps family ties help offenders penetrate the job market and employment in turn also enables a more resourceful relationship between the offender and their family (Farrall, 2004). In this way, family ties and job attainment are mutually beneficial to one another. Few have examined these ideas systematically, hence they warrant future research.

We uncovered a nuanced set of findings with regard to the effects of family ties on offending and employment—ties to relatives but not parents were important predictors of recidivism and job attainment. Research on adult child-parent relations suggests that parental support to adult children commonly involves the exchange of emotional support and companionship, especially among older children from poorer families (Lye, 1996). It is possible that this unique provision of support paradoxically diminishes offenders' need to find employment and gain both material and financial independence.[16] Ultimately, this may have detrimental effects on whether they are able to desist from offending in the post-release environment. In addition, the analyses showed that offenders with strong marital ties are also more likely to gain employment upon release. Neither social capital nor criminological theory makes explicit assumptions about whether ties with parents versus other relatives (including intimate partners) are most relevant to prisoner reentry. Some empirical evidence suggests that offenders are most likely to rely on assistance from their parents, particularly their mothers upon release (Visher et al., 2008), whereas other research

---

15. In fact, Ericson (1977, p. 24) asserts that "employment is *the* indication of respectability" it signifies to the wider community that offenders have made an alignment with legitimate society.
16. We would like to thank an anonymous reviewer for prompting this idea.

has shown that reentering offenders commonly turn to siblings and cousins in part because their parents are either enfeebled or deceased (Braman, 2004; Farrall, 2004; Glaser, 1964; Irwin, 2005; Maruna, 2001; Shover, 1996). In addition, the literature linking marriage to positive outcomes on parole is quite strong, yet data show that few high-risk offenders are married before prison and even fewer sustain marriages following incarceration (Huebner, 2005). This project represents an initial inquiry into the role of family ties in prisoner reentry; we encourage future research to pay closer attention to the characteristics of the actors embedded within offender networks in order to develop this line of work further.

Finally, our observation that ties to relatives attenuated some of the negative effects of inadequate work history on post-release employment highlights the utility of social capital theory for understanding job attainment among reentering offenders. These results mirror those frequently reported using non-offender samples, suggesting that while credentials (i.e., work history) are significant predictors of job attainment, the people one knows are perhaps equally or even more important when it comes to finding a job (Granovetter, 1974; Lin, 2001). In fact, recall that the interaction terms indicated that irrespective of pre-prison employment history, those with quality ties to family had a higher predicted probability of being employed in the post-release setting. On a practical level, these findings suggest that in the absence of good quality ties, reentering offenders with insufficient credentials have poor prospects of finding a steady job. Consequently, their risk for recidivism is relatively high. With regard to reentry programming, this implies that by developing close ties between reentering offenders and people who have a strong traditional obligation to offer assistance, such as family members, offenders might be more successful at finding opportunities in conventional arenas. Future research should build upon this study by isolating the precise way these and other social ties in offenders' networks (i.e., friends, community leaders) alleviate barriers to employment.

Before concluding, it is important to illuminate the caveats to our study. First, alternative explanations might question the validity of the results uncovered in Tables 2 and 3. It is possible that employment, family ties, and recidivism are all symptoms of an underlying unobservable trait, including low self-control, sensation seeking, or risk tasking (Gottfredson & Hirschi, 1990). Under these circumstances, the observed statistical relationships are spurious and explained by unobserved heterogeneity. Put differently, this would mean that parolees who secure employment compared to those who do not would differ from one another according to an unobserved trait, a trait which would also confound the negative effect of employment on recidivism. Empirical researchers have found, however, that the link between employment, various types of social ties, and criminal behavior remains strong notwithstanding rigid methodological controls for unobserved propensity or selection (Horney et al., 1995; Laub & Sampson, 2003; Uggen, 1999; cf. Uggen et al., 2005, p. 213). Furthermore, we included measures (i.e., substance abuse, arrest record, antisocial attitudes, mental health conditions) which, existing research suggests, represent viable proxies for unobserved

propensity (see DeLisi, 2005; cf. Gottfredson & Hirschi, 1990; Matsueda, Gartner, Piliavin & Polakowski, 1992; Stouthamer-Loeber et al., 2002). This strategy provided us with added confidence in the validity of our findings. Proxies, of course, are no substitute for true experimental designs; in the future research should attempt to isolate the extent to which propensity or self-selection contributes to the relationships uncovered here.

Second, our measures of social ties (parental ties, ties to relatives, and inti-mate partner ties) have the important advantage of capturing both the quality and presence of the network tie, still they cannot tell us about the role of key actors within the tie in facilitating reentry outcomes. For example, our measure of ties to relatives includes a broad array of potential individuals; therefore, we can only comment on the cluster of individuals who fall under this classification and are not able to identify whether cousins, aunts, uncles, or grandparents are important actors in one's social network. Furthermore, our measures of post-prison social conditions—similar to other research of this type—are static and hence do not capture the dynamic nature of the post-release period. For exam-ple, we assess social relationships at the two-week mark when the LSI-R was administered, yet at this time-point these relationships may be of a different quality, perhaps less conflicted and more supportive, than at a later time-point when the stressors of post-release life may be more fully realized (Farrell, 2004). Likewise, the measure of post-prison employment would be a stronger indicator if it included data on the quality and nature of employment across *repeated* time-points in the post-release period (see also Note 16). Plus, we are not able to capture the sample members' attachment to work, which may shape their employment experiences and ultimately recidivism; however, there is existing research to suggest that even low-wage work can be important for most offenders (Uggen, 2000). This study is an *initial* attempt to gain a more complete understanding of social ties and reentry, but in order to develop this line of work further, future research should adopt measures that identify the family members who play a prominent role in offenders' release and take addi-tional steps to quantify the dynamic nature of employment experiences.

In conclusion, the goal of this research was to further explore the mecha-nisms by which social ties affect criminal trajectories and post-release outcomes. As noted extensively in the literature, incarceration can be a driving force in the pathway of chronic offending through its corrosive effect on conventional opportunities and relations. Laub and Sampson (2003, p. 291) assert that what is needed is a "series of mechanisms to bring offenders back into the institutional fabric of society." Our findings suggest that by facilitating job attainment, familial social ties, as well as marriage, we may break the cycle of prison to unemployment and thereby stymie the pathway of state depen-dence leading from prison to reoffending. Although more research is needed to illuminate the specific mechanisms that link social ties to employment, this research suggests that strengthening offenders' social relationships may have important implications for job attainment, and may be one possible path to desistance.

# References

Agnew, R. (2005). *Why do criminals offend: A general theory of crime and delinquency.* New York: Oxford University Press.

Andrews, D., & Botna, J. A. (2006). *The psychology of criminal conduct* (4th ed.). Cincinnati, OH: Anderson.

Bales, W. D., & Mears, D. P. (2008). Inmate social ties and the transition to society: Does visitation reduce recidivism. *Journal of Research in Crime and Delinquency, 45*, 287–321.

Braithwaite, J. (1989). *Crime, shame and reintegration.* New York: Cambridge University Press.

Braman, D. (2004). *Doing time on the outside.* Ann Arbor: University of Michigan Press.

Burnett, R. (2004). To re-offend or not to re-offend? The ambivalence of convicted property offenders. In S. Maruna & R. Immarigeon (Eds.), *After crime and punishment: Pathways to offender reintegration.* Cullompton, Devon: Willan.

Bushway, S., Stoll, M., & Weiman, D. F. (2007). *Barriers to reentry? The labor market for released prisoners in post-industrial America.* New York: Russell Sage.

Cattell, V. (2001). Poor people, poor places and poor health: The mediating role of social networks and social capital. *Social Science and Medicine, 52*, 1501–1516.

Cox, D. R. (1972). Regression models and life tables. *Journal of the Royal Statistical Society, 34*, 187–220.

DeLisi, M. (2005). *Career criminals in society.* Thousand Oaks, CA: Sage.

Eckland-Olson, S., Supancic, M., Campbell, J., & Lenihan, K. (1983). Postrelease depression and the importance of familial support. *Criminology, 21*, 253–275.

Ericson, R. (1977). Social distance and reaction to criminality. *British Journal of Criminology, 17*, 16–29.

Farrall, S. (2004). Social capital and offender reintegration: Making probation desistence focused. In S. Maruna & R. Immarigeon (Eds.), *After crime and punishment: Pathways to offender reintegration* (pp. 57–84). Portland, OR: Willan.

Finestone, H. (1967). Reformation and recidivism among Italian and Polish criminal offenders. *American Journal of Sociology, 72*, 575–588.

Furstenberg, F. (2005). Banking on families: How families generate and distribute social capital. *Journal of Marriage and Family, 67*, 809–821.

Gendreau, P., Little, T., & Goggin, C. (1996). A meta-analysis of adult offender recidivism. What works? *Criminology, 34*, 575–607.

Giordano, P., Cernkovich, S., & Rudolph, J. (2002). Gender, crime and desistance: Toward a theory of cognitive transformation. *American Journal of Sociology, 107*, 990–1064.

Glaser, D. (1964). *Effectiveness of a probation and parole system.* Indianapolis, IN: Bobbs-Merrill.

Gottfredson, M., & Hirschi, T. (1990). *A general theory of crime.* Stanford, CA: Stanford University Press.

Granovetter, M. (1974). *Getting a job: A study of contacts and careers.* Cambridge, MA: Harvard University Press.

Granovetter, M. (1985). Economic action and social structure: The problem of embeddedness. *American Journal of Sociology, 91*, 481–510.

Hirschi, T. (1969). *Causes of delinquency.* Berekely: University of California Press.

Holtfreter, K., Reisig, M. D., & Morash, M. (2004). Poverty, state capital, and recidivism among women offenders. *Criminology and Public Policy, 3*, 185–208.

Holzer, H. (1996). *What employers want: Job prospects for less educated workers.* New York: Sage.

Holzer, H. J., Raphael, S., & Stoll, M. A. (2001). *Will employers hire ex-offenders? Employer preferences, background checks, and their determinants* (JCPR Working Papers 238). Northwestern University/University of Chicago Joint Center for Poverty Research.

Horney, J., Osgood, D. W., & Marshall, I. H. (1995). Criminal careers in the short term: Intra-individual variability to crime and its relation to local life circumstances. *American Sociological Review, 60*, 655–673.

Hosmer, D., & Lemeshow, S. (1999). *Applied survival analysis: Regression modeling of time to event data.* New York: Wiley.

Huebner, B. M. (2005). The effect incarceration on marriage and work over the life course. *Justice Quarterly, 22*, 281–303.

Irwin, J. (2005). *The warehouse prison: Disposal of the new dangerous class.* Los Angeles, CA: Roxbury.

Langan, P., & Levin, D. (2002). *Recidivism of prisoners released in 1994.* Washington, DC: Bureau of Justice Statistics.

Laub, J., & Sampson, R. (2003). *Shared beginnings, divergent lives: Delinquent boys to age 70.* Boston: Harvard University Press.

Lin, N. (2001). *Social capital: A theory of social structure and action.* Cambridge, MA: Cambridge University Press.

Lofland, J. (1969). *Deviance and identity.* Englewood Cliffs, NJ: Prentice Hall.

Long, J. S. (1997). *Regression models for categorical and limited dependent variables.* Thousand Oaks, CA: Sage.

Lye, D. (1996). Adult child–parent relationships. *Annual Review of Sociology, 22*, 79–102.

Malik-Kane, K., & Visher, C. (2008). *Health and prisoner reentry: How physical, mental, and substance abuse conditions shape the process of reintegration.* Washington, DC: The Urban Institute.

Maruna, S. (2001). *Making good: How ex-convicts reform and rebuild their lives.* Washington, DC: American Psychological Association.

Maruna, S., & Toch, H. (2005). The impact of imprisonment on the desistance process. In J. Travis & C. Visher (Eds.), *Prisoner reentry and crime in America* (pp. 139–178). Cambridge, MA: Cambridge University Press.

Matsueda, R., Gartner, R., Piliavin, I., & Polakowski, M. (1992). The prestige of criminal and conventional occupations: A subcultural model of criminal activity. *American Sociological Review, 57*, 752–770.

Matsueda, R. L., & Heimer, K. (1997). A symbolic interactionist theory of role transitions, role commitments, and delinquency. In T. P. Thornberry (Ed.), *Advances in criminological theory, vol. 7, developmental theories of crime and delinquency* (pp. 163-213). New Brunswick, NJ: Transaction.

Matza, D. (1969). *Becoming deviant.* Englewood Cliffs, NJ: Prentice Hall.

Meisenhelder, T. (1977). An exploratory study of exiting from criminal careers. *Criminology, 15*, 319–334.

Naser, R., & Visher, C. (2006). Family members experiences with incarceration and reentry. *Western Criminology Review, 7*, 20–31.

Nelson, M., Dees, P., & Allen, C. (1999). *The first month out.* New York: Vera Institute of Justice.

Pager, D. (2003). The mark of a criminal record. *American Journal of Sociology, 108*, 937–975.

Petersilia, J. (2003). *When prisoners come home.* New York: Oxford University Press.

Petersilia, J., & Rosenfeld, R. (2008). *Parole, desistance from crime and community integration.* Washington, DC: National Academies Press, National Research Council.

Portes, A. (1998). Social capital: Its origins and applications in modern society. *Annual Review of Sociology, 24*, 1–24.

Rosenbaum, J., Kariya, T., Settersten, R., & Maier, T. (1990). Market and network theories of the transition from high school to work: Their application to industrialized societies. *Annual Review of Sociology, 16*, 263–299.

Rubenstein, G. (2001). *Getting to work: How TANF can support ex-offender parents in the transition to self-sufficiency.* Washington, DC: Legal Action Center.

Sampson, R., & Laub, J. (1993). *Crime in the making.* Cambridge, MA: Harvard University Press.

Shapiro, C., & Schwartz, M. (2001). Coming home: Building on family connections. *Corrections Management Quarterly, 5*, 52–61.

Shover, N. (1996). *Great pretenders: Pursuits and careers of persistent thieves.* London: Westview Press.

Singer, J. D., & Willett, J. B. (2003). *Applied longitudinal data analysis: Modeling change and event occurrence.* New York: Oxford University Press.

Smith, P., Cullen, F. T., & Latessa, E. J. (2009). Can 14,737 women be wrong? A meta-analysis of the LSI-R and recidivism for female offenders. *Criminology and Public Policy, 8*, 183–208.

Stouthamer-Loeber, M., Loeber, R., Wei, E., Farrington, D., & Wikstrom, P. (2002). Risk and promotive effects in the explanation of persistent serious delinquency in boys. *Journal of Consulting and Clinical Psychology, 70*, 111–123.

Sullivan, M. (1989). *Getting paid: Youth crime and work in the inner city.* Ithaca, NY: Cornell University Press.

Sullivan, E., Mino, M., & Nelson, K. (2002). *Families as a resource in recovery from drug abuse: An evaluation of La Bodega de la Familia.* Washington, DC: Vera Institute of Justice.

Thurow, L. (1975). *Generating inequality.* New York: Basic Books.

Uggen, C. (1999). Ex-offenders and the conformist alternative: A job quality model of work and crime. S*ocial Problems, 46*, 127–151.

Uggen, C. (2000). Work as a turning point in the life course of criminals: A duration model of age, employment and recidivism. *American Sociological Review, 67*, 529–546.

Uggen, C., Wakefield, S., & Western, B. (2005). Work and family perspectives on reentry. In J. Travis & C. Visher (Eds.), *Prisoner reentry and crime in America* (pp. 209–243), Cambridge, MA: Cambridge University Press.

Umberson, D. (1987). Family Status and health social behaviors: Social control as a dimension of social integration. *Journal of Health and Social Behavior, 28*, 308–319.

Visher, C., & Courtney, S. (2006). *Cleveland prisoners' experiences returning home.* Washington, DC: The Urban Institute.

Visher, C., Debus, S., & Yahner, J. (2008). *Employment after release: A longitudinal study of releasees in three states* (Research brief). Washington, DC: The Urban Institute, Justice Policy Center.

Visher, C., Kachnowski, V., La Vigne, N., & Travis, J. (2004). *Baltimore prisoners experiences returning home.* Washington, DC: The Urban Institute.

Visher, C., & Travis, J. (2003). Transitions from prison to community: Understanding individual pathways. *Annual Review of Sociology, 29*, 89–113.

Vose, B., Cullen, F., & Smith, P. (2008). The empirical status of the level of service inventory. *Federal Probation, 72*, 22–29.

Warr, M. (1998). Life course transitions and desistance from crime. *Criminology, 36*, 183–215.

Wellman, B., & Wortley, S. (1990). Different strokes from different folks: Community ties and social support. *American Journal of Sociology, 96*, 558–588.

West, H. C., & Sabol, W. J. (2009). *Prison inmates at midyear 2008 – statistical tables.* Washington, DC: Bureau of Justice Statistics.

Appendix 1.    Supplementary Variable Coding Information from the LSI-R Scoring Guide

| Variables | Description |
|---|---|
| Stable living arrangements | The item is scored on a three-level ordinal scale. Scores of (3) are assigned if the offender expresses satisfaction with home; has long-term plans to continue living there takes pride in their home or takes measures to increase value or comfort. Scores of (2) are assigned if the offender is satisfied with living arrangements but is not expressing complete satisfaction, has been there only a short time or willing to move if a better place comes along. Scores of (1) are assigned if the offender is dissatisfied or indifferent regarding current conditions, if they are in temporary housing, making few efforts to improve the home or the environment, if they like the residence but are living with antisocial others. Score of (0) are assigned if the offender displays extreme dissatisfaction with living arrangements, if they claim they are only staying there temporarily, they are homeless, or living with antisocial others. |
| Antisocial attitudes | The item is scored on a three-level ordinal scale. Scores of (0), *satisfactory situation*, are assigned if an offender places an emphasis on the negative consequences of law violation, if they accept responsibility for their own actions, and if the offender rejects justification for law violation. Scores of (1), *relatively satisfactory situation*, are given if an offender's recent behavior and self-disclosure indicate pro-social inclinations, if the offender has a sense of respect for rules beyond just "talking the talk" and if the individual has some awareness of the effects of criminal behavior on the lives of others. Scores of (2), a *relatively unsatisfactory situation*, are determined by whether the offender expresses guilt for the victims, but mixed expression of concern (e.g., I was in the wrong place at the wrong time or I wish I hadn't been caught) and if the offender says that they value pro-social behavior, but is acting in contrast to that by breaking the law, defying authority. Finally, scores of (3), a *very unsatisfactory situation*, are assigned if an offender places emphasis on the usefulness of criminal activity, if they express rationalizations for law violations and do not appear to have the ability to be genuinely sensitive to the feelings and wishes of others including victims of criminal behavior, if they are hostile toward the police or courts, if they explain prior offenses with no guilt or remorse, or if they have self-identified as a criminal. |
| Mental health problems | According to the LSI-R scoring guide, examples of moderate mental health problems may include mild anxiety or mild depression. Also, according to the scoring guide severe mental health problems are detected by observing the following factors: excessive sweating, extreme passivity or aggression, verbal abusiveness, odd or strange verbalizations, very slow or very fast speech, rambling conversations, auditory or visual hallucinations, delusional thinking. Moreover, DOC officials assessed severe interference based on in-prison psychiatric reports assessed by medical staff. |

## Appendix 1. *(continued)*

| Variables | Description |
| --- | --- |
| Ties to relatives and parental ties | These two items were originally coded on a three-item ordinal scale: (0) *unsatisfactory,* (1) *relatively unsatisfactory,* (2) *relatively satisfactory,* and (3) *highly satisfactory*. According to the LSI-R scoring criterion, a score of (0) is given to relationships that are absent, hostile, punishing, or uncaring, or in cases when no contact is maintained, or if the offender has contact but the family condones antisocial attitudes; a score of (1) is given to relations marked by significant conflicts, dissatisfaction, or indifference regarding the relationship on either part; when there is irregular contact or personal contact; a score of (2) is given to relationships that are mostly reward, positive, and when there are good attempts at caring and positive influence with regular contact; and finally, scores of (3) are given to relationships that are highly satisfying, with obvious caring and positive influence, and one in which the offender maintains regular contact. The measure was subsequently recoded into a binary indicator (see Table 1). |
| Intimate partner relationships | This item was scored on a four-level ordinal coding scheme. Relationships are coded as *very unsatisfactory* (0) if it is unpleasant or hostile and includes a history of, or recent abuse; *relatively unsatisfactory* (1) if there are conflicts or problems with the partner, significant stressors, or ambivalence regarding continuing the relationship, and includes offenders who are single but lonely; *relatively satisfactory* (2) if the relationship is mostly rewarding and caring, and this group includes men who are single but wish to become involved in a relationship; and *highly satisfactory* (3) if the relationship is highly satisfying and all partners are effectively able to deal with conflict. |

# HHS Public Access
Author manuscript
*J Res Crime Delinq*. Author manuscript; available in PMC 2020 July 01.

Published in final edited form as:
*J Res Crime Delinq*. 2019 July ; 56(4): 483–523. doi:10.1177/0022427818820902.

# Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters during Reentry from Prison

**Thomas J. Mowen**[1], **Richard Stansfield**[2], **John H. Boman IV**[1]

[1]Department of Sociology, Bowling Green State University, Bowling Green, OH, USA

[2]Department of Sociology, Anthropology, and Criminal Justice, Rutgers University, Camden, NJ, USA

## Abstract

**Objectives:** Informed by social control and differential coercion and social support theories, we examine how multiple theoretically and methodologically distinct factors of family support relate to reincarceration, substance use, and criminal offending during prison reentry.

**Method:** Using four waves of data from the Serious and Violent Offender Reentry Initiative, we identified three separate factors of family support—interactional (e.g., providing guidance and support), instrumental (e.g., providing housing and transportation), and emotional (e.g., providing love and belongingness). A series of mixed-effects models examined how each form of family support related to reincarceration, substance use, and criminal offending.

**Results:** Findings demonstrated that instrumental, but not interactional or emotional, support related to significantly lower odds of reincarceration and lower levels of substance use and criminal offending. Interaction terms revealed that the effect of instrumental family support is almost entirely independent, and not interactive, on each outcome.

**Conclusions:** Family support appears to relate to prosocial reentry outcomes not because of emotional or interactional bonds, but because families provide for the basic needs of returning individuals. Instrumental familial support mechanisms such as providing housing and financial support appear more salient in promoting prosocial reentry outcomes than mechanisms of emotional or interactional support.

## Keywords

family support; prison reentry; differential coercion and social support; social control

The process of release from prison—called "reentry"—has received increasing attention from researchers and policymakers alike (Lynch and Sabol 2004; Travis 2014). Despite a small decrease in the incarcerated population over the past two years, the United States

Article reuse guidelines: sagepub.com/journals-permissions

**Corresponding Author:** Thomas J. Mowen, Department of Sociology, Bowling Green State University, 243 Williams Hall, Bowling Green, OH 43403, USA., tmowen@bgsu.edu.

Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

Notes

continues to incarcerate more individuals than any other country in the world (Carson 2018). Because the vast majority of individuals who spend time in prison will be released (Carson and Anderson 2016; Travis 2005), understanding factors that promote successful reintegration has become an important task for the development of both theory and policy (see Seiter and Kadela 2003). Although research has highlighted a number of dimensions as important for successful reintegration including employment (Seiter and Kadela 2003; Uggen 2000), mental health care (Mallik-Kane and Visher 2008), treatment and reentry preparation (Prendergast 2009; Robbins, Martin, and Surratt 2007), and desistance from criminal peers (Boman and Mowen 2017), perhaps more so than any other factor, family support has been highlighted as an extraordinarily vital component for reentry success (see, generally, Arditti and Few 2006; Braman 2004; Breese, Ra'el, and Grant 2000; Naser and La Vigne 2006; Naser and Visher 2006; Nelson, Deess, and Allen 1999; Shapiro and Schwartz 2001; Visher and Courtney 2007; Western et al. 2015).

The importance of family support has been highlighted in both qualitative and quantitative research efforts using a variety of samples across the United States. Existing research has shown that family support relates to decreased recidivism (Boman and Mowen 2017; Shollenberger 2009; Visher and Courtney 2007), increased odds of employment (Berg and Huebner 2011; Visher, Debus, and Yahner 2008), and better mental health outcomes (Grieb et al. 2014; Wallace et al. 2016) during reentry. As Naser and Visher (2006:20) find, "for most former prisoners, relationships with family members are critical to successful reintegration." In addition to a moderate level of empirical support, these findings can be understood via criminological theory. From the perspectives of both social control (Hirschi 1969) and differential coercion and social support (DCSS; Colvin, Cullen, and Vander Ven 2002) theories, family members provide both strong affectionate bonds (like emotional support and attachment) and important mechanisms of social support (like housing, transportation, and financial support) to the returning individual that serve to reduce recidivism and promote successful reentry outcomes.

Given the established empirical and theoretical support for the importance that family plays during the reintegration process, it is imperative for researchers to not just ask *if* family support matters but also examine *why* family support makes a difference during reentry. With a small handful of exceptions (Martinez 2006; Taylor 2016), the specific mechanisms through which family matters during this process remain unclear. Is family support important for reintegration because of emotional support characterized by love, warmth, and affection? Alternatively, does family support matter due to the presence of instrumental support–like financial resources, transportation, and housing? Or do both perspectives carry explanatory power? Consequently, a shift in focus to understanding *why* family matters is an important step to take to enhance theoretical clarity concerning the specific mechanisms through which family support matters and to provide evidence for scholars to make sound and empirically grounded policy recommendations.

Accordingly, the current study seeks to accomplish two goals. Using longitudinal panel data from the Serious and Violent Offender Reentry Initiative (SVORI), we first seek to examine how a variety of family dynamics that broadly represent family support may constitute a series of theoretically and empirically distinct subfactors of family support (e.g., emotional

or instrumental family support; see Martinez 2006). Second, we seek to examine whether these different forms of family support independently or interdependently relate to reincarceration as well as self-reported substance use and criminal offending during the reentry process.

## Why Family Matters: Theoretical Orientations

### Social Control Theory

Drawing from the classic formulation of social control theory, family provides important bonds that prevent offending (Hirschi 1969). According to Hirschi, attachment refers to the close affectional ties an individual has to significant others and particularly parental and other family figures. These affectionate ties often include emotional bonds and feelings of warmth and companionship. Although some studies find mixed support for the theory (e.g., Agnew 1991), research tends to support the notion that individuals with strong bonds to conventional others report lower levels of deviance than individuals with weaker bonds (Agnew 1993; Baier and Wright 2001; Durkin, Wolfe, and May 2007; Krohn and Massey 1980; Loeber and Stouthamer-Loeber 1986; Sampson and Laub 1990).

Within the research on prison reentry, the importance of family as a central mechanism that provides strong bonds has been steadily realized. For example, men and women tend to report high levels of perceived emotional family support both prior to release and during the reentry process (Visher et al. 2007). Family members are far more likely to overlook the negative stigma attached to "having a record" than other members of society (Ekland-Olson et al. 1983), and prior work has demonstrated that family members report wanting to emotionally support their returning family member (Grieb et al. 2014). In fact, families tend to mark a relative's release with a celebration to express their affectionate support (Western et al. 2015). Individuals who lack affectionate family support, or who experience decreases in affectionate support during the reentry process, may be placed at risk of reoffending.

### DCSS

Sharing some similarities to social control theory, the social support component of DCSS refers to the feelings of support one receives from another individual (Colvin et al. 2002; Cullen 1994). The presence of social support creates strong bonds among the individual and significant others that reduce criminal offending (Colvin et al. 2002). According to Colvin, Cullen, and Vander Ven (2002), social support promotes noncriminal coping strategies in the presence of adversity, and individuals who receive consistent social support should, therefore, desist from criminal offending. On the other hand, a lack of consistent social support may result in less desirable outcomes. When individuals fail to receive consistent social support from others, they "are more or less being set adrift to fend for themselves as best they can" (Colvin et al. 2002:25).

When applied to the context of reentry, DCSS suggests that individuals who experience decreases in family support across time should report increases in offending, substance use, and reincarceration risk. Moreover, while social control theory tends to focus primarily on affectionate bonds (see Akers, Sellers, and Jennings 2012:123), DCSS allows for social

support to also be provided through instrumental supports such as housing, employment, and financial support. Indeed, prior research demonstrates that this instrumental role is routinely filled by family members via providing transportation (Hlavka, Wheelock, and Jones 2015), housing (Western et al. 2015), and financial resources to returning individuals.

Overall, both social control theory and DCSS suggest that families provide important mechanisms of support during the process of reintegration. Whether the support is emotional/affectionate (e.g., attachment; Hirschi 1969) or instrumental (e.g., material social support; Colvin et al. 2002), families are perhaps the most significant source of support during reentry. Unfortunately, it remains unclear how family support matters. Stated differently, criminologists do not fully understand whether emotional/affectionate support, instrumental support, or some other combination of family support reduces recidivism the most. To explore this issue further, we now turn to the research on family support during reentry.

## Empirical Research on Family Support and Reentry

The knowledge that family support is a key contributor to prosocial reentry outcomes is well established in the literature. In fact, the titles of research projects examining family as an important bond often use the metaphor "ties that bind" in both the broader research (Bersani and Doherty 2013; Herreros 2015; Wade 2008) and reentry research specifically (see Berg and Huebner 2011; Boman and Mowen 2017). These titles reflect the wide range of criminological research that has shown that ties to family relate to decreased criminal offending and delinquency (Berg and Huebner 2011; Bersani and Doherty 2013; Boman and Mowen 2017; Canter 1982; Sampson and Laub 1990, 1993; Savolainen 2009; Wright, Cullen, and Miller 2001).

At the same time, there remain both theoretical and empirical limitations on understanding how and why family matters. For example, existing research finds that high levels of family support do not necessarily decrease the link between victimization and recidivism during reentry (Taylor 2015b). Prior work has also suggested that family support may have an indirect—but not a direct—effect of recidivism (Berg and Huebner 2011). At least one study also demonstrates that supportive relationships may also be marked by conflict (Mowen and Boman 2018a), implying that conflictual family relationships may undermine the prosocial ties provided by family support. Although more research is warranted to examine the intricacies of the role of family support during reentry, research tends to support the notion that family support matters.

Despite the understanding that family support decreases a variety of deviant outcomes, scholars have recently called for increased specificity in understanding the mechanisms through which family support provides these necessary ties. In perhaps the first—and most poignant—call for researchers to consider how different forms of family support relate to reentry outcomes reentry, Martinez (2006:34, *emphasis in original*) implored scholars to examine specific dimensions "[b]ecause *support* has not been clearly defined or used similarly across studies." Martinez suggests that researchers must begin to examine a variety

of different types of family support mechanisms to provide "clarity as to the exact nature of familial support" (p. 34) on reentry outcomes.

To date, only a handful of studies have grappled with examining how different dimensions of family support play important roles during the reentry process, though a number of projects have implicitly explored multiple dimensions of family support. For example, in a study of individuals returning in the Boston area, Western and colleagues (2015) find that families provide housing and income support to returning family members. In fact, the vast majority of returning individuals had contact with their family on their first day out, and many lived with these family members immediately following release. Detailing the experience of one individual named Nick, Western and colleagues found that Nick's sister found him a job in construction prior to his release and, upon release, invited him to live with her family in their apartment. Beyond these forms of practical support, Nick's sister was also reported as being emotionally supportive (p. 1524). While this narrative paints a portrait of the importance of family, it does not directly provide an understanding of how these different forms of support (instrumental or emotional) relate to reentry success.

In a study using the *Returning Home* data, Mowen and Visher (2016) recognize that multiple dimensions of family support are affected by incarceration. For example, the authors show that some experiences during incarceration can change the amount of instrumental and emotional support an individual receives at release. However, the authors do not demonstrate how specific forms of family support relate to reentry outcomes. In interviewing returning men in multiple states, Visher and Courtney (2007) find that the most commonly cited factor keeping individuals out of prison was family support. Likewise, Nelson, Deess, and Allen (1999:10) find that "self-defined family support was the strongest predictor of individual success." Yet it is not clear in this study whether individuals are referring to emotional support, instrumental support, some combination of the two, or something else entirely (see also Grieb et al. 2014). Despite this shortcoming, these findings are important as they demonstrate that family support is a multifaceted construct that does impact reentry outcomes.

Only a few studies have examined how multiple forms of family support relate to reentry outcomes. Using the SVORI data, Taylor (2016) summed 10 items encompassing a variety of affectionate-type supports (e.g., my family loves me, I have someone in my family who listens to me) labeled "emotional support." The author also summed five items capturing instrumental types of support (e.g., someone in my family can provide transportation, support on substance abuse) labeled "instrumental support." Using logistic regression, Taylor found that individuals with higher emotional support reported lower offending than those with lower emotional support. Instrumental family support did not significantly relate to offending between individuals. Another study published by Taylor (2015a) using the same data and measures found that emotional support was more strongly associated with desistance for females than males. Finally, using a sample of 255 returning individuals, Barrick, Lattimore, and Visher (2014) used identical questions as Taylor (2016) to examine how family emotional support and instrumental support related to reincarceration. As emotional support only marginally associated with reincarceration, the findings were mixed. Overall, these studies provide an excellent place to start as they collectively demonstrate that

different family support mechanisms may relate to reentry outcomes, albeit in different ways.

Despite Taylor's (2015a, 2016) and Barrick et al.'s (2014) important findings, two important questions remain unanswered. First, as each of these studies used the same data and identical measures, the factor structure among these items may demonstrate that family support is comprised of more than two factors. In particular, the 10-item measure of emotional support in all of these studies combined a variety of measures of support (e.g., my family loves me) as well as conflict (e.g., I fight a lot with my family). Drawing from the perspectives of social control and DCSS theories, prior work has demonstrated that family support and conflict are theoretically and empirically distinct (e.g., Mowen and Boman 2018a; Mowen and Visher 2015), and the presence of conflict is not the same as the absence of support. Further, it is possible that the remaining items may represent other forms of support (e.g., emotional, interactional—see Martinez 2006). Thus, a more rigorous analysis is necessary to explore whether family support may be comprised of distinct factors.

Second, and perhaps more importantly, both social control theory and DCSS would expect that *changes* in family support relate to reentry outcomes. Decreases in particular forms of family support may relate to significant increases in offending. This is particularly important as prior projects have demonstrated that family support changes across time during the reentry process in consequential ways for behavior (see, generally, Boman and Mowen 2017; Stansfield et al. 2017; Wallace et al. 2016). For example, Western and colleagues (2015) document the experiences of people returning to the Boston, MA, area. The researchers carefully document how individuals experience changes in the frequency to which they interact with family, live with family, and receive some forms of support (like financial assistance) from family. Likewise, using the *Returning Home* data, Mowen and Visher (2015) note that family relationships and dynamics change during the reentry period as individuals work to reintegrate. Similarly, analyzing data from returning individuals in Baltimore and Chicago, Naser and La Vigne (2006) found that prerelease expectations of family support did not necessarily match up to postrelease family support experiences, again highlighting that family support levels, whether perceived or actual, change over the course of reentry. In sum, these studies have demonstrated that family relationships and dynamics—like support—change within persons over time. However, existing research has tended to focus exclusively on between-person differences (e.g., an individual "with" support compared to an individual "without" support). Given the significant amount of change that occurs postrelease as individuals negotiate postrelease identities, roles, and relationships, it is likely that within-person changes—in addition to between-person differences—in family support carry important meaning for postrelease behaviors. These two important limitations draw attention to the goal of the current study.

## Current Study

While family support is clearly related to reentry success, the specific means through which family support provides the "ties that bind" (e.g., Boman and Mowen 2017) has proven to be particularly difficult to pin down. To enhance clarity on this issue, we use four waves of data from the SVORI to examine the extent to which different forms of family support relate to

reincarceration, self-reported substance use, and self-reported offending over time. Because prior work has largely failed to distinguish between different forms of family support (Martinez 2006), we make only three broad hypotheses. First, we expect that multiple individual items capturing family support will represent distinct factors of family support (Hypothesis 1). Second, we expect that all factors of family support will relate to decreased odds of reincarceration and lower levels of substance use and offending during the reentry time frame (Hypothesis 2). Third, we expect that family support measures will be interdependent—and not independent—in their effects on each outcome measure via multiplicative interactions (Hypothesis 3).

## Method

### Data

Data for this project come from the SVORI. SVORI, a federally funded initiative, was designed to examine how enhanced reentry services related to criminal justice (CJ), employment, education, housing, and health outcomes among returning individuals. The National Institute of Justice provided funding to the Urban Institute to collect panel data on the SVORI project (Lattimore and Visher 2009) to examine whether enhanced reentry services improved reintegration outcomes. Specifically, the SVORI was a quasi-experimental evaluation study encompassing a total of 1,697 males across 12 different SVORI sites. Approximately half of the individuals received enhanced reentry programming, including a variety of practical services (like needs assessment, reentry planning, and reentry classes) as well as individual change services (like mental health treatment, anger management, and educational resources; see Visher et al. 2017). Although findings on the efficacy of SVORI programming are mixed (Lattimore and Visher 2009; Visher et al. 2017), the breadth of information collected has provided researchers with ample data to examine a variety of topics related to prison reentry.

The data collection provided four waves of panel data. Wave 1 was collected from the respondent approximately 30 days prior to their scheduled date of release, wave 2 data collected at three months postrelease, wave 3 at about nine months postrelease, and wave 4 data collected 15 months from the day of initial release. Individual sites largely determined how individuals were selected into the SVORI program (see Lattimore and Steffey 2010). Although individuals identified as SVORI participants were more likely to receive reentry services, non-SVORI participants also reported receiving some assistance (Visher et al. 2017). Finally, though the SVORI data also included a subsample of adult females and juvenile males, we use only the adult male sample due to the small sample size and high rate of attrition in the female and juvenile subsamples.

At each wave, respondents were asked about a variety of dynamics and experiences including criminal offending and substance use, family relationships and experiences, treatment and programming, mental and physical health, and a variety of additional measures (see Lattimore and Steffey 2009, for an overview). In addition to data collected from each respondent, data were collected from the state departments of corrections for each site as well as the National Center for Crime Information (NCIC), providing official measures of recidivism (i.e., reincarceration) and criminal history. In the forthcoming

analysis, we use data from all four waves but concentrate primarily on the postrelease waves as the outcome measures (reincarceration, substance use, and criminal offending) could only occur following release (waves 2, 3, and 4). Our total sample size encompasses 1,002 individuals (sample attrition is discussed at length in the subsequent section).

## Dependent Measures

In this study, we use three time-variant measures encompassing reincarceration, substance use, and criminal offending. Common measures of recidivism include both rearrest and reincarceration. Given that rearrest may include events where charges are dropped, changed, or an individual is acquitted, reincarceration represents a more conservative and consistent measure across jurisdictions (Lyman and LuBoglio 2007). This measure captures whether the respondent had been reincarcerated at each postrelease wave (this includes being reincarcerated for a technical violation). Overall, a total of 23.4 percent of respondents were recorded as having been reincarcerated sometime within the four waves of the SVORI data collection. However, this measure is time variant as individuals could be incarcerated at one wave and not in another. Overall, the within-individual standard deviation (0.246) is slightly smaller than the between-individual standard deviation (0.374). Summary statistics for all measures are shown in Table 1.

To create a measure capturing substance use, we draw from questions at each wave asking the individual if he had used marijuana, hallucinogens, cocaine, heroin, inhalants, sedatives, amphetamines, alcohol methadone, stimulants, or methadone. As some of these substances can be prescribed by a doctor, respondents were asked about illicit use and could respond yes (coded as "1") or no (coded as "0"). Because these substances represent differing levels of severity, we apply severity weights outlined by Boman and Mowen (2018) and originally developed by Pandina, White, and Yorke (1981). As a result, more severe substances like heroin are not counted equally to less severe substances like marijuana.[1] To create a composite measure, we multiplied each substance by the appropriate weight and summed each. Given the skew in this measure, we use the natural logarithmic transformation (Zumel and Mount 2014). This logged measure has a mean of 0.751, standard deviation of 0.623, and ranges from 0 (*no substance use*) to 2.336 (*a great deal of substance use*). As respondents could report differing levels of substance use across the postrelease waves, the within-individual standard deviation is 0.462, which is about the same as the between-individual standard deviation (0.484).

The final dependent measure encompasses criminal offending. To create this measure, we draw self-reported data that asked the respondent (*yes* = 1, *no* = 0) if they had (1) threatened to harm someone, (2) physically harmed someone, (3) carried a gun, (4) sold any drugs, or (5) committed any property crimes. Again, because these acts represent very different levels of severity, we apply the weights developed by Wolfgang and colleagues (1985) and summed the items to create a composite index. This strategy that has been used in prior work using the SVORI data (see Boman and Mowen 2017). As this measure is also skewed,

---

[1] We also examined a nonweighted scale as well as a binary measure (1 = *any substance use*). The substantive results in the forthcoming analysis were nearly identical. Since we believe the weighted items are more theoretically and methodologically precise, we report models using the weights.

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

we use the natural logarithm in the forthcoming analysis. The logged measure has a mean of 1.422, an overall standard deviation of 1.407, and ranges from 0 (*no offending*) to 3.515 (*a great deal of offending*). This measure is time variant as individuals could report different behaviors in each wave. The time-variant within-individual standard deviation is slightly less than the between-individual standard deviation (0.968 and 1.097, respectively).

### Independent Measures

The independent measures in this study capture family support. To identify distinct forms of family support, we draw data from a total of 15 questions in the SVORI questionnaire that asked the respondent about a variety of family dynamics/relations. These questions asked the respondent along a four-point Likert-type scale (1 = *strongly disagree*, 2 = *disagree*, 3 = *agree*,4 = *strongly agree*) whether or not he agreed with the following statements: (1) I feel close to my family; (2) I want family involved in my life; (3) I am a source of support for my family; I have someone in my family to (4) talk to about myself or my problems, (5) to turn to for suggestions, (6) who understands my problems, (7) to love me and make me feel wanted, (8) to provide help and advice finding a place to live, (9) to provide help of advice finding a job, (10) to provide support for a substance abuse problem, (11) to provide transportation to work or other appointments, and (12) to provide financial support; and to what extent, he (13) fights a lot with family members, (14) feels like a disappointment to family, and (15) is criticized a lot by family.

To determine the extent to which these individual items capture specific factors, we performed an orthogonal varimax rotated factor analysis, the results of which are shown in Table 2. Based upon factor loadings (those exceeding 0.600) and Eigenvalues (above 1.00), this factor analysis detected four total factors, three of which capture family support (Kim and Mueller 1978). The first factor captures the extent to which individuals believed they could draw upon their family to talk about their problems, turn to for suggestions, and rely on family for understanding. This is our measure of *interactional support*. The second factor captures the extent to which individuals could draw upon family for housing, employment, transportation, and financial support. This factor is referred to as *instrumental support*. The third factor encompasses the extent to which the individual feels close to their family and wants his family involved in his life. This is labeled *emotional support*. To create measures capturing each of these three factors, we summed the respective items, so that higher values indicate greater levels of family support. The fourth factor identified—which we discuss at greater length as a control measure—captures the extent to which individuals fight with and are criticized by their family members. This measure represents *family conflict*.

Table 2 shows descriptive statistics for these scales as well as the additional measures in this analysis. Overall, interactional family support has three items and a mean of 9.739, a standard deviation of 1.98, and ranges from 3 (*very low interactional support*) to 12 (*very high interactional support*). As support changes overtime, the within-individual standard deviation is 1.079. Instrumental family support has four items, a mean of 12.922, a standard deviation of 2.419, and ranges from 4 to 16. The within-individual standard deviation is 1.221 (between-individual standard deviation = 2.194). The measure of emotional support has two items, a mean of 6.878, a standard deviation of 1.177, and ranges from 2 to 8. The

within-individual standard deviation is 0.621 (between-individual standard deviation = 1.057).

## Family and Demographic Controls

We include a number of family and demographic controls. First, because prior research has demonstrated the importance of maintaining family contact on family outcomes and offending postrelease, we control for family contact during incarceration. To create this measure, we drew data from three separate questions that asked respondents the extent to which they had received in-person visits, phone calls, and mail from family members while incarcerated. Respondents could answer along a five-point Likert-type scale (0 = *never*, 1 = *a few times*, 2 = *monthly*, 3 = *weekly*, and 4 = *daily*). To create a scale capturing family contact during incarceration, we summed these responses. This measure has a mean of 5.988, a standard deviation of 2.655, and ranges from 0 (*no contact*) to 12 (*a great deal of contact*).

We also account for family incarceration, criminal, and drug use history by drawing data from three separate questions that asked the respondent whether any of their family members had ever been incarcerated, used drugs, or been convicted of a crime (all items measured 1 = *yes*, 0 = *no*). We summed these items together to create a three-position scale capturing family history (labeled "Family CJ History" in Table 2). Overall, this measure has a mean of 2.217, a standard deviation of 1.099, and ranges from 0 (*no prior family member contact*) to 3 (*all family contacts reported*).

We also include a measure indicating the number of children the respondents had at wave 1. This measure has a mean of 1.404, a standard deviation of 1.678, and ranges from 0 children to 18. As very few men reported having additional children within the SVORI time frame, this measure is time invariant. To account for the influence of marital/relationship status (Bersani and Doherty 2013; Sampson and Laub 1993), we include a measure that asked the respondent if they were married or in a steady relationship (mean = 0.109, standard deviation = 0.311). As individuals could report changes in partnership, we include this as a time-variant measure (within-individual standard deviation = 0.141).

Finally, the previously discussed factor analysis on the questions assessing family relationships revealed a fourth factor capturing family conflict. As prior research has established the importance of the harmful aspect of family conflict (Mowen and Boman 2018a; Mowen and Visher 2015), we include it as a control. Two items asked the extent to which the individual fights with (item 1) and is criticized by (item 2) family members (both items have a range of 1 [*never*] to 4 [*a great deal*]). Item scores were summed, so that higher scores capture higher conflict. The scale has an overall mean of 3.905, a standard deviation of 1.304, and ranges from 2 (*no conflict*) to 8 (*a great deal of conflict*). Much like family support, levels of family conflict can change across time. As such, this measure is time variant (within-individual standard deviation = 0.648).

To account for the importance of employment (Skardhamar and Telle 2012; Uggen 2000), we draw from data at each wave that asked respondents whether they were legally employed.

Overall, 65.7 percent of the respondents reported being employed. Individuals could—and did—report changes in employment status (within-individual standard deviation = 0.280).

To control for the importance of depression (e.g., Mallik-Kane and Visher 2008), we draw data from five measures encompassing depressive symptoms. Measured along a five-point Likert-type scale (1 = *not at all*, 2 = *a little bit*, 3 = *moderately*, 4 = *quite a bit*, and 5 = *extremely*), questions asked the respondent how much they felt: hopeless about the future, blue, lonely, like they had no interest in things, or worthless. Although these items have already been validated (see Wallace et al. 2016), the average Cronbach's α across each wave is .809, indicating a high level of interitem reliability. This measure has a mean of 7.843, a standard deviation of 3.872, and ranges from 5 (*no depressive symptoms*) to 25 (*high depressive symptoms*). As individuals reported changes in depressive symptoms, we include this as a time-variant measure (within-individual standard deviation = 2.002).

To account for peer influence (Thornberry et al. 1994), we summed three items that asked whether the respondent had a close friend who had sold drugs, committed assault, or been incarcerated. Overall, this measure has a mean of 2.089, a standard deviation of 1.152, and ranges from 0 (*no peer offending*) to 3 (*high levels of peer offending*). As respondents could report changes in peer crime across time, we treat this measure as time variant (within-individual standard deviation = 0.579). The Kuder–Richardson 21 (KR21) reliability statistic (KR21 = .834) indicates a high level of reliability across these measures (Webster 1960).

We include two additional demographic controls to account for the influence of race and age. Specifically, we include a series of time-invariant binary variables indicating whether the respondent was Black (53.3 percent of the sample), White (32.8 percent of the sample), or Other race/ethnicity (12.7 percent of the sample). We withhold White as the contrast category in the forthcoming analysis. Finally, age is also included as a time-invariant measure (mean = 29.203, standard deviation = 7.287, range = 18–73).

### Criminal History, Treatment, and Programming Controls

To account for criminal history, we first include binary measures that capture whether the respondent was convicted of a violent (15.4 percent), drug (22.2 percent), or property crime (11.8 percent) in contrast to any other crime. We also include measures that capture the total number of prior arrests (mean = 14.515, standard deviation = 20.626), prior convictions (mean = 5.967, standard deviation = 8.268), and length of incarceration (mean = 918 days, standard deviation = 932 days). As each of these measures is significantly skewed, we use the natural logarithm in the forth-coming analysis. To account for treatment, we include a binary measure indicating whether the respondent participated in treatment to change their attitudes and behaviors toward crime. Overall, 43.8 percent of respondents reported receiving this treatment. We also include a measure that indicated whether or not the respondent participated in substance abuse treatment (22.4 percent) in contrast to those who did not. As recent work has marked the importance of the social networks of support provided by religion for people in prison (e.g., Stansfield et al. 2017) and since religious involvement can promote family interaction (Wilcox 2002), we include a binary measure that asked the respondent whether he had received religious or spiritual assistance. Overall, about 36.8 percent of respondents reported that they received religious/spiritual support.

Finally, as the goal of SVORI was to examine outcomes associated with SVORI program participation, we covary a variable indicating if the respondent was an SVORI program participant (50.8 percent) in contrast to nonparticipant.

## Missing Data

Missing data within the SVORI sample have been well-documented (Lattimore and Steffey 2009). In our analysis, we draw data from a total of 1,002 respondents or about 59 percent of the original sample. Although we discuss the specifics of the analytic strategy in the following section, one of the key advantages of a mixed-effects model is that it leverages the ability to include both between-individuals differences and within-individual changes to retain individuals within the sample even if they do not have data on all measures in all waves (Rabe-Hesketh and Skrondal 2012). Specifically, the 1,002 respondents used in our analysis had at least two waves of complete data and thus could contribute to both between-individual differences and estimates of within-individual change.

A variety of prior publications offer in-depth discussions on attrition in the SVORI data (see Boman and Mowen 2018; Stansfield et al. 2017; Wallace et al. 2016). The conclusion that is reached is that patterns of missing data are largely at random. Reports published by the National Institute of Justice report that there are no key predictors of attrition across the four waves of data, further supporting this previous work. However, to confirm that our analyses were not significantly affected by attrition, we performed a sensitivity analysis by dichotomizing each measure and comparing patterns of missing data using $t$ tests (see Brame and Paternoster 2003). No $t$ test reached statistical significance. As a result, we conclude that while missing data are an issue in the SVORI data, our results are not significantly altered by patterns of missingness.

## Analytic Strategy

Although there are a variety of methods suitable for the analysis of longitudinal panel data like SVORI, we use a mixed-effects model (Rabe-Hesketh and Skrondal 2012).[2] Because respondents were sampled at four distinct time points, the assumption of independence made by ordinary least squares regression is violated as individuals tend to be like themselves over time. This correlation requires the use of a random intercept to account for similarity across time (Raudenbush and Bryk 2002). A mixed-effects model introduces a random intercept and models the effects of both between-individual differences and within-individual changes on the outcome measure. As reincarceration is a binary outcome, we used a generalized nonlinear form of mixed-effects model (see Mowen and Culhane 2017) and a linear mixed-effects model for the substance use and criminal offending outcomes.

We note that one important assumption of the mixed-effects model is the assumption of equality (sometimes referred to as the assumption of endogeneity). That is, because a mixed-model examines both between-person differences and within-person changes on the outcome

---

[2] Other studies using the SVORI data have used cross-lagged fixed-effect dynamic panel models (Mowen and Boman 2018a). We use the mixed-effects model as our focus is more squarely on between-individual differences and within-individual changes in time-variant predictors (family support). Cross-lagged fixed-effects models examine only within-person changes in time-variant measures.

measure, it assumes that between-person differences exert similar effects as within-person changes. To examine whether this assumption is met, we use Hausman tests (see Rabe-Hesketh and Skrondal 2012) throughout the presentation of results to compare the mixed-effects estimates to fixed-effects estimates for each model.

To address our hypotheses, we first examine the bivariate relationships among the differing measures of family support and the three outcome variables used in the study. Then, we move to the multivariate framework to assess the influence of each measure of family support on reincarceration, substance use, and criminal offending while accounting for the control measures discussed above. Additionally, we expect the various dimensions of family support to interact with each other dimension of support in relation to the outcome measures. To examine this possibility, we introduce interaction terms encompassing each combination of family support to determine whether they are independent, or interdependent, in their effects. To properly create the interaction terms, we grand mean centered each variable and then multiplied them together (see Paccagnella 2006).

## Results

A bivariate analysis (a *t* test; not shown) demonstrates that individuals who are reincarcerated during the SVORI time frame report significantly lower levels of family emotional, interactional, and instrumental support than individuals who are not reincarcerated. Similarly, bivariate analyses (two analyses of variance; not shown) show that higher scores on each of the three family support measures are related to significantly lower levels of substance use and criminal offending at the bivariate level. These findings, combined with the results from the factor analysis, demonstrate that each measure of family support is empirically distinct ($r$ = about .40 across all three measures) despite each independently relating to positive reentry outcomes at the bivariate level. The question, however, is whether these results will remain once the measures of support are considered independently and interdependently in a more rigorous set of analyses.

Moving to the multivariate context, mixed-effects models examining the outcome of reincarceration are shown in Table 3. A Hausman test was used to compare whether the within-individual effect of the time-variant measures was equal in magnitude to the between-individual effect and vice versa. The test statistic was nonsignificant, indicating that the assumption of equality was met. Further examination revealed that the differences in the fixed- and mixed-effects coefficients were very small, thus further validating the results.

As shown in Table 3, the significant $\chi^2$ statistic indicates good model fit to the data while the intraclass correlation demonstrates that about 41 percent of the variation in reincarceration is within individuals across time. Turning to the results of the coefficients, model 1 demonstrates that emotional and interactional family support are not significantly associated with reincarceration. On the other hand, instrumental support is significantly associated with lower odds of reincarceration. Specifically, individuals with higher levels of instrumental support report lower odds of reincarceration net the effect of the other measures in the models. Converting the mixed-effect coefficient to odds ratios can assist in interpreting the magnitude of the effect. Overall, an increase of one unit on the family

instrumental scale is associated with a 13 percent decrease in the odds of reincarceration both between-individuals and within-individuals across time.

Results of the family and demographic control measures indicate that employment is related to lower odds of reincarceration, while those with higher levels of family conflict, depressive symptoms, and criminal peers have significantly greater odds of reincarceration. Finally, older individuals report lower odds of reincarceration than younger individuals.

In order to examine the extent to which these measures of family support are conditionally related to reincarceration, we introduce interaction terms encompassing each combination of family support in models 2, 3, and 4. While the substantive results of the main effects and control measures remain substantively identical across each model, the interaction terms fail to reach significance, thus indicating that levels of family support are largely independent in their effects on reincarceration. Stated differently, the effect of instrumental support on reincarceration does not appear to be moderated by emotional or interactional family support.

Models in Table 4 examine the relationship between family support and self-reported substance use. Again, we invoked a Hausman test to ensure the models were robust to the assumption of equality and not affected by endogeneity across level 1 (within) and level 2 (between) effects. The Hausman test statistic was nonsignificant, indicating the assumption was met and the models unbiased by effect levels.[3] Model 1 fits the data well and accounts for about 24.4 percent of the variation in self-reported substance use. Similar to the prior analysis, the mixed-effects regression in model 1 demonstrates that instrumental support is related to significant decreases in substance use. Individuals with high levels of instrumental support—or those who experience increases in instrumental support across time—report lower levels of substance use than those with lower instrumental support. More specifically, a one-unit change in family instrumental support is related to a .017 reduction in substance use. As the measure of substance use has a mean of 0.751, this effect is modest in size. Like the prior analysis, emotional and interactional support appear unrelated to substance use net the effect of the covariates in the model.

Results of the control measures demonstrate that individuals in a steady relationship and Black respondents report lower levels of substance use. Individuals convicted of a property crime report higher levels of substance use than those convicted of another offense, and length of incarceration is related to decreased substance use. The effects of employment, depression, criminal peers, age, and family conflict are consistent with the prior models.

To again examine the independent or interdependent nature of emotional, interactional, and instrumental support on the outcome measure, we introduce interaction terms encompassing each combination of family support on offending. Like the prior analysis examining reincarceration, no interactions reach statistical significance in any model. As such, differing

---

[3.]Although the effect of emotional support was near zero, the within-individual effect was slightly positive in direction (coefficient = .006) and the random effect was slightly negative (coefficient = −.0001). This difference in the directions of the near-zero effects is the underlying reason for the change of coefficient direction for emotional support in models 3 and 4.

forms of family support appear to be independent in their effects on self-reported substance use.

The last series of models examines criminal offending as an outcome (see Table 5). The Hausman test statistic was not significant, indicating that the assumption of equality was met. Results demonstrate that high levels of instrumental support are significantly associated with decreased criminal offending. Specifically, a one-unit change in instrumental support is associated with a reduction of .037 on the offending scale. As the offending scale has a mean of 1.422, this effect is modest in size. Emotional and interactional family support is again not significantly associated with self-reported offending. Results of the controls closely mirror the prior results as depression, criminal peers, prior arrest history, and family conflict relate to high levels of self-reported crime. Age, on the other hand, is significantly associated with decreased criminal offending.

Models 2, 3, and 4 introduce interaction terms encompassing the various combinations of the different factors of family support. Interestingly, the interaction encompassing interactional and instrumental family support emerged as significant despite the main effect of interactional support remaining nonsignificant. To further explore this relationship, we split the interactional support coefficient into two separate effects capturing the within-person change in interactional support ($b_1$) and the between-person difference in interactional support ($b_2$). After reestimating with the two separate coefficients, results of these models (not shown) demonstrated that only the interaction encompassing the between-person effect of interactional support reached significance. As a result, this interaction demonstrates that instrumental support is especially important for individuals with lower levels of interactional family support. Put differently, people with comparatively low levels of interactional support report lower levels of offending when they are provided with ample amounts of instrumental support. Although this interaction emerged as significant, results of all other models demonstrated that instrumental support is largely independent in its effect on reincarceration, substance use, and criminal offending.

## Discussion and Conclusions

The goal of this project was to move beyond the question of *if* family support matters during reentry and ask *how* family support matters. Using data from the SVORI, we sought to examine whether family support items represented distinct factors and, if so, how these factors related to reincarceration, self-reported substance use, and criminal offending. We now turn back to our hypotheses and prior literature to understand the findings of this study.

Our first hypothesis proposed that multiple items capturing family support would represent fundamentally distinct factors of family support. This expectation is confirmed. The results of a factor analysis on a series of items capturing support in the SVORI data demonstrated that these items encompassed three support factors—interactional family support, instrumental family support, and emotional family support. As Martinez (2006) suggests, the broad conceptualization of "family support" as a unidimensional construct is theoretically and methodologically imprecise. Instead, family support is comprised of a variety of distinct factors encompassing more affectionate-type bonds (emotional and interactional support) as

well as more utilitarian bonds (instrumental support). In fact, it is likely that there are other forms of family support not captured in this study. By way of example, Martinez suggests that families may also provide support in the form of validation by providing feedback on the appropriateness of behavior, a notion consistent with tenets of social learning theory. Future research should explore how family support may be comprised of more than the three factors we capture in the current study.

The second hypothesis premised that all forms of family support would relate to prosocial reentry outcomes received mixed support. Through a series of mixed-effects models, results demonstrated that higher family instrumental support related to lower odds of reincarceration and lower levels of substance use and criminal offending. Yet, contrary to expectations, interactional and emotional support did not significantly relate to any outcome. Results relevant to our third hypothesis further help understand this phenomenon. Although we expected that the measures of family support would interact in their effects on each outcome measure, a complete lack of significant interaction terms leads us to reject the third hypothesis. Overall, findings relevant to Hypotheses 2 and 3 demonstrate that instrumental family support is independent, and not interdependent, in its effect on reincarceration, substance use, and criminal offending.

From the perspective of social control theory (Hirschi 1969), attachment should prevent offending since it is a form of an affectionate bond (it is both emotional and interactional). Our findings, however, suggest that affectionate-type bonds do not significantly relate to reincarceration, substance use, or offending during the reentry process. Although this contrasts with the primary tenets of the theory (see Krohn and Massey 1980), this work does support other research which shows that emotionally based family support fails to reduce substance use or offending for returning men (see Mowen and Visher 2015). It could be that supportive family relationships are also characterized by stress and emotional turmoil. For example, Berg and Huebner (2011) find that while individuals report high levels of emotional support from their families, these relationships are also characterized by fighting, upheaval, and emotional stress (see similar findings from Breese et al. 2000). As a consequence, while individuals report high levels of emotional and interactive support, the stress that accompanies a returning individual may reduce the effectiveness of these bonds in promoting desistance.

On the other hand, we find support for the notion that instrumental forms of family support promote successful reentry outcomes. From the perspective of DCSS (Colvin et al. 2002), individuals who experience instrumental social support may feel connected to others, and utilitarian measures of social support may provide individuals with the important ties they need to desist. Emotional and interactional support may both be undermined by the stress that accompanies the reentry process (see Breese et al. 2000). Even though the protective effects of emotional and interactional family support may be lost amid the strains of family life during reentry, instrumental support may be more tangible and predictable. In other words, an individual may continue to receive instrumental family support *even if the relationship is emotionally strained.*

When cast against the backdrop of research highlighting the ubiquity and importance of family during the reentry process (Visher and Courtney 2007; Naser and Visher 2006; Nelson et al. 1999; Western et al. 2015), our findings shed light onto the specific mechanisms and underlying reasons behind *why* family support matters. While prior research has shown that family relationships are central to reentry success, existing studies have overwhelmingly tended to treat family support as a single and monolithic characteristic. Results from this study clearly demonstrate that although higher reported levels of any family support improved reentry outcomes at the bivariate level, once specific types of family support were delineated and considered within a broader statistical framework, only instrumental support significantly related to prosocial outcomes. It appears, then, that instrumental support, relative to emotive types of support, is far more significant during the process of reentry.

This finding meshes with prior research conducted by Western and colleagues (2015) who told the story of reintegration of "Nick." Upon returning from prison, Nick's sister provided him with housing, financial support, and employment—all types of instrumental support. While the narrative does not discuss any other form of support (e.g., emotional or interactive) Nick may have received, the reality is that instrumental family support was highlighted as the key factor for Nick's reentry success. Similarly, other studies that have highlighted family support as a key source of desistance (e.g., Visher and Courtney 2007) may also be tapping instrumental types of support instead of emotional types of support. At the same time, researchers should not simply discard the role of other forms of support as emotional and interactional support may play an important role in other reentry outcomes. However, our findings clearly suggest that the broad characterization that family support "matters" (e.g., Nelson et al. 1999; Western et al. 2015; Visher and Courtney 2007) may be overstated and simplified. Our findings, instead, provide evidence that it may be the instrumental component of family support—and not the emotional or interactive components—that motivates such strong and robust findings regarding family within the research on reentry.

In addition, findings from our study suggest that mechanisms of family support are independent, but not interdependent, in their effects on reincarceration, substance use, and criminal offending. This finding is important as additional models (not shown) combining all measures of family support in one metric demonstrated significant results for a combined and seemingly unidimensional measure of family support across each model. This once again demonstrates a clear lack of theoretical clarity and methodological precision as separating the various types of family support into methodologically informed factors uncovers the key differences.

Interestingly, our findings are nearly the opposite of findings reported by Taylor (2016) who used the same data to try to determine the impact of different types of family support during reentry. Our results also diverge from the findings of Barrick et al. (2014). We believe there are multiple reasons for these differences. First, our use of a factor analysis to examine the multiple dimensions of family support resulted in fundamentally different measures than those used by Taylor (2015a, 2016) and Barrick et al. (2014). Whereas the emotional support measure in these prior studies included 10 items, our analysis demonstrated that several of

*J Res Crime Delinq.* Author manuscript; available in PMC 2020 July 01.

Author Manuscript

those items composed two methodologically distinct constructs (emotional and interactive support), while some items did not load consistently on any factor at all. Similarly, our instrumental measure was comprised of only four items relative to five by Taylor (2016) and Barrick et al. (2014). We believe the use of a factor analysis to construct multiple markers of family support (e.g., Martinez 2006) is a powerful tool which has helped determine which items are, and—equally importantly—are *not*, useful at helping inform why family matters during the reentry process.

To the prior point, a total of four items in the SVORI data failed to clearly load onto any single factor of family support. This includes questions that asked the respondent the degree to which they believed: (1) I am a source of support for my family, (2) I have someone in my family to love me and make me feel wanted, (3) I have someone in my family to provide support for substance abuse problems, and (4) I feel like I disappoint my family. There are potential reasons behind why each of these items failed to load cleanly onto any of the constructs. Item one captures the extent to which the individual wants to be a source of support for the family instead of how much he feels supported. As a result, this question may be capturing a fundamentally different component of support representing support given to others instead of support received from others. The second item's loadings were split between emotional and interactional support. This is likely because the item taps the two separate dimensions of love (a form of emotional support) and a feeling of belongingness (a form of interactive support).

Capturing substance use support, the third item is somewhat different than the first two due to variability. People in the SVORI sample overwhelmingly have members of their family with substance use and abuse histories. As a result, respondents may have been less confident in receiving help desisting from substance abuse by family members who probably have histories of abuse themselves, thus leading this item to fail to load on any measure. Finally, the fourth question, which partially loaded onto family conflict, taps an emotional response while the remaining two items of family conflict capture actions (fighting and being criticized). Thus, this item captures a negative emotion probably more analogous to a lack of emotional support rather than family conflict, which could explain why family conflict has been shown to relate to reincarceration (Mowen and Boman 2018b). Collectively, this discussion demonstrates that family support measures are theoretically and methodological distinct. Beyond this, however, some individual items may overlap and simultaneously tap multiple distinct dimensions of family support and/or conflict. Future research should consider rigorous, measurement-focused methodological techniques (e.g., item response theory; de Ayala 2009) to more clearly leverage all items into separate dimensions.

A second explanation for our divergent findings from prior literature is likely due to the inclusion of family conflict as a separate construct that is different from simply the absence of family support (e.g., Mowen and Visher 2015). Our analysis included family conflict as a distinct control measure that was robustly related to two of the three outcomes. As a consequence, accounting for family conflict as a separate measure to family support likely explains some of the differences in findings as well. Relatedly, factor analytic techniques demonstrated that one item used in prior research as a measure of family conflict (e.g.,

Mowen and Boman 2018b) was capturing negative emotions and not necessarily conflict. Again, these findings strongly suggest that researchers need to better consider the complexities and multidimensional nature of measures of family support and family conflict. Third, and finally, our analysis examined both between-person differences and within-individual changes in contrast to Taylor's (2015a) and Barrick and colleagues' focus on between-individual estimates only. As a result, our models account for longer term changes across time, an important point which aids in the explanation of the divergence between this study and prior research on this topic.

Outside of the theoretical implications, this research also carries potentially important policy implications. Because instrumental family support is the only form of support linked to reincarceration, substance use, and offending, our findings suggest that policymakers should ensure that the outreach and support offered to families welcoming loved ones home from prison focus on instrumental assistance. With access to public housing and employment restricted by law in addition to amassed fees and other legal obligations, many people may face a prolonged reliance on families for instrumental support. It is thus important that families be kept informed of support resources available to them, including access to nonprofits which can provide food, shelter, and financial assistance (Travis 2005). In the absence of such support and assistance, families may experience tension between meeting the needs of the formerly incarcerated person and other family members (Christian, Mellow, and Thomas 2006). Innovative programs and policies aimed at developing financial planning and assisting persons released from prisons in making steady payments toward fees and other legal obligations may offer several benefits for both the released person and his or her family. While these programs may provide some relief for families, they may be even more significant for individuals who would not otherwise experience instrumental support.

Of course, there are cases where individuals face reintegration in isolation from family. Consequentially, instrumental support may not be able to be derived from family members in all situations. Drawing from the perspective of DCSS theory, other individuals and/or social groups could fill this role and deliver instrumental support. Supporting this proposition, recent studies (e.g., Chamberlain et al. 2018; Vidal, Oudekerk, and Reppucci 2015) show that individuals can derive social support from their probation/parole officer. As such, people who do not have family contact could potentially still benefit from the instrumental support that stems from other important social groups such as supervision officers, supportive peers, or members of a faith community during reintegration.

Despite the contributions of this project, it is not without notable limitations. First, as the SVORI data contain individuals classified as "serious" and "violent," our findings may not be generalizable to a broader population. Future research should examine how multiple family support factors relate to reentry outcomes across other samples. Our control measure of peer criminality may also suffer from projection (see Boman and Ward 2014; Young et al. 2014), and this could have affected estimates of other variables in the model. If an analysis similar to this one could be performed with dyadic or network data, it would be extremely valuable.

In addition to the limitations above, it is likely that differing forms of family support have effects on outcomes beyond recidivism. It is possible that family emotional support—while perhaps not linked to recidivism— may be linked to employment or educational outcomes which, in turn, promote desistance (Denver, Siwach, and Bushway 2017). As a result, it is likely that different forms of family support may have direct effects on other outcomes and have indirect effects on offending. In a related point, we found that several items did not load cleanly onto any measure of family support. Despite estimating supplemental analyses using the factor loadings as weights, this did not change the substantive results of the bivariate or multivariate models. Future research is needed to explore the additional forms of family support as well as the overlap among the forms of support which people can receive when leaving prison.

Finally, DCSS also posits that social support can be derived from macro-level factors such as communities and social networks (Colvin et al. 2002). Placed within the context of reentry, the role of communities and neighborhoods in affecting social support and recidivism is an important—but often overlooked—factor, especially considering that individuals who return to disadvantaged neighborhoods are far more likely to recidivate than those returning to areas with more resources irrespective of microlevel characteristics (Kubrin and Stewart 2006). From the perspective of DCSS, economically disadvantaged and marginalized communities may have fewer forms of social support to offer and their support services may face greater demand (Hipp, Petersilia, and Turner 2010). Accordingly, neighborhood context may significantly impact a family's ability to provide support to returning individuals. Prior work supports this notion, as Morenoff and Harding (2014:424) find that communities with fewer resources are "less able to provide supportive environments for those leaving prison." Consequently, it is entirely possible that a family's ability to provide instrumental support may be influenced both by the family's socioeconomic status and community-level resources. Future research should examine how these macro-level processes affect the delivery and impact of family support during reentry.

Overall, this study serves as a reminder and a cautionary note for researchers that the reentry process is multifaceted and complex. Family support—so often considered critical for successful reentry and desistance processes more broadly—is not a monolithic or unidimensional construct. Instead, family support is multidimensional, and particular dimensions of family support may possess anti-criminogenic effects while other forms of family support may not significantly reduce recidivism at all. With specific regard to reentry, our findings suggest that affectionate and emotional types of family support may play a secondary role to the more utility-oriented form of instrumental support in promoting positive reentry outcomes. In other words, families may "matter" during reentry because they provide support in the form of caring for the basic needs of returning loved ones.

## Acknowledgments

Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: This research was supported in part by the Center for Family and Demographic Research, Bowling Green State University, which has core funding from the Eunice Kennedy Shriver National Institute of Child Health and Human Development (P2CHD050959).

Author Manuscript

## Author Biographies

**Thomas J. Mowen** is an assistant professor in the Department of Sociology at Bowling Green State University. His research examines the effect of punishment on youth and family outcomes and the role of family within the process of reentry from prison. Tom's recent work has appeared in *Criminology, Justice Quarterly,* and *Journal of Quantitative Criminology.*

**Richard Stansfield** is an assistant professor of criminal justice at Rutgers University - Camden. He teaches and publishes broadly on the topics of violence, risk assessment, recidivism, and reentry with a particular interest in the role of religious services and the individual ways people make meaning in their desistance journey.

**John H. Boman, IV** is an assistant professor at Bowling Green State University in the Department of Sociology. His research is primarily focused on developmental issues, peers and social relationships through the life-course, and theory. John's recent work has appeared in *Criminology, Justice Quarterly,* and *Crime & Delinquency.*

## References

Agnew Robert. 1991 "A Longitudinal Test of Social Control Theory and Delinquency." Journal of Research in Crime and Delinquency 28:126–56.

Agnew Robert. 1993 "Why Do They Do It? An Examination of the Intervening Mechanisms between 'Social Control' Variables and Delinquency." Journal of Research in Crime and Delinquency 30:245–66.

Akers Ronald L., Sellers Christine S., and Jennings Wesley G. 2012 Criminological Theories New York: Oxford University Press.

Arditti Joyce A. and Few April L. 2006 "Mothers' Reentry into Family Life Following Incarceration." Criminal Justice Policy Review 17:103–23.

Baier Colin J. and Wright Bradley R. E. 2001 "'If You Love Me, Keep My Commandments': A Meta-analysis of the Effect of Religion on Crime." Journal of Research in Crime and Delinquency 38:3–21.

Barrick K, Lattimore Pamela K., and Visher Christy A. 2014 "Returning Women: The Impact of Social Ties on Long-term Recidivism." The Prison Journal 94:279–304.

Berg Mark T. and Huebner Beth. 2011 "Reentry and the Ties That Bind: An Examination of Social Ties, Employment and Recidivism." Justice Quarterly 28:382–410.

Bersani Bianca and Doherty Elaine Eggleston. 2013 "When the Ties That Bind Unwind: Examining the Enduring and Situational Processes of Change Behind the Marriage Effect." Criminology 51:399–433.

Boman IV, John H and Ward Jeffrey T. 2014 "Beyond Projection: Specifying the Types of Peer Delinquency Misperception and the Item- and Scale-levels." Deviant Behavior 35:555–80.

Boman IV, John H and Mowen Thomas J. 2017 "Building the Ties That Bind, Breaking the Ties That Don't." Criminology & Public Policy 16:753–74.

Boman IV, John H and Mowen Thomas J. 2018 "The Role of Turning Points in Establishing Baseline Differences between People in Developmental and Life-course Criminology." Criminology 56:191–224. [PubMed: 31447488]

Braman Donald. 2004 Doing Time on the Outside: Incarceration and Family Life in Urban America Ann Arbor: University of Michigan Press.

Brame Robert and Paternoster Raymond. 2003 "Missing Data Problems in Criminological Research: Two Case Studies." Journal of Quantitative Criminology 19:55–78.

Breese Jeffrey R., Ra'el Khaz, and Grant G. Kathleen. 2000 "No Place Like Home: A Qualitative Investigation of Social Support and Its Effects on Recidivism." Sociological Practice: A Journal of Clinical and Applied Research 2:1–21.

Canter Rachelle J. 1982 "Family Correlates of Male and Female Delinquency." Criminology 20:149–68.

Carson E. Ann. 2018 Prisoners in 2016. U.S. Department of Justice, Office of Justice Programs. NCJ 251149 Retrieved January 12, 2018 (https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6187).

Carson E. Ann and Anderson Elizabeth. 2016 Prisoners in 2015. U.S. Department of Justice, Office of Justice Programs. NCJ 250229 Retrieved January 12, 2018 (https://www.bjs.gov/content/pub/pdf/p15.pdf).

Chamberlain Aylssa W., Gricius Matthew, Wallace Danielle M., Borjas Diana, and Ware Vincent M. 2018 "Parolee-Parole Officer Rapport: Does It Impact Recidivism?" International Journal of Offender Therapy and Comparative Criminology 62:3581–602. [PubMed: 29188732]

Christian Johnna, Mellow Jeff, and Thomas Shenique. 2006 "Social and Economic Implications of Family Connections to Prisoners." Journal of Criminal Justice 34:443–52.

Colvin Mark, Cullen Francis T., and Vander Ven Thomas. 2002 "Coercion, Social Support, and Crime: An Emerging Theoretical Consensus." Criminology 40: 19–42.

Cullen Frank T. 1994 "Social Support as an Organizing Concept for Criminology: Presidential Address to the Academy of Criminal Justice Sciences." Justice Quarterly 11:527–59.

de Ayala Ralph J. 2009 The Theory and Practice of Item Response Theory New York: Guilford.

Denver Megan, Siwach Garima, and Bushway Shawn D. 2017 "A New Look at the Employment and Recidivism Relationship through the Lens of a Criminal Background Check." Criminology 55:174–204.

Durkin Keith F., Wolfe Scott E., and May Ross W. 2007 "Social Bond Theory and Drunk Driving in a Sample of College Students." College Student Journal 41:734–44.

Ekland-Olson Sheldon, Supancic Michael, Campbell James, and Lenihan Kenneth J. 1983 "Postrelease Depression and the Importance of Familial Support." Criminology 21:253–75.

Grieb Suzanne M. D., Crawford Amelia, Fields Julie, Smith Horace, Harris Richard, and Matson Pamela. 2014 "'The Stress Will Kill You': Prisoner Reentry as Experienced by Family Members and the Urgent Need for Support Services." Journal of Health Care for the Poor and Underserved 25:1183–200. [PubMed: 25130233]

Herreros Francisco. 2015 "Ties That Bind: Family Relationships and Social Trust." Rationality and Society 27:334–57.

Hipp John, Petersilia Joan, and Turner Susan. 2010 "Parolee Recidivism in California: The Effect of Neighborhood Context and Social Service Agency Characteristics." Criminology 48:947–79.

Hirschi Travis. 1969 The Causes of Delinquency Berkeley: University of California Press.

Hlavka Heather, Wheelock Darren, and Jones Richard. 2015 "Exoffender Accounts of Successful Reentry from Prison." Journal of Offender Rehabilitation 54:406–28.

Kim Jae-On and Mueller Charles W. 1978 Factor Analysis: Statistical Methods and Practical Issues New York: Sage.

Krohn Marvin D. and Massey James L. 1980 "Social Control and Delinquent Behavior: An Examination of the Elements of the Social Bond." The Sociological Quarterly 21:529–43.

Kubrin Charis E. and Stewart Eric A. 2006 "Predicting Who Reoffends: The Neglected role of Neighborhood Context in Recidivism Studies." Criminology 44:165–97.

Lattimore Pamela K. and Visher Christy A. 2009 The Multi-site Evaluation of SVORI: Summary and Synthesis. Research Triangle Park, NC: RTI International.

Lattimore Patricia K. and Steffey Danielle M. 2010 The Multi-site Evaluation of SVORI: Methodology and Analytic Approach. U.S. Department of Justice, Document 230424 Retrieved January 12, 2018 (https://www.ncjrs.gov/pdffiles1/nij/grants/230424.pdf).

Loeber Rolf and Stouthamer-Loeber Magda. 1986 "Family Factors as Correlates and Predictors of Juvenile Conduct Problems and Delinquency." Crime and Justice 7:29–149.

Lyman Marta and LoBuglio Stefan. 2007 "'Whys' and 'Hows' of Measuring Jail Recidivism." Paper submitted for Jail Reentry Roundtable, 6 27–28, 2006, Urban Institute, Washington, DC.

Lynch James and Sabol William. 2004 "Assessing the Effects of Mass Incarceration on Informal Social Control in Communities." Criminology & Public Policy 3:267–94.

Mallik-Kane Kamala and Visher Christy Ann. 2008 Health and Prisoner Reentry: How Physical, Mental, and Substance Abuse Conditions Shape the Process of Reintegration Washington, DC: Urban Institute Justice Policy Center.

Martinez Damien J. 2006 "Informal Helping Mechanisms." Journal of Offender Rehabilitation 44:23–37.

Morenoff Jeffrey D. and Harding David J. 2014 "Incarceration, Prisoner Reentry, and Communities." Annual Review of Sociology 40:411–29.

Mowen Thomas J., and Boman IV. 2018a "The Criminogenic Influence of Family on Substance Use during Reentry: A Life-course Perspective on between Individual Differences and within Individual Changes." Justice Quarterly 41: 110–22. doi:10.1080/07418825.2018.1439518

Mowen Thomas J. and Boman John H. IV. 2018b "Do We Have It All Wrong? The Protective Roles of Peers and the Criminogenic Risks from family during Prison Reentry." Crime & Delinquency 65:681–704. doi:10.1177/0011128718800286 [PubMed: 32089563]

Mowen Thomas J. and Visher Christy A. 2015 "Drug Use and Crime after Incarceration: The Role of Family Support and Family Conflict." Justice Quarterly 32:337–59.

Mowen Thomas J. and Culhane Scott E. 2017 "Modeling Recidivism within the Study of Offender Reentry: Hierarchical Generalized Linear Models and Lagged Dependent Variable Models." Criminal Justice and Behavior 44: 85–102.

Naser Rebecca L. and Visher Christy A. 2006 "Family Members' Experiences with Incarceration and Reentry." Western Criminology Review 7:20–31.

Naser Rebecca L. and Vigne Nancy G. La. 2006 "Family Support in the Prisoner Reentry Process: Expectations and Realities." Journal of Offender Rehabilitation 43:93–106.

Mowen Thomas J. and Visher Christy A. 2016 "Changing the Ties That Bind: How Incarceration Impacts Families." Criminology & Public Policy 15: 503–28.

Nelson Matra, Deess Perry, and Allen Charlotte. 1999 First Month Out: Post-incarceration Experiences in New York City New York: Vera Institute of Justice.

Paccagnella Omar. 2006 "Centering or Not Centering in Multilevel Models? The Role of the Group Mean and the Assessment of Group Effects." Evaluation Review 30:66–85. [PubMed: 16394187]

Pandina Robert, White Helene R., and Yorke Joseph. 1981 "Estimation of substance use involvement: Theoretical considerations and empirical findings." The International Journal of the Addictions 16:1–24.

Prendergast Michael L. 2009 "Interventions to Promote Successful Re-entry Among Drug-abusing Parolees." Addiction Science & Clinical Practice 5:4–13. [PubMed: 19369913]

Rabe-Hesketh Sophia and Skrondal Anders. 2012 Multilevel and Longitudinal Modeling Using Stata 3rd ed. College Station, TX: Stata Press.

Raudenbush Stephen W. and Bryk Anthony S. 2002 Hierarchical Linear Models 2nd ed. Thousand Oaks, CA: Sage.

Robbins Cynthia A., Martin Steven S., and Surratt Hilary L. 2007 "Substance Abuse Treatment, Anticipated Maternal Roles, and Reentry Success of Drug-involved Women Prisoners." Crime & Delinquency 55:388–411.

Sampson Robert J. and Laub John H. 1990 "Crime and Deviance over the Life Course: The Salience of Adult Social Bonds." American Sociological Review 55: 609–27.

Sampson Robert J. and Laub John H. 1993 "Crime in the Making: Pathways and Turning Points through Life" Cambridge, MA: Harvard University Press.

Savolainen Jukka. 2009 "Work, Family and Criminal Desistance: Adult Social Bonds in a Nordic Welfare State." The British Journal of Criminology 49: 285–304.

Seiter Richard P. and Kadela Karen R. 2003 "Prisoner Reentry: What Works, What Does Not, and What Is Promising." Crime & Delinquency 49:360–88.

Shapiro Carol and Schwartz Meryl. 2001 "Coming Home: Building on Family Connections." Corrections Management Quarterly 5:52–61.

Shollenberger Tracey L. 2009 When Relatives Return: Interviews with Family Members of Returning Prisoners in Houston, Texas Washington, DC: Urban Institute.

Skardhamar Torbjorn and Telle Kjetil. 2012 "Post-release Employment and Recidivism in Norway." Journal of Quantitative Criminology 28:629–49.

Stansfeld Richard, Mowen Thomas J., O'Connor Thomas, and Boman John H. 2017 "The Role of Religious Support in Reentry: Evidence from the SVORI Data." Journal of Research in Crime and Delinquency 54:111–45.

Taylor Caitlyn J. 2015a "Gendered Pathways to Recidivism: Differential Effects of Family Support by Gender." Women & Criminal Justice 25:169–83.

Taylor Caitlyn J. 2015b "Recent victimization and Recidivism: The Potential Moderating Effects of Family Support." Violence and Victims 30:342–60. [PubMed: 25929146]

Taylor Caitlyn J. 2016 "The Family's Role in the Reintegration of Formerly Incarcerated Individuals: The Direct Effects of Emotional Support." The Prison Journal 96:331–54.

Thornberry Terence P., Lizotte Alan J., Krohn Marvin D., Farnworth Margaret, and Jang Sung Joon. 1994 "Delinquent Peers, Beliefs, and Delinquent Behavior: A Longitudinal Test of Interactional Theory." Criminology 32:47–83.

Travis Jeremy. 2005 They All Come Back: Facing the Challenges of Prisoner Reentry Washington, DC: Urban Institute.

Travis Jeremy. 2014 "Assessing the State of Mass Incarceration: Tipping Point or the New Normal?" Criminology & Public Policy 13(4):567–77.

Uggen Chris. 2000 "Work as a Turning Point in the Life Course of Criminals: A Duration Model of Age, Employment and Recidivism." American Sociological Review 65:529–46.

Vidal Sarah, Oudekerk Barbara A., and Reppucci N. Dickon. 2015 "Examining the Link between Perceptions of Relationship Quality with Parole Officers and Recidivism Among Female Youth Parolees." Youth Violence and Juvenile Justice 13:60–76.

Visher Christy A., Lattimore Pamela K., Barrick Kelle, and Tueller Stephen. 2017 "Evaluating the Long-term Effects of Prisoner Reentry Services on Recidivism: What Types of Services Matter?" Justice Quarterly 34:136–65.

Visher Christy A. and Courtney Shannon M. E. 2007 One Year Out: Experiences of Prisoners Returning to Cleveland Washington, DC: Urban Institute.

Visher Christy, Debus Sara, and Yahner Jennifer. 2008 "Employment after Prison: A Longitudinal Study of Releasees in Three States." Urban Institute Justice Policy Center Retrieved January 12, 2018 (https://www.urban.org/sites/default/files/publication/32106/411778-Employment-after-Prison-A-Longitudinal-Study-of-Releasees-in-Three-States.PDF).

Wade Jim. 2008 "The Ties That Bind: Support from Birth Families and Substitute Families for Young People Leaving Care." British Journal of Social Work 38:39–54.

Wallace Danielle, Fahmy Chantal, Cotton Lindsy, Jimmons Charis, McKay Rachel Stoffer Sidney, and Syed Sarah. 2016 "Examining the Role of Familial Support during Prison and after Release on Post-incarceration Mental Health." International Journal of Offender Therapy and Comparative Criminology 60:3–20. [PubMed: 25156422]

Webster Harold. 1960 "A Generalization of Kuder-Richardson Reliability Formula 21." Educational and Psychological Measurement 20:131–38.

Western Bruce, Braga Anthony A., Davis Jaclyn, and Sirois Catherine. 2015 "Stress and Hardship after Prison." American Journal of Sociology 120:1512–47.

Wilcox W. Bradford. 2002 "Religion, Convention, and Paternal Involvement." Journal of Marriage and Family 64:780–92.

Wolfgang Marvin E., Figlio Robert M., Tracy Paul E., and Singer Simon I. 1985 The National Survey of Crime Severity Washington, DC: U.S. Government Printing Office.

Wright John Paul, Cullen Francis T., and Miller Jeremy T. 2001 "Family Social Capital and Delinquent Involvement." Journal of criminal Justice 29:1–9.

Young Jacob T. N., Rebellon Cesar J., Barnes JC, and Weerman Frank M. 2014 "Unpacking the Black Box of Peer Similarity in Deviance: Understanding the Mechanisms Linking Personal Behavior, Peer Behavior, and Perceptions." Criminology 52:60–86.

Zumel Nina and Mount John. 2014 Practical Data Science with R Shelter Island, NY: Manning.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Table 1.**

Descriptive Statistics of the SVORI Sample.

| Variable | Mean | *SD* | Range | *SD* Within | *SD* Between |
|---|---|---|---|---|---|
| Dependent measures | | | | | |
| Reincarceration | 0.234 | 0.424 | 0, 1 | 0.246 | 0.374 |
| Substance use | 0.751 | 0.628 | 0–2.336 | 0.462 | 0.484 |
| Criminal offending | 1.422 | 1.407 | 0–3.515 | 0.968 | 1.097 |
| Family support measures | | | | | |
| Interactional | 9.739 | 1.98 | 3–12 | 1.079 | 1.762 |
| Instrumental | 12.922 | 2.419 | 4–16 | 1.221 | 2.194 |
| Emotional | 6.878 | 1.177 | 2–8 | 0.621 | 1.057 |
| Family and demographic controls | | | | | |
| Family contact | 5.988 | 2.655 | 0–12 | — | — |
| Family CJ history | 2.217 | 1.099 | 0–3 | — | — |
| Number of children | 1.404 | 1.678 | 0–18 | — | — |
| Married/stable partner | 0.109 | 0.311 | 0, 1 | 0.141 | 0.408 |
| Family conflict | 3.905 | 1.304 | 2–8 | 0.648 | 1.198 |
| Employment | 0.657 | 0.475 | 0, 1 | 0.280 | 0.409 |
| Depressive symptoms | 7.843 | 3.872 | 5–25 | 2.002 | 3.531 |
| Criminal peers | 2.089 | 1.152 | 0–3 | 0.579 | 1.028 |
| Race (*White* contrast) | | | | | |
| Black | 0.533 | 0.498 | 0, 1 | — | — |
| Other | 0.127 | 0.333 | 0, 1 | — | — |
| Age | 29.203 | 7.287 | 18–73 | — | — |
| Criminal history, treatment, and programming | | | | | |
| Primary conviction type (*Other* contrast) | | | | | |
| Violent | 0.154 | 0.367 | 0, 1 | — | — |
| Drug | 0.222 | 0.415 | 0, 1 | — | — |
| Property | 0.118 | 0.323 | 0, 1 | — | — |
| Prior arrest | 14.515 | 20.626 | 1–300 | — | — |
| Prior convictions | 5.967 | 8.268 | 1–90 | — | — |
| Length of incarceration | 918.297 | 932.353 | 44–6,486 | — | — |
| Change in criminal behavior | 0.438 | 0.496 | 0, 1 | — | — |
| Substance abuse treatment | 0.224 | 0.417 | 0, 1 | — | — |
| Religious support | 0.368 | 0.482 | 0, 1 | — | — |
| SVORI participant | 0.508 | 0.499 | 0, 1 | — | — |

*Note*: SVORI = Serious and Violent Offender Reentry Initiative; *SD* = standard deviation; CJ = criminal justice.

Mowen et al.                                                                                                     Page 27

**Table 2.**

Orthogonal Varimax Rotated Factor Analysis for Family Support Measures.

| Question | Factor 1: Interactional | Factor 2: Instrumental | Factor 3: Emotional | Factor 4: Conflict |
|---|---|---|---|---|
| I feel close to my family | .295 | .272 | .627 | .220 |
| I want family involved in my life | .340 | .278 | .625 | .104 |
| I am a source of support for my family | .229 | .226 | .334 | .202 |
| I have someone in my family … to talk to about myself/my problems | **.761** | .287 | .141 | .125 |
| to turn to for suggestions | **.809** | .314 | .179 | .143 |
| who understands my problems | **.701** | .325 | .233 | .181 |
| to love me and make me feel wanted | .510 | .520 | .318 | .154 |
| to provide help/advice finding a place to live | .456 | **.691** | .155 | .159 |
| to provide help or advice finding a job | .361 | **.751** | .160 | .129 |
| to provide support for a substance abuse problem | .479 | .473 | .172 | .067 |
| to provide transportation to work/appointments | .237 | **.645** | .223 | .145 |
| to provide me with financial support | .306 | **.656** | .176 | .185 |
| I fight a lot with my family members | −.192 | −.172 | −.219 | **−.610** |
| I feel like I disappoint my family | −.125 | −.148 | −.017 | −.539 |
| I am criticized a lot by my family | −.261 | −.239 | −.204 | **−.611** |
| Eigenvalue | 3.077 | 2.979 | 1.351 | 1.331 |

*Note.* Standardized factor loadings reported.

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Table 3.**

Results of Mixed-Effects Models Examining Reincarceration.

| Variable | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| | Coef. | SE | Coef. | SE | Coef. | SE | Coef. | SE |
| **Family support measures** | | | | | | | | |
| Emotional | −.004 | .061 | −.006 | .062 | −.006 | .062 | −.005 | .062 |
| Interactional | .110 | .096 | .104 | .098 | .120 | .096 | .153 | .101 |
| Instrumental | −.136 | .052** | −.136 | .053* | −.127 | .054* | −.127 | .054* |
| Emotional × Interactional | — | — | −.007 | .030 | — | — | — | — |
| Emotional × Instrumental | — | — | — | — | .018 | .013 | — | — |
| Interactional × Instrumental | — | — | — | — | — | — | .033 | .023 |
| **Family/demographic measures** | | | | | | | | |
| Family contact | .322 | .221 | .322 | .221 | .321 | .221 | .326 | .222 |
| Family CJ history | −.057 | .089 | −.057 | .089 | −.055 | .089 | −.057 | .090 |
| Number of children | .258 | .172 | .260 | .172 | .251 | .172 | .250 | .172 |
| Married/stable partner | −.524 | .308 | −.526 | .309 | −.515 | .308 | −.508 | .309 |
| Family conflict | .060 | .076 | .060 | .076 | .058 | .076 | .063 | .076 |
| Employment | .458 | .197* | .460 | .197* | .446 | .198* | .453 | .197* |
| Depressive symptoms | .244 | .028*** | .245 | .028*** | .242 | .028*** | .245 | .028*** |
| Criminal peers | .183 | .065** | .182 | .065** | .186 | .065** | .186 | .065** |
| Race | | | | | | | | |
| Black | .275 | .228 | .275 | .228 | .282 | .228 | .287 | .229 |
| Other | .243 | .306 | .242 | .306 | .241 | .306 | .246 | .307 |
| Age | −.049 | .016** | −.049 | .016** | −.049 | .016** | −.049 | .016** |
| **Criminal history, treatment, and programming** | | | | | | | | |
| Primary conviction | | | | | | | | |
| Violent | −.032 | .271 | −.029 | .271 | −.038 | .271 | −.041 | .272 |
| Drug | −.465 | .261 | −.466 | .261 | −.469 | .260 | −.475 | .261 |
| Property | .230 | .293 | .233 | .294 | .218 | .294 | .221 | .294 |
| Prior arrest | .274 | .152 | .275 | .152 | .270 | .152 | .270 | .152 |
| Prior convictions | .047 | .173 | .047 | .173 | .050 | .173 | .051 | .173 |

*J Res Crime Delinq.* Author manuscript; available in PMC 2020 July 01.

Mowen et al. Page 29

| Variable | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| | Coef. | SE | Coef. | SE | Coef. | SE | Coef. | SE |
| Length of incarceration | .084 | .125 | .085 | .125 | .080 | .125 | .081 | .125 |
| Change in criminal behavior | .444 | .221 | .443 | .221 | .441 | .221 | .438 | .222 |
| Substance abuse treatment | .088 | .217 | .091 | .217 | .082 | .217 | .072 | .218 |
| Religious support | .008 | .198 | .009 | .199 | .005 | .198 | .004 | .199 |
| SVORI participant | −.137 | .197 | −.140 | .198 | −.130 | .197 | −.138 | .198 |
| Constant | −4.974 | 1.372 *** | −4.910 | 1.396 *** | −5.245 | 1.391 *** | −5.414 | 1.415 *** |
| $\chi^2$ | 98.44 *** | | 98.49 *** | | 98.24 *** | | 97.69 *** | |
| Intraclass correlation | .418 | .075 | .419 | .075 | .417 | .076 | .421 | .076 |
| Random variation | .861 | .311 | .862 | .310 | .857 | .313 | .870 | .312 |

*Note:* SVORI = Serious and Violent Offender Reentry Initiative; coef. = unstandardized coefficient, *SE* = standard error; CI = criminal justice.

*
  *p*  .05.

**
  *p*  .01.

***
  *p*  .001.

**Table 4.**

Results of Mixed-Effects Models Examining Self-Reported Substance Use.

| Variable | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| | Coef. | SE | Coef. | SE | Coef. | SE | Coef. | SE |
| **Family support measures** | | | | | | | | |
| Emotional | 1.42E-04 | .007 | 5.57E-04 | .007 | -7E-05 | .007 | -4E-05 | .007 |
| Interactional | 0.006 | .010 | 0.008 | .010 | 0.006 | .010 | 0.008 | .010 |
| Instrumental | -0.017 | .005** | -0.017 | .005** | -0.017 | .005** | -0.016 | .005** |
| Emotional × Interactional | — | — | 0.003 | .003 | — | — | — | — |
| Emotional × Instrumental | — | — | — | — | -0.001 | .001 | — | — |
| Interactional × Instrumental | — | — | — | — | — | — | 0.002 | .002 |
| **Family/demographic measures** | | | | | | | | |
| Family contact | -0.017 | .025 | 0.016 | .025 | -0.017 | .025 | -0.017 | .025 |
| Family CJ history | -0.002 | .010 | 0.002 | .010 | -0.002 | .010 | -0.002 | .010 |
| Number of children | -0.027 | .020 | 0.027 | .020 | -0.026 | .020 | -0.027 | .020 |
| Married/stable partner | -0.074 | .030* | 0.074 | .030 | -0.074 | .030 | -0.074 | .030 |
| Family conflict | 0.035 | .008*** | 0.035 | .008*** | 0.035 | .008*** | 0.035 | .008*** |
| Employment | -0.050 | .019** | 0.050 | .019** | -0.049 | .019** | -0.050 | .019** |
| Depressive symptoms | 0.018 | .002*** | 0.018 | .003*** | 0.018 | .003*** | 0.018 | .003*** |
| Criminal peers | 0.044 | .006** | 0.044 | .006** | 0.044 | .006** | 0.044 | .006** |
| Race | -0.083 | | -0.083 | | -0.083 | | -0.082 | |
| Black | | .026** | | .026** | | .026** | | .026** |
| Other | -0.036 | .037 | -0.036 | .037 | -0.036 | .037 | -0.036 | .037 |
| Age | -0.005 | .001** | -0.005 | .001** | -0.005 | .001** | -0.005 | .001** |
| **Criminal history, treatment, and programming** | | | | | | | | |
| Primary conviction | -0.013 | | -0.014 | | -0.013 | | -0.014 | |
| Violent | | .032 | | .032 | | .032 | | .032 |
| Drug | 0.057 | .029 | 0.056 | .029 | 0.057 | .029 | 0.056 | .029 |
| Property | 0.071 | .036* | 0.071 | .036* | 0.072 | .036* | 0.071 | .036* |
| Prior arrest | 0.063 | .017*** | 0.062 | .017*** | 0.063 | .017*** | 0.062 | .017*** |

| Variable | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| | Coef. | SE | Coef. | SE | Coef. | SE | Coef. | SE |
| Prior convictions | 0.051 | .021 | 0.051 | .021 | 0.051 | .021 | 0.051 | .021 |
| Length of incarceration | -0.033 | .013* | -0.033 | .013* | -0.032 | .013* | -0.033 | .013* |
| Change in criminal behavior | -0.044 | .026 | -0.044 | .026 | -0.044 | .026 | -0.044 | .026 |
| Substance abuse treatment | 0.038 | .026 | 0.037 | .026 | 0.038 | .026 | 0.037 | .026 |
| Religious support | -0.016 | .023 | -0.016 | .023 | -0.016 | .023 | -0.016 | .023 |
| SVORI participant | -0.020 | .023 | -0.020 | .023 | -0.020 | .023 | -0.020 | .023 |
| Constant | 0.541 | .147*** | 0.524 | .149*** | 0.550 | .148*** | 0.521 | .148*** |
| $\chi^2$ | 448.73*** | | 449.18*** | | 449.43*** | | 427.96*** | |
| $R^2$ | .244 | | .244 | | .244 | | .224 | |
| Intraclass correlation | .450 | | .450 | | .449 | | .474 | |
| Random variation | .271 | | .272 | | .272 | | .283 | |

*Note.* SVORI = Serious and Violent Offender Reentry Initiative; coef. = unstandardized coefficient; *SE* = standard error; CI = criminal justice.

*
  *p*  .05

**
  *p*  .01.

***
  *p*  .001.

**Table 5.**

Results of Mixed-Effects Models Examining Self-Reported Criminal Offending.

| Variable | Model 1 | | Model 2 | | Model 3 | | Model 4 | |
|---|---|---|---|---|---|---|---|---|
| | Coef. | SE | Coef. | SE | Coef. | SE | Coef. | SE |
| Family support measures | | | | | | | | |
| Emotional | .037 | .020 | .036 | .020 | .038 | .020 | .035 | .020 |
| Interactional | .007 | .030 | .007 | .031 | .009 | .030 | .024 | .031 |
| Instrumental | −.037 | .017* | −.037 | .017* | −.035 | .017* | −.035 | .016* |
| Emotional × Interactional | — | — | −.001 | .010 | — | — | — | — |
| Emotional × Instrumental | — | — | — | — | .005 | .004 | — | — |
| Interactional × Instrumental | — | — | — | — | — | — | .020 | .008* |
| Family/demographic measures | | | | | | | | |
| Family contact | −.029 | .073 | −.029 | .073 | −.029 | .073 | −.027 | .073 |
| Family CJ history | .015 | .031 | .015 | .031 | .016 | .031 | .016 | .031 |
| Number of children | −.013 | .059 | −.013 | .059 | −.014 | .059 | −.016 | .059 |
| Married/stable partner | −.181 | .091* | −.181 | .092 | −.180 | .092 | −.177 | .092 |
| Family conflict | .153 | .024*** | .152 | .024*** | .152 | .024*** | .154 | .024*** |
| Employment | −.072 | .058 | −.072 | .058 | −.075 | .058 | −.075 | .058 |
| Depressive symptoms | .070 | .007*** | .070 | .007*** | .069 | .007*** | .069 | .007*** |
| Criminal peers | .177 | .019*** | .177 | .019*** | .178 | .019*** | .178 | .019*** |
| Race | | | | | −.091 | .078 | −.089 | .078 |
| Black | −.092 | .078 | −.092 | .078 | | | | |
| Other | −.025 | .108 | −.025 | .108 | −.026 | .108 | −.025 | .108 |
| Age | −.025 | .004*** | −.025 | .004*** | −.025 | .004*** | −.025 | .004*** |
| Criminal history, treatment, and programming | | | | | | | | |
| Primary conviction | | | | | | | | |
| Violent | −.188 | .096 | −.187 | .096 | −.190 | .096 | −.196 | .096 |
| Drug | −.066 | .086 | −.066 | .086 | −.068 | .086 | −.073 | .086 |
| Property | .028 | .106 | .028 | .107 | .024 | .106 | .018 | .106 |
| Prior arrest | .140 | .052** | .140 | .052** | .139 | .052** | .138 | .052** |

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

| Variable | Model 1 Coef. | SE | Model 2 Coef. | SE | Model 3 Coef. | SE | Model 4 Coef. | SE |
|---|---|---|---|---|---|---|---|---|
| Prior convictions | .013 | .061 | .013 | .061 | .014 | .061 | .015 | .061 |
| Length of incarceration | −.015 | .041 | −.014 | .041 | −.016 | .041 | −.015 | .041 |
| Change in criminal behavior | −.010 | .075 | −.010 | .075 | −.011 | .075 | −.014 | .075 |
| Substance abuse treatment | −.033 | .075 | −.033 | .075 | −.034 | .075 | −.041 | .075 |
| Religious support | −.056 | .069 | −.056 | .069 | −.057 | .069 | −.058 | .069 |
| SVORI participant | −.068 | .068 | −.068 | .068 | −.067 | .068 | −.068 | .068 |
| Constant | .268 | .441 | .275 | .445 | .225 | .442 | .085 | .446 |
| $\chi^2$ | 452.00*** | | 451.60*** | | 453.57*** | | 459.24*** | |
| $R^2$ | .233 | | .233 | | .234 | | .236 | |
| Intraclass correlation | .402 | | .402 | | .401 | | .403 | |
| Random variation | .766 | | .767 | | .765 | | .766 | |

*Note.* SVORI = Serious and Violent Offender Reentry Initiative; coef. = unstandardized coefficient; *SE* = standard error; CJ = criminal justice.

*
  *p* .05.

**
  *p* .01.

***
  *p* .001.